UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

\- v. -

MALCOLM A. SMITH,
DANIEL J. HALLORAN,
VINCENT TABONE,
JOSEPH J. SAVINO,
NORAMIE JASMIN,
JOSEPH DESMARET,

                                  Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

*ORIGINAL*

*RETURN OF INDICTMENT*
*5 MINUTES*

**INDICTMENT**

**13 Cr.** 297

**BACKGROUND**

The Defendants

1.     At all times relevant to this Indictment, MALCOLM A. SMITH, the

defendant, was a Democratic member of the New York State Senate (the "NYS Senate") and

Chairman of the Independent Democratic Conference.  SMITH was elected to represent a district

in Queens County, New York.  Between in or about 2012 and 2013, SMITH publicly discussed

the possibility of running for Mayor of New York City (the "City") in 2013 on the Republican

ticket.  Because he was a registered Democrat, pursuant to New York Election Law § 6-120(3),

SMITH was not permitted to run for New York City Mayor as a Republican absent the written

consent of three of the City's five Republican Party county chairmen.  That consent is commonly

referred to as a "Wilson Pakula certificate."

2.     At all times relevant to this Indictment, DANIEL J. HALLORAN, the

defendant, was a member of the New York City Council ("City Council"), representing the 19th

Council District in Queens, New York.

3.      At all times relevant to this Indictment, VINCENT TABONE and

JOSEPH J. SAVINO, the defendants, were Republican Party officials in New York City.

SAVINO was the Chairman of the Bronx County Republican Party and TABONE was the Vice

Chairman of the Queens County Republican Party.

4.      At all times relevant to this Indictment, NORAMIE JASMIN, the

defendant, was the Mayor of the Village of Spring Valley, in Rockland County, New York (the

"Village") and JOSEPH DESMARET, the defendant, was Deputy Mayor of the Village.

<u>The Bribery Schemes</u>

5.      Between in or about August 2011 and April 2013, MALCOLM A.

SMITH, DANIEL J. HALLORAN, VINCENT TABONE, JOSEPH J. SAVINO, NORAMIE

JASMIN and JOSEPH DESMARET, the defendants, engaged in three separate, but related,

bribery schemes:

a.      MALCOLM A. SMITH, the defendant, engaged in a scheme to

bribe New York City Republican Party county committee leaders in an effort to appear on the

Republican ballot for New York City Mayor in 2013.  DANIEL J. HALLORAN, the defendant,

in exchange for cash payments totaling tens of thousands of dollars, assisted SMITH in bribing

committee leaders by arranging meetings with them and negotiating the bribe payments.

VINCENT TABONE and JOSEPH J. SAVINO, the defendants, accepted cash bribes totaling

$40,000 in exchange for their agreements to use their offices as Vice Chairman and Chairman of

Republican Party county committees to approve and obtain approval for SMITH to run as a

Republican candidate for New York City Mayor.  During the scheme, SMITH used an

undercover FBI agent (the "UC") and a cooperating witness (the "CW") to negotiate and pay the

bribes on his behalf.  In return for the assistance of the UC and the CW, SMITH agreed to use his

2

office as a New York State Senator to help the UC and the CW obtain $500,000 in New York

State transportation money for a road project associated with a real estate development project in

the Village that SMITH understood the UC and the CW to be developing (the "Real Estate

Project");

        b.     DANIEL J. HALLORAN, the defendant, accepted bribes in

exchange for his use of his office as a New York City Council Member to allocate City funds to

a company he understood was controlled by the UC and the CW; and

        c.     NORAMIE JASMIN and JOSEPH DESMARET, the defendants,

accepted money and property in exchange for using their official positions as Mayor and Deputy

Mayor and members of the Board of Trustees of the Village to approve the Real Estate Project

and to divert state transportation money to a company controlled by the UC and the CW.

## THE SPRING VALLEY REAL ESTATE PROJECT SCHEME

        6.     On or about August 5, 2011, NORAMIE JASMIN, the defendant, met

with the CW at a restaurant in Rockland County.  During the meeting, JASMIN and the CW

discussed acquiring property for the Village through eminent domain and then selling that

property to the CW.  On or about February 3, 2012, JASMIN met again with the CW, this time at

a hotel in Suffern, New York.  During the meeting, JASMIN and the CW discussed JASMIN

using her authority as Mayor to sell a parcel of Village land to the CW to develop into a

community center (the project referred to in paragraph 5(a) above as the Real Estate Project).  In

exchange for her assistance, JASMIN told the CW that she wanted to be a "partner, to build it

together."  Later in the conversation, the CW asked JASMIN, "[W]hat is, like, what's our

thing?" and JASMIN replied, "[L]et's say the project is gonna take you like a year to build,

instead of waiting, like, I can schedule [U/I] for you . . . the zoning thing, for everything to go

smoothly for you.  That's that."

7.     On or about January 18, 2012, JOSEPH DESMARET, the defendant, met the CW in the CW's car in Rockland County, New York.  During the meeting, the CW told DESMARET about the Real Estate Project and asked DESMARET to vote, as a member of the Village Board of Trustees, to approve the project.  The CW asked, "How much will it take me to get it done?"  Later in the conversation DESMARET asked the CW, "What is the chance that what we say here, what we talk here stay here?"  DESMARET later said to the CW: "Make an offer."  The CW suggested $10,000, and DESMARET then asked for $20,000.

8.     On or about February 28, 2012, JOSEPH DESMARET, the defendant, met the CW in the CW's car in Suffern, New York.  During the meeting, the CW paid DESMARET $5,000 in cash as partial payment of the bribe described in paragraph 7 above.  The CW said to DESMARET: "I gotta make sure that nobody else that, you know, stand up, somebody else might want to jump on it . . . maybe give you another offer."  DESMARET responded: "No, they won't get the vote. . . . It's a done deal."

