UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
UNITED STATES OF AMERICA

        v.

                                     Case No.: 7:13-CR-00297-KMK-2

MALCOLM A. SMITH
DANIEL J. HALLORAN
VINCENT TABONE
JOSEPH J. SAVINO
NORAMIE JASMIN
JOSEPH DESMARET,

              Defendants.

-------------------------------------------------------X

     PLEASE TAKE NOTICE THAT, upon the annexed affirmation of Deborah N. Misir,

Esq., dated the 6th of September, 2013, and the Memorandum of Law submitted herewith,

Defendant Vincent Tabone will move this Court before the Honorable Kenneth M. Karas, at the

United States Courthouse for the Southern District of New York, 300 Quarropas Street, White

Plains, NY, for an Order dismissing the Indictment under Federal Rules of Criminal Procedure

12(b). The grounds for the motion are set forth in greater detail in the accompanying

Memorandum of Law.

Dated: Mineola, New York
       September 06, 2013


                                           _____
                                           DEBORAH N. MISIR, ESQ.
                                           Attorneys for Vincent Tabone
                                           Lally & Misir LLP
                                           220 Old Country Road
                                           Mineola, New York 11501
                                           (516) 741-2666

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X
UNITED STATES OF AMERICA

        v.

                          Case No.: 7:13-CR-00297-KMK-2

MALCOLM A. SMITH
DANIEL J. HALLORAN
VINCENT TABONE
JOSEPH J. SAVINO
NORAMIE JASMIN
JOSEPH DESMARET,

               Defendants.

---------------------------------------------------------X

       DEBORAH N. MISIR, being duly sworn, hereby affirms the following:

1. I am a Partner at Lally & Misir LLP, located at 220 Old Country Road Mineola, NY 11501, and my office represents Defendant Vincent Tabone in the above referenced matter.

2. I am admitted to practice in the State of New York and before this Court

3. This Affirmation and the Memorandum of Law submitted herewith are respectfully submitted in support of Vincent Tabone's Motion to Dismiss.

4. All facts relevant to this motion are contained within the Memorandum of Law and incorporated by reference herein.

Dated: Mineola, New York
      September 06, 2013

                                 DEBORAH N. MISIR, ESQ.
                                 Attorneys for Vincent Tabone
                                 Lally & Misir LLP
                                 220 Old Country Road
                                 Mineola, New York 11501
                                 (516) 741-2666

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

UNITED STATES OF AMERICA

        v.

MALCOLM A. SMITH
DANIEL J. HALLORAN
VINCENT TABONE
JOSEPH J. SAVINO
NORAMIE JASMIN
JOSEPH DESMARET,

        Defendants.

-----------------------------------------------------------X

Case No.: 7:13-CR-00297-KMK-2


**VINCENT TABONE'S MEMORANDUM OF LAW
IN SUPPORT OF HIS MOTION TO DISMISS THE INDICTMENT
FOR FAILURE TO STATE AN OFFENSE**


Lally & Misir, LLP
220 Old Country Road
Mineola, New York 11501
(516) 741-2666

*Attorneys for Vincent Tabone*

# TABLE OF CONTENTS

TABLE OF CONTENTS...........................................................................................i

TABLE OF AUTHORITIES...................................................................................ii

INTRODUCTION.....................................................................................................1

ARGUMENT.............................................................................................................2

I.     STANDARD OF REVIEW...................................................................2

II.    THE COURT SHOULD DENY THE GOVERNMENT'S ATTEMPT TO CRIMINALIZE, THROUGH ITS TRAVEL ACT CHARGES, CONDUCT NOT PROSCRIBED IN STATE LAW, AND DISMISS THE RELEVANT PORTIONS OF THE INDICTMENT.........................................................................3

III.   THE COURT SHOULD REJECT THE GOVERNMENT'S THEORY THAT IT IS EMPOWERED TO POLICIE THE INTERNAL WORKINGS OF THE NEW YORK REPUBLICAN PARTY UNDER THE HONEST SERVICES FRAUD STATUTE AND TRAVEL ACT, AS A CLEAR VIOLATION OF FIRST AMENDMENT AND FEDERALISIM PROTECTIONS..............................11

IV.   THE HONEST SERVICES FRAUD STATUTE IS UNCONSITUTIONALLY VOID FOR VAGUENESS, AS APPLIED TO MR. TABONE, AND ACCORDINGLY THE COURT SHOULD DISMISS THE INDICTMENT.......15

V.    BREACH OF A FIDUCIARY DUTY BY A VOLUNTEER POLITICAL PARTY MEMBER TO HIS POLITICAL PARTY DOES NOT FALL WITHIN THE AMBIT OF THE FEDERAL HONEST SERVICES STATUTE.....................25

      A.  As An Unpaid Party Volunteer, Tabone Does Not Owe A Legally Cognizable Fiduciary Duty To the Bronx, the New York County, the Richmond County. The Kings County or even the Queens County republican party's Executive Committee or County Committees and Members of the Republican Party, And Thus Cannot Deprive Them Of Any Honest Services Under

      The Statute........................................................................................28

VI.   THE INDICTMENT DOES NOT PLEAD WITH SUFFICENT PARTICULARITY THE CHARGES AGAINST MR. TABONE AND SHOULD BE DISMISSED FOR FAILURE TO SATISFY MR.TABONES CONSTITUTIONAL GUARANTEES UNDER THE SIXTH AND FIFTH AMENDMENT.......................................................................................38

VII. CONCLUSION......................................................................................40

## INTRODUCTION

Vincent Tabone, an attorney in good standing with no criminal record, and an unpaid, party volunteer for the Queens County Republican Party, is charged by the Federal Government with three counts related to an alleged "conspiracy to bribe New York City Political Party Officials." Specifically, the Government alleges that Mr. Tabone accepted cash in exchange for his agreement to use his position in the Queens County Republican county committee, "to approve and obtain approval for [State Senator Malcolm] Smith to run as a candidate for New York City Mayor." Indictment ¶5. Mr. Tabone is not charged with any wrongdoing with regard to the two other alleged conspiracies identified in the Indictment.

The undersigned counsel is mindful that counsel for Co-Defendants State Senator Malcolm Smith and Councilman Daniel Halloran have already submitted lengthy, well-argued and researched Motions to Dismiss in this matter, and that counsel for Co-Defendant Joseph Savino has moved the Court to join their motions. We respectfully move to join Defendants Smith and Halloran's motions, in part, with respect to their arguments that: (1) the relevant portions of Counts 1 and 3 of the Indictment should be dismissed because a Wilson-Pakula authorization is not an object of bribery within the meaning of the New York Penal Law §§ 200.45 and 200.50 -- the predicate state law crime for the Travel Act charges alleged in Counts 1 and 3; and (2) the relevant potions of Counts 1 and 3 of the Indictment should be dismissed for lack of federal jurisdiction, under United States v. Archer, 486 F.2d 670 (2d Cir. 1973), because the interstate contact giving rise to a federal nexus was exclusively related to the actions of the undercover federal agent.

However, we respectfully decline to join Co-Defendants' argument that the honest services fraud portions of the Indictment should be dismissed because Mr. Tabone and Co-

1

Defendant Savino as political party leaders did not owe a duty of honest services to the <u>public</u>. In fact, the Indictment alleges that Mr. Tabone and Co-Defendants Smith, Halloran and Savino breached a duty of honest services owed to <u>New York City Republican Party county committees and members of the Republican Party by the leaders of such county committees</u>. <u>See</u> Indictment ¶ 59, 63.

Thus, on its face, the Indictment does not allege that a duty of honest services was owed to the public, nor does it limit the allegation of breach of duty of honest services solely to Mr. Tabone and Co-Defendant Savino. Accordingly, while we reach the same conclusion as Co-Defendants, i.e. that portions of the Counts 1 and 2 of the Indictment should be dismissed for failure to charge a crime within the ambit of Section 1346 of Title 18, we do so for a different reason. No court has ever held that the Federal honest services statute may be used by the Federal Government to prosecute and punish a leader of a political county committee for his purported disloyalty or breach of fiduciary duty to his own political party. The distinction is important, among other reasons, because it marks an unprecedented Government attempt to police the inner workings of a political party, and chill the freedom of political association guaranteed to political party members and all Americans under the First Amendment of the United States Constitution.

**ARGUMENT**

## I.      STANDARD OF REVIEW

A motion to dismiss under Federal Rule of Criminal Procedure (FRCP)12(b) should be granted if the Indictment fails to (1) "contain[] the elements of the offense charged," (2) "fairly inform[] a defendant of the charge against which he must defend," or (3) provide enough detail to allow the defendant to plead double jeopardy in a future prosecution based on the same events.

2

Hamling v. U.S., 418 U.S. 87, 117 (1974); United States v. Walsh, 194 F.3d 37, 44 (2d Cir.

1999); U.S. v. Alfonso, 143 F.3d 772, 776 (2d Cir. 1998); U.S. v. Pirro, 212 F.3d 86, 91-92 (2d

Cir. 2000).  Because federal crimes are solely products of statute, a federal indictment can be

challenged on the ground that it fails to allege a crime within the terms of the applicable statutes.