9.     On or about March 20, 2012, NORAMIE JASMIN, the defendant, met the CW at a hotel in Suffern, New York.  During the meeting, JASMIN and the CW discussed the financial stake each of them would have in the Real Estate Project.  The CW suggested that JASMIN receive a twenty percent stake in the project, and JASMIN replied, "Partnership is fifty fifty, right?"  JASMIN also discussed with the CW the manner in which the Real Estate Project would be presented to the Village Board of Trustees.  JASMIN told the CW:

> I need something that will not attach you to anything.  Let's say okay and they say yes, we can do it, and I will put something out there . . . and then, uh, maybe two, three developers will come in.  I will pick you, you understand?  . . . So, so I will tell you ahead of time this is how you have to present it, this is how, what we have to do.  Again, so we can move forward.  Are you comfortable with that?

10.     During the March 20, 2012 meeting, NORAMIE JASMIN, the defendant, and the CW discussed forming a series of companies with ownership interests in a single company (the "Holding Company") to hide the identities of the true owners of the Real Estate Project. At the end of the meeting, JASMIN told the CW that she would give him a cellphone that she said was "solely" for the CW to use to communicate with her about the Real Estate Project. On or about March 23, 2012, JASMIN met the CW in the parking lot of Spring Valley Village Hall and handed the CW an envelope containing the name and Social Security number of a relative in whose name JASMIN's interest in the Real Estate Project would be held and $600 in cash in order to register the Holding Company.

11.     On or about June 21, 2012, NORAMIE JASMIN, the defendant, met the CW in Manhattan and handed him a cellphone.

12.     In accordance with the plan agreed upon by NORAMIE JASMIN, the defendant, and the CW, on or about July 23, 2012, an application to incorporate the Holding Company was sent to the Delaware Department of State. On or about July 24, 2012, the Holding Company was incorporated in the State of Delaware.

13.     On or about August 9, 2012, the CW met NORAMIE JASMIN, the defendant, at a hotel in Suffern, New York, and gave JASMIN $5,000 in cash as an advance on her share of the profits from the Real Estate Project.

14.     On or about October 21, 2012, NORAMIE JASMIN, the defendant, the CW and the UC met at a hotel in White Plains, New York, and on or about October 22, 2012, JASMIN, the CW and the UC met at a hotel in Suffern, New York. Two other undercover FBI agents posing as associates of the UC attended portions of the meetings. During the meetings, JASMIN, the UC, the CW and the additional undercover agents agreed that those two

5

undercover agents would appear before the Village Board of Trustees posing as developers unrelated to the UC (the "Straw Developers"). During the meetings, JASMIN coached the UC and the Straw Developers on how to make their presentations to the Village Board of Trustees. JASMIN told the UC that it was important that the UC and the Straw Developers appear as if they were "separate entities coming to . . . bid on that thing." She also instructed the UC that, when describing how the UC became interested in the Real Estate Project, the UC should say the UC saw an advertisement in a newspaper. When asked if the UC should behave at the Village Board of Trustees meeting as if the UC had never met JASMIN, JASMIN replied, "Oh, I can assure you, I don't know you at all." JASMIN told the UC that she mailed a copy of the proposed contract between the Village and the Holding Company for the Real Estate Project and the UC should bring that copy to the Board meeting.

15.     On or about October 22, 2012, NORAMIE JASMIN and JOSEPH DESMARET, the defendants, attended a meeting of the Village Board of Trustees. During the meeting, the UC and the Straw Developers presented separate plans for the Real Estate Project. On or about October 23, 2012, JASMIN and DESMARET attended a meeting of the Village Board of Trustees during which the Real Estate Project was considered. According to the minutes of that meeting, JASMIN told the Board of Trustees that she and the other members of the Board of Trustees had just "carefully interviewed" the potential developers and that she sought the approval of the Board members to negotiate a contract with the Holding Company, which she described as "a reputable company who is willing to work with the Village of Spring Valley . . . ." JASMIN also told a fellow Board member that she "cannot sit behind closed doors with a developer to negotiate on behalf of the Board." At no point during the meeting did JASMIN disclose her prior relationship with the CW, the UC and the Straw Developers or her

financial interest in the Holding Company. At no point during the meeting did DESMARET disclose that he had received money in exchange for his vote. Both JASMIN and DESMARET voted in favor of JASMIN's proposal to negotiate a development contract with the Holding Company.

      16.    On or about November 28, 2012, the Village Attorney mailed a proposed contract for the sale of the Village property on which the Real Estate Project would be built to the Holding Company.

      17.    On or about February 25, 2013, NORAMIE JASMIN, the defendant, met the CW at a hotel in Suffern, New York. During the meeting, JASMIN agreed to use her office, as Mayor and a member of the Village Board of Trustees, to assist in obtaining for the Holding Company a contract for the road work associated with the Real Estate Project and the $500,000 in New York State funding described in paragraph 44, below.

      18.    On or about March 6, 2013, JOSEPH DESMARET, the defendant, met the CW at a hotel in Suffern, New York. During the meeting, DESMARET agreed, in exchange for $500, to use his office, as Deputy Mayor and a member of the Village Board of Trustees, to assist in obtaining for the Holding Company a contract for the road work associated with the Real Estate Project and the $500,000 in New York State funding described in paragraph 44, below.

      19.    On or about the following dates, JOSEPH DESMARET, the defendant, met the CW at the following locations and received the following cash payments in exchange for his use of his office as Deputy Mayor and member of the Village Board of Trustees in support of the Real Estate Project:

| Date | Amount | Location |
|------|--------|----------|
| February 28, 2012 | $5,000 | Suffern, New York |
| April 27, 2012 | $1,000 | Suffern, New York |
| August 9, 2012 | $1,600 | Suffern, New York |
| October 23, 2012 | $500 | White Plains, New York |
| December 12, 2012 | $1,000 | Suffern, New York |
| January 22, 2013 | $900 | Suffern, New York |
| March 6, 2013 | $500 | Suffern, New York |

### THE NEW YORK CITY COUNCIL CONSULTING CONTRACT BRIBE SCHEME

20.     On or about September 7, 2012, DANIEL J. HALLORAN, the defendant,
met the CW at a restaurant in Manhattan. During the meeting, HALLORAN explained to the
CW that he was seeking matching funds for his congressional campaign from the national
Republican Party. The CW offered to give HALLORAN money for his campaign. The CW
later asked HALLORAN if he could obtain discretionary funding from the City Council budget
for the CW, and HALLORAN said he could. After listing various projects that he funds through
City Council discretionary funding, HALLORAN stated, "So now you come in and tell me what
we got to do. Not an issue, not an issue." Later in the conversation, HALLORAN said:

> That's politics, that's politics, it's all about how much. Not about
> whether or will, it's about how much, and that's our politicians in
> New York, they're all like that, all like that. And they get like that
> because of the drive that the money does for everything else. You
> can't do anything without the fucking money.