United States v. Aleynikov, 676 F.3d 71 (2d Cir. N.Y. 2012) (citing Dowling v. United States,

473 U.S. 207, 213 (1985)); see also U.S. v. Hall, 577 F. Supp. 2d 610 (N.D.N.Y. 2008).  Because

the requirement of a sufficient indictment is grounded not merely in the Federal Rules of

Criminal Procedure, but also in the U.S. Constitution itself, "the indictment must be considered

as it was actually drawn, not as it might have been drawn." Pirro, 212 F.3d at 92. An indictment

must be read to include facts which are necessarily implied by the specific allegations made.U.S.

v. Heicklen 858 F.Supp.2d 256 (SDNY 2012).

## II.     THE COURT SHOULD DENY THE GOVERNMENT'S ATTEMPT TO CRIMINALIZE, THROUGH ITS TRAVEL ACT CHARGES, CONDUCT NOT PROSCRIBED IN STATE LAW, AND DISMISS THE RELEVANT PORTIONS OF THE INDICTMENT.

In Count One of the Indictment, the Government charges Mr. Tabone with conspiracy to

commit a Travel Act violation, and in Count Three with a substantive Travel Act violation.  In

both Counts One and Three, the Government appears to allege (it is not clear from the

Indictment) that the state predicate act – violation of New York Penal Law §§ 200.45 and 200.50

bribery -- encompasses a Wilson Pakula authorization.  A Wilson Pakula authorization has a

precise meaning under New York State Election Law, and does not constitute an appointment,

nomination or designation for the purposes of the New York bribery statute underpinning the

Travel Act allegations.  Because we have requested to join Co-Defendants' motions to dismiss

on this issue, supra, this Memorandum will not re-tread ground already covered.  However, we

3

think it may be useful to the Court to review some of the history of the Wilson Pakula authorization and its actual application.

The Federal Government's expansive interpretation of the New York bribery statutes has no merit given the plain and unambiguous language of the bribery statutes clearly indicating what conduct is proscribed, People v. Ditta, 52 N.Y. 2d 657, 660 (N.Y 1981). See also, Grayned v. City of Rockford, 408 U.S. 104, 108, (1972) (a criminal statute must clearly define the conduct it proscribes). Indeed, the Government's lack of understanding and sensitivity to the history, structure and practice of New York Election Law in this case is precisely why the courts have long instructed that ballots and election processes as a means for electing public officials election is a matter of traditional State concern. Bullock v. Carter, 405 U.S. 134 (1972).

New York State is unique in the United States political landscape in having a multi-party system. In addition to the Democratic and Republican parties, there is a robust tradition of minor parties, including the Conservative party, the Liberal party, the Green party, and the Independence party. Under New York State Election Law, candidates can run on multiple party lines, and the candidate's votes are cumulative.

The Government's charges against Mr. Tabone allege a conspiracy involving the Government's Cooperating Witness, one Moses "Mark" Stern, who has been prosecuted for fraud, and a Federal Law Enforcement Undercover Agent[1], who were infiltrated by the Federal Government into the New York Republican Party, to secure Republican Party support for a

---

[1] The Cooperating Witness and Undercover Federal Agent's names and identities were revealed by the press right after the arrests of the Defendants. See e.g. Reuven Blau, Moses Mark Stern, witness who wore wire in state Senator Malcolm Smith bribery case, is $126 million in debt, NY Daily News, April 03, 2013.

Wilson Pakula authorization for State Senator Malcolm Smith, an enrolled Democrat, to allow

him to run for Mayor of New York City on the Republican line. See Indict. ¶¶57-61

A Wilson Pakula authorization is a creature of Section 6-120 of the New York State

Election law. Commonly known as the ''Wilson Pakula Law'' after the names of its legislative

sponsors, the provision was enacted to limit the ability of persons enrolled in one party from

running party primary elections for executive or legislative office in another political party.

Prior to 1947 (and still the law for elected judicial offices in New York State) candidates could

run – by filing Designating Petitions and seeking the Nomination – in any political party.

"The purpose of the Wilson-Pakula Law was... to prevent the invasion or takeover of the

party by outsiders. As one New York court recognized, the Wilson-Pakula Law was designed

'to protect the integrity of political parties and to prevent the invasion into or the capture of

control of political parties by persons not in sympathy with the principles of such political

parties." Matter of Werbel v Gernstein, 191 Misc 275, 277 (Sup Ct Kings County 1948), affd

273 App Div 917 (2d Dept 1948); see also Matter of Ingersoll v Curran, 188 Misc 1003, 1008

(Sup Ct Albany County 1947), affd 297 NY 522 (1947)). As such, the law, "sought to

restrict...the manner in which one could or could not invade the political party of which one was

not a member to obtain party or public office." Werbel, 191 Misc at 277; Matter of Master v.

Pohanka, 10 NY3d 620, 623 (2008).

During the 1930's and 1940's, communist and fascist front organizations had begun to

"raid" the primaries of American political parties. Particularly threatening was the rise and

radicalization of the American Labor Party ("ALP") in New York. Organized in 1936 to support

the presidential candidacy of Franklin Roosevelt, a Democrat, the ALP initially also backed notable Republicans, such as Fiorella LaGuardia and Thomas Dewey.

But by the mid-1940's the ALP was widely accused of being infiltrated by communist agents, and had become closely associated with the political ambitions of Congressman Vito Marcantonio, of East Harlem.  First elected to Congress in 1932 as a Republican, Marcantonio later switched his enrollment to the ALP.  By the mid 1940's Marcantonio was increasingly opposing the policies of both President Harry Truman (D) and New York Governor Thomas Dewey (R).  Marcantonio, and his ALP supporters, had also raided -- and won -- some primary elections in the major parties, and Marcantonio was planning to run for NYC Mayor in 1949.

On March 25, 1947, New York Governor Thomas Dewey signed the Wilson Pakula Act into law.  The bill had enjoyed bi-partisan support, notably that of its sponsor, Senator (later Governor) Malcolm Wilson (R), and New York City Mayor William O'Dwyer (D).  The Law provides, with several relevant exceptions, in relevant part:

> "[N]o party designation or nomination shall be valid unless the person so designated or nominated shall be an enrolled member of the political party referred to in the certificate of designation or nomination at the time of filing of such certificate."

N. Y. Elec. Law § 6-120 (2).

The Wilson Pakula law several contains notable Exceptions -- which allow a person to run for public office in another party from the one in which she is enrolled.  These exceptions fall into three broad categories:  Change of Enrollment; Opportunity to Ballot; and the Wilson Pakula Authorization.

Change of Enrollment – the simplest way for a potential candidate to remove the legal disability imposed by the Wilson Pakula Law is to change her enrollment to the party in which she plans to run.  Section 5-210 of the Election Law allows a person to change their enrollment, and vote in the next year's primary elections, as late as twenty five (25) days prior to the General Election in the prior year.   For example, an enrolled Democrat who wishes to run in the Republican primary in 2014, need only to file a Change of Enrollment by October, 2013.

Opportunity to Ballot – Pursuant to Sections 6-132 and 6-166 of the New York State Election Law, any registered voter can run an Opportunity to Ballot ("OTB") in a party in which he is not enrolled.  The OTB process requires a candidate to file OTB Petitions, after gathering petition signatures of enrolled voters of that party - just like any candidate enrolled in that party filing Designating Petitions - and then win the primary election by persuading voters to write-in (or rubber stamp-in) his or her name.  This OTB process is often successfully employed.  In 2012, candidate Frank Scaturro, a registered Republican, won the contested Conservative Party primary nomination for US Congress by OTB.  Also notable was the victory in 1988, of State Senator  Serphin Maltese, then a registered Conservative, in winning the Republican Party primary nomination – and subsequent reelection – to the New York State Senate by OTB.  Maltese, who recently retired from the State Senate, was formerly Chairman of the Queens County Republican Party, and still serves on its Executive Committee.

Wilson Pakula Authorization – Finally, Election Law section 6-120 (3) also provides a waiver mechanism for removing the legal disability imposed upon potential candidates enrolled in another party.  A party committee can waive the disability imposed by the Wilson Pakula Law, by voting, by majority vote of the committee, to issue a certificate of authorization to the potential candidate.  The Wilson Pakula authorization merely puts the potential candidate in the

same position as all other registered voters of that party.  It does not advance the potential candidate to the level of designation, nomination or appointment as a candidate for public office.

The Wilson Pakula authorization does not serve as a Designation.  It is not the placement of a candidate's name on the primary ballot by a) filing a candidate's designating petitions, Election Law 6-118; or approval at the state party convention, for placement on the ballot for a statewide party primary. N.Y. Elec. Law 6-104.

The Wilson Pakula authorization is also not a Nomination – the placement of a candidate's name on the General Election ballot by a) that candidate winning the party primary election.  Election Law 6-160; b) filing of an Independent Nominating  Petition, Election Law 6-140; or c) selection of the candidate by the party committee as the party's nominee in a special election, Election Law 6-114.   The Wilson Pakula authorization / waiver simply removes a legal disability, putting the candidate enrolled in another party on the same footing as a voter enrolled in that party.

In addition, the Election Law provides a special process for issuing Wilson Pakula authorization waivers for candidates seeking election to city-wide office (Mayor, Public Advocate, and Comptroller) in New York City.  "In the event that such designation or nomination is for an office to be filled by all the voters of the city of New York, such authorization must be by a majority vote of those present at a joint meeting of the executive committees of each of the county committees of the party within the city of New York…"  N.Y. Elec. Law § 6-120 (3).