During the meeting, the CW paid HALLORAN $7,500 in cash. Near the end of the
conversation, HALLORAN remarked "Money is what greases the wheels — good, bad, or
indifferent."

21.     On or about September 27, 2012, DANIEL J. HALLORAN, the
defendant, met the CW and the UC at a hotel in Manhattan. During the meeting, the UC gave
HALLORAN $6,500 in checks made payable to his congressional campaign that were issued on
the accounts of other individuals. The CW later asked HALLORAN for $20,000 from City

Council discretionary funds and HALLORAN said: "Absolutely, that's easy, that's not even an issue, not even an issue. . . . In fact, . . . I might even be able to get you more." HALLORAN then told the CW to provide him with a tax identification number, the name and address of a corporation, and an application for discretionary funding "so that there's no questions, it raises no flags, and everybody's got it like it's gotta be.  You do it the right way, not a problem, then you will definitely have my, my member item." HALLORAN, the UC and the CW then raised their glasses and the CW said, "Pleasure doing business with you."

22.     On or about October 18, 2012, DANIEL J. HALLORAN, the defendant, met the CW and the UC at a restaurant in Queens.  During the meeting, HALLORAN suggested, in substance, that HALLORAN give discretionary money from the City Council to the UC and the CW by granting them a contract to perform consulting work on a senior center in Queens (the "Senior Center Project").  The UC told HALLORAN, in substance, that the UC did not intend to do any work on the project but was instead interested in "basically a no show" job. HALLORAN then told the UC that the Senior Center Project in his district might provide what the UC was looking for.  During the meeting, the UC paid HALLORAN $800 in cash.

23.     On or about October 23, 2012, DANIEL J. HALLORAN, the defendant, emailed in interstate commerce to the Holding Company a letter on New York City Council letterhead addressed to three other organizations stating that HALLORAN would allocate City Council discretionary funding up to $80,000 for the Senior Center Project.  That same day, HALLORAN sent text messages to the CW requesting, in substance, at least $20,000 from the CW and the UC.

24.     On or about November 11, 2012, DANIEL J. HALLORAN, the defendant, emailed in interstate commerce a letter to the Holding Company on New York City

Council letterhead requesting that the Holding Company consult on the Senior Center Project

and stating that HALLORAN would allocate up to $80,000 in City Council discretionary funding

for the Holding Company's work on the project.

          25.    On or about the following dates, DANIEL J. HALLORAN, the defendant,

received from the UC and the CW the following payments in connection with the above-

described scheme as well as the scheme to bribe New York City Republican Party county

committee leaders described below, in the forms and at the locations listed below:

| Date | Amount | Form | Location |
|------|--------|------|----------|
| September 7, 2012 | $7,500 | Cash | Manhattan |
| September 27, 2012 | $6,500 | Checks to HALLORAN's congressional campaign | Manhattan |
| October 18, 2012 | $800 | Cash | Queens |
| November 16, 2012 | $10,000 | Cash | Queens |
| January 25, 2013 | $5,000 | Cash | Manhattan |
| February 10, 2013 | $500 | Cash | Manhattan |
| February 15, 2013 | $15,000 | Cash | Manhattan |

### THE CONSPIRACY TO BRIBE NEW YORK CITY POLITICAL PARTY OFFICIALS

          26.    On or about April 26, 2012, MALCOLM A. SMITH, the defendant, met

the CW at a restaurant in Rockland County, New York.  During that meeting, SMITH solicited a

$10,000 contribution to his campaign for State Senate from the CW and discussed the CW giving

SMITH an additional $100,000 for SMITH to give to other State Senators in an effort to win

their support of SMITH for a State Senate leadership position.  During the same meeting,

SMITH stated that he was considering running for New York City Mayor in 2013 on the

Republican Party ballot.  At the end of the meeting, the CW told SMITH that the CW would give

money to an associate of the CW who, in turn, would give the money to other people who would

donate it to SMITH's campaign in order to keep the CW's name off of SMITH's campaign finance disclosures. SMITH responded: "Okay."

      27.    On or about August 8, 2012, MALCOLM A. SMITH, the defendant, met the CW at the same Rockland County restaurant. During the meeting, the CW gave SMITH $15,000 worth of checks made out to SMITH's campaign drawn on the accounts of various persons. The CW told SMITH, in substance, that the money came from the CW but that the CW was providing the money through other people. The CW told SMITH, in substance, that the CW did not want the CW's name to appear on any campaign finance disclosures. SMITH said, in substance, that the CW's name would not appear on any disclosure statements. In fact, SMITH later disclosed the checks on his campaign finance filings as contributions from the people whose names appeared on the checks and not the CW. During the meeting, SMITH told the CW, in substance, that he was meeting with the five New York City Republican Party county committee leaders the following week to discuss obtaining a Wilson Pakula certificate from each.

      28.    On or about August 22, 2012, MALCOLM A. SMITH, the defendant, met with the CW at a hotel in Manhattan. During the meeting, the CW and SMITH discussed ways for SMITH to provide state funding to the Real Estate Project. SMITH asked the CW whether the Real Estate Project would be used for "a religious thing, because that kind of ties their hands a little bit." The CW responded, "Is it better if it's religious?" SMITH said, "It's not," and the CW replied, "Then it's not." SMITH and the CW then discussed possible sources of state money for the Real Estate Project. In particular, after the CW suggested widening a road in front of the Real Estate Project, SMITH said that there "are monies that can be redirected" for roads and infrastructure.