Each of the party executive committees of the five (5) county Republican organizations – Queens, Kings, New York, Bronx, and Richmond – has dozens of members, including assistant

8

secretaries, district leaders, sergeants at arms, and at-large members. The Queens GOP executive committee, alone, currently has 58 members – all volunteers. Thus a "joint meeting" of the executive committees of each of the county committees within the City of New York easily has 250 to 300 members.

However not all members have the same vote. Each member's vote is "weighted." First, each county is weighted in accordance with that county's relative citywide share of the most recent vote for Governor on the Republican line. Second, each members vote is further discounted by the size of that county Republican Party's executive committee. For example, if Bronx had 12% of the citywide vote for Governor, and has an executive committee of 10 members, then each Bronx member of the executive committee would have a vote of 1.2% (10% of 12%) of the total joint executive committee. The result is that a "joint meeting" of the five country party executive committees, which is a mass meeting of over 250 people, all of whom hold different weighted votes.

After obtaining a Wilson Pakula authorization, a potential candidate must then present a petition signed by either 5% of the persons registered in the party, or by 7,500 persons, whichever is fewer in order to qualify for the primary race. N.Y. Elec. Law § 6-136(2)(a); see also, Ulrich v. Mane, 383 F. Supp. 2d 405, 408 (E.D.N.Y. 2005) (upholding the constitutionality of this ballot access requirement). Then the potential candidate's petition must pass muster under the Board of Elections rules and regulations as well as any legal scrutiny or court challenges that may arise. Further, there likely will be other candidates for nomination in that political party's primary which could effectively thwart the non-member's objectives. Thus, the Wilson Pakula authorization does not place anyone on the ballot, but simply opens the party primary process to persons who would otherwise be legally barred.

New York courts have traditionally refused to intervene in the Wilson Pakula waiver process, deeming it as part of "the internal functioning of a political party." Scaturro v Becker, 76 AD3d 687, 688, 906 NYS2d 620, (2nd Dept, 2010), cert denied, ___NY ___; 934 N.E.2d 893 (2010). See also, Berney v. Ragusa, 76 AD3d 647, 906, NYS2d 342 (2nd Dept, 2010). In addition, as indicated in other briefs submitted on this issue in this case, the Government has enjoyed little success with bringing charges under the New York bribery statutes, and New York prosecutors are clearly disinclined to make such charges. See People v. Cunningham, 88 Misc. 2d 1065 (N.Y. Sup. Ct. 1976); United States v. Margiotta, 688 F.2d 108 (2d Cir. N.Y. 1982).

Nevertheless, the Federal Government now seeks to open up to Government scrutiny and criminalize, as bribery, the New York Republican Party internal decisions and deliberations regarding whether State Senator Smith should receive a Wilson Pakula authorization. The Government's Indictment conveniently ignores the GOP's public record of cooperation with Senator Smith when he caucused with the Independent Democratic Conference in the State Senate in a coalition to enable the State Senate Republicans to form a Majority. Additionally, it is a matter of public record, that State Senator Smith was previously cross- endorsed by the Queens Republican Party when he was a junior Senator.

Otto von Bismark stated that Laws are like sausages, it is better not to see them being made. Perhaps the same can be said for how political parties make determinations about shaping a primary ballot. In the hurly-burley, horse trading world of politics, Smith might have obtained the Republican nomination for Mayor, or perhaps ultimately accepted a different position on the ballot line thereby strengthening the overall City-wide ticket. But for the Government's intervention, there might have been a broader, more inclusive diversified ballot that would have

borne fruit in another cycle. These are matters for the political sphere and properly so, not for Federal prosecutors and law enforcement.

Any ambiguity "concerning the ambit of criminal statutes should be resolved in favor of lenity." See Skilling, 130 S.Ct. at 2933. In "a judicial construction of a statute," the court announces "what the statute meant before as well as after the decision of the case giving rise to that construction." Rivers v. Roadway Express, Inc., 511 U.S. 298, 312-13(1994). Thus, "when [a] court construes a statute, it is explaining its understanding of what the statute has meant continuously since the date when it became law." Id. at 313 n.12.

This Court should construe the penal law according to its terms, with a reference to the meaning of the relevant election law provision. By a plain reading of the penal law, only an appointment, nomination or designation to public office is criminalized under the bribery statute. The fair import of the term "nomination" or the term "designation" in New York State Penal Law § 200.50 is distinct from "certificate of authorization" under New York State Election Law § 6-120(3) since the authorization does not grant access to a primary election or public office. New York State legislators pointedly excluded language on, or even an inference to, the Wilson-Pakula authorization when crafting the bribery statutes. Extending the scope of the penal law to include one of a party's privileges in selecting its leaders would be incongruous with the plain meaning of the statute, judicial construction and the principles of lenity.

As described herein, the Government has failed to state a predicate state offense, and accordingly the portions of the Indictment alleging conspiracy and substantive Travel Act violations should be dismissed.

**III.  THE COURT SHOULD REJECT THE GOVERNMENT'S THEORY THAT IT IS EMPOWERED TO POLICIE THE INTERNAL WORKINGS OF THE**

11

**NEW YORK REPUBLICAN PARTY UNDER THE HONEST SERVICES
FRAUD STATUTE AND TRAVEL ACT, AS A CLEAR VIOLATION OF
FIRST AMENDMENT AND FEDERALISIM PROTECTIONS**

In the Indictment, the Government charges Mr. Tabone with conspiracy and substantive

violations of the federal honest services fraud statute and the Travel Act. The Government's

theory of prosecution under the honest services provision is that Mr. Tabone breached his duty of

honest services, or caused leaders of the Republican Party county committees (it is not clear from

the Indictment) to breach their duty of honest services owed to New York City Republican Party

county committees and members of the Republican Party by allegedly accepting a bribe to obtain

approval for Defendant Smith to run as a candidate in the New York mayoral election. See

generally Indict. ¶¶ 59, 63. The "approval" cited by the Government is presumably the Wilson

Pakula authorization mentioned throughout the factual allegations in the Indictment.

The Government's effective assertion that it has the right to police, whether the unpaid

volunteer leaders of the Republican Party are serving their county committees and GOP Party

members "honestly," is a troubling assault on the First Amendment guarantees of freedom of

association of the U.S. Constitution, and the underlying principle of checks and balances upon

which our Government is predicated.

In the United States, political parties have always had broad protection under the First

Amendment to decide their principals, candidates and electoral strategies, and who constitutes an

effective leader of the Party to advance its political goals, free from Federal Government

interference. See Eu v. San Francisco County Democratic Cent. Committee, 489 U.S. 214, 1021

(1989); Kusper v. Pontikes, 414 U.S. 51, 58 (U.S. 1973) (A critical touchstone of a political

party's associational rights is the selection of candidates for public office at general elections). If

the local Republican Party county committees and members have no problem with a volunteer

member accepting money to work for a particular candidate, why should the Federal Government be offended?

More critically, why is the Government troubled that Mr. Tabone was allegedly supporting a dissident Democratic candidate to compete for the Republican nomination for mayor, or that he allegedly accepted money to work for the candidate? It is a common practice across the political spectrum for campaigns to pay political consultants, who are usually veteran political party members or party officials. Why is Mr.Tabone singled out, and why have the numerous Democratic political party officials who are paid to work on campaigns as consultants not indicted? How exactly will the Government prove that the political party and its members were deprived of honest services at trial? Is the deprivation of services, the act of supporting a non-Republican candidate to compete in a Republican primary, the act of advancing ethnic minority candidates in a diverse city, or is it the act of accepting money to support a candidate? By what measure does the Government propose to decide who speaks for the Republican Party ?

These questions illustrate the difficulty of ascertaining, constitutionally sound standards under the federal honest services fraud statute. As Judge Winters noted in dissent, in Margiotta, with respect to unbounded honest services prosecutions of political party leaders, "... no distinction is made between the fiduciary obligations of a civil servant, political appointee, elected official, candidate or partisan political leader. Juries are simply left free to apply a legal standard which amounts to little more than the rhetoric of sixth grade civics classes. One searches in vain for even the vaguest contours of the legal obligations created beyond the obligation to conduct governmental affairs "honestly" or "impartially," to ensure one's "honest and faithful participation" in government and to obey "accepted standards of moral uprightness,

fundamental honesty, fair play and right dealing." Margiotta, 688 F.2d at 143 (quoting Mandel,

591 F.2d 1347, 1361(4th Cir. 1978), *reh'g granted,* 602 F.2d 653(4th Cir. 1979)).

This prosecution invites the unseemly scrutiny by the Federal Government of the political

motivations of not only Mr. Tabone, but also the GOP executive county committees and

members required by this prosecution, utterly in violation of the First Amendment.  If members

of the Republican party felt ill-served by Mr. Tabone, its by-laws allow the party to remove him

as a Vice-Chairman and member, and State laws would permit the Queens GOP to file for his

dis-enrollment from the Republican Party.  It is simply not the place of the Federal Government

to decide who is a "good" Republican and who is not, and to prosecute and punish those deemed,

by Federal officials, to be lacking in sufficient party loyalty.

Moreover, the courts have long recognized that the interest in protecting the integrity,

fairness, and efficiency of ballots and election processes as a means for electing public officials

is a matter of traditional State concern.  Bullock v. Carter, 405 U.S. 134 (1972) (State may

prevent "frivolous or fraudulent candidacies.")   Indeed most states, such as New York have

enacted statutes to do specifically this.  See e.g. N.Y. Elec. Law §§ 2-100 et seq (McKinney

1978 & Supp. 1997).   In light of this and the fact that this prosecution involves a local Mayor's

race, there is simply not sufficient Federal nexus to warrant the level of First Amendment

intrusion brought by this prosecution.  See e.g. Cleveland v. United States, 531 U.S. 12 (2000).