11

29.     On or about November 16, 2012, MALCOLM A. SMITH, the defendant

met with the UC and the CW at a hotel in White Plains, New York.  During the meeting, SMITH

and the CW discussed SMITH's plan to run for New York City Mayor.  SMITH told the CW

that one of the Republican Party county committee leaders ("County Chairman #1") was

supporting someone else.  When the CW suggested that the CW might be able to influence

County Chairman #1, SMITH responded: "If you can change him, call me.  Seriously."  The CW

said that the CW knew someone close to County Chairman #1, and SMITH said: "I need you to

make that phone call. . . .  If you can change him that would be huge."  A short time later,

SMITH reiterated, "If you can switch him, if you can switch him, that would be huge."

30.     Later on November 16, 2012, the UC met DANIEL J. HALLORAN, the

defendant, in Queens.  During the meeting, the UC asked HALLORAN if he knew County

Chairman #1.  HALLORAN said he knew County Chairman #1 well, and HALLORAN said, in

substance, that he could find out what it would take to obtain County Chairman #1's support for

a candidate for New York City Mayor.  The UC and HALLORAN also discussed HALLORAN

contacting JOSEPH J. SAVINO, the defendant, for the same purpose.

31.     Later on November 16, 2012, the UC met again with MALCOLM A.

SMITH, the defendant, at a hotel in Manhattan to report to SMITH on the UC's discussion

earlier that day with DANIEL J. HALLORAN, the defendant.  SMITH, referring to County

Chairman #1, stated, "I want him done. I want him done. I want him to say, 'You know what,

Malcolm, we did make a commitment to you early on  . . . . We're going back to that.' I want

him done." Later in the conversation, the UC said: "Look, what I, what I need to know is, if it's

a small thing, that's fine. Do I . . . is this worth going to the bank to . . . ?"  SMITH replied: "This

is a big thing."

12

32.     On or about January 25, 2013, MALCOLM A. SMITH, the defendant, met the CW in Rockland County, New York. During the meeting, the CW told SMITH that obtaining the Republican Party county committee leaders' support for Smith would cost "a pretty penny" and asked "It's worth any price?" SMITH replied, "Look, talk to me before you close it. But it's worth it. Because you know how big a deal it is."

33.     On or about January 25, 2013, an undercover FBI agent ("UC-2") posing as a courier for the UC met with DANIEL J. HALLORAN, the defendant, in Manhattan. UC-2 delivered to HALLORAN $5,000 in cash for HALLORAN's agreement to arrange meetings with JOSEPH J. SAVINO and VINCENT TABONE, the defendants.

34.     On or about January 31, 2013, DANIEL J. HALLORAN, the defendant, met the UC at a restaurant in Queens to discuss making payments to VINCENT TABONE and JOSEPH J. SAVINO, the defendants. HALLORAN told the UC, in substance, that TABONE wanted $100,000 paid to TABONE and $50,000 paid to the Queens County Republican Party. HALLORAN also said that he believed that SAVINO would need to be paid only $15,000 or $20,000.

35.     On or about February 1, 2013, DANIEL J. HALLORAN and JOSEPH J. SAVINO, the defendants, met with the UC at a restaurant in Manhattan. The meeting was arranged by HALLORAN. During the meeting, HALLORAN, SAVINO and the UC discussed getting MALCOLM A. SMITH, the defendant, on the Republican ballot as a candidate for Mayor of New York City. SAVINO, in substance, said that if the UC purchased insurance from SAVINO's insurance agency or sent work to SAVINO's law firm that would make things, "very easy." SAVINO also said: "everybody needs to pay their mortgage."

36.     Later on February 1, 2013, DANIEL J. HALLORAN and VINCENT TABONE, the defendants, met with the UC in Manhattan. HALLORAN arranged the meeting. During the meeting, TABONE, HALLORAN and the UC discussed the possibility of TABONE obtaining a Wilson Pakula certificate for SMITH.

37.     On or about February 5, 2013, the UC spoke by telephone with DANIEL J. HALLORAN, the defendant, and HALLORAN reported that he had spoken with, among others, VINCENT TABONE and JOSEPH J. SAVINO, the defendants, and they had, "agreed to do what [HALLORAN] asked them."

38.     On or about February 8, 2013, DANIEL J. HALLORAN, the defendant, met in Manhattan with the CW and the UC. During the meeting, HALLORAN gave the following instructions to the CW and the UC: "So, look, you gotta, you gotta get [SAVINO] business but put twenty-five in an envelope. . . . [TABONE] is twenty-five up front, twenty-five when the Wilson Pakula is delivered. So, he wants, and he doesn't care about [the Queens County Republican Party] getting anything at this point."

39.     On or about February 10, 2013, MALCOLM A. SMITH, the defendant, met with the CW and the UC in a hotel room in Manhattan. The UC told SMITH: "We have all five" and that DANIEL J. HALLORAN, the defendant, was "the one to make this whole thing happen." The UC further stated: "I have a number from every one of them" and that, in total, it would cost in the range of "two hundred grand." As described further below, SMITH, the UC, and the CW discussed: (a) directing the payments to the committee leaders personally and not to the Republican Party; (b) making partial payments to ensure that the committee leaders actually obtained Wilson Pakula certificates for SMITH; (c) keeping the payments secret; and (d) making

an appropriate payment to VINCENT TABONE, the defendant, whose support SMITH thought was particularly important.

      40.     During the conversation, the UC told MALCOLM A. SMITH, the defendant, that the payments would be made to the committee leaders personally and not to the Republican Party. For example, the UC said: "We've gone away from giving some donations to parties. I didn't want to get involved with that mess." Later in the conversation, the following exchange occurred:

| | |
|---|---|
| UC: | We're going to do it in a way that there's no ties to me. You mean - we're going to go play golf somewhere, and your [the Committee leaders], your golf bag will be a little heavier when you, when you leave the course. |
| SMITH: | Mm, hmm. |
| UC: | We'll – I'll lose a couple of bets to you, we'll go to Vegas, and you'll cash in some chips, whatever. An envelope, you know? |
| SMITH: | I, I just - now there's, there's no question that there's been movement. I mean, I know, you know, believe me. |
| UC: | That's understatement. |
| SMITH: | The conversations and the calls and, you know, that I've gotten from them, and you know. . . . |
| UC: | They want to support you now. |
| SMITH: | Oh, yeah. |

The UC also told SMITH that the payments would be to committee leaders who "have financial needs and want to be taken care of." The UC mentioned that these needs included college tuition for one committee leader and mortgage payments for another.