In addition, the instant case also raises federalism concerns, as the Government's

prosecution of Mr. Tabone under honest services fraud rests upon the imposition of a "fiduciary

duty" where the State laws do not recognize one.  As the Courts recognized in U.S. v. Brumley,

serious federalism concerns arise where there would be federal criminalization of conduct where

the individual is innocent under state law. 116 F.3d 728 (5th Cir. 1997).  In New York, there is

14

no state law requiring a party official or leader to serve his party and other party members "honestly." Sections 200.45 and 200.50 only proscribe bribery in the specifically, identified contexts of an appointment, nomination or designation -- none of which encompasses a Wilson Pakula authorization. Supra.

Finally, the Supreme Court has observed, that expansive application of the Travel Act, 18 U.S.C. § 1952 (1982), to activity "traditionally subject to state regulation" and to defendants who themselves did not travel interstate, can alter sensitive federal-state relationships" and "could overextend limited federal police resources." Rewis v. United States, 401 U.S. 808, 812, 28 L. Ed. 2d 493, 91 S. Ct. 1056 (1971); Archer, 486 F.2d at 680. In this case, none of the Defendants are alleged to have traveled interstate, and the only interstate nexus arises through the travel of the undercover federal agent. The Government's interference in this prosecution, with the internal affairs and organization of a local political party under the auspices of either the honest services fraud statute or Travel Act offends federalism principles by upsetting the Federal- State balance by intruding upon an area of State concern, and by assaulting the broad Constitutional protection afforded to Political Parties under the First Amendment.

IV.    **THE HONEST SERVICES FRAUD STATUTE IS UNCONSITUTIONALLY VOID FOR VAGUENESS, AS APPLIED TO MR. TABONE, AND ACCORDINGLY THE COURT SHOULD DISMISS THE INDICTMENT.**

In Count One of the Indictment, the Government charges Mr. Tabone with conspiracy to commit Federal Honest Services wire fraud, and in Count Two, with substantive Federal Honest Services wire fraud. See 18 U.S.C. § 1346. In both Counts 1 and 2, the Government alleges that the violation of honest services was, "to deprive New York City Republican Party county committees and members of the Republican Party of the honest services of leaders of such county committees...." Indictment ¶¶59, 63.

In other words, the Federal Government is charging a volunteer political party member, with breach of a fiduciary duty to his political party, or of influencing leaders of the party committees to breach a fiduciary duty (which it is not clear), purportedly owed by them to the five New York City Republican party county committees, and, to all members of the Republican party.

A statute violates due process when it is so vague that it does not give "the person of ordinary intelligence a reasonable opportunity to know what is prohibited." Grayned v. Rockford, 408 U.S. 104, 108 (1972). To satisfy due process, "a penal statute must define the criminal offense [1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement." Skilling 130 S.Ct. at 2928 (quoting Kolender v. Lawson, 461 U.S. 352, 357 (1983)). In this case, nothing in the text of the honest services fraud statute, or the history of the enforcement of this statute could give fair warning to a political party member that he might be violating a penal statute by advocating a particular political act in exchange for money.

Indeed, the U.S. Department of Justice has itself stated in the past that applicability of the honest services theory of mail and wire fraud does not apply to election fraud schemes, and is circumscribed by the fact that "most voter fraud schemes do not appear to involve such an objective." U.S. DEP'T OF JUSTICE, FEDERAL PROSECUTION OF ELECTION OFFENSES 15-16 (May 2007), available at http://www.usdoj.gov/criminal/pin/docs/electbook-0507.pdf. The Agency further elaborated that Section 1346 "does not reach schemes to deprive citizens of fair elections because such schemes do not include an intent to deprive any identifiable victim of the 'honest services' of a fiduciary." United States v. Turner, 465 F.3d 667, 674 (6th Cir. Ky. 2006); see also, United States v. Ratcliff, 381 F. Supp. 2d 537, 543 (M.D.

16

La. 2005). Despite this position, the Agency is now in this case, prosecuting purported election related fraud under honest services. Tabone, is an unpaid political party volunteer, who engaged in political "horsetrading" to secure a Wilson-Pakula authorization for a prospective Candidate. Volunteer Party officials routinely banter for strategic advantage for their party organizations. Lawyers and political consultants reference their abilities and seek new engagements. There is no statutory bar against volunteer rank and file party officials wearing many hats even if such might be a good idea and one the legislature is free to act upon, yet under the honest services fraud statute, the Government is now selectively prosecuting political party members.

The honest services fraud counts of the Indictment clearly impede upon Mr. Tabone's overlapping First Amendment interests of the right to freedom of speech, association and the right not to be compelled to associate with any particular group. U.S. Const. Amend. I.; Buckley v. Valeo, 424 U.S. 1 (1976). The First Amendment right to freedom of association has been held to protect an individual's right to associate with whom they please, to further their personal beliefs and ideas, to air grievances, to hold and express unpopular views and to associate with others who share that viewpoint. Speech need not be verbal to receive constitutional protection. See NLRB v. International Longshoremen's Ass'n, 332 F.2d 992, 999 (4th Cir. 1964). Courts have recognized a broad spectrum of protected speech, including: consumer boycotts (NAACP v. Claiborne Hardware Co., 458 U.S. 886, reh'g denied, 459 U.S. 898 (1982)), derogatory statements on clothing (Cohen v. California, 403 U.S. 15, reh'g denied, 404 U.S. 876 (1971)), wearing of arm-bands and other symbols (Tinker v. Des Moines Indep. Community Sch. Dist., 393 U.S. 503, 505-06 (1969)), the brandishing of a red flag (Stromberg v. California, 283 U.S. 359, 369 (1931)), the burning of an American flag (U.S. v. Eichman, 496 U.S. 310, 312 (1990)), ballot designations (Rosen v. Brown, 1990 WL 384957, at 3 (N.D. Ohio 1990) aff'd, 970 F.2d

17

169 (6th Cir. 1992)), and candidacy announcements (Newcomb v. Brennan, 558 F.2d 825, 828-29 (7th Cir.), cert. denied, 434 U.S. 968 (1977)).  Advocating for a potential candidate to receive a Wilson Pakula authorization should also be sheltered under the mantle of the First Amendment.

The constitutional guarantee of freedom of speech is of critical importance in the political sphere as it is one that necessarily entails the free and unrestricted exchange of ideas.  For this reason, in the arena of "political expression, the First Amendment affords the broadest protection."  Gewertz v. Jackman, 467 F. Supp. 1047, 1059 (D.N.J. 1979) (citing Valeo, 424 U.S. at 14).

First Amendment protections have also been extended to political parties.  The New York Republican party, like all political parties, enjoys constitutional associational protections in its "government, structure and activities," including providing or withholding access to potential election candidates.  Timmons v. Twin Cities Area New Party, 520 U.S. 351, 358 (U.S. 1997).  Further, the party maintains "discretion in how to organize itself, conduct its affairs, and select its leaders."  Eu v. San Francisco County Democratic Cent. Comm., 489 U.S. 214, 230 (U.S. 1989) (emphasis added).   A political party has a First Amendment right to choose a candidate-selection process that will in its view produce the nominee who best represents its political platform."  N.Y.S. Bd. of Elections v. Lopez Torres, 552 U.S. 196, 202 (2006).

While the Honest Services Statute may be generally constitutional, it operates unconstitutionally as to Tabone because of his particular circumstance.  In the instant case, the application of the Honest Services Statute to the criminal prosecution of Tabone would be unconstitutional as it would substantially impede upon his First Amendment protected activity of voicing his political views, ideas and associational rights to support a potential candidate for election.

18

The federal government appears to claim that it can regulate political parties and party officials volunteering for those organizations since it has an interest in the fair administration of elections.  The basis of the purported regulation is that political parties are creatures of statute since they operate like corporations or non-profit organizations.  However, the federal government lacks any authority to wield the specter of a federal statute and its criminal sanctions against a political party official in the name of regulation.  Enforcement of party loyalty and party discipline firmly remains in the realm of the state and State and county party rules anchored in State Election law.

In New York State, political parties are created under New York State Election Law and are voluntary, unincorporated associations that are not publicly funded.  Although political parties are recognized by statute and have statutory rights and duties, they are still unincorporated associations.  Battipaglia v. Executive Committee of Democratic County Committee, 20 Misc. 2d 226, 229 (N.Y. Sup. Ct. 1959).  An unincorporated association is not a legal entity (not a partnership, a corporation or an artificial person), and thus has no existence independent of its members.  Saxer v. Democratic County Committee, 161 Misc. 35, 36-37 (N.Y. Sup. Ct. 1936).   Rather, a political party has been construed to be an "organization composed of a body of persons united without a charter for the prosecution of some common enterprise."  Heifetz v. Rockaway Point Volunteer Fire Dep't, 124 N.Y.S.2d 257, 260 (N.Y. Sup. Ct. 1953).  Like a political party, a "political committee derives its powers and rights from the State."  Casey v. Nuttall, 62 Misc. 2d 386, 390 (N.Y. Sup. Ct. 1970).   As such, New York State is the only governmental body which can determine the parameters of its political parties' conduct.