      41.     During the conversation, the UC also told SMITH that the payments would be structured so that they would be "half up front" and the "other half" would be after the committee leaders "deliver." The UC said that he would tell the committee leaders: "[Y]ou're going to get half now and when you deliver, you'll get the other half." In response, SMITH said,

"Right." Later in the conversation, SMITH cautioned: "I wouldn't give them more than like ten, just to, just to start out. . . ."

42.     During the conversation, the UC and SMITH also discussed that payments would be made so that there would be, "no trace back" to the UC or the CW. SMITH suggested that the payments be made via retainer agreements between the committee leaders and the UC, leaving no connection to SMITH. The UC said that the UC did not want any written contracts to tie the UC and the committee leaders together and SMITH suggested that the retainer agreements could be done "on a handshake." When the discussion returned to the topic of making sure that the committee leaders actually followed through and delivered the Wilson Pakula certificates, SMITH suggested, "hav[ing] them sign a piece of paper or something." The UC responded: "No, no, I'm not signing anything," and SMITH replied: "That's true, you don't want to do that."

43.     At one point during the conversation, the CW, the UC and SMITH discussed the possibility of a prominent person endorsing SMITH's candidacy for mayor. The CW told SMITH that TABONE indicated that he "could deliver" this endorsement for the "right amount." SMITH responded, "That's the one we need to do."

44.     Immediately following the discussion of payments to the party committee leaders, the CW and the UC asked MALCOLM A. SMITH, the defendant, to direct $500,000 in New York State funding for improvement of a road that would benefit the Real Estate Project. SMITH said that it was "doable" and said that he would speak with the State Senator whose district encompasses Spring Valley (the "Spring Valley State Senator") to help get the funding allocated in the State budget.

45.     Later on February 10, 2013, the UC and the CW met with DANIEL J. HALLORAN, the defendant, and MALCOLM A. SMITH, the defendant.  SMITH said to HALLORAN, "You've been busy," and HALLORAN responded that it had been, "a heavy lift."

46.     DANIEL J. HALLORAN, the defendant, and the UC had a follow-up conversation after the meeting with MALCOLM A. SMITH, the defendant, described immediately above, during which they discussed scheduling meetings with VINCENT TABONE and JOSEPH J. SAVINO, the defendants, for the purpose of making payments to them.  During this follow-up conversation, the UC made a $500 cash payment to HALLORAN.

47.     On or about February 14, 2013, during the evening, the UC and the CW met with DANIEL J. HALLORAN and JOSEPH J. SAVINO, the defendants, at a restaurant in Manhattan.  At one point during the evening, the UC and JOSEPH J. SAVINO, the defendant, stepped outside of the restaurant so they could meet privately in the UC's car.  In the car, the UC paid SAVINO $15,000 in cash.  SAVINO and the UC agreed that the UC would pay SAVINO an additional $15,000 after SAVINO signed a Wilson Pakula certificate for SMITH.  During the conversation in the UC's car, SAVINO, who is a lawyer, proposed that he send the UC a retainer agreement for $15,000 in legal services.  The UC told SAVINO, "If you need some bullshit number, or something, to call it . . . just invoice me for something," and SAVINO responded, "Yeah, absolutely."  The UC elaborated: "If you want a number to call and say somebody answered it, and you spent a couple of hours, whatever you need," and SAVINO responded, "Fantastic, good."  Shortly thereafter, SAVINO said, "[Another County Chairman is] on board so we already got two."

48.     Later during the evening of February 14, 2013, the UC spoke separately with VINCENT TABONE, the defendant, at the same restaurant in Manhattan.  The UC

17

suggested paying TABONE, "Twenty now, twenty later" and TABONE responded, "I was
thinking twenty-five now, twenty-five later." TABONE also told the UC that he would send the
UC a retainer agreement for the money.  The UC said that rather than pay a lump sum retainer,
he would make an up-front payment and then pay the other "half" later.  TABONE stated, in
substance, that he was "making [a] commitment" to get SMITH a Wilson Pakula certificate.  The
UC asked whether TABONE, as the Vice Chairman of the Queens County Republican Party
Committee, could deliver a Wilson Pakula certificate, and TABONE said, "I run the Queens
County Republican Party.  Nobody else runs the party.  I run the party."  During the
conversation, TABONE frisked the UC in an apparent effort to make sure that the UC was not
recording their conversation.  The UC was, in fact, recording the conversation.

49.     During the evening of February 14, 2013, the UC and VINCENT
TABONE, the defendant, stepped outside the restaurant to go to the UC's car where the UC paid
TABONE $25,000 in cash.

50.     On or about February 15, 2013, DANIEL J. HALLORAN, the defendant,
met the UC at a hotel in Manhattan.  During the meeting, the UC paid HALLORAN $15,000 in
cash in exchange for HALLORAN having arranged the meetings the day before with JOSEPH J.
SAVINO and VINCENT TABONE, the defendants.

51.     On or about February 17, 2013, MALCOLM A. SMITH, the defendant,
and the UC had a telephone conversation during which SMITH and the UC discussed how the
UC should conduct a conversation with the Spring Valley State Senator about the Real Estate
Project.  During the conversation, the UC and SMITH also discussed paying a bribe to County
Chairman #1 and SMITH said, in substance, that County Chairman #1 should receive "less" than
VINCENT TABONE and JOSEPH J. SAVINO, the defendants, and that County Chairman #1

18

should be told that he is receiving less because he would be the fourth chairman to sign a Wilson

Pakula certificate, and SMITH only needed three signatures. The UC was in North Carolina

when this telephone conversation with SMITH took place.