New York Election Law is founded on the power of the New York State Legislature to promulgate a system for the regulation of party machinery. The Legislature, then, is the only entity which holds a compelling interest in the conduct of county committees of political parties and reasonable legislation regulating such committees has been held as valid and constitutional. Davis v. Sullivan County Democratic Committee, 58 A.D.2d 169, 172 (N.Y. App. Div. 1977). The Legislature accomplished this by establishing the New York State Board of Elections on June 1, 1974 as a bipartisan agency vested with the responsibility for administration and enforcement of all laws relating to elections in New York State. N.Y. Elec. Law § 3-102.

The internal functions and management of the Queens County Republican Party, then, is governed by the laws and regulations of New York State and its own Party rules and regulations biennially duly adopted by the Queens County Republican Party's County Committee and then filed with both the New York City and New York State Board of Elections, not those of the federal government. There is no imaginable conflict between a party official and his or her party which would necessitate the involvement of the federal government. Therefore, as one of many Vice Chairman of the Queens County Republican Party, Mr. Tabone is but a member of an unincorporated association and held to the standards of New York State Election Law. He has a First Amendment right to freely associate with the political party of his choosing. In his capacity, Tabone has the liberty in offering his advice, knowledge, services and his support to advance the best interests of the party. One of the Republican Party's primary objectives is the recruitment of women and minority candidates for public office. Tabone's alleged support of Smith, a minority political figure, would only be in service of his role as a Vice Chairman to assist the Republican Party with such enrollment. Organizing amongst the county political parties and negotiating with fellow party officers to allow Smith, a registered Democrat, to gain

20

access to the Republican Party with the Wilson-Pakula authorization would be in the aid of a "common enterprise" and well within Tabone's duties. The political "horse trading" accompanying such an effort then or now should not be criminalized under the amorphous guidelines of the Honest Services Fraud Statute.

As a result, the federal government's intrusion into New York State election law regulation is invalid within constitutional strictures. The criminal prosecution of Tabone under the Honest Services Statute would have the effect of chilling his First Amendment right to freedom of political association and expression, which has been recognized as particularly essential in the political sphere. Tabone is an unpaid political party officer who allegedly negotiated to support Smith with access to the Republican Party so that he could petition as a Republican candidate for a ballot spot in the mayoral election. This kind of bargaining has traditionally been held to be among the privileges of a political party and not subject to the regulation of the federal government. For the foregoing reasons, the Honest Services Statute should be held unconstitutional as applied to Tabone,

The prosecution of individuals similar to Tabone, under the Honest Services Statute, for expressing his political views and support for a particular candidate to obtain a Wilson Pakula waiver, implicates important First Amendment concerns, which call into question the constitutionality of the statute itself. The Honest Services Statue, upon a plain reading of the text and upon an examination of precedent interpreting its application, is substantially overbroad and runs a realistic danger that the statute will significantly compromise recognized First Amendment protections of a substantial number of parties not before this Court.

The Supreme Court has held that generally a facial challenge to the constitutionality of a statute requires a showing that no set of circumstances exist under which the statute would be valid. United States v. Stevens, 130 S.Ct. 1577, 1587 (2010).

However, where the facial change to the statute is based upon First Amendment, the Courts have found an exception exists whereby the challenger bears a lesser burden "to demonstrate that a 'substantial number of instances exist in which the law cannot be applied constitutionally.'" Glenn v. Holder, 690 F.3d 417, 422 (6th Cir. 2012). Essentially the court's reasoning is that where a statute is found to be substantially overbroad, there is "'a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court such that the statue itself can be held facially invalid.'" N. Y. State Club Ass'n v. City of N. Y., 487 U.S. 1, 11 (1988) (quoting Taxpayers for Vincent, 466 U.S. at 801). Such a challenge to a statue's constitutionality is also known as an over-breadth facial challenge.

Additionally, the Supreme Court and this Court have held that "We must scrutinize criminal statutes . . . with particular care." Winters v. New York, 333 U.S. 507 (1948); U.S. v. Rybickii. Specifically, the Courts have held that criminal statutes should describe the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." Kolender v. Lawson, 461 U.S. 352, 357, 75 L. Ed. 2d 903, 103 S. Ct. 1855 (1983).

In the instant case, the Honest Services Statute impedes upon First Amendment protected activity, the right to freedom of association, expression, and speech. Accordingly the appropriate standard for a facial challenge upon the statute's constitutionality should be under a lower burden

22

of showing, a substantial number of instances exist in which the law cannot be applied constitutionally. Here, there is a realistic danger that the honest services fraud statue will significantly compromise the First Amendment right to express political views and show support for a political cause or candidate, in a substantial number of instances, namely involving private individuals who are a member of a particular political party or otherwise express their political views and participate in the political sphere, such that the Statute should be held facially invalid.

Indeed were this interpretation to be given credence it would have a chilling effect on the ability of political parties, especially the less than dominant parties, to attract volunteers and engage participation insofar as prospective volunteers would not only have to countenance countless unrecompensed  volunteer hours taking away from perhaps more fruitful pursuits but they would also have to worry that the Federal Government's agents might be waiting in the wings ready to second guess their political judgments with regard to support for past candidates and all pecuniary engagements or conversations about retainers they might entertain, however peripheral.

Such a holding is particularly necessitated by public policy interests, which support the free exchange of ideas in the political sphere. The imposition of criminal liability, under the honest services fraud statute, for a private individual's expression of his political views and support for a particular candidate, would certainly undermine those public policy interests.

The Supreme Court, in <u>Skilling v. United States</u>, recently addressed the concern previously advanced on numerous occasions before the circuit courts, and analyzed the doctrine in light of contradicting precedent which fails to establish a clear interpretation of the statute. 130 S.Ct. 2896 (2010).

While the <u>Skilling</u> Court limited the statute's application to kickback and bribery schemes, this decision was met with scrutiny by many legal scholars, and Justice Scalia in particular. Justice Scalia, in his concurrence, flatly disagreed with the Court's decision to uphold the constitutionality of the statute, finding that the statute was unconstitutionally vague, even after limiting the statute's application to the acts of bribery and kickback schemes, and that the Court's attempt to "save" the statue was "clearly beyond judicial power." <u>Skilling,</u> 130 S.Ct. at 2929 (Scalia, J. concurring). The core issue is that the statute does not adequately define what behavior it bars and facilitates arbitrary prosecutions.

Specifically, Justice Scalia noted, that an examination of pre-McNally honest services doctrine reveals that there is disagreement among the circuit courts as to those fiduciaries subject to the honest services fraud, what obligations the fiduciary owed, whether something beyond a mere fiduciary duty was need to establish honest services fraud or the source of the fiduciary obligation (state law, federal law or general principles). <u>Skilling,</u> 130 S.Ct. at 2937 (Scalia, J. concurring). "Does it apply only to public officials? Or in addition to private individuals who contract with the public? Or to everyone, including the corporate officer here?" <u>Skilling,</u> 130 S.Ct. at 2939 (Scalia, J. concurring). Thus, the Statute should be held as unconstitutionally vague to the ambiguity which continues to remain as to the criterion for guilt.

In light of the instant prosecution, so at odds with even the U.S. Department of Justice's own public stance, the Defendant urges this court, to adopt Justice Scalia's position, and find that the Honest Services Statute, upon a plain reading of the text and analysis of pre-McNally honest services doctrine, is unclear and unconstitutionally vague. The Court's attempt to "save" the statute by limiting its application to kickback and bribery schemes, has clearly not eliminated the vagueness of the statute.

V.     **BREACH OF A FIDUCIARY DUTY BY A VOLUNTEER POLITICAL PARTY MEMBER TO HIS POLITICAL PARTY DOES NOT FALL WITHIN THE AMBIT OF THE FEDERAL HONEST SERVICES STATUTE.**

In the alternative, if this Court determines that the Honest Services statute is not

unconstitutionally vague, the Court should dismiss under Federal Rule of Criminal Procedure

(FRCP)12(b), those portions of the Indictment alleging a violation of the Honest Services statute

for failure to charge a crime within the ambit of Section 1346.  The Government's theory of

honest services fraud in this case is unprecedented, extreme and Kafkaesque, and taken to its

logical reaches would impermissibly empower federal prosecutors to criminalize garden-variety

unethical or immoral behavior in private relationships.  The acts alleged in the Indictment are

simply not a crime within the terms of the Honest Services statute under the binding precedent of

this Circuit in United States v. Rybicki, 354 F.3d 124 (2nd Cir. 2003), or that of any other court in

the country.

No court has ever held that the Federal honest services statute may be used by the Federal

Government to prosecute and punish a political party member for his purported disloyalty or

breach of fiduciary duty to his political party.  The Government has, in the past, before the U.S.

Supreme Court's decision in McNally, striking down the old honest services provision ,

controversially, prosecuted political party officials for breach of fiduciary duty to the public in

cases involving the expenditure of public funds.[2]  See United States v. Margiotta, 688 F.2d 108

(2d Cir. N.Y. 1982).  That is not what is alleged in this Indictment.  In this case, no public funds

are at issue and no duty is alleged to be owed to the public.

A political party volunteer in this country owes no fiduciary duty under the Federal

honest services statute to his political party.  Under the guarantees of the First Amendment of the

---

[2] United States v. Margiotta, 688 F.2d 108 (2d Cir. N.Y. 1982) was overruled by the Supreme Court in McNally and is no longer binding precedent. Its holding has been criticized.