52.     On or about March 21, 2013, MALCOLM A. SMITH, the defendant, met

with the UC and the CW in SMITH's New York State Senate office in Albany, New York. At

the beginning of the meeting, SMITH raised the subject of the $500,000 in state transportation

funding that he had agreed to help the UC and the CW obtain to benefit the Real Estate Project.

SMITH said:

> I'm surprised you didn't see um, um, [the Spring Valley State
> Senator].... Why don't you use him up for your for your little
> road stuff. I bet ya he can. I think, I think I found another place
> for him to do it, too. Out of multi-modal money.... Multi-modal
> money is outside the budget . . . and it's always around.

53.     The conversation then turned to the New York City Republican Party

county committee leaders. The UC told SMITH that, "April 3rd, they're going to meet....

They're going to get together.... They're going to do their little kabuki dance.... They're

going to discuss it.... And they got a hundred thousand dollar reasons to come out and say hey,

here we go." SMITH replied, "You gave it to them already?" and the UC responded, "Yeah.

Okay, now, no, no, I gave them – like we discussed – half .... They gotta come through."

Later in the conversation the UC said, "Right now they have a small upper hand, because they

got the first half of their pay, but then once they get that, we need them to now, now I push their

buttons." SMITH replied:

> Whatever you gave them, you know, is you know there. And trust
> me, they don't, even if they screw, let's just say they screwed you
> and me and said, you know, I'm not doing anything. The worst
> part about that is, when you screw somebody over money like that,
> . . . you know, that's the worst . . . you're looking over your
> shoulder all the rest of your life. . . . You're looking over your
> shoulder, because, because, not only that, this world is too small

> . . . . Yeah, the world is too small. And any time you do that,
> imagine you came to me and said, Malcolm, they screwed me. . . .
> I got them already asking me about judgeships, because you know
> judgeships now come through here, it comes through the governor.

54.    Later in the conversation, SMITH said, "If they screw you, they screw . . .

Listen, I'd rather them say, you know what, no I'm not gonna do it.  But, I know they haven't

said that, but they're screwed if they try to play the game and string it along."  The CW then

said, "I think the only thing is, maybe a shakedown for a little bit more."  SMITH responded:

> Yeah, but I wouldn't do. I wouldn't touch 'em. I wouldn't. You
> know what? I'd say I wouldn't even touch that. . . . I'd say
> absolutely not. I'd say I'm not giving you a freaking dime. I'd
> say, if I even give you a nickel more, you'd have to stand on the
> Empire State Building, and drop every person you endorsed, and
> hold Malcolm up and say he's the best thing since sliced bread.
> Matter of fact, he's better than sliced bread.

55.    The UC said, "What I can do, and we should talk about is, maybe if they

want to up the ante a little bit on the back end, but then they're going to have to do more."

SMITH responded, "Let's close the deal. I mean, I'm just saying, I wouldn't do anything with

them until you close the first deal.  I would close it first."

56.    Later in the conversation, the UC said, "I may be naive in this back

world."  SMITH replied, "Business is business. They understand. You don't take somebody's

money and just go, you know.  Life is too short, I'm telling you, it comes back around fast."  The

UC said, "And they're all crying about what they, you know they need this, they need that, you

know."  SMITH then asked, "They are crying about what?"  The UC replied, "All this stuff with

mon . . . oh, I got a kid in college, I got debt, I got debts, whatever, I got a vacation home."

SMITH responded, "You know what you do?  Tell him, tell him I got a kid in Albany that needs

to be born. So, when you birth him, when you birth my child up in Albany, I'll, I'll help you

with your kid."

## COUNT ONE

(New York City Political Party Official Bribery Conspiracy)

The Grand Jury charges:

57.     The allegations set forth in paragraphs 1 through 56 are repeated and realleged as if set forth fully herein.

58.     From in or about November 2012 through in or about April 2013, in the Southern District of New York and elsewhere, MALCOLM A. SMITH, DANIEL J. HALLORAN, VINCENT TABONE, and JOSEPH J. SAVINO, the defendants, together with others known and unknown, willfully and knowingly did combine, conspire, confederate and agree together and with each other to commit offenses against the United States, to wit, wire fraud and bribery in violation of Title 18, United States Code, Sections 1343, 1346, and 1952.

### OBJECTS OF THE CONSPIRACY

59.     It was a part and an object of the conspiracy that MALCOLM A. SMITH, DANIEL J. HALLORAN, VINCENT TABONE and JOSEPH J. SAVINO, the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and to deprive New York City Republican Party county committees and members of the Republican Party of the honest services of leaders of such county committees would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice.

60.     It was further a part and an object of the conspiracy that MALCOLM A. SMITH, DANIEL J. HALLORAN, VINCENT TABONE and JOSEPH J. SAVINO, the defendants, and others known and unknown, knowingly would and did travel in interstate and foreign commerce and use the mail and a facility in interstate and foreign commerce, with intent

21

to promote, manage, establish, carry on, and facilitate the promotion, management,

establishment, and carrying on, of an unlawful activity, namely bribery in violation of New York

Penal Law §§ 200.45 and 200.50, and thereafter would and did perform and attempt to perform

an act to promote, manage, establish, carry on and facilitate the promotion, management,

establishment and carrying on of the unlawful activity.

**OVERT ACTS**

61.     In furtherance of the conspiracy and to effect the illegal objects thereof,

MALCOLM A. SMITH, DANIEL J. HALLORAN, VINCENT TABONE, and JOSEPH J.