United States Constitution, an American is free to change his political beliefs and loyalties -- his freedom of association -- as often as he wishes. He is certainly not required to explain and justify his political inclinations to the Federal Government under threat of criminal prosecution.

In this case, the Government has taken the extraordinary and unconstitutional step of policing the internal working and affairs of the Republican Party, which happens to be the major opposition party to the Democratic Party currently in control of the Executive Branch. No similar indictment has been made charging Democratic Party members and officials with deprivation of honest services to the Democratic Party in New York. The Federal Government's indictment of Mr. Tabone and Jay Savino, the Bronx Republican Party chairman have disrupted the New York City Mayor's race by chilling the ordinary cross-endorsement of candidates by the political parties through the Wilson- Pakula process.

Taken to its logical extreme, the honest services statute could be used to prosecute volunteer members of the local Boy Scouts for disloyalty to the local Troop, and a host of private relationships. There is simply no limit on the reaches of the statute under the theory of prosecution proposed by the Government in the Indictment.

The Court should dismiss the portions of Counts 1 and 2 of the Indictment which charge a violation of the Federal Honest Services Statute because the Indictment fails to allege a crime within the terms of the applicable statutes. See Aleynikov, 676 F.3d at 71.

The gravamen of the indictment is that Smith and Halloran engaged in a scheme to influence Republican party officers to secure a Wilson-Pakula waiver for Smith, authorizing Smith to run for New York City Mayor as a Republican candidate. The central focus of these alleged overtures is the 2013 Mayoral election. The indictment, in essence, alleges a scheme to

deprive citizens of fair elections.  However, the right to an honest election is separate and distinct from the right to honest services.

Election fraud schemes span the breadth of voter payment and vote-buying (United States v. Thomas, 510 F.3d 714 (7th Cir. Ill. 2007)) to casting fictitious votes and ballot box stuffing (Anderson v. United States, 417 U.S. 211 (U.S. 1974) to fraudulent voting and registration (United States v. Smith, 231 F.3d 800 (11th Cir. 2000) to Federal Election Campaign Act and contribution limit violations (McConnell v. FEC, 540 U.S. 93 (2003).  New York State has enacted several election law statutes aimed at securing fair and honest conduct of an election.

As described supra, the U.S. Department of Justice has itself stated that honest services does not apply to election fraud schemes.  The Sixth Circuit has also expressly rejected this interpretation of honest services.  As Judge Gibbons propounded, "the plain terms of [Section 1346], the Supreme Court's discussion of the statute…and the legislative history of the statute all demonstrate that Congressional enactment of Section 1346 did not revive those cases involving prosecutions under the mail fraud statute for deprivations of the intangible right of honest elections." Id. at 674.  Instead, the right to honest elections and the right to honest services constituted separate and distinct intangible rights.  Id. at 673.

The Turner Court further explained that a plain reading of the statute suggests that one must have a right to those honest services in order to be deprived of them.  Further, the Supreme Court's analysis of Section 1346 revealed that Section 1346 was a limited revival of only the "intangible right of honest services." Cleveland v. United States, 531 U.S. 12, 121 S. Ct. 365, 148 L. Ed. 2d 221 (2000).  This revival was to the exclusion of election fraud schemes and other election related offenses.

The legislative history also illuminates congressional intent on the scope of honest services. Congress recognized the public's interest in having public officials or employees making decisions in a disinterested manner on behalf of the public at large, and thus imposed a fiduciary relationship between officials and the public. The proposed Fraud Amendments Act of 1987 and the Anti-Corruption Act of 1988 contained broad definitions of fraud that contemplated a deprivation of a fair and honest election. However, Congress did not enact either act. When then Senator Biden reintroduced the Anti-Corruption Act in 1989, he cautioned that "current law does not permit prosecution of election fraud because such offenses do not involve anyone's 'honest services.'" Turner, 459 F.3d at 674. Applying this analysis to the facts before the Turner Court, Judge Gibbons stated that Turner could not be prosecuted under an honest services theory.

As such, Defendant invites this Court to construe the honest services theory as narrowly as the Turner Court in ruling that the alleged election fraud offenses in this indictment do not fall within the scope of the "intangible right of honest services" protected under the mail fraud statute's definition of a scheme or artifice to defraud. Casting Tabone's alleged conduct as the subject of honest services would blur the delineation clearly evidenced by the statute and Congress. To axiomatically include the right to an honest election within the right to honest services would encourage exponential generalization and subjective prosecution. As a result, the honest services statute does not reach the scheme alleged in the indictment to deprive citizens of fair elections.

A. **As An Unpaid Party Volunteer, Tabone Does Not Owe A Legally Cognizable Fiduciary Duty To the Bronx, the New York County, the Richmond County, The Kings County or even the Queens County Republican Party's Executive Committee or County Committees and Members of the Republican Party, And Thus Cannot Deprive Them Of Any Honest Services Under The Statute**

Tabone was an unpaid party volunteer and is not a "public official" or otherwise elected or appointed to public office such that he owes a fiduciary duty to the Republican Party, its county committee and its members which would subject him to liability under the Honest Services statute for the conduct alleged in the indictment.  Private relationships do not carry an inherent duty to act in the public's best interest.  The fact that a private actor's conduct could have a widespread effect does not transform the nature of his position into one that carries fiduciary obligations.  In sum, a political party does not retain the right to the honest services of a political party officer, and conversely, a party officer does not owe a duty of honest services to the political party. Indeed the notion that former volunteer Vice Chairman Tabone might have owed a duty rising to the level of a fiduciary duty to Executive or County Committees over and above the one he was an actual member of as one of approximately 58 Executive Committee Members on the Queens County Republican party's volunteer committee or one of the approximately 1500 county committee members comprising the Queens County Republican Party's County Committee is starkly contrary to anyone's reasonable expectations. Mr.  Tabone was neither elected or appointed to any party position outside Queens and his conduct would not have been governed by their party rules during his tenure as a volunteer party officer – only the Queen's party's rules.

Political corruption jurisprudence has attempted to define the contours of the honest services statute with respect to private actors.  Multiple courts have declared that private actors, including party officials, do not have a fiduciary duty to the public.  Consequently, they cannot be prosecuted under the honest services fraud statute.  Acts far more grievous than those alleged in the indictment have been held to be insufficient under the Honest Services Statute.

29

The Sixth Circuit in Turner confronted the nature of election fraud offenses including direct cash payment to voters, straw contributors and direct cash payments to the candidate above the contribution limit. Id. at 670. The Court reasoned that candidates for office, unlike elected officials, provide no "services" to the public, and therefore could not be said to have deprived the public of honest services under 18 U.S.C. §1346 when engaging in alleged dishonest conduct. Id. at 672.

Similarly, the Third Circuit disavowed the government's theory to prosecute a party official under the honest services statute. Peter A. Murphy was the Chairman of the Republican Party in Passaic County, New Jersey, and was convicted under the honest services fraud statute for his role in a contracts-for-payments scheme. United States v. Murphy, 323 F.3d 102 (3d Cir. 2003). The government relied on the holding in United States v. Margiotta (688 F.2d 108 (2d Cir. 1982)) that a politically involved private actor could be equivalent to a publicly elected official for the purposes of the honest services statute, thus assigning Murphy with a fiduciary duty to the public to provide honest services. Murphy, 323 F.3d at 104. The Third Circuit thoroughly discounted the Margiotta theory which failed to "provide any logical rationale for treating private party officials in the same manner as public officials since such a loose interpretation of the mail fraud statute creates 'a catch-all political crime which has no use but misuse.'" Id. at 117-118. The court further held that the government must prove that the defendant violated "a state-created fiduciary duty." Id. The Murphy Court declined to read the New Jersey Bribery Act as creating a fiduciary or other legal relationship to the public. Id. Further, the bribery statute did not create an obligation to provide honest services without any preexisting legal duty. Id. Thus, the Court reversed Murphy's conviction on the mail fraud counts. United States v. Brumley similarly held that in order to be prosecuted under the honest

services statute the defendant must have breached a duty concerning the services he owed to his employer under state law.  United States v. Brumley, 116 F.3d 728, 735 (5th Cir. 1997).

Judge Brieant of this Court also ruled on the existence of a fiduciary duty between a private actor and the public.  U.S. v. Adler, 274 F. Supp. 2d 583 (S.D.N.Y. 2003).  Adler was Chairman of the Democratic Party of Rockland County, New York and was convicted under the mail fraud statute for his involvement in a local Planning Board scheme.  The Adler Court held that the honest services statute was not void for vagueness as applied to Adler's conduct, and that Adler attempted to deprive the public of the honest services of a public official and was therefore rightfully convicted of mail fraud.  Id. at 587.

The Margiotta theory was again relied upon by the government in United States v. Warner, and again, ultimately repudiated.  U.S. v. Warner, 292 F. Supp. 2d 1051 (N.D. Ill. 2003).  Lawrence Warner was a close confidant of a high-ranking Illinois Secretary of State Office official who participated in official matters, and was convicted based on mail fraud counts.  Id. at 1053-55.  The government asserted the Margiotta theory that Warner had "direct and substantial participation in Office SOS affairs," and deprived the public of his honest services.  Id. at 1063.  However, the Warner Court decisively concluded that Warner was a private citizen who did not owe a fiduciary duty to the public.  Id.  In fact, no court has "found that a private individual who does not hold public office or employment and whose private company does not receive any public funds can have a fiduciary duty to provide honest services to the public."  Id. at 1062.  As a result, there is clear precedent in differentiating between the roles, and liabilities, of private actors who participate in political affairs and true public officials.