SAVINO, the defendants, together with others known and unknown, committed the following

overt acts, in the Southern District of New York and elsewhere:

a.     On or about November 16, 2012, MALCOLM A. SMITH, the defendant, met the UC at a hotel in Manhattan.

b.     On or about January 25, 2013, SMITH met the CW in SMITH's car in Rockland County, New York.

c.     On or about January 31, 2013, DANIEL J. HALLORAN, the defendant, met the UC at a restaurant in Queens, New York.

d.     On or about February 1, 2013, HALLORAN and JOSEPH J. SAVINO, the defendant, met the UC at a restaurant in Manhattan.

e.     On or about February 1, 2013, HALLORAN and VINCENT TABONE, the defendant, met the UC at a restaurant in Manhattan.

f.     On or about February 8, 2013, HALLORAN met the CW and the UC at a hotel in Manhattan.

g.     On or about February 10, 2013, SMITH met the CW and the UC in a hotel room in Manhattan.

h.     On or about February 14, 2013, SAVINO met HALLORAN, the CW and the UC at a restaurant in Manhattan and, shortly thereafter, accepted from the UC $15,000 in cash in the UC's car.

i.     On or about February 14, 2013, TABONE spoke with the UC at a restaurant in Manhattan and, shortly thereafter, accepted from the UC $25,000 in cash in the UC's car.

j.      On or about February 17, 2013, SMITH and the UC had a telephone conversation while the UC was in North Carolina.

k.      On or about March 21, 2013, SMITH met the UC and the CW in SMITH's State Senate office in Albany, New York.

l.      On several occasions throughout the relevant time period, SMITH and HALLORAN placed telephone calls and sent text messages to the UC while the UC was outside New York State.

m.      On several occasions throughout the relevant time period, SMITH, HALLORAN, SAVINO and TABONE arranged to meet with the UC, causing the UC to travel from outside New York State to the Southern District of New York.

(Title 18, United States Code, Section 371.)

## COUNT TWO

(Wire Fraud – New York City Political Party Officials)

The Grand Jury further charges:

62.      The allegations set forth in paragraphs 1 through 56 are repeated and realleged as if set forth fully herein.

63.      From in or about November 2012, through in or about April 2013, in the Southern District of New York and elsewhere, MALCOLM A. SMITH, DANIEL J. HALLORAN, VINCENT TABONE and JOSEPH J. SAVINO, the defendants, together with others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and to deprive New York City Republican Party county committees and members of the Republican Party of the honest services of leaders of such county committees, for the purpose of executing such scheme and artifice, and attempting to do so, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit, telephone calls and text messages.

(Title 18, United States Code, Sections 1343, 1346, 1349 and 2.)

23

## COUNT THREE

(Travel and Use of Interstate Facilities to Commit Bribery –
New York City Political Party Officials)

The Grand Jury further charges:

64.     The allegations set forth in paragraphs 1 through 56 are repeated and realleged as if set forth fully herein.

65.     From in or about November 2012, through in or about April 2013, in the Southern District of New York and elsewhere, MALCOLM A. SMITH, DANIEL J. HALLORAN, VINCENT TABONE and JOSEPH J. SAVINO, the defendants, together with others known and unknown, willfully and knowingly caused the UC to travel in interstate and foreign commerce and used and caused the use of the mail and a facility in interstate and foreign commerce, to wit, facilities that transmitted telephone calls, text messages and emails, with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on, of an unlawful activity, namely bribery in violation of New York Penal Law §§ 200.45 and 200.50, and thereafter acted to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of the unlawful activity.

(Title 18, United States Code, Sections 1952(a)(3) and 2).

## COUNT FOUR

(Hobbs Act Extortion – New York State Transportation Money)

The Grand Jury further charges:

66.     The allegations set forth in paragraphs 1 through 56 are repeated and realleged as if set forth fully herein.

24

67.     From in or about November 2012 through in or about April 2013, in the Southern District of New York and elsewhere, MALCOLM A. SMITH, the defendant, knowingly obstructed, delayed, and affected commerce and the movement of an article and commodity in commerce, by extortion, as that term is defined in Title 18, United States Code, Section 1951(b)(2), and attempted so to do, to wit, the UC and the CW paid bribes on SMITH's behalf to obtain for SMITH approval to run for New York City Mayor as a Republican in return for SMITH using, and agreeing to use, his official position to help the UC and CW obtain, among other things, New York State funds that would benefit the Real Estate Project.

(Title 18, United States Code, Section 1951.)

## COUNT FIVE

(Wire Fraud – New York City Council)

The Grand Jury further charges:

68.     The allegations set forth in paragraphs 2, 5 and 20 through 25 are repeated and realleged as if set forth fully herein.

69.     From in or about September 2012 through in or about April 2013, in the Southern District of New York and elsewhere, DANIEL J. HALLORAN, the defendant, together with others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, and to deprive the citizens of New York City and the New York City Council of the honest services of HALLORAN, a member of the New York City Council, for the purpose of executing such scheme and artifice and attempting so to do, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit, for the purpose of executing a scheme to obtain money for himself in exchange for the

award of New York City Council discretionary funds, HALLORAN emailed the letters described in paragraphs 23 and 24, above.

(Title 18, United States Code, Sections 1343 and 1346.)

## COUNT SIX

(Travel and Use of Interstate Facilities to Commit Bribery –
New York City Council)

The Grand Jury further charges:

70.     The allegations set forth in paragraphs 2, 5 and 20 through 25 are repeated and realleged as if set forth fully herein.

71.     From in or about September 2012 through in or about April 2013, in the Southern District of New York and elsewhere, DANIEL J. HALLORAN, the defendant, willfully and knowingly caused the UC to travel in interstate and foreign commerce and used the mail and a facility in interstate and foreign commerce, to wit, facilities that transmitted telephone calls, text messages and emails, with intent to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of an unlawful activity, namely, bribery, in that HALLORAN solicited, accepted and agreed to accept benefits that were conferred, and offered and agreed to be conferred by the CW and the UC upon an agreement and understanding that HALLORAN's vote, opinion, judgment, action, decision and exercise of discretion as a New York City Council Member would thereby be influenced, in violation of New York Penal Law §§ 200.10 and 200.11, and thereafter acted to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of the unlawful activity.

(Title 18, United States Code, Sections 1952(a)(3) and 2.)

## COUNT SEVEN

(Mail Fraud - Spring Valley Real Estate Project – Jasmin)

The Grand Jury further charges:

72.     The allegations set forth in paragraphs 4 through 19 and 26 through 56 are repeated and realleged as if set forth fully herein.