The Second Circuit elucidated that the government must show a breach of a duty rising to the level of "a duty of loyalty" in order to uphold a conviction under Section 1346, but also

narrowed the scope of this duty by instituting the same element of materiality.  United States v.

Rybicki, 354 F.3d 124 (2nd Cir. 2003).This test defines that the misrepresentation or omission for

an honest services fraud conviction must be "material," such that the misinformation or omission

would naturally tend to lead or is capable of leading a reasonable employer to change its

conduct.  Id. at 145.   The Seventh Circuit has outlined another stance in limiting 18 U.S.C.

§1346's reach.  As an additional requirement, the government must show that the defendant

breached the fiduciary duty with the intent to reap private gain. United States v. Sorich, 523 F.3d

702, 708 (7th Cir. 2008).

        In private sector cases, the Fifth Circuit notably stated that not every breach of fiduciary

duty is criminal.  United States v. Ballard, 663 F.2d 534, 540 (5th Cir. 1981).  Rather, the

defendant must be shown to have breached a fiduciary duty that caused detriment to his or her

employer.  United States v. Brown, 459 F.3d 509, 519 (5th Cir. 2006).  Some courts have

required that the fraud be "active" or that the fiduciary utilize his trusted position to obtain a

benefit for himself at the expense of the person whose trust he breaches.  In the context of an

employer-employee relationship, sufficient evidence of the intent to defraud an employer

necessary under the wire fraud statute rests on the employee acting with the knowledge or

contemplation that his actions posed an independent business risk to the employer.  United States

v. Lemire, 720 F.2d 1327, 1337 (D.C. Cir. 1983).

        The Eleventh Circuit further clarified the distinction between public and private actors,

following Lemire's reasoning in proclaiming that the government must demonstrate that the

breach of loyalty inherently harmed the relationship's purpose.  In the private sector context

which is economic in nature, the breach must have involved a "reasonably foreseeable economic

harm."  United States v. deVegter, 198 F.3d 1324, 1328, 1330 (11th Cir. 1999); United States v.

Vinyard, 266 F.3d 320, 328 (4th Cir. S.C. 2001).  Similarly, the Sixth Circuit focused on the reasonably foreseeable economic harm as a result of the breach.  Turner, 465 F.3d at 675.  The Turner Court rejected the materiality requirement followed by other circuits in limiting the scope of the honest services fraud statute.  Attempting to craft a more restrained standard, the Sixth Circuit desired to avoid an "over-criminalization of private relationships" in which disloyalty alone could become a crime.  United States v. Frost, 125 F.3d 346, 368 (6th Cir. Tenn. 1997).

As can be readily observed, the circuit split on the ambiguity of the fiduciary duty requirement of the honest services fraud statute raises certain dilemmas.  The United States Supreme Court was petitioned to determine the scope in light of the absence of a coherent rule. However, Skilling v. United States leaves the legal landscape with a standard that induces further criticism, confusion and queries.

The Supreme Court noted the lack of agreement amongst the circuit courts as to which fiduciary would be subject to the honest services fraud, what obligations the fiduciary owed, whether something beyond a mere fiduciary duty was needed to establish honest services fraud or the source of the fiduciary obligation (state law, federal law or general principles).  Skilling at 2937.  In an attempt to "save" the statute, the Court limited the statute to specific "acts," concluding that the "the intangible right to honest services means the right not to have one's fiduciaries accept bribes or kickbacks."  Skilling at 2936.  While ostensibly clear, this determination left open a fundamental uncertainty: the character of the "fiduciary capacity" to which the bribery and kickback restriction applies, as Justice Scalia advised in the concurrence. "Does it apply only to public officials? Or in addition to private individuals who contract with the public? Or to everyone, including the corporate officer here?"  Skilling at 2939.

Thus, while the Supreme Court in Skilling reaffirmed the requirement of a fiduciary relationship, it did not establish a universal standard to determine the character of the "fiduciary capacity".   As the analysis below details, an examination under the various circuit court decisions yields that application of the Honest Services Statute to a unpaid private political party volunteer is unprecedented, perilous, injurious to public policy and generally against public policy.

In applying the various Circuit Courts' limiting doctrines to the facts at issue in this indictment, it becomes apparent that Tabone provides no "services" to the public and owes no fiduciary duty to the public.   Further, Tabone does not owe a fiduciary duty to the party of which he is a member.   The federal government premises the indictment on the fact that Tabone allegedly received a sum of money from the Cooperating Smith and pledged his support for Smith by agreeing to deliver a Wilson-Pakula authorization.   However, these theories do not indicate a deprivation of the honest services of the New York City Republican Party county committees and members.

As an individual who volunteers as a political party member, Tabone is not a public official.   While a candidate for office is aiming to secure an elected position, an unpaid volunteer of a political party is not.   Instead, Tabone's role is that of a private individual who is politically active in his community.   He does not hold an elected or appointed position nor is he paid a salary by the local government.   His efforts are purely discretionary and confined to the inner mechanisms of the political party of which he is a member.   At best, Tabone owes a duty of loyalty to his local political party which candidly he has served ably and on a pro bono basis for decades, but his First Amendment associational right affords him the freedom to abandon this role at his choosing and volunteer for a different political party.   The federal government cannot

34

circumscribe this long-honored freedom and condemn Tabone with criminal sanction for his alleged disloyalty to the party.

Tabone's alleged conduct, if true, would in actuality support the party's stated aims. As a Vice Chairman of the Queens County Republican Party, Tabone's volunteered to advance the interests of the party. The political party, as an unincorporated association, then engages in decision making processes, and specifically in this case, regarding granting access to the Republican Party to a non-party voter through a Wilson-Pakula authorization. Tabone is but one member of this cohort – a County based organization with a large Executive Committee tasked with governing the day to day affairs of the local party. Even were this Executive Committee by a majority vote to grant an authorization to Smith, this without more would be of no force. The five County Executive Committees would have had to subsequently agree to 1) notice a collective meeting of all five executive committee in compliance with statute and established precedent 2) convene a meeting and secure a quorum 3) have a vote put forward that would carry a majority of the vote in favor of granting Democratic Senator Smith an authorization 4) and then have a 3 Chairman elected by the joint meeting sign an authorization and have it filed in a timely and satisfactory manner with the New York City Board of Elections 5) despite the fact that virtually every County organization had publically stated favorites already and the Queens Republican Party's Executive Committee has already formally endorsed a citywide Mayoral candidate other than Smith. If the government's allegation is that Tabone as one of literally hundreds of rank and file members throughout the city was precluded from entertaining an engagement as a political consultant or candidly from being retained for other legal work because of unknowable entanglements and motives of a prospective employer intermediary the ramifications for such a government power would be unconstitutional. As a result, Tabone's

position is even farther removed from public office than a candidate running for an election, such as Turner, and more akin to Murphy or Adler's position. These Circuit Courts have unequivocally and consistently declared that a party official does not owe a duty to the public. Therefore, Tabone could not – by definition – have deprived the public of honest services pursuant to the statute. Further, he could not have deprived the Republican Party, its county committee or its members of any honest services since he owed only a duty of loyalty to the party. Tabone cannot be considered a fiduciary of the political party of which he is enrolled, but only a volunteer member with limited responsibilities. A party official's decision to act as a consultant to a prospective candidate is a legal and widespread method by which a party negotiates the candidacy. Any alleged disloyalty to the party cannot now be criminalized under the Honest Services Statute.

Within the context of Tabone's role as a member of the Queens County Republican Party, the analysis of the materiality element becomes simple: any alleged omission on the part of Tabone could not have led a reasonable "employer" to change its conduct precisely because Tabone could not have demanded that the five separate New York City based Republican County organizations issue a Wilson-Pakula authorization for Smith. Tabone could not have reasonably foreseen any potential harm, and neither did he act with fraudulent intent. Even if this conduct was true, Tabone, in fact, would be acting in the best interests of the party. As explained herein, a Wilson Pakula waiver merely allows a non-party member candidate granted such permission with the opportunity to collect the signatures of at least 7,500 Republican voters residing within the five (5) counties in New York City. Indeed the precursor to such a grant is a citywide conclave of literally hundreds of Executive Committee Members from throughout the five counties comprising New York city. Accordingly, Tabone's supposed promise to support Smith

could not have caused any harm to the public or to the party since Tabone, alone, could not have issued the waiver for Smith. Smith himself would have to collect the sufficient number of signatures to petition for a spot on the primary election ballot. As the Fifth Circuit noted, not every breach of fiduciary duty is criminal; Tabone's alleged actions did not cause a detriment to the public or the party as multiple signatures were required for Smith to receive the waiver. Likewise, there was no reasonably foreseeable economic harm, and the mere alleged disloyalty would not rise to criminal liability under the Honest Services Statute. Finally, the <u>Skilling</u> rule does not address the character of the "fiduciary capacity" to which the bribery and kickback restriction of the statute applies; namely, if Tabone as a politically involved private individual could come under the purview of § 1346. Instead, the various elements proposed by the circuit courts, the plain meaning and legislative intent of the statute stress a determination that Tabone is not a public official and thus does not owe a fiduciary duty to the public. Moreover, Tabone only owed, at best a duty of loyalty to the political party of which he is a member within his own County. He was not a member of a New York City Republican Party Board. There is no such animal.   Therefore, Tabone could not deprive the other four New York based Republican Party organizations of the intangible right to honest services sufficient to support a § 1346 violation. He did not work for them or volunteer for them. His volunteer efforts and volunteer office resided solely in his home County.