73.     From in or about August 2011, through in or about April 2013, in the Southern District of New York and elsewhere, NORAMIE JASMIN, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, and to deprive the Village and its citizens of the honest services of JASMIN, the Mayor of the Village and a member of the Village's Board of Trustees, for the purpose of executing such scheme and artifice and attempting so to do, placed in a post office and authorized depository for mail matter, a matter and thing to be sent and delivered by the Postal Service, and deposited and caused to be deposited a matter and thing to be sent and delivered by private and commercial interstate carrier, and took and received therefrom, such matter and thing, and caused to be delivered by mail and such carrier according to the direction thereon, and at the place at which it was directed to be delivered by the person to whom it was addressed, such matter and thing, to wit, in exchange for an undisclosed interest in the Holding Company, JASMIN agreed to use, and used, her official position with the Village to assist the Holding Company in its development of the Real Estate Project and, in doing so, caused the mailing described in paragraph 16, above.

(Title 18, United States Code, Sections 1341 and 1346.)

## COUNT EIGHT

(Hobbs Act Extortion – Spring Valley Real Estate Project – Jasmin)

The Grand Jury further charges:

74.     The allegations set forth in paragraphs 4 through 19 and 26 through 56 are repeated and realleged as if set forth fully herein.

75.     From in or about August 2011, through in or about April 2013, in the Southern District of New York and elsewhere, NORAMIE JASMIN, the defendant, knowingly obstructed, delayed, and affected commerce and the movement of an article and commodity in commerce, by extortion, as that term is defined in Title 18, United States Code, Section 1951(b)(2), and attempted so to do, to wit, in exchange for an undisclosed ownership interest in the Holding Company, JASMIN agreed to use, and used, her official position with the Village to assist the Holding Company in its development of the Real Estate Project.

(Title 18, United States Code, Section 1951.)

## COUNT NINE

(Mail Fraud - Spring Valley Real Estate Project - Desmaret)

The Grand Jury further charges:

76.     The allegations set forth in paragraphs 4 through 19 and 26 through 56 are repeated and realleged as if set forth fully herein.

77.     From in or about January 2012, through in or about April 2013, in the Southern District of New York and elsewhere, JOSEPH DESMARET, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, and to deprive the Village and its citizens of the honest services of DESMARET, the Deputy Mayor of the Village and a member of the Village's Board of Trustees, for the purpose

28

of executing such scheme and artifice and attempting so to do, placed in a post office and authorized depository for mail matter, a matter and thing to be sent and delivered by the Postal Service, and deposited and caused to be deposited a matter and thing to be sent and delivered by private and commercial interstate carrier, and took and received therefrom, such matter and thing, and caused to be delivered by mail and such carrier according to the direction thereon, and at the place at which it was directed to be delivered by the person to whom it was addressed, such matter and thing, to wit, in exchange for cash payments, DESMARET agreed to use, and used, his official position with the Village to assist the Holding Company in its development of the Real Estate Project and, in doing so, caused the mailing described in paragraph 16, above.

(Title 18, United States Code, Sections 1341 and 1346.)

## COUNT TEN

(Hobbs Act Extortion – Spring Valley Real Estate Project – Desmaret)

The Grand Jury further charges:

78.     The allegations set forth in paragraphs 4 through 19 and 26 through 56 are repeated and realleged as if set forth fully herein.

79.     From in or about August 2011 through in or about April 2013, in the Southern District of New York and elsewhere, JOSEPH DESMARET, the defendant, knowingly obstructed, delayed, and affected commerce and the movement of an article and commodity in commerce, by extortion, as that term is defined in Title 18, United States Code, Section 1951(b)(2), and attempted so to do, to wit, in exchange for cash bribes, DESMARET agreed to use, and used, his official position with the Village to assist the Holding Company in its development of the Real Estate Project.

(Title 18, United States Code, Section 1951.)

## FORFEITURE ALLEGATIONS

80.     As a result of committing or conspiring to commit one or more offenses in violation of Title 18, United States Code, Section 1341, 1343, 1951, and 1952, as charged in Counts One through Ten of this Indictment, MALCOLM A. SMITH, DANIEL J. HALLORAN, VINCENT TABONE, JOSEPH J. SAVINO, NORAMIE JASMIN, and JOSEPH DESMARET, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, any property, real or personal, that constitutes or is derived from proceeds traceable to said offenses, including but not limited to a sum of United States currency representing the amount of proceeds obtained by the defendants as a result of the charged offenses.

### Substitute Asset Provision

81.     If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

      a.     cannot be located upon the exercise of due diligence;

      b.     has been transferred or sold to, or deposited with, a third person;

      c.     been placed beyond the jurisdiction of the Court;

      d.     has been substantially diminished in value; or;

      e.     has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to

seek forfeiture of any other property of said defendant up to the value of the above forfeitable

property.

(Title 18, United States Code, Section 981(a)(1)(C);
Title 21, United States Code, Section 853(p); and
Title 28, United States Code, Section 2461.)

_____
FOREPERSON

_____
PREET BHARARA
United States Attorney

*United States District Court*

SOUTHERN DISTRICT OF NEW YORK

## THE UNITED STATES OF AMERICA

vs.

**MALCOLM A. SMITH,**
**DANIEL J. HALLORAN,**
**VINCENT TABONE,**
**JOSEPH J. SAVINO,**
**NORAMIE JASMIN,**
**JOSEPH DESMARET,**

Defendants.

# INDICTMENT

12 Cr. 297

**(In Violation of Title 18, United States Code, Section 371)**
**(In Violation of Title 18, United States Code, Sections 1343, 1346, 1349 and 2)**
**(In Violation of Title 18, United States Code, Sections 1952(a)(2) and 2)**
**(In Violation of Title 18, United States Code, Sections 1951)**
**(In Violation of Title 18, United States Code, Sections 1341 and 1346)**

## PREET BHARARA

United States Attorney.

**A TRUE BILL**

Foreperson.