Empowering this statute beyond its boundaries would cultivate a potentially treacherous terrain. A host of protected political actions would find themselves on uncertain footing. Those actors who merely influence or participate in the processes of government would be subject to criminal prosecution. Lobbying, political party activities, political action committees, party caucuses, non-governmental and special interest advocacy and more would be vulnerable to

attack. However, as to such actions, "the public has no right to disinterested service." Margiotta,

688 F.2d at 122 (Judge Winters dissenting). If courts find that private actors owe a duty to the

political party of which he or she is a member, then the mail fraud statute's scope would be

immeasurable. It would effectively encumber that person's First Amendment associational

freedoms and interminably couple one to a particular political affiliation. Disloyalty itself would

be criminalized. Therefore, it is incumbent upon this Court to comb the history of the honest

services statute for its true purpose, narrowly read the statutory language and reasonably

circumscribe the parameters of this oft-abused criminal provision.

  In light of the foregoing, we respectfully request that Count One and Count Two alleging

an honest services fraud charge as against Vincent Tabone are dismissed under Federal Rule of

Criminal Procedure 12(b)(3)

## VI   THE INDICTMENT DOES NOT PLEAD WITH SUFFICENT PARTICULARITY THE CHARGES AGAINST MR. TABONE AND SHOULD BE DISMISSED FOR FAILURE TO SATISFY MR.TABONES CONSTITUTIONAL GUARANTEES UNDER THE SIXTH AND FIFTH AMENDMENT.

  In addition to its defects under FRCP 12(b), the Indictment does not allege with any

clearness, particularity, or certainty, as required by the FRCP Rule 7(c ), the essential facts

constituting the offense Mr. Tabone is charged with under the Honest Services Statue. See U.S.

v. Cruikshank 92 U.S. 542 (1875); U.S. v. Valentine 644 F.Supp. 818 (SDNY 1986) (noting to

satisfy requirements of Fifth Amendment due process clause, the Indictment must set forth the

offense with clearness and all necessary certainty, to apprise accused of crime with which he or

she stands charged; and to furnish the Defendant with such description of charge for protection

against further prosecution for same cause).

  While, the language of the statute may be used in the general description of an offense, it

must be accompanied with a statement of the facts and circumstances as will inform the accused

of the specific offense, coming under the general description with which he is charged. <u>Hamling v. US</u> 418 US 87, 2908 (1974).  It is well settled law that where the definition of an offense, whether it is common law or statutory, includes generic terms, an Indictment is insufficient if it charges the offense in the same generic terms as in its definition, the indictment must state the particulars.<u>U.S. v. Cruikshank</u> 92 U.S. 542 (1875).

Specifically, the Portion of the Indictment in Count One, accusing Mr. Tabone of Honest Services Wire Fraud Conspiracy, and Count Two, charging substantive wire fraud, are premised upon the general conclusory allegation that Mr. Tabone, along with Defendants, Malcolm A. Smith, Daniel J. Halloran, and Joseph J. Savino, allegedly schemed to "deprive New York City Republican Party county committees and members of the Republican Party of the honest services of leaders of such county committees". Indict. ¶¶ 59, 63.

The Indictment fails to provide any clarification as to whether Mr. Tabone's alleged deprivation of "honest services" is the deprivation of Mr. Tabone's own honest services to the Party, or a deprivation which Mr. Tabone allegedly furthered. The language of the Indictment is unclear and confusing, leading to numerous interpretations of the possible "deprivation of honest services" Mr. Tabone is accused of. Accordingly, the Indictment fails to meet the particularity requirement under Rule 7(c ) of the FRCP.

Thus, the Indictment as pled does not pass constitutional muster. The lack of specificity and particularity in the Indictment impedes upon Mr. Tabone's Constitutional rights under the Sixth and Fifth Amendment, to be informed of the nature of the charges against him and to have an opportunity to adequately prepare his defense. <u>U.S. v. Sugar</u> 606 F.Supp. 1134 (SDNY 1985); <u>U.S. v. Ashley</u> 905 F.Supp. 1146 (EDNY1995).

For the foregoing reasons, the charges against Mr. Tabone should be dismissed for failure to meet the pleading requirements under the Federal Rules and for failure to pass constitutional muster.

## CONCLUSION

For all of the foregoing reasons, the Court should dismiss Counts 1, 2 and 3 of the Indictment as applied against Defendant Vincent Tabone.

Respectfully submitted,

DEBORAH N. MISIR
Attorney for Vincent Tabone
Lally & Misir LLP
220 Old Country Road
Mineola, New York 11501
(516) 741-2666

40

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

UNITED STATES OF AMERICA

        v.

                                   Case No.: 7:13-CR-00297-KMK-2

MALCOLM A. SMITH
DANIEL J. HALLORAN
VINCENT TABONE
JOSEPH J. SAVINO
NORAMIE JASMIN
JOSEPH DESMARET,

            Defendants.

-------------------------------------------------------X

### CERTIFICATE OF SERVICE

    I hereby certify that on September 06, 2013, I electronically filed the foregoing with the Clerk of the District Court using the CM/ECF system, which sent notification of such filing to the following:

    Kenneth Gribetz, Esq.
    Attorney for Joseph Desmaret
    Gribetz & Loewenberg, PLLC
    155 North Main Street
    New City, Y 10956
    Office: (845) 634-9500
    Fax:   (845) 639-9105
    E-mail: kg@gribetzloewenberg.com

    Deborah Wolikow Loewenberg, Esq.
    Attorney for Joseph Desmaret
    Gribetz & Loewenberg, PLLC
    155 North Main Street
    New City, Y 10956
    Office: (845) 634-9500
    Fax:   (845) 639-9105
    E-mail: dwl@glcriminallaw.com

    Vinoo P. Varghese, Esq.
    Attorney for Dan Halloran
    Varghese & Associates
    65 Broadway, 7th Floor

1

New York, New York 10006
Office: (212) 430-6469
Fax:    (646) 292-5169
E-Mail: vpv@vargheselaw.com
        info@varfheselaw.com

John Gilgun Mateus, Esq.
Attorney for Dan Halloran
Varghese & Associates, P.C.
65 Broadway, 7th Fl.
New York, NY 10006
Office: (212) 430-6469
Fax:    (212) 292-5169
E-mail: jm@varcheselaw.com

Dennis Joseph Ring, Esq.
Attorney for Dan Halloran
Law Office of Dennis J. Ring
148-29 Cross Island Pkwy
Whitestone, NY 11357
Office: (718) 357-1040
Fax:    (718) 357-1219
E-mail: dennisringlaw@gmail.com

Benjamin Ostrer, Esq.
Attorney for Noramie Jasmin
Benjamin Ostrer & Associates, P.C.
111 Main Street
Chester, NY 10918
Office: (845)469-7577
Fax:    (845) 469-8690
E-mail: ostrerben@aol.com

David Hoovler, Esq.
Attorney for Noramie Jasmin
Benjamin Ostrer & Associates, P.C.
111 Main Street
Chester, NY 10918
Office: (845) 549-3815
E-mail: dhoovler@orlawllp.com

Domenick J. Porco, Esq.
Domenick J. Porco, Attorney At Law
108 Brook Street
Scarsdale, NY 10583
Office: (914) 725-6000

2

Fax:   (914) 725-8114
E-mail: domenickporco@gmail.com

Robert Peter LaRusso, Partner
Attorney for Joseph J. Savino
Larusso & Conway, LLP
300 Old Country Road
Suite 341
Mineola, NY 11501
Office: (516) 248-3520
Fax:   (516) 248-3522
Email: rlarusso@larussoandconway.com

Joseph Robert Conway
Attorney for Joseph J. Savino
Larusso & Conway, LLP
300 Old Country Road
Suite 341
Mineola, NY 11501
Office: (516) 248-3520
Fax:   (516) 248-3522
Email: jconway@larussoandconway.com

Gerald Lawrence Shargel, Esq.
Attorney for Malcom Smith
Winston & Strawn, LLP
200 Park Avenue
New York, NY 10166
Office: (212) 294-2637
Fax:   (212) 294-4700
E-mail: gshargel@winston.com

Ross Mitchell Kramer, Esq.
Attorney for Malcom Smith
Winston & Strawn, LLP
200 Park Avenue
New York, NY 10166
Office: (212) 294-2637
Fax:   (212) 294-4700
E-mail: rkramer@winston.com

Leo E. Ahern, Esq.
Co-Counsel for Defendant Vincent Tabone
50 Elm Street
New Haven, Connecticut 06511
Office: (203) 865-3309

Fax:    (203) 752-1213
Cell:   (203) 499-7685
E-mail: leo.ahern.esq@gmail.com


Dated: Mineola, New York
       September 06, 2013


DEBORAH N. MISIR
Attorney for Vincent Tabone
Lally & Misir LLP
220 Old Country Road
Mineola, New York 11501
(516) 741-2666

4