```
┌──────────────────────────────────────────┐
│ USDC SDNY                                 │
│ DOCUMENT                                  │
│ ELECTRONICALLY FILED                      │
│ DOC #:_____            │
│ DATE FILED:_____            │
└──────────────────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

      -v-

MALCOLM A. SMITH,
DANIEL J. HALLORAN,
VINCENT TABONE,
JOSEPH J. SAVINO,
NORAMIE JASMIN, and
JOSEPH DESMARET,

                  Defendants.

Case No. 13-CR-297 (KMK)

OPINION AND ORDER

KENNETH M. KARAS, District Judge:

Appearances:
Douglas B. Bloom, Esq.
Justin Anderson, Esq.
U.S. Attorney's Office, SDNY
New York & White Plains, NY
*Counsel For the Government*

Vinoo P. Varghese, Esq.
Varghese & Associates, P.C.
New York, NY
*Counsel for Defendant Daniel J. Halloran*

Deborah N. Misir, Esq.
Lally & Misir, LLP
Mineola, NY
*Counsel for Defendant Vincent Tabone*

Benjamin Ostrer, Esq.
Ostrer & Hoovler P.C.
Chester, NY
*Counsel for Defendant Noramie Jasmin*

KENNETH M. KARAS, District Judge:

In this multi-defendant case, the Government seeks a protective order governing the discovery materials it has produced and will be producing. Three of six Defendants oppose the Government's Application. For the reasons discussed herein, the Government's Application is granted, though with some modifications.

I. Background

A. Factual Background

1. The Arrests and the United States Attorney's Press Conference

The Defendants in this case were arrested on April 2, 2013, and charged in a 28-page, 75-paragraph criminal complaint.[1]  The Complaint contained six counts and described in extensive detail allegations of bribery and fraud involving all six Defendants. Defendant Daniel J. Halloran ("Halloran") alleges that he was arrested in the early-morning hours and taken from his residence "before a throng of reporters." (Letter from Vinoo P. Varghese, Esq. to the Ct., Oct. 16, 2013 ("Oct. 16 Varghese Ltr.") 2.); *see also* Josh Margolin, *State Sen. Malcolm Smith, City Councilman Halloran Arrested in 'Bribery Plot' To Rig Mayor Race*, N.Y. Post (Apr. 2, 2013), http://nypost.com/2013/04/02/state-sen-malcolm-smith-city-councilman-halloran-arrested-in-bribery-plot-to-rig-mayor-race/ (noting that a handcuffed Halloran was asked by reporters at his residence about his arrest and that Smith made no comment as "he was hauled off").

Later that day, the United States Attorney held a press conference to announce the arrests. Defendants base their opposition to the Government's Application, in part, on

---

[1] More than half of the 75 paragraphs in the Complaint contained direct quotes attributed to Defendants during meetings with undercover agents and a cooperating witness. Indeed, there are several paragraphs that contain extensive quotes attributed to Defendants. (*See* Compl. ¶¶ 32, 51, 71, and 72.)

2

statements made by the United States Attorney at this press conference (and on other occasions). The United States Attorney began the press conference by introducing himself and then stating that "[t]oday is another sad and disappointing day for every New Yorker who hasn't yet given up on the dream of honest government." Preet Bharara, U.S. Att'y for the S. Dist. of N.Y., *United States v. Malcolm Smith et al.*, Prepared Remarks (Apr. 2, 2013), *available at* http://www.justice.gov/usao/nys/pressconference/malcolmsmith/remarks.pdf. The United States Attorney then stated that this case "demonstrate[d], once again, that a show-me-the-money culture seems to pervade every level of New York government." *Id.* He also said that this case involved "an unappetizing smorgasbord of graft and greed." *Id.* The United States Attorney then described in some detail the allegations in the criminal complaint that had been filed. *Id.* After noting that the "case against these defendants will unfold in federal court, and each is presumed innocent unless and until proven guilty," the United States Attorney went on to "make a general point" about how common corruption was in New York. *Id.* After citing the public-corruption cases the United States Attorney's Office has brought as proof of how common corruption was in New York, the United States Attorney said, "don't take my word for it," and asked those in attendance to "[c]onsider the words of [Defendant] Halloran, caught on tape in this case." *Id.* After quoting from Halloran, the United States Attorney observed that "[p]utting dirty politicians in prison may be necessary but it is not sufficient." *Id.* He then went on to explain that "even after a parade of politicians have been hauled off to prison," "it's time for others to step up" to also combat public corruption. *Id.*

3

2. The Indictment

On April 18, 2013, a grand jury returned an Indictment in ten counts.[2] (*See* Dkt. No. 42.)

Count One charges Defendants Halloran, Malcolm A. Smith ("Smith"), Vincent Tabone

("Tabone"), and Joseph Savino ("Savino") with conspiring, in violation of Title 18, United

States Code, Section 371, to commit honest-services wire fraud and to violate the Travel Act

related to an alleged scheme to bribe leaders of the New York City Republican Party in exchange

for a so-called Wilson Pakula certificate that would have allowed Smith to seek the Republican

nomination for New York City mayor. (*Id.*) Count Two charges these same four Defendants

with substantive honest-services wire fraud and attempt to commit honest-services wire fraud as

part of the same bribery scheme, in violation of Title 18, United States Code, Sections 1343,

1346, 1349, and 2. Count Three charges these same Defendants with a substantive violation of

the Travel Act in connection with the same bribery scheme, in violation of Title 18, United

States Code, Sections 1952 and 2, and New York Penal Law Sections 200.45 and 200.50.

Count Four charges only Smith with extortion under the Hobbs Act, Title 18, United

States Code, Section 1951, in connection with his alleged promise to obtain state funding for a

community-center project in Spring Valley, New York, in exchange for bribes related to the

scheme charged in Counts One through Three. Counts Five and Six charge Halloran with

honest-services wire fraud and a Travel Act violation, in connection with his alleged acceptance

of bribes in exchange for discretionary funds from the New York City Council.

---

[2] The Indictment is 31 pages long and contains 81 paragraphs. As was true with the Complaint, the first 20 pages (and 56 paragraphs) contain extensive details about Defendants' alleged conduct, including dozens of quotes from recordings of Defendants. The actual charges do not begin until page 21 (paragraph 57).

Counts Seven through Ten charge Defendants Noramie Jasmin ("Jasmin") and Joseph Desmaret ("Desmaret") with honest-services mail fraud, in violation of Title 18, United States Code, Sections 1343 and 1346, and Hobbs Act extortion, in violation of Title 18, United States Code, Section 1951, in connection with a scheme in which Jasmin and Desmaret allegedly accepted bribes in exchange for their help in completing the community-center project to which Smith allegedly agreed to send state money.

### 3. Discovery Production

At the initial appearance before the Court, on April 23, 2013, the Government described the discovery materials it would be producing in this case. This discovery included line sheets, recordings, text messages, and transcripts from both court-authorized and consensually recorded electronic surveillance. (*See* Apr. 23, 2013 Initial Conference Tr. ("Apr. 23 Conference Tr.") 4–5.) The discovery also included financial records, the fruits of physical searches (including several computers), and the affidavits and other documents submitted in support of the court-authorized electronic surveillance and searches. (*See id.*; *see also* Letter of Douglas B. Bloom, Esq. to the Ct., June 3, 2013 ("June 3 Bloom Ltr.").) These materials were mostly provided to Defendants in electronic format by copying them onto a hard drive. (*See* Apr. 23 Conference Tr. 4.)

Also, at this initial conference, counsel for Defendant, referring to a "local rule," shared his concern about public statements that had been made by the United States Attorney for this District and the District Attorney for Rockland County. (*Id.* at 9, 11 (noting that "there were a number of interviews given by law enforcement [in connection with this case]," and then specifically commenting, "I shouldn't say 'law enforcement[]'[;] [t]he United States Attorney, the District Attorney of Rockland County").) Counsel specifically expressed his concern about

5

the possibility that the recorded conversations in this case might be leaked to the media. (*Id.* at

9–10.) While counsel acknowledged that he trusted the Assistant United States Attorney

("AUSA") assigned to this case, he noted that "there is a press office in the United States

Attorney's Office," and that the AUSA could not "guarantee that the press office wouldn't have

a different view of things." (*Id.* at 10.)[3]

Regarding the possibility that the recorded conversations might be leaked to the media,

the Court inquired of the Government whether it would be seeking a protective order of some

kind, without suggesting that such an order was necessary or appropriate. (*Id.* at 12.)   In

response, the AUSA said that it was not the Government's intention to seek such an order, but

noted that if "defense counsel have concerns about other defense counsel's conduct," then the

issue could be re-visited. (*Id.*) The Court then reminded *all* counsel about the local rule of this

District regarding extrajudicial statements by counsel, specifically citing the concern that no

extrajudicial statements jeopardize the Parties' right to a fair trial. (*Id.* at 11–12; *see also*

S.D.N.Y. Local Crim. R. 23.1 ("Free Press–Fair Trial Directives").)

The Court held a second conference on July 19, 2013. At that conference, the

Government represented that it had produced the discovery it had promised to produce at the

---

[3] Counsel recounted how he had received a telephone call from members of the media
"regarding the fact that [his client] had been indicted," and that he "didn't know that the
defendants had been indicted at that point," because he had not received ECF notification "until
hours later." (Apr. 23 Conference Tr. 9.) One of the AUSAs responded that he had "e-mailed
the indictment to all defense counsel shortly after its return," so counsel "should have had [the
Indictment] before anyone in the media." (*Id.* at 11.)

April 23 conference. (July 19, 2013 Conference Tr. ("July 19 Conference Tr.") 4–5.)[4] The Government also stated that it had been receiving "additional documents, audiotapes, et cetera," which it would be producing on a rolling basis. (*Id.*) As to "some" of these materials, the Government indicated that it would be "seeking a protective order," which it had been discussing with counsel for the Defendants. (*Id.* at 5 ("There are some materials that the government has recently received that we are seeking a protective order.").)

### B. Procedural History

As noted, the Indictment in this case was returned on April 18, 2013. (*See* Dkt. No. 42.) On August 21, 2013, the Government filed an Application requesting that the Court enter a protective order pursuant to Fed. R. Crim. P. 16(d)(1) "governing the use and disclosure of discovery materials containing personal, proprietary or other confidential information produced by the Government in this action." (Letter of Justin Anderson, Esq. to the Ct., Aug. 21, 2013 ("Aug. 21 Anderson Ltr.") 1.) The proposed protective order would deem "[a]ll materials . . . provided by the Government to the defense in this action pursuant to Rule 16 of the Federal Rules of Criminal Procedure, Title 18 United States Code Section 3500; *Brady v. Maryland*; or *United States v. Giglio*" to be considered "Confidential Information." (Letter of Deborah N. Misir, Esq. to the Ct., Aug. 28, 2013 ("Aug. 28 Misir Ltr.") Ex. A.) Under the protective order, this "Confidential Information" is to be used by Defendants and their counsel "only for purposes of defending this criminal action," but it may be disclosed to certain individuals (investigators, paralegals, etc.) who are called "Designated Persons" and who are assisting in the defense. (*Id.*)

---

[4] In particular, the Government indicated that it had "produced the discovery that [it] discussed at the [April 23] conference shortly after that conference," including "the audiotapes and other documents that [it] received prior to issuing the indictment." (July 19 Conference Tr. 4.)

These "Designated Persons" are to sign an acknowledgment memorandum, to be kept by counsel for Defendants, indicating that they have read the protective order and have agreed to be bound by it. (*Id.*) Moreover, counsel for Defendants are not to attach any "Confidential Information" to any public filings without prior notice to the Government, and must return or destroy such information at the end of the Case. (*Id.*)

Three Defendants (Halloran, Tabone, and Jasmin) submitted letters opposing the Government's request for this protective order. (*See* Letter of Benjamin Ostrer, Esq. to the Ct., Aug. 27, 2013 ("Aug. 27 Ostrer Ltr."); Aug. 28 Misir Ltr.; Letter of Vinoo P. Varghese, Esq. to the Court, Aug. 30, 2013 ("Aug. 30 Varghese Ltr.").) The Court held oral argument on October 7, 2013. On October 15, 2013, at the Court's direction, the Government submitted *ex parte* and for *in camera* review a letter outlining the Government's ongoing investigation of "possible misconduct connected to this case," which the Government contends would be at risk in the absence of a protective order. On October 16, 2013, counsel for Defendant Halloran submitted a letter to the Court arguing that the United States Attorney had committed "multiple infringements of the local rules, which have severely prejudiced Mr. Halloran's absolute right to a fair trial." (Oct. 16 Varghese Ltr. 1.) The Government responded to this letter on October 21, 2013. (*See* Letter of Douglas B. Bloom, Esq. to the Ct., Oct. 21, 2013 ("Oct. 21 Bloom Ltr.").)

## II. Discussion

### A. Standard of Review

#### 1. Right of Access

The Government seeks a protective order limiting the dissemination of the discovery materials it has produced, and will be producing, to Defendants. In particular, the Government's

proposed protective order seeks to prevent Defendants from making the discovery materials available to the public, including the media.

The Supreme Court has held that "the press and general public have a constitutional right of access to criminal trials." *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 603 (1982) (citing *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980)). This right serves a vital function in our government: "The presumption of access is based on the need for federal courts, although independent—indeed, particularly because they are independent—to have a measure of accountability and for the public to have confidence in the administration of justice." *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995) ("*Amodeo II*"); *see also Richmond Newspapers*, 448 U.S. at 584 (Stevens, J., concurring) ("[T]he First Amendment protects the public and the press from abridgment of their rights of access to information about the operation of their government, including the Judicial Branch . . . ."); *Press-Enter. Co. v. Superior Court of California*, 464 U.S. 501, 518 (1984) ("*Press-Enter. I*") (Stevens, J., concurring) (noting that First Amendment access should be promoted where it "makes a positive contribution to th[e] process of self-governance"); *In re Providence Journal*, 293 F.3d 1, 9 (1st Cir. 2002) ("Courts long have recognized that public monitoring of the judicial system fosters the important values of quality, honesty, and respect for our legal system." (internal quotation marks omitted)).

Subsequent to *Globe Newspaper*, the Supreme Court has used the same rationale to extend the First Amendment right of access to certain other criminal proceedings. In *Press-Enterprise Co. v. Superior Court of Cal.*, 478 U.S. 1 (1986) ("*Press-Enter. II*"), the Supreme Court explained that in determining whether a First Amendment right of access attaches to a particular proceeding or filing, courts should consider (i) whether the proceeding or filing at issue has "historically been open to the press and general public" (the "experience" prong), and

9

(ii) whether "public access plays a significant positive role in the functioning of the particular process in question" (the "logic" prong). *Id.* at 8–9. In that case, for example, the Supreme Court recognized a qualified right of access to preliminary criminal hearings. *Id.* at 10–13.

The Second Circuit has applied the "'experience-and-logic' approach . . . to both judicial proceedings and documents, and asks 'both whether the documents have historically been open to the press and general public and whether public access plays a significant positive role in the functioning of the particular process in question.'" *Newsday LLC v. Cnty. of Nassau*, 730 F.3d 156, 164 (2d Cir. 2013) (emphasis removed) (quoting *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 120 (2d Cir. 2006)). The Second Circuit uses another approach when analyzing only judicial documents related to judicial proceedings themselves covered by the First Amendment. *Id.* Under this approach, the Second Circuit "asks whether the documents at issue 'are derived from or are a necessary corollary of the capacity to attend the relevant proceedings.'" *Id.* (quoting *Lugosch*, 435 F.3d at 120).

Applying these approaches, the Second Circuit has held that the First Amendment right of access applies to pretrial suppression hearings, *see In re Herald Co.*, 734 F.2d 93, 98 (2d Cir. 1984); voir-dire proceedings, *see ABC, Inc. v. Stewart*, 360 F.3d 90, 105–06 (2d Cir. 2004); plea hearings, *see United States v. Haller*, 837 F.2d 84, 86 (2d Cir. 1988); and sentencing hearings, *see United States v. Alcantara*, 396 F.3d 189, 191–92 (2d Cir. 2005). In *In re New York Times Co.*, 828 F.2d 110 (2d Cir. 1987) ("*New York Times I*"), the Second Circuit extended the constitutional right to "written documents submitted in connection with judicial proceedings that themselves implicate the right of access," which in that case involved papers related to a motion to suppress an electronic-surveillance order. *Id.* at 114. Indeed, the Second Circuit has consistently affirmed that the right of access applies to "judicial documents" in criminal cases.

10

*See, e.g., United States v. Aref*, 533 F.3d 72, 81–82 (2d Cir. 2008) (applying the First Amendment right of access to a court order and legal memoranda filed with the court); *United States v. Gerena*, 869 F.2d 82, 85 (2d Cir. 1989) (extending right of access to "briefs and memoranda" filed in connection with pre-trial and post-trial motions); *Haller*, 837 F.2d at 86 (applying the qualified right of access to plea agreements); *In re New York Times Co.*, 834 F.2d 1152, 1154 (2d Cir. 1987) ("*New York Times II*") (applying right of access to suppression-motion papers). *See generally Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 93 (2d Cir. 2004) (noting that the "qualified right of access to judicial documents" is a "necessary corollary of the capacity to attend the relevant proceedings"); *United States v. Madoff*, 626 F. Supp. 2d 420, 423–24 (S.D.N.Y. 2009) (discussing the First Amendment right of access to certain judicial documents); *DiPietro v. United States*, No. 02-CR-1237, 2009 WL 801609, at *2 (S.D.N.Y. Mar. 24, 2009) ("The right of access to judicial documents stems from the right of access to criminal trials.").

Apart from a constitutional right of access to court proceedings and documents, the Supreme Court has held that the public has a common law "right to inspect and copy public records and documents, including judicial records and documents." *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978); *see also United States v. Myers*, 635 F.2d 945, 949 (2d Cir. 1980) ("The existence of the common law right to inspect and copy judicial records is beyond dispute."); *United States v. Gotti*, 322 F. Supp. 2d 230, 239 (E.D.N.Y. 2004) ("The common law right of access to judicial documents under American jurisprudence traces its origin to the general English common law right of access to public records . . . ."). In determining if a document should be publicly accessible, a court should: (i) determine if it is a judicial document; (ii) determine the weight of the presumption of access attached to it; and (iii) balance the

11

countervailing interests against the presumption of access. *See Lugosch*, 435 F.3d at 119–20. To be designated a judicial document, "the item filed must be relevant to the performance of the judicial function and useful in the judicial process." *United States v. Amodeo*, 44 F.3d 141, 145 (2d Cir. 1995) ("*Amodeo I*"). Relatedly, the weight of the presumption of access is determined by the role the material plays "in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts." *Amodeo II*, 71 F.3d at 1049. For example, the presumption of access is high for documents submitted as part of dispositive-motion practice, *see Lugosch*, 435 F.3d at 123 (summary-judgment motion papers), or offered as evidence at trial, *In re Application of Nat'l Broad. Co.*, 635 F.2d 945, 952 (2d Cir. 1980) (exhibits admitted into evidence at public-corruption criminal trial). However, "[d]ocuments that play no role in the performance of Article III functions" are accorded little weight as presumptively accessible. *Amodeo II*, 71 F.3d at 1050.[5]

Under the qualified right of access, whether as a matter of common or constitutional law, "[i]t is beyond dispute that . . . members of the media and the public may bring third-party challenges to protective orders that shield court records and court proceedings from public view." *Bond v. Utreras*, 585 F.3d 1061, 1074 (7th Cir. 2009); *see also Nixon*, 435 U.S. at 597

---

[5] "The common law does not afford as much substantive protection of the interests of the press and the public as does the First Amendment." *Rushford v. New Yorker Magazine, Inc.*, 846 F.2d 249, 253 (4th Cir. 1988); *see also Lugosch*, 435 F.3d at 124 (agreeing with *Rushford* that the First Amendment imposes a higher burden in requiring disclosure). While the common law right of access requires a court to balance the competing considerations of providing access, *see Lugosch*, 435 F.3d at 120, the First Amendment allows for access unless sealing or closure "is essential to preserve higher values and is narrowly tailored to serve that interest," *id.* (quoting *New York Times I*, 828 F.2d at 116). *See also In re Gushlak*, No. 11-MC-218, 2012 WL 3683514, at *3 (E.D.N.Y. July 27, 2012) ("The test for overcoming [the First Amendment] qualified constitutional right is more stringent than its common law counterpart." (internal quotation marks omitted)); *In re NBC Universal*, 426 F. Supp. 2d 49, 56 (E.D.N.Y. 2006) ("The First Amendment demands broader disclosure than the common law." (emphasis removed)).

("It is clear that the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents."). However, neither the First Amendment nor the common law right of access is absolute. *See Waller v. Georgia*, 467 U.S. 39, 45 (1984) (noting that the constitutional right of access may "give way . . . to other rights or interests"); *Stewart*, 360 F.3d at 98 ("The constitutional right of access . . . is not absolute . . . ."). Indeed, the Supreme Court has cautioned that access may be denied "where court files might . . . become a vehicle for improper purposes," such as "to gratify private spite or promote public scandal." *Nixon*, 435 U.S. at 598, 603 (internal quotation marks omitted); *see also New York Times I*, 828 F.2d at 116 (noting that criminal proceedings may be closed and documents may be sealed if there are specific findings demonstrating that closure "is essential to preserve higher values") (internal quotation marks omitted). In keeping with this point, the Second Circuit has held that the qualified right of access may yield to, among other things, the "privacy interests of innocent third parties" and "the danger of impairing law enforcement." *Amodeo II*, 71 F.3d at 1050 (internal quotation marks omitted); *see also Lugosch*, 435 F.3d at 120 (same).

While protective orders related to judicial documents and criminal proceedings are subject to constitutional and common law scrutiny, protective orders related to discovery are not. This is because experience and logic show that there is no right of access to discovery materials. With respect to experience, pre-trial discovery, "unlike the trial itself, is usually conducted in private." *Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co.*, 178 F.3d 943, 945 (7th Cir. 1999); *see also Bond*, 585 F.3d at 1074 ("At common law, pretrial proceedings were closed to the public, and the federal discovery rules have not changed this common-law tradition." (citation omitted)); *United States v. Anderson*, 799 F.2d 1438, 1441 (11th Cir. 1986) ("Discovery, whether civil or criminal, is essentially a private process because the litigants and

13

the courts assume that the sole purpose of discovery is to assist trial preparation. That is why parties regularly agree, and courts often order, that discovery information will remain private."); Richard L. Marcus, *Myth and Reality in Protective Order Litigation*, 69 Cornell L. Rev. 1, 37 (1983) ("[T]here simply is no tradition of public access to discovery.").

Because discovery is a private process between the parties to an action (even if governed by specific rules and managed by trial judges), courts generally view the documents or materials shared between them as outside the judicial function and therefore not presumptively accessible. *See Amodeo II*, 71 F.3d at 1050 (noting that because documents "passed between the parties in discovery" "play no role in the performance of Article III functions," they "lie entirely beyond" the common law presumption of access); *accord Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 33 (1984) (noting that "restraints placed on discovered, but not yet admitted, information are not a restriction on a traditionally public source of information"); *United States v. Kravetz*, 706 F.3d 47, 54 (1st Cir. 2013) ("[T]here is no tradition of access to criminal discovery."); *Baxter Int'l, Inc. v. Abbott Labs.*, 297 F.3d 544, 545 (7th Cir. 2002) (noting that "[s]ecrecy is fine at the discovery stage, before the material enters the judicial record."); *Bank of Am. Nat'l Trust & Sav. Ass'n v. Hotel Rittenhouse Assocs.*, 800 F.2d 339, 343 (3d Cir. 1986) (stating that "discovery . . . which is ordinarily conducted in private, stands on a different footing than does a motion filed by a party seeking action by the court"); *Travelers Indem. Co. v. Excalibur Reinsurance Corp.*, No. 11-CV-1209, 2013 WL 4012772, at *11 (D. Conn. Aug. 5, 2013) ("Put simply, the public has no constitutional, statutory or common-law right of access to unfiled discovery."); *United States v. Gangi*, No. 97-CR-1215, 1998 WL 226196, at *3 (S.D.N.Y. May 4, 1998) (noting that there is no common law tradition of public access to discovery in criminal cases). Indeed, even discovery materials filed with the court in connection with discovery-related disputes are not

14

covered by the qualified right of access. *See SEC v. TheStreet.Com*, 273 F.3d 222, 233 (2d Cir. 2001) (rejecting claim that deposition testimony became a "judicial document" "because the Court reviewed it in order to decide whether or not to enter [a] protective order"); *United States v. Wolfson*, 55 F.3d 58, 61 (2d Cir. 1995) ("We are not aware . . . of any common-law principle that documents submitted to a court *in camera* for the sole purpose of confirming that the refusal to disclose them to another party was proper, are to be deemed judicial records open to the public."); *accord United States v. Wecht*, 484 F.3d 194, 209 (3d Cir. 2007) (noting that "documents filed with the court are generally subject to the common law right of access, unless attached to a discovery motion"); *Leucadia, Inc. v. Applied Extrusion Techs., Inc.*, 998 F.2d 157, 165 (3d Cir. 1993) (holding that "there is a presumptive [common law] right to public access to all material filed in connection with nondiscovery pretrial motions, . . . but no such right as to discovery motions and their supporting documents"). *See generally Newsday*, 730 F.3d at 167 n.15 (noting that "the category of 'judicial documents' should not be readily expanded," and "the fact that a document is relevant to the subject matter of a judicial proceeding, or that the proceeding was in some way stimulated by the document, does not make it public").

With respect to logic, the courts have recognized the pitfalls in allowing unfettered public access to discovery materials. For one, the purpose of the discovery rules—to encourage the disclosure of information and materials to avoid unnecessary surprise and to level the playing field—might be undermined. *See Kravetz*, 706 F.3d at 54 (noting that decisions restricting public access to criminal discovery materials "are grounded largely on the concerns surrounding the deleterious effect that public access would have on the parties' search for and exchange of information in the discovery process"); *Anderson*, 799 F.2d at 1441 ("If . . . discovery information and discovery orders were readily available to the public and the press, the

15

consequences to the smooth functioning of the discovery process would be severe."). For another, there is the risk that disclosure of some of the discovery materials could taint a trial. *See United States v. McVeigh*, 119 F.3d 806, 813 (10th Cir. 1997) (upholding district court's sealing of discovery materials deemed inadmissible at trial, holding that "disclosure of such [materials] would play a negative role in the functioning of the criminal process, by exposing the public generally, as well as potential jurors, to incriminating evidence that the law has determined may not be used to support a conviction"); *United States v. White*, No. 04-CR-370, 2004 WL 2399731, at *5 (E.D. Pa. Sept. 22, 2004) (noting that "[i]f the prosecutors and/or defense counsel had a practice of disclosing discovery materials to the media, this could be disruptive to a fair trial for all parties . . . ."). And, because the discovery rules are reciprocal, there is the risk that unfettered public access could jeopardize a defendant's trial strategy. *See Kravetz*, 706 F.3d at 54 (noting, in context of journalist's request for materials obtained by Rule 17(c) subpoena, that "there is scant value and considerable danger in a rule that could result in requiring counsel for a criminal defendant to prematurely expose trial strategy to public scrutiny").

In the end, there is no presumptive right of access to the discovery materials provided in this Case. Thus, "an order prohibiting dissemination of discovered information before trial is not the kind of classic prior restraint that requires exacting First Amendment scrutiny." *Seattle Times*, 467 U.S. at 33. Indeed, the Supreme Court has held that "the trial court can and should, where appropriate, place a defendant and his counsel under enforceable orders against unwarranted disclosure of the materials which they may be entitled to inspect." *Alderman v. United States*, 394 U.S. 165, 185 (1969); *see also Seattle Times*, 467 U.S. at 32 (noting that "continued court control over the discovered information does not raise the same specter of

16

government censorship that such control might suggest in other situations"); *United States v. O'Keefe*, No. 06-CR-249, 2007 WL 1239204, at *2 (D.D.C. Apr. 27, 2009) ("Protective orders in criminal cases are not uncommon . . . .").

### 2. Rule 16(d) and Good Cause

The sought-after protective order would restrict public dissemination of discovery materials. "Rules authorizing discovery . . . are a matter of legislative grace." *Seattle Times*, 467 U.S. at 32; *see also Pub. Citizen v. Liggett Grp., Inc.*, 858 F.2d 775, 788 (1st Cir. 1988) (noting that the Supreme Court, in evaluating the legality of discovery protective orders, has "focused on the fact that discovery is a 'matter of legislative grace'"). As a general matter, these rules are meant to foster "the use of compulsory process to facilitate orderly preparation for trial, not to educate or titillate the public." *Joy v. North*, 692 F.2d 880, 893 (2d Cir. 1982). Here, as in all federal criminal cases, it is Rule 16 that principally governs pre-trial discovery. *See* Fed. R. Crim. P. 16; *see also United States v. Briggs*, No. 10-CR-184S, 2011 WL 4017886, at *5 (W.D.N.Y. Sept. 8, 2011) ("Federal Rule of Criminal Procedure 16 governs discovery in criminal cases."); *United States v. Louis*, No. 04-CR-203, 2005 WL 180885, at *2 (S.D.N.Y. Jan. 27, 2005) ("Rule 16 is . . . the sole authorized vehicle under the Federal Rules of Criminal Procedure for pre-trial discovery in criminal cases."); *United States v. Sturman*, No. 93-CR-167, 1993 WL 262458, at *5 (N.D. Ill. July 12, 1993) ("It is only by virtue of Rule 16 of the Federal Rules of Criminal Procedure that pretrial discovery is generally provided for in criminal cases."). *See generally Weatherford v. Bursey*, 429 U.S. 545, 559 (1977) (observing that "[t]here is no general constitutional right to discovery in a criminal case").[6] This rule requires that the

---

[6] Of course, *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972), require the Government to produce, respectively, exculpatory and impeachment

prosecution provide, among other things: "certain statements made by the defendant; the defendant's criminal record; access to certain physical evidence; and reports related to expert, scientific, and medical evidence." *United States v. Tucker*, 249 F.R.D. 58, 61 (S.D.N.Y. 2008); *see also United States v. Saunders*, No. 07-CR-341, 2008 WL 1886089, at *4 (M.D. Pa. Apr. 28, 2008) ("Under Rule 16 . . . . the defendant is entitled to receive from the government certain discovery material such as statements of the defendant, defendant's prior record, documents and tangible objects, reports of examinations and tests and expert witnesses that the government intends to use in its case-in-chief at trial."). Rule 16 also imposes reciprocal discovery obligations on defendants. *See United States v. Knight*, No. 12-CV-50035, 2013 WL 5930030, at *1 (W.D. Ark. Nov. 1, 2013) ("The discovery obligations of the government and a defendant under Rule 16 are reciprocal."); *United States v. Jasper*, No. 00-CR-825, 2003 WL 223212, at *3 n.4 (S.D.N.Y. Jan. 31, 2000) ("Under Rule 16(b)(1)(A), if defendant requests disclosure from the government under Rule 16(a)(1)(E), then upon compliance with a similar request by the government, defendant is required to permit the government to inspect and copy or photograph documents and tangible objects which are 'within the possession, custody or control of the

---

material in time to permit their effective use at trial. *See United States v. Yousef*, 327 F.3d 56, 112 (2d Cir. 2003).

The "Government's discovery obligations and *Brady* obligations are not coterminous." *United States v. Meregildo*, 920 F. Supp. 2d 434, 443 (S.D.N.Y. 2013). "Rule 16 protects against trial by surprise," while "*Brady* ensures that the Government will not secure an unfair advantage at trial." *Id.*; *see also United States v. Maniktala*, 934 F.2d 25, 28 (2d Cir. 1991) ("Unlike Rule 16 . . . *Brady* is not a discovery rule, but a rule of fairness and minimum prosecutorial obligation and is not violated unless the Government's nondisclosure infringes upon a defendant's right to a fair trial." (internal quotation marks omitted)); *Lamborn v. Dittmer*, 873 F.2d 522, 527 (2d Cir. 1989) ("Rule 16 . . . was intended to [e]nsure the efficient resolution of cases and, most importantly, minimize prejudicial surprise.").

defendant and which the defendant intends to introduce at trial.'" (quoting Fed. R. Crim. P. 16(b)(1)(A))).

Rule 16 also contains a provision governing protective orders related to the production of pretrial discovery. Indeed, it is this provision, Rule 16(d)(1), that the Government cites in support of its request for a protective order. *See* Fed. R. Crim P. 16(d)(1) (providing that "[a]t any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief."); *see also In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 93, 122 (2d Cir. 2008) (noting that Rule 16(d) grants district courts the discretion to establish conditions "under which the defense may obtain access to discoverable information"); *United States v. Delia*, 944 F.2d 1010, 1018 (2d Cir. 1991) (noting that because the language of Rule 16(d)(1) "is . . . permissive," the district court may "limit or otherwise regulate discovery had pursuant to the Rule"); *United States v. Bulger*, 283 F.R.D. 46, 51 (D. Mass. 2012) ("Where . . . a defendant seeks unlimited access to discovery that is subject to a protective order, the federal rules provide the framework to adjudicate the disclosure and dissemination issue."); *United States v. Lindh*, 198 F. Supp. 2d 739, 741 (E.D. Va. 2002) ("Analysis of the government's request for a protective order . . . appropriately begins with Rule 16(d). . . .").[7] Under the explicit terms of Rule 16(d), "good cause provides the basis to enter a protective order." *Bulger*, 283 F.R.D. at 52; *see also United States v. Lee*, 374 F.3d 637, 652 (8th Cir. 2004) (applying "good cause" standard to Rule 16(d) analysis). "As the party seeking a

---

[7] Protective orders in civil cases are governed by Federal Rule of Civil Procedure 26(c)(1), which allows courts to enter protective orders "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense . . . ." Fed. R. Civ. P. 26(c)(1). *See generally Pub. Citizen v. Liggett Grp., Inc.*, 858 F.2d 775, 788 (1st Cir. 1988) (noting that disputes over protective orders regarding discovery "must be judged by the text of rules and the applicable cases interpreting the rules").

produced by [a party], without a showing of good cause for confidentiality as to any individual documents." *Bulger*, 283 F.R.D. at 52–53 (quoting *Public Citizen*, 858 F.2d at 790) (alterations in original); *see also In re Terrorist Attacks on Sept. 11, 2001*, 454 F. Supp. 2d at 222 ("In cases of unusual scope and complexity . . . broad protection during the pretrial stages of litigation may be warranted without a highly particularized finding of good cause.").

"Examining [a] protective order under the framework of Rule 16(d) . . . does not eliminate the First Amendment as a relevant concern." *Bulger*, 283 F.R.D. at 50. Rather, "[t]he existence of the protective order . . . confines First Amendment scrutiny, including defendant's right to disseminate the discovery material, to the framework of Rule 16(d)'s good cause requirement." *Id.*; *see also Chi. Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1310 (11th Cir. 2001) ("The district court required Firestone to meet a compelling interest standard. To the extent this was predicated on a constitutional right of access, it was error."); *Public Citizen*, 858 F.2d at 788 (noting that *Seattle Times* did not eliminate the First Amendment "as a relevant consideration in protective order," but rather established that protective orders must be considered "within the framework of [the] requirement of good cause"); *Anderson*, 805 F.2d at 7 (noting that under *Seattle Times*, if the good-cause standard is met, then a protective order "does not offend the First Amendment"). Applying this standard requires courts to balance several interests, including whether dissemination of the discovery materials inflicts "hazard to others," *Carriles*, 654 F. Supp. 2d at 566 (quoting *Alderman*, 394 U.S. at 185), and whether "the imposition of the protective order would prejudice the defendant," *id.*; *see also United States v. Davis*, 809 F.2d 1194, 1210 (6th Cir. 1987) (requiring the defendant to "demonstrate substantial prejudice" from "imposition of a Rule 16 protective order"). Finally, "[t]he good cause determination must also balance the public's interest in the information against the injuries that

21

protective order, the Government bears the burden of showing good cause." *United States v. Carriles*, 654 F. Supp. 2d 557, 565–66 (W.D. Tex. 2009); *see also Gambale v. Deutsche Bank AG*, 377 F.3d 133, 142 (2d Cir. 2004) ("The party seeking a protective order [under Fed. R. Civ. P. 26(c)] has the burden of showing that good cause exists for issuance of that order.") (internal quotation marks and brackets omitted); *United States v. Jones*, No. 06-CR-149, 2007 WL 4404682, at *2 (E.D. Tenn. Dec. 13, 2007) (rejecting government's request for a Rule 16(d) protective order where government failed to "make the requisite showing" of good cause). Indeed, good cause remains the standard "even where parties consent to a stipulated protective order." *United States v. Luchko*, No. 06-CR-319, 2006 WL 3060985, at *3 (E.D. Pa. Oct. 27, 2006).

Good cause exists "when a party shows that disclosure will result in a clearly defined, specific and serious injury." *In re Terrorist Attacks on September 11, 2001*, 454 F. Supp. 2d 220, 222 (S.D.N.Y. 2006) (quoting *Shingara v. Skiles*, 420 F.3d 301, 306 (3d Cir. 2005)). A finding of harm "must be based on a particular factual demonstration of potential harm, not on conclusory statements." *Gangi*, 1998 WL 226196, at *2 (quoting *Anderson v. Cryovac, Inc.*, 805 F.2d 1, 8 (1st Cir. 1986)); *see also Wecht*, 484 F.3d at 211 ("Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not support a good cause showing." (internal quotation marks omitted)). "The nature of the showing of particularity, however, depends upon the nature or type of protective order at issue." *Bulger*, 283 F.R.D. at 52. Protective orders come in all shapes and sizes, "from true blanket orders (everything is tentatively protected until otherwise ordered) to very narrow ones limiting access only to specific information after a specific finding of need." *Poliquin v. Garden Way, Inc.*, 989 F.2d 527, 532 (1st Cir. 1993). "A blanket protective order 'extend[s] broad protection to all documents

20

disclosure would cause." *Wecht*, 484 F.3d at 211 (citing *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 787–91 (3d Cir. 1994)).[8]  Thus, "courts should take care to ensure that the protection afforded to [discovery] information is no broader than is necessary to accomplish the [proffered] goals" of the protective order. *Lindh*, 198 F. Supp. 2d at 741–42.

### B. Discussion

#### 1. Government's Claim of Good Cause

The Government seeks a blanket protective order in this case, claiming it is necessary to further two interests.  One is the protection of third parties whose interests might be jeopardized by being associated with the Defendants and their alleged misconduct.  The other is the integrity of what the Government contends are ongoing investigations into the criminal conduct of others connected to this case.

##### a. Privacy Interests of Third Parties

The Government asserts that a protective order is appropriate here because the "discovery . . . includes recorded conversations of and references to third parties who have not been charged with any criminal offenses." (Aug. 21 Anderson Ltr. 3.)  According to the Government, the "use of the discovery to besmirch the character and reputation of uncharged third parties should not be allowed." (*Id.*)

---

[8] In *Wecht*, the Third Circuit distinguished between the Government's obligations under rules governing discovery, and the Government's obligations under *Brady v. Maryland*, 373 U.S. 83 (1963).  In the view of the *Wecht* court, while the production of discovery pursuant to the federal rules of criminal procedure is beyond the reach of the qualified right of access, the production of *Brady* and *Giglio* material may not be. *Wecht*, 484 F.3d at 209–10.

Based on the Government's description of the discovery it has produced to date (and expects to produce), it appears that the bulk of the materials at issue are being produced solely pursuant to the Government's Rule 16 obligations.  If that assumption proves to be false, the Court expects the Government to notify the Court.

The Government is correct that courts have recognized that the interests of third parties may justify restrictions on public access to judicial and other documents and materials. *See, e.g.,* *Amodeo II*, 71 F.3d at 1050–51 (noting that the "privacy interests of innocent third parties . . . should weigh heavily in a court's balancing equation" in determining the public's access to judicial documents) (quoting *Gardner v. Newsday, Inc.*, 895 F.2d 74, 79–80 (2d Cir. 1988)); *TheStreet.Com*, 273 F.3d at 232 (same); *United States v. Gerena*, 869 F.2d 82, 85 (2d Cir. 1989) (noting, in context of disclosure of Title III intercepts, that district courts must "balance the public's right of access against the privacy and fair trial interests of defendants, witnesses and third parties"); *New York Times I*, 828 F.2d at 116 ("Certainly, the privacy interests of innocent third parties as well as those of defendants that may be harmed by disclosure of Title III material should weigh heavily in a court's balancing equation in determining what portions of motion papers in question should remain sealed or should be redacted."); *Carriles*, 654 F. Supp. 2d at 567 ("It is well settled that preventing harm to a person's economic interests is an appropriate purpose of a protective order."); *United States v. Simpson*, No. 09-CR-249, 2010 WL 3633611, at *2 (N.D. Tex. Sept. 20, 2010) ("*Simpson I*") ("The court can order the redaction of [third-

party] names if it finds that substantial privacy interests would be violated by disclosure. . . . .").[9] As the Second Circuit has explained, courts "have long declined to allow public access simply to cater 'to a morbid craving for that which is sensational and impure.'" *Amodeo II*, 71 F.3d at 1051 (quoting *In re Caswell*, 29 A. 259, 259 (R.I. 1893)). Just as poignant is the Supreme Court's admonition that judicial documents not be "used to gratify private spite or promote public scandal," and, therefore, that courts may refuse "to permit their files to serve as reservoirs of libelous statements for press consumption." *Nixon*, 435 U.S. at 598 (internal quotation marks omitted).

Defendants do not contest the general authority of courts to enter protective orders to protect innocent third parties, but they reject the need for any such order here. First, Defendants argue that because the third parties in this case are public officials, any misconduct on their part should not be shielded from the public. (*See* Aug. 28 Misir Ltr. 3.) In support of this point, Defendants rely on *United States v. Huntley*, No. 13-CR-54, 2013 WL 1881536 (E.D.N.Y. May 7, 2013). In *Huntley*, members of the media sought the unsealing of a memorandum filed by a defendant in anticipation of sentencing in a public-corruption case. *See Huntley*, 2013 WL

---

[9] The Government also cites *United States v. King*, No. 10-CR-122, 2012 WL 2196674, at *3 (S.D.N.Y. June 5, 2012), in support of its argument that the interests of innocent third parties may bar public access to discovery materials. (*See* Letter of Justin Anderson to the Ct., Sept. 3, 2013 ("Sept. 3 Anderson Ltr.") 2.) The Government parenthetically quotes *King* as follows: "'The need to protect the privacy of . . . third parties is a compelling one' that 'overrides any public interest in the disclosure of the [ ] materials' (internal quotation marks omitted).'" (*Id.*) However, a fuller version of the quote reads: "[T]he Government points to records containing medical information about the defendant's daughter and parents. The need to protect the privacy of *these* third parties is a compelling one . . . which overrides any public interest in the disclosure of *these materials because such materials are truly tangential to the sentencing decision in this case*." *King*, 2012 WL 2196674, at *4 (emphasis added). Because the Government has not claimed the need to keep medical information of third parties confidential, the actual holding from *King* is not relevant here.

24

1881536, at *1. The letter argued for a lower sentence because of the defendant's cooperation, and listed the state legislators and other elected officials who were recorded by the defendant as part of her cooperation. *Id.* In granting the media's request for access to the letter, the court noted that the privacy interests of the elected officials were at their "lowest," because these officials were "well-equipped" to "respond to any accusations of wrongdoing." *Id.* at *4; *see also Pansy*, 23 F.3d at 787 (noting that "privacy interests are diminished when the party seeking protection is a public person subject to legitimate public scrutiny"); *White*, 2004 WL 2399731, at *5 (holding that disclosure of grand-jury testimony of city employees was proper because "they cannot be expected to have any personal privacy interest in their duties as [c]ity employees").

*Huntley*, however, provides limited support to Defendants' position. First, that case involved a sentencing letter filed with the court and thus was a judicial document that was presumptively accessible to the public as a matter of constitutional and common law. *See Huntley*, 2013 WL 1881536, at *2–4 (explaining why defense letter filed in advance of sentencing was presumptively accessible under First Amendment and common law). Here, on the other hand, the materials at issue are not judicial documents and, as explained above, are not presumptively accessible to the public as a matter of common and constitutional law. This difference is legally significant as discovery materials may be subject to a protective order on a mere showing of good cause, but then become presumptively accessible under the First Amendment and/or the common law if they later become judicial documents. *See Newsday*, 730 F.3d at 166 ("[T]he facts necessary to show good cause for a protective order applicable to discovery documents that are not yet implicated in judicial proceedings will not necessarily meet the higher threshold imposed by the First Amendment with respect to judicial documents."); *Union Oil Co. of Cal. v. Leavell*, 220 F.3d 562, 568 (7th Cir. 2000) ("Much of what passes

25

between the parties remains out of public sight because discovery materials are not filed with the court. But most portions of discovery that are filed and form the basis of judicial action must eventually be released . . . ." (citation omitted)); *Rushford v. New Yorker Magazine, Inc.*, 846 F.2d 249, 252–53 (4th Cir. 1988) ("[D]iscovery [subject to a protective order] . . . stands on a wholly different footing than does a motion filed by a party seeking action by the court.").

Second, the cases that recognize the interests of third parties as justifying non-disclosure of certain materials speak to the unfairness of being stigmatized from sensationalized and potentially out-of-context insinuations of wrongdoing, combined with the inability of these third parties to clear their names at trial. *See, e.g.*, *United States v. Ladd*, 218 F.3d 701, 703 (7th Cir. 2000) ("[T]he only reason for disclosing the identities was to stigmatize the individuals . . . . [B]ut [they] would have no opportunity to clear their names at trial."); *Simpson I*, 2010 WL 3633611, at *2 ("The primary concern is that public disclosure of the persons associated with criminal activity may cause damage to the unindicted person's reputation with no corresponding opportunity to defend his reputation at trial."). Thus, while it may be that elected officials have easier access to the media, thus facilitating public denials of any wrongdoing, they are not able to clear their names through such denials with the same force as a favorable verdict might provide. The Eighth Circuit recognized this when it denied the media access to intercepted communications in a case involving "allegations of widespread fraud and bribery within the Department of Defense and the defense industry." *Certain Interested Individuals v. Pulitzer Publ'g Co.*, 895 F.2d 460, 461 (8th Cir. 1990). In that case, the court explained the incurable damage that could be caused by disclosure of the intercepted conversations against those who are not charged and who therefore will not be tried:

> We think the lack of an indictment is critical because where no indictments have
> issued against persons allegedly involved in criminal activity, there is a clear
> suggestion that, whatever their truth, the Government cannot prove these
> allegations. The court of public opinion is not the place to seek to prove them. If
> the Government has such proof, it should be submitted to a grand jury, an
> institution developed to protect all citizens from unfounded charges. All citizens,
> whatever their real or imagined past history, are entitled to the protection of a
> grand jury proceeding . . . . Moreover, in the absence of an indictment and a
> pending criminal trial, individuals whose wiretapped conversations are disclosed
> have no judicial forum in which they may potentially vindicate themselves or
> their conduct. Without an indictment, there can be no trial and, from their
> perspective, no acquittal.

*Id.* at 466–67 (citations, internal quotation marks, and brackets omitted).

A similar conclusion was reached by the Third Circuit in *United States v. Smith*, 776 F.2d

1104 (3d Cir. 1985). In that case, the defendants were indicted on fraud and racketeering

charges related to an alleged scheme to corruptly obtain certain government contracts from state

and municipal officials. *Id.* at 1105. The defendants filed a motion for a bill of particulars,

pursuant to Fed. R. Crim. P. 7(f), seeking, inter alia, the identity of the unindicted co-

conspirators, which the trial court granted and which the government subsequently provided to

the defendants and filed under seal with the district court. *Id.* at 1105–06. Various newspapers

sought access to the list of co-conspirators contained in the bill of particulars. *Id.* at 1106. The

district court rejected the newspapers' request, finding that the government had established

"good cause" for keeping the identities of the co-conspirators under seal. In particular, while the

district court found that disclosure would not jeopardize the fair-trial rights of the defendants and

would not adversely affect any ongoing investigation, the district court concluded that risk "of

serious injury to the persons named on the list" from disclosure outweighed any qualified right

of access to the bill of particulars. *Id.* at 1107.

27

In affirming, the Third Circuit determined that the bill of particulars was "more akin to the functions of an indictment than to discovery," *id.* at 1111, and therefore was a judicial document that should be presumptively accessible under the First Amendment and common law, *id.* at 1112 ("[W]e hold that . . . access [to the bill of particulars] is protected by the First Amendment and the common law . . . ."). Nonetheless, the Third Circuit found that the privacy interests of the unindicted co-conspirators outweighed the public's qualified right of access. *Id.* at 1105, 1113–14. The publication of the list, especially in the absence of sufficient facts to explain why these individuals might be viewed as co-conspirators in the alleged corruption scheme, was viewed as risking more "than mere embarrassment" to these third parties. *Id.* at 1114. Instead, because these individuals had not been indicted, "and, accordingly, [would] not have an opportunity to prove their innocence at trial," the *Smith* court concluded that these individuals would suffer "clearly predictable injuries to [their] reputations" that were "likely to be irreparable," and "career ending." *Id.* at 1113–14. In reaching this conclusion, the court was "mindful of the fact that the list contains the names of some individuals who are public officials and some who are public employees," and "that the public has a substantial interest in the integrity or lack of integrity of those who serve them in public office." *Id.* at 1114. However, the court rejected the notion that "the subject matter of the particular information to which access is sought can control the issue . . . ." *Id.* As the court explained:

> [T]he underpinnings of the First Amendment and common law rights of access are historical experience and societal utility. When resolving issues involving these rights, the Supreme Court has not examined whether there has been a tradition of access with respect to information of the particular character involved or whether that information is of significant public interest. Rather, it has inquired whether there has historically been public access to this particular part of the judicial process and whether access to that portion of the process will significantly enhance public understanding and appreciation of the judicial process or improve the process itself.

28

> If the answers to these questions are in the affirmative, the [Supreme] Court has recognized and protected the public interest involved by precluding closure in the absence of a compelling, countervailing government interest.

*Id.* at 1114–15. There may well be, and indeed there should be, public interest in how our public officials behave. But, this does not mean that discovery materials, which have no tradition of being publicly accessible, should *automatically* become fodder for selective dissemination at the potential expense of the reputation even of public officials when those officials might not be able to vindicate themselves through the judicial process.[10] Of course, this also does not mean that the interests of public officials necessarily should be on the same footing as non-public individuals. *See Amodeo II*, 71 F.3d at 1051 (noting that courts should consider "the degree to which the subject matter is traditionally considered private rather than public"). Rather, the courts should evaluate the extent of the harm to public officials caused by the discovery materials on a case-by-case basis, taking into consideration the nature of the information in the discovery materials, as well as the public officials at issue.

Moreover, in this case, it is far from clear that all the third parties whose reputations might be tainted from public disclosure of the discovery materials are, in fact, public officials. *See Luchko*, 2007 WL 1651139, at *7 (noting that while "some of the persons involved in the[]

---

[10] Part of the risk faced by third parties derives from the *selective* dissemination of the discovery materials. For example, the release of partial conversations or portions of documents could falsely implicate those connected to the investigation. Thus, while cases such as *Smith* did not involve disclosure of evidence of wrongdoing by any third parties, but merely a list of co-conspirators prepared by the government, they still reflect the risk to the reputation of third parties who could be stigmatized by disclosure of snippets of the discovery that might be disclosed to serve the strategic interests of a party in this case. *See United States v. Lindh*, 198 F. Supp. 2d 739, 743 (E.D. Va. 2002) ("[I]t is a lamentable fact of life that parties in newsworthy trials may attempt to use the media precisely for th[e] purpose [of influencing public opinion by disclosing discovery materials].").

discovery materials are certainly public officials for whom privacy interests are diminished, many of the persons referenced . . . are private persons who have personal privacy interests"). Indeed, the Indictment contains allegations against non-government individuals whose connection to this case is that they are members of, or associated with, political parties. And, the Indictment contains other allegations relating to certain business transactions that could well involve non-public officials.

This point, in fact, segues into Defendants' second objection to the Government's claim of good cause. Specifically, Defendants argue that the Government has not identified the third parties whose reputations might be affected by public disclosure of information, or how their interests would be compromised. (*See* Aug. 30 Varghese Ltr. 3.) This is a fair point, because to establish good cause based on the interests of third parties, the Government may not rely on conclusory allegations. *See Pansy*, 23 F.3d at 786 ("Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not support a good cause showing." (internal quotation marks omitted)); *United States v. Simpson*, No. 09-CR-249, 2010 WL 4282173, at *2 (N.D. Tex. Oct. 28, 2010) ("*Simpson II*") (rejecting prosecutor's request to redact certain portions of an affidavit because it included names of third parties, noting that "the government does not specifically establish how disclosure of these individuals' names amounts to a firm accusation, or how disclosure violates substantial privacy interests"); *HSqd, LLC v. Morinville*, No. 11-CV-1225, 2013 WL 1149944, at *3 (D. Conn. Mar. 19, 2013) (rejecting request for protective order because movant's "alleged example of injury is rife with speculative language"); *United States v. Talco Contractors, Inc.*, 153 F.R.D. 501, 513 (W.D.N.Y. 1994) ("Good cause must be established and not merely alleged."). Rather, the Government must

30

provide specific information about the third parties whose interests might be at risk, and how dissemination of the discovery might jeopardize them. *See Pansy*, 23 F.3d at 786 (noting in civil context that "[g]ood cause is established on a showing that disclosure will work a clearly defined and serious injury . . . . The injury must be shown with specificity." (internal quotation marks omitted)); *United States v. Stone*, No. 10-CR-20123, 2012 WL 137746, at *2 (E.D. Mich. Jan. 18, 2012) (applying same test for application for protective order in criminal case); *United States v. Patkar*, No. 06-CR-250, 2008 WL 233062, at *4 n.5 (D. Haw. Jan. 28, 2008) (same).

In its initial letter seeking a protective order, the Government argued that "the discovery in this matter includes recorded conversations of and references to third parties who have not been charged with any criminal offenses." (Aug. 21 Anderson Ltr. 3.)[11] As an example, the Government attached an article citing recorded conversations in this case of a Republican Party official. (*Id.* at Ex. A.) The article discussed the fact that another Republican party official was recorded discussing a possible bribe. *See* Carl Campanile, *Manhattan GOP Leader Isaacs Caught on FBI Tape Entertaining $30G Bribe from Agent—Pol Whines 'I Have Never Been Charged'*, N.Y. Post (Aug. 20, 2013), http://nypost.com/2013/08/20/manhattan-gop-leader-isaacs-caught-on-fbi-tape-entertaining-30g-bribe-from-agent-pol-whines-i-have-never-been-charged.[12] In its reply letter in further support

---

[11] The Government also claimed that some discovery materials contain "financial-account numbers and personal identifiers that are private and should not be made public." (Aug. 21 Anderson Ltr. 2.) Defendants do not object to protecting this type information, so the Court will assume that no party will publicly disclose such information. *Cf.* Fed. R. Crim. P. 49.1 (requiring that court filings redact certain personal information such as street addresses, full social security numbers, dates of birth, and full financial account numbers).

[12] At oral argument, the Government characterized the leak that led to this story as something done "for political advantage outside of this case." (Oct. 7, 2013 Discovery Conference Tr. ("Oct. 7 Conference Tr.") 12.) At this point, the record is silent as to who

31

of its application, the Government asserted that "the interests of uncharged third parties were implicated in the investigation," that it had provided "a stark example of that in its application" (referring to the article about Isaacs), and that "[t]here are others, which is plain from the materials already provided and to be provided in discovery . . . ." (Letter of Justin Anderson to the Ct., Sept. 3, 2013 ("Sept. 3 Anderson Ltr.") 3.) At oral argument, the Court invited the Government to provide these additional examples, if it wanted, in an *ex parte* submission. (Oct. 7, 2013 Discovery Conference Tr. ("Oct. 7 Conference Tr.") 63 (The Court: "Do you want to submit something for in-camera review on the third-party issue and the 'continuing investigation' issue?"; AUSA: "We do, Judge.").); *see Luchko*, 2007 WL 1651139, at *7 (noting that the government had submitted over 800 pages of discovery for *in camera* review in support of the claim that innocent third parties would be harmed in the absence of a protective order). However, as discussed below, in its one *ex parte* submission filed after oral argument, the Government focused it discussion on the ongoing investigations that were at risk from disclosure of the discovery in this case. It did not identify any third parties whose interests would be harmed separate and apart from the concerns raised about the ongoing investigations.

The Court has no basis to accept or reject the Government's claim that third parties could be tainted because they are picked up on the recordings in this case, or otherwise appear in the

---

provided the recording cited in the article to the media or why it was provided, but it bears sharing with the Parties that the local rules governing extrajudicial statements could well proscribe the dissemination of discovery materials to the media. *See United States v. White*, No. 04-CR-370, 2004 WL 2399731, at *5 n.2 (E.D. Pa. Sept. 22, 2004) (warning counsel that they should be "aware of" their obligations to "abide by" the local criminal rule prohibiting "extrajudicial statements which may 'interfere with a fair trial or otherwise prejudice the due administration of justice,'" and commenting that "the purposeful disclosure of pretrial discovery materials to the media could have a detrimental effect on achieving a fair trial for all parties").

discovery in this case. *See Gerena*, 869 F.2d at 86 ("Certainly, the privacy interests of innocent third parties as well as those of defendants that may be harmed by disclosure of the Title III material should weigh heavily in a court's balancing equation . . . ." (quoting *New York Times I*, 828 F.2d at 116)). However, the absence of specific examples beyond Isaacs (which cannot be undone) leaves a gap in the record that prevents the Court from making a finding, either way, as to whether there is good cause to enter a protective order. For example, the Government has not offered information about, among other things, the identities of the third parties, whether these other third parties are public officials or private citizens, which specific discovery materials would unfairly sully their reputation, and whether the conduct of these individuals would be proven at trial (which would be open to the public). Without this information, the Court cannot determine, for example, how much weight to give to the interests of the third parties, whether redactions to the discovery might alleviate the Government's concerns, or instead, whether a blanket protective order would be the only way to protect the interests of the third parties. *See, e.g.*, *United States v. Swartz*, No. 11-CR-10260, 2013 WL 2237798, at *5 (D. Mass. May 13, 2013) ("[R]edaction of even judicial records may be appropriate when third-party privacy interests are jeopardized."); *Bulger*, 283 F.R.D. at 57 ("[T]he government's statement regarding privacy presents a viable argument. At this point, however, and without a description of the material or reviewing the documents at issue, it is difficult to make a determination."). Thus, as it currently stands, the Government's case for good cause is quintessentially one based on conclusory allegations and cannot be the basis for the protective order the Government seeks. *See S.E.C. v. Rajaratnam*, 622 F.3d 159, 185 (2d Cir. 2010) ("[A] definitive balancing of the interests at stake in this case is impossible, because the record is not adequately developed to support the broad order appealed from."); *Simpson I*, 2010 WL 3633611, at *3 ("The

33

government has not established that the unindicted persons will suffer injury to their reputations because of public disclosure of their names."). If the Government wishes to augment the Record on this point, it may seek leave to do so. *See Simpson I*, 2010 WL 3633611, at *3 (providing the prosecution with additional time to establish good cause to keep sealed a post-indictment restraining-order application on the claim that disclosure of the application threatened the interests of unindicted third parties). For now, therefore, the Court will not enter a protective order on this basis.

### b. Ongoing Investigations

In its initial application for the Protective Order, the Government asserted that disclosure of the discovery materials might "impede[]" ongoing investigations. (Aug. 21 Anderson Ltr. 3.) In particular, the Government contended that public dissemination of the discovery materials "will alert possible subjects of the investigation to the Government's interest in them," and will "compromise the ability of individuals named in the discovery to assist the Government in its continuing efforts to ferret out wrongdoing by putting subjects on notice of the risk that these individuals are cooperating with law enforcement authorities." (*Id.*)

As a general proposition, courts have repeatedly recognized that materials, including even judicial documents which are presumptively accessible, can be kept from the public if their dissemination might "adversely affect law enforcement interests." *Amodeo II*, 71 F.3d at 1050; *see also Lugosch*, 435 F.3d at 120 (noting that the "danger of impairing law enforcement" may be a countervailing factor outweighing the qualified right of access); *Madoff*, 626 F. Supp. at 427 (rejecting press access to emails sent by victims in a major fraud case, because "disclosing the details of the Government's efforts to obtain evidence will undoubtedly hamper the

34

investigation"); *United States v. Park*, 619 F. Supp. 2d 89, 94 (S.D.N.Y. 2009) (holding that the

need to "maintain the secrecy of the Government's investigation" outweighed the public's right

of access to sentencing documents). Thus, where public disclosure of certain materials might

officially reveal the sources and methods law-enforcement officials have used, and will continue

to use, to investigate other criminal conduct related to the publicly filed charges, courts have

found it appropriate to enter a protective order. *See, e.g.*, *United States v. Bin Laden*, No. 98-

CR-1023, 2001 WL 66393, at *2 (S.D.N.Y. Jan. 25, 2001) (noting that the court adopted a

protective order because dissemination of discovery materials would "jeopardize the ongoing

Government investigation into the activities of alleged associates of the Defendants"); *United*

*States v. Milken*, 780 F. Supp. 123, 127 (S.D.N.Y. 1991) ("[T]he public should have access to

information as to the general nature and extent of defendant's cooperation, if disclosure can be

made without jeopardizing ongoing or future investigations . . . ." (emphasis removed)).

As is true with the assertion of protecting the interests of third parties, the Government

has the burden of demonstrating, and not just alleging, that public disclosure of the Rule 16

materials in this case could jeopardize ongoing investigations. In support of its application, the

Government has submitted *ex parte* a letter for *in camera* review. (*See* Sealed Letter from the

Government to the Ct., Oct. 15, 2013 ("Sealed Ltr.").)[13] In this letter, the Government has

provided specific details of ongoing investigations that are related to the discovery materials

---

[13] Courts routinely consider these types of *ex parte* submissions. *See In re S.F. Chronicle*, No. 07-M-256, 2007 WL 2782753, at *2 (E.D.N.Y. Sept. 24, 2007) (considering sealed affidavit to "make an on-the-record finding that continued closure is necessary to preserve ongoing criminal investigations in the pending action"); *United States v. Mannino*, 480 F. Supp. 1182, 1187 (S.D.N.Y. 1979) ("[T]he court granted the Government's request to make an Ex parte submission in support of its motion for a protective order, in accordance with Rule 16(d)(1).").

provided, or that will be provided, in this case. (*Id.*) Suffice it to say, the Court will not discuss the details of this letter in this Opinion. But, the Court finds that the letter adequately establishes both that there are ongoing investigations into criminal conduct related to the discovery materials in this Case, and that public disclosure of some of these materials plausibly could undermine these investigations. In particular, disclosure of the materials could: (i) reveal the targets of the investigations and the suspected criminal conduct being investigated; (ii) disclose the type of evidence being collected, or that could be collected, against these individuals; and (iii) officially confirm who some of the cooperating witnesses in these investigations are. This information, should it become publicly available, could alert the targets of the investigation and could lead to efforts by them to frustrate the ongoing investigations. *See United States v. Steinger*, 626 F. Supp. 2d 1231, 1235 (S.D. Fla. 2009) ("If the sealed documents and transcripts were made available to the press and public at this time, the nature of the grand jury investigation would come to light, and those individuals whose actions are being looked at would—by learning of the nature of the investigation—likely become aware that they are subjects or targets of the grand jury. Such knowledge, in turn, would compromise the investigation and might also lead to the destruction of evidence."); *Park*, 619 F. Supp. 2d at 94 ("Unsealing the redacted information would eviscerate the Government's ability to continue its covert investigation.").

Defendants, who have not been made privy to the Government's *ex parte* submission, and who do not quarrel with the legal supposition that protective orders may be appropriate in certain cases, contest the Government's need for a protective order (especially one as broad as that sought here) on three grounds: that (i) the public has a right to know which public officials are under investigation; (ii) media reports already have revealed the Government's cooperating

witness; and (iii) the Government jeopardized its own investigation during its "loud" press conference. (*See* Aug. 28 Misir Ltr. 3–4 (explaining that press reports which came out within a day of Defendants' arrest about the Government's cooperating witness have already alerted other targets of the ongoing investigation); Aug. 30 Varghese Ltr. 1, 4 (discussing the public's interest in knowing about how "the government investigates and prosecutes" public officials and the press conference announcing the arrests in this case).) None of these objections, however, sufficiently undercuts the Government's good-cause claim.

First, as Defendants suggest, while there may be great public interest in learning about the Government's investigation of public officials, there is a greater public interest in allowing those investigations to run their course. Indeed, Defendants argued, in response to the Government's claim about the privacy interests of unindicted third parties, that the public has an interest in learning about the misdeeds of their public officials. If true, then presumably the public would not want these officials to escape accountability because they are able to frustrate law-enforcement investigations that are prematurely revealed. Thus, there is no countervailing interest that would outweigh the Government's substantiated interest in meeting its discovery obligations in this case in a way that does not jeopardize the investigation of other public officials suspected of violating the law. *See Swartz*, 2013 WL 2237798, at *6 ("[A]lthough the public has expressed a strong interest in the investigation and prosecution of Mr. Swartz, that fact does not bestow upon his estate the right to disclose criminal discovery materials produced to his counsel solely for the purpose of preparing for trial."); *Mannino*, 480 F. Supp. at 1188 (delaying the prosecution's production of certain discovery materials and the trial to avoid disclosing an ongoing criminal investigation, noting that "[a]lthough the public ordinarily has a

strong interest in prompt disposition of criminal charges, in this case the public has an even stronger stake in assuring that a comprehensive inquiry into serious criminal activity is completed . . . .").

As to the second point, that media sources have already burned the investigation by revealing the Government's cooperating witness, the Court concludes that this is no basis to reject the Government's proposed protective order. To begin, Defendant's argument is premised on the notion that there is only one cooperating witness, and that that witness is the only source of the information that is part of the ongoing investigations. Based on the sealed letter that the Government has submitted, this premise appears to be inaccurate. (*See* Sealed Ltr.) Moreover, even if there were press reports suggesting the identity of the cooperating witness, and even if those reports prove to be accurate, *see Senior Aide Implicating Bin Laden in Terrorism*, N.Y. Times (Dec. 3, 1998), http://nytimes.com/1998/12/03/world/senior-aide-implicating-bin-laden-in-terrorism.html (citing unnamed sources to identify prosecution's cooperating witness in ongoing terrorism investigation, but the sources' information proved inaccurate), that is not the functional equivalent of officially acknowledging the cooperating witness, let alone the information that the witness has provided. *See Afshar v. Dep't of State*, 702 F.2d 1125, 1130 (D.C. Cir. 1983) ("[E]ven if a fact—such as the existence of . . . [a secret] liaison—is the subject of widespread media and public speculation, its official acknowledgment by an authoritative source  might well be new information that could cause damage to the national security."); *cf. Wilson v. CIA*, 586 F.3d 171, 186 (2d Cir. 2009) (noting that under the Freedom of Information Act ("FOIA"), "the law will not infer official disclosure of information classified by the CIA from . . . widespread discussion of a classified matter"); *Halpern v. FBI*, 181 F.3d 279, 294 (2d

Cir. 1999) (under FOIA, the government may be deemed to have waived its right to keep certain information confidential "only where the government has *officially* disclosed the information the requester seeks" (emphasis added)).[14] Thus, as to any media reports that do not involve official recognition of the identity of a cooperating witness, the Court finds Defendants' position to be without merit.

However, after the Parties fully briefed this issue, the Government officially recognized the existence of a cooperating witness. On November 12, 2013, the Court accepted the guilty plea of Defendant Savino. In media reports immediately following this plea, Savino's attorney would not say whether his client was cooperating with the Government and specifically declined to "speculate" how Savino's plea would affect the cases of the other Defendants in this Case. *See* Courtney Gross, *Former Bronx GOP Chairman Pleads Guilty in Connection with Alleged Bribery Scheme*, N.Y. 1 (Nov. 12, 2013), http//www.ny1.com/content/politics/political_news/198612/former-bronx-gop-chairman-pleas-guilty-in-connection-with-alleged-bribery-scheme. However, over the next two days, media reports surfaced that Savino "has turned federal witness as part of his guilty plea," citing the Plea Agreement itself that spelled out Savino's cooperation with the Government. Steve Lieberman, *Ex-Clarkstown Attorney Savino Cooperates with Feds in NYC Corruption Probe*, Journal News

---

[14] *United States v. Zazi*, Nos. 09-CR-663, 10-CR-19, 2010 WL 2710605 (E.D.N.Y. June 30, 2010), is not to the contrary. In that case, the court denied a government request to seal plea agreements for two cooperators. In so doing, the court noted that while "unsealing is not mandated merely because the media has speculated that [defendant] is cooperating," the media reports in that case were different because they cited multiple law-enforcement sources. *Id.* at *3. Moreover, because the media reports coincided with other events, the court concluded that there was no guesswork left to be done to know that the defendants were cooperating. *Id.* at *4 ("At another time, under different circumstances, the government's arguments may have had enough punch to justify continued non-disclosure of the defendants' cooperation agreements.").

(Nov. 14, 2013), http://www.lohud.com/article/20131114/NEWS02/311140056/; *see also* Laurel

Babcock & Rich Calder, *Ex-head of Bronx GOP Admits Taking Bribe, but Spreads Blame*, N.Y.

Post (Nov. 12, 2013),

http://nypost.com/2013/11/12/ex-head-of-bronx-gop-admits-taking-bribe-but-spreads-blame/

(referencing terms of plea).   It was the *Government* that provided this Agreement to the media,

thus officially acknowledging that Savino was cooperating and that his cooperation included

"taking a personal benefit in 2009 from the Bronx GOP," and "misappropriations between 2005

and 2013 from the Republican Party . . . ."   The Government's decision to officially

acknowledge the cooperation of a defendant in this case is perplexing in light of its insistence

that the Court enter a protective order to shield from the media and the public its investigation of

other crimes, which investigation includes the use of cooperating witnesses.   Recall that it was

one of the Government's arguments at the outset of the briefing on this issue that public

disclosure of the discovery here would  "compromise the ability of individuals named in the

discovery to assist the Government in its continuing efforts to ferret out wrongdoing by putting

subjects on notice of the risk that these individuals are cooperating with law enforcement

authorities." (Aug. 21 Anderson Ltr. 3.)   But, by sharing the Plea Agreement with the media, the

Government has put the subjects of any investigation related to Savino's cooperation on notice

that he is cooperating, and has revealed in some detail the type of misconduct he could assist

with and the timing of that misconduct.   Of course, an argument could be made that the Plea

Agreement is a judicial document (though it was not marked as a court exhibit and the

Government kept custody of the original agreement), and therefore is presumptively accessible.

*See Haller*, 837 F.2d at 86–87.   However, there is legal authority that would have allowed the

Government to at least ask that the Agreement be sealed precisely to protect the integrity of the

Government's ongoing investigations. *See Haller*, 837 F.2d at 87 (closure of paragraph of plea agreement appropriate because it was "essential to protect the secrecy of sensitive maters affecting a grand jury proceeding and an ongoing criminal investigation"); *Zazi*, 2010 WL 2710605, at *1–3 (describing prosecution's application to keep cooperation agreements sealed, but rejecting it, in part, because law-enforcement officials had leaked the fact of cooperation to media organizations); *United States v. Ketner*, 566 F. Supp. 2d 568, 587–88 (W.D. Tex. 2008) (sealing portions of plea minutes and sealing plea agreements because "opening these documents to public scrutiny at this time would seriously undermine the viability of the Government's investigation"). Indeed, it is the Court's experience that the Government routinely makes such applications, even when there is no claim that the cooperator's personal safety is at risk. The Government elected to forego making such an application here.

The official disclosure that Savino is cooperating weakens the Government's claimed need for the Protective Order. Again, without revealing the details of the Sealed Letter, it is clear that some of the investigative fault lines described in the letter can now be ascertained by those whose cooperation Savino would implicate. *See Huntley*, 2013 WL 1881536, at *4 ("Every legislator who has conversed with this defendant will necessarily assume that he or she was recorded under the supervision of the FBI. There will be no surprises to the potentially accused by the revelations of their names. Interference with ongoing investigations will be of almost no significance."). Still, there are other aspects to the ongoing investigations that are unaffected by the official revelation that Savino is now a cooperating witness. It is those investigative lines that, in the Court's view, constitute good cause to subject the discovery in this case to a protective order.

Third, and finally, Defendants' claim that the Government has undermined its own investigative interests through the "loud" press conference misses the mark. (*See* Aug. 30 Varghese Ltr. 4.) Defendants have failed to identify anything in the substance of what was said during the press conference that was beyond the public record. Indeed, at oral argument, the Government explained how each of the conversations that were quoted during the press conference was lifted from the criminal complaint. (Oct. 7 Conference Tr. 17–18.) Therefore, the Government did not waive its claim for a protective order by revealing at the press conference anything in the discovery materials that is not already part of the public record. And, because, as explained, the discovery materials do contain information that is germane to the ongoing investigations, the Court concludes that nothing about the press conference, or any of the other statements made by the United States Attorney, jeopardized the Government's ongoing investigations.

Accordingly, the Court finds that the Government has established that the ongoing investigations related to this case and/or the Defendants constitutes good cause under Rule 16(d)(1) for a protective order.

### 2. Defense Objections

Apart from rebutting the Government's claims of good cause, the Defendants who oppose the Government's request have lodged other objections to the entry of a protective order. These objections are as follows: (i) the Defense should be given a fair opportunity to rebut the inappropriate extrajudicial statements by the United States Attorney; (ii) the Government has

42

waived its right to a protective order because of the delay in seeking it; and (iii) a blanket protective order would unfairly prejudice the Defendants by adversely affecting their trial preparation.

### a. Fair Response to the United States Attorney's Extrajudicial Statements

In Halloran's initial opposition to the Government's application, he argued that "the United States Attorney in this district called a widely publicized press conference to announce the defendants' arrests, and made comments effectively rendering the presumption of innocence null and void." (Aug. 30 Varghese Ltr. 6–7.)  At oral argument, counsel for Tabone concurred with this assessment, claiming that the United States Attorney violated Local Rule 23.1 by making certain statements during the aforementioned press conference and during his appearance before the Moreland Commission which prejudged the guilt of Defendants.  (Oct. 7 Conference Tr. 33.)  After oral argument, Halloran submitted a letter outlining in greater detail why he thinks the United States Attorney violated Local Rule 23.1.  (*See* Oct. 16 Varghese Ltr.)  However, while Halloran believes that the Government should be admonished for this violation of Local Rule 23.1, he explicitly declined in his follow-up letter to seek sanctions for the alleged violations of this Local Rule.  (*Id.* at 8.)   Instead, Halloran and Tabone argue that the Court should take the alleged violations into consideration in evaluating the proposed protective order, and they specifically contend that the proposed order improperly inhibits their right to rebut the United States Attorney's statements.  (*See* Oct. 16 Varghese Ltr. 7–8; *see also* Aug. 30 Varghese Ltr. 7 ("Mr. Halloran has every right to counter the government's over-the-top accusations in the press with any exculpatory discovery that the government has already provided.").)

43

There are a number of rules, regulations, and ethical canons governing extrajudicial statements in criminal cases.  Local Rule 23.1 sets forth a number of requirements regarding extra-judicial commentary regarding pending cases:

> a) It is the duty of the lawyer or law firm, and of non-lawyer personnel employed by a lawyer's office or subject to a lawyer's supervision, private investigators acting under the supervision of a criminal defense lawyer, and government agents and police officers, not to release or authorize the release of non-public information or opinion which a reasonable person would expect to be disseminated by means of public communication, in connection with pending or imminent criminal litigation with which they are associated, if there is a substantial likelihood that such dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice.
>
> . . . .
>
> d) Statements concerning the following subject matters presumptively involve a substantial likelihood that their public dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice within the meaning of this rule:
>
> > (1) The prior criminal record (including arrests, indictments or other charges of crime), or the character or reputation of the accused . . . .
> >
> > . . . .
> >
> > (5) The possibility of a plea of guilty to the offense charged or a lesser offense;
> >
> > (6) Information the lawyer or law firm knows is likely to be inadmissible at trial and would if disclosed create a substantial likelihood of prejudicing an impartial trial; and
> >
> > (7) Any opinion as to the accused's guilt or innocence or as to the merits of the case or the evidence in the case.

S.D.N.Y. Local Crim. R. 23.1 (last updated 1997).  This rule mirrors Rule 3.6 of the New York Rules of Professional Conduct, which provides that:

> a) A lawyer who is participating in or has participated in a criminal or civil matter shall not make an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter.

44

(b) A statement ordinarily is likely to prejudice materially an adjudicative proceeding when it refers to a civil matter triable to a jury, a criminal matter or any other proceeding that could result in incarceration, and the statement relates to:

. . . .

(4) any opinion as to the guilt or innocence of a defendant or suspect in a criminal matter that could result in incarceration;

(5) information the lawyer knows or reasonably should know is likely to be inadmissible as evidence in a trial and would, if disclosed, create a substantial risk of prejudicing an impartial trial; or

(6) the fact that a defendant has been charged with a crime, unless there is included therein a statement explaining that the charge is merely an accusation and that the defendant is presumed innocent until and unless proven guilty.

N.Y. Rules of Prof'l Conduct 3.6 (adopted Apr. 1, 2009).[15]

Moreover, the Department of Justice "has issued guidelines to its employees governing trial publicity . . . . DOJ employees are permitted only to release identifying information regarding the defendant, the substance of the charges, the identity of the investigating agency and the circumstances immediately surrounding an arrest." *United States v. Corbin*, 620 F. Supp. 2d 400, 410 (E.D.N.Y. 2009) (citing 28 C.F.R. § 50.2) (internal quotation marks omitted). The applicable DOJ regulations specifically provide that "[d]isclosures should include only incontrovertible, factual matters, and should not include subjective observations." 28 C.F.R. § 50.2(b)(3)(iv). These regulations also instruct DOJ personnel to refrain from making any comments about "[s]tatements, admissions, confessions, or alibis attributable to a defendant," or

---

[15] The American Bar Association's Model Rules of Professional Conduct ("ABA Model Rules") also offer guidelines to prosecutors, advising them to, "except for statements that are necessary to inform the public of the nature and extent of the prosecutor's action and that serve a legitimate law enforcement purpose, refrain from making extrajudicial comments that have a substantial likelihood of heightening public condemnation of the accused . . . ." Model Rules of Prof'l Conduct R. 3.8(f).

offering "[a]ny opinion as to the accused's guilt, or the possibility of a plea of guilty to the

offense charged, or the possibility of a plea to a lesser offense." 28 C.F.R. §§ 50.2(b)(6)(ii) and

(vi). This regulation is supplemented by guidelines in the Department of Justice United States

Attorneys' Manual. The Manual instructs that "[p]ress conferences should be held only for the

most significant and newsworthy actions, or if a particularly important deterrent or law

enforcement purpose would be served." U.S. Dep't of Justice, U.S. Att'ys' Manual § 1-7.401(A)

(2009) ("U.S. Att'ys' Manual"). The Manual also counsels that "[p]rudence and caution should

be exercised in the conduct of any press conference or other media contact." *Id.*[16]

---

[16] Commentators have noted that the DOJ guidelines and ethical rules may be inadequate to avoid prejudicial comments being made at press conferences. *See* Anthony S. Barkow, *Prosecuting Political Defendants*, 44 Ga. L. Rev. 953, 1009 (2010) ("The undefined 'public policy' and 'law enforcement significance' exceptions, which allow political appointees to engage in post-charging, pre-conviction press outreach, provide vague loopholes through which prosecutors can make inappropriate statements, whether deliberately or inadvertently."); Abigail H. Lipman, *Extrajudicial Comments and the Special Responsibilities of Prosecutors: Failings of the Model Rules in Today's Media Age*, 47 Am. Crim. L. Rev. 1513, 1541 (2010) ("Although still subject to the restrictions contained in the Model Rules against improper extrajudicial speech and trial advocacy, it is not surprising when prosecutors seek to take advantage of every opportunity afforded by the media attention in a high-profile case to further their reputations . . . ."); Lonnie T. Brown, Jr., *"May It Please the Camera , . . . I Mean the Court"—An Intrajudicial Solution to an Extrajudicial Problem*, 39 Ga. L. Rev. 83, 116 (2004) (commenting that "the language of [the ethical] rules is readily subject to strained interpretations and skillful manipulation that can enable prosecutors to speak about cases in great detail and in self-serving ways."). Indeed, the United States Attorneys' Manual is "for internal guidance purposes and do[es] not create any rights enforceable at law." Lipman, 47 Am. Crim. L. Rev. at 1529. As a result, prosecutors rarely are sanctioned for inappropriate extra-judicial statements. *See id.* at 1537 (noting that the ABA Model Rules regarding extrajudicial commentary "are frequently broken, but rarely investigated or sanctioned").

These commentators accordingly have suggested limits to press conferences by prosecutors. *See* Barkow, 44 Ga. L. Rev. at 1010 ("Arguably, a press conference, as compared to a written press release, primarily provides a personal benefit to the appointed official because it associates that official with a prominent case in the media and to the public. . . . At the same time, the public's right to know is not meaningfully enhanced by pre-conviction press conferences."); Lipman, 47 Am. Crim. L. Rev. at 1533 (noting that prosecutors should be subject to strict scrutiny in their extrajudicial statements because of their "unique role . . . in the justice system"). *See generally Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 601 n.27 (1976) (Brennan, J.,

Halloran's claim that the United States Attorney violated Local Rule 23.1 focuses on the

following: (i) statements at the April 2, 2013 press conference where the United States Attorney

proclaimed that this case involved "an unappetizing smorgasbord of graft and greed," that it

represented a "show-me-the-money culture," that Halloran "quarterbacked" the alleged scheme,

that Halloran was "dirty" and "corrupt," and the use by the United States Attorney of allegedly

out-of-context statements by Halloran; (ii) statements made by the United States Attorney before

the Moreland Commission in September 2013, during which the United States Attorney testified

that there was "rampant" public corruption in New York and used the "show me the money"

phrase; and (iii) statements in an October 7, 2013 filing in this case where the Government

mentioned that "plea negotiations are ongoing." (Oct. 16 Varghese Ltr. 4–5.)[17]

---

concurring) ("As officers of the court, court personnel and attorneys have a fiduciary
responsibility not to engage in public debate that will redound to the detriment of the accused or
that will obstruct the fair administration of justice.").

    Relatedly, commentators also have voiced concerns about so-called "speaking
indictments," which "sometimes" include "information that is unnecessary to establish the
charge and that is possibly inflammatory, or, in the worst case intentionally included solely to
notify the media . . . of information about the defendant that the prosecutor would otherwise be
restricted from disclosing." Barkow, 44 Ga. L. Rev. at 1004. Such indictments "are criticized
by some who argue that prosecutors use them to evade no-comment rules by including highly
prejudicial information in official court documents that are accessible by the press." *Id.* (citation
and internal quotation marks omitted).

[17] Halloran also contends that the Government violated Local Rule 16.1 by filing a bill of
particulars without certifying that "counsel has conferred with counsel for the opposing party."
(Oct. 16 Varghese Ltr. 6–7.) He also says the bill of particulars was incomplete because it did
not deal with all the charges in this case. (*Id.* at 7.) However, as the Government notes, Local
Rule 16.1 governs only the filing of "a motion addressed to a bill of particulars or any discovery
matter . . . ." *See* S.D.N.Y. Local Crim. Rule 16.1. The Government did not file a motion
related to a bill of particulars; rather, it filed a bill of particulars providing notice of its intention
to seek forfeiture of certain of Halloran's assets should there be a conviction. (*See* Dkt. No.
111.) As such, there is no merit to Halloran's claim.

Taking the claims in reverse order, the argument that the Government violated Local Rule 23.1 when it mentioned in a *court filing* that there were plea discussions is without merit. Local Rule 23.1 is addressed only to extrajudicial statements, not to court filings. Indeed, it is common for counsel in criminal cases to comment in written submissions and during court proceedings that there are plea discussions when, for example, seeking an extension of time in which to file pretrial motions and asking that time be excluded from the Speedy Trial Act.

Similarly unpersuasive is Halloran's claim that the statements made by the United States Attorney during the Moreland Commission hearing violated Local Rule 23.1. The Court has read the prepared testimony given by the United States Attorney (which is attached as an exhibit to Halloran's letter), and finds nothing about it that contravenes Local Rule 23.1. Indeed, this case was mentioned only once (along with another pending case), and no comments were made about Halloran or any of the Defendants charged in this case. And while the United States Attorney used the "show me the money" phrase, there is nothing about his use of that phrase during his testimony that could be prejudicial to Halloran, as Halloran was not named in connection with that phrase (or at all during the testimony). Implicitly conceding that he was not mentioned during the testimony, Halloran claims prejudice resulted from "linking" him with alleged "rampant" and "systemic" corruption. But, the United States Attorney made no such connection. Instead, he merely cited the number of cases that his office has prosecuted as the basis for that statement. And, while the United States Attorney revealed at that hearing that his office had filed the bill of particulars seeking forfeiture of certain assets of public officials charged with crimes, he offered no other statements about the merits of the Government's case against Defendants and made no other comment about this case. Thus, the Court finds that there

is nothing about the United States Attorney's testimony that ran afoul of Local Rule 23.1 (or any other applicable regulation or ethical canon).

Turning to the comments made by the United States Attorney at his April press conference, Defendants point to the United States Attorney's descriptions of the charges in this case as representing an "unappetizing smorgasbord of graft and greed," and a "show me the money" culture of corruption, and argue that those statements improperly taint them in the public eye. Defendants' concerns about these phrases are not entirely baseless, for whatever goal these phrases were meant to serve, it is hard to find that they had any compelling law-enforcement purpose. As such, there is room to question whether these comments are the type of "subjective observations" that the regulations eschew, *see* 28 C.F.R. § 50.2(b)(3)(iv), or whether they reflect the degree of "prudence and caution" that is to be exercised by prosecutors during press conferences, *see* U.S. Att'ys' Manual § 1-7.401(A). But, these phrases do not cross the line drawn by Rule 23.1 in the sense that they do not, by themselves, constitute opinions as to the Defendants' guilt, and are not otherwise the type of statements proscribed by the rule. The same is true of the characterization that Halloran "quarterbacked" the scheme. This merely describes Halloran's alleged role in the conspiracy. That the United States Attorney chose to use the word "quarterbacked," as opposed to "led" or "directed," does not make for a Rule 23.1 violation.

Halloran also objects to the United States Attorney's reference to "dirty" and "corrupt" politicians in the same press conference. The Government defends the use of these words because they were used later in the press conference when the United States Attorney "addressed the problem of corruption more generally," and after he noted that each of the Defendants was presumed innocent. (Oct. 21 Bloom Ltr. 2.) It is true that after describing the particular charges

49

in this case (which description included the above-discussed phrases), the United States Attorney elected to address the general topic of public corruption, and inserted the line about the presumption of innocence between these two topics. But, in commenting about how pervasive corruption was in New York, the United States Attorney specifically said, "don't take my word for it[:] [c]onsider the words of . . . Halloran . . . ." He then quoted from two recordings that involved Halloran, and said that "[a]fter statements like this and after the string of public corruption scandals that we continue to expose, many may understandably fear that there is no vote that is not for sale, no office without a price, and no official clean of corruption." The United States Attorney further stated that "[p]utting dirty politicians in prison may be necessary but it is not sufficient." He explained that it was time for "others to step up" to combat public corruption, "even after a parade of politicians have been hauled off to prison . . . ."

The Government's effort to decouple the general comments about public corruption from this case is tenuous. The statements about "dirty" and "corrupt" politicians being "hauled off to prison" were made at the very same conference where the charges against these Defendants were announced. And, the link between the charges in this case and the "general point" about "pervasive" public corruption in New York state was made by quoting Halloran's recorded statements. Thus, it would not be irrational for some to interpret the statements at the press conference, taken in their entirety, as holding Defendants out as the latest examples of "dirty" and "corrupt" politicians who will be "hauled off to prison" in the broad-scale efforts to combat corruption and, therefore, to be a comment on the guilt of Defendants. *See Corbin*, 620 F. Supp. 2d at 411 (finding statements by the United States Attorney and a senior FBI official about how

public-official defendant "will . . . be held to account" for his crimes, and how "[t]he people rightly expect their elected representatives . . . to behave honorably," to be improper).

But, even if these statements could be considered opinions on the Defendants' guilt, they do not justify rejecting the requested Protective Order, given the Government's demonstration of good cause here. First, Defendants have not demonstrated, and, in fact, have not asked the Court to determine, that the statements at the press conference have "compromised this criminal proceeding and the future trial." *Id.*; *see also United States v. Perryman*, No. 12-CR-123, 2013 WL 4039374, at *13 (E.D.N.Y. Aug. 7, 2013) (same). Indeed, to make out such a claim, Defendants would have to show that the press conference "so permeated the public as to have hindered the ability of the Court, probably some six months or more from now, to impanel a fair and impartial jury in this case, especially in light of the size of the jury pool in this huge district." *Corbin*, 620 F. Supp. 2d at 411; *Perryman*, 2013 WL 4039374, at *13 (same).

Second, regardless of the propriety of these statements, "Defendant[s] [have] no constitutional right to use the media to influence public opinion concerning [t]his case so as to gain an advantage at trial." *Lindh*, 198 F. Supp. 2d at 743. Thus, the "argument that a protective order would impede such a right is entirely unconvincing." *Id.* Put another way, and in the simplest terms, two wrongs do not make a right. Indeed, apart from any "right" of Defendants to use the discovery to counter the Government's extra-judicial statements, the Court has an independent obligation to "avoid the creation of a 'carnival atmosphere' in high-profile cases." *United States v. Brown*, 218 F.3d 415, 429 (5th Cir. 2000) (quoting *Sheppard v. Maxwell*, 384 U.S. 333, 358 (1966)). As Justice Holmes explained over a century ago: "The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and

51

argument in open court, and not by any outside influence, whether of private talk or public print." *Patterson v. Colorado*, 205 U.S. 454, 462 (1907); *see also Bridges v. California*, 314 U.S. 252, 271 (1941) ("Legal trials are not like elections, to be won through the use of the meeting-hall, the radio, and the newspaper."). Indeed, the risk of prejudice to the fair administration of justice from a public-relations battle is heightened in high-profile cases. *See In re Dow Jones & Co.*, 842 F.2d 603 (2d Cir. 1988) (upholding imposition of a "gag order" in high-profile public corruption); *United States v. Bulger*, No. 99-CR-10371, 2013 WL 3338749, at *6 (D. Mass. July 1, 2013) (noting that courts "have found that heightened media scrutiny supports the conclusion that attorneys and parties should not make extrajudicial statements"); *White*, 2004 WL 2399731, at *5 (noting that "a practice of disclosing discovery materials" could threaten "a fair trial"). Thus, the Court rejects Defendants' assertion that they should be entitled to disseminate discovery materials to counter the handful of statements made by the United States Attorney in this case.

However, none of this discussion should be interpreted as giving senior prosecutorial officials a one-time pass, let alone a blank check, to make any statements they might like about a case that has not reached its conclusion. "The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all." *Berger v. United States*, 295 U.S. 78, 88 (1935). As such, the prosecutor's interest "is not that [he] shall win a case, but that justice shall be done." *Id.* Because of the unique role played by prosecutors in our justice system, "[t]he prevailing view is that prosecutor statements are more likely to influence prospective jurors," than those of other advocates. Scott M. Matheson, Jr., *The Prosecutor, the Press, and Free Speech*, 58 Fordham L. Rev. 865, 868 (1990); *see also* Lipman, 47 Am. Crim. L. Rev. at 1533

("Statements by prosecuting attorneys, in particular, have increased likelihood to influence the public because the attorneys speak with the inherent authority of the government." (citation and internal quotation marks omitted)). Thus, it is essential that prosecutors respect both the power of their words and their office, and ensure that their public comments are carefully tailored solely to further valid law enforcement interests and to steer far clear of violating a defendant's fundamental right to a fair trial. *See* Barkow, 44 Ga. L. Rev. at 1019 (noting that press conferences "provide little benefit relative to the dangers that they may pose in creating bias against the defendant"). And, it is well within the courts' authority to adopt appropriate measures to ensure that the entire process, from arrest to disposition, is fair and is perceived to be fair. *See United States v. Capra*, 372 F. Supp. 609, 615–16 (S.D.N.Y. 1974) (noting that "mere gnashing of judicial teeth should not remain the sole response to . . . [instances where ] the indictment and arrest become the circuses they too often are, complete with prosecutors' press conferences and photographic spreads"). Included in that authority is the ability to impose a wide range of sanctions or other remedies. *See, e.g., Dow Jones*, 842 F.2d at 609–12 (approving of "gag order"); *United States v. Scrushy*, No. 03-CR-530, 2004 WL 848221, at *2 (N.D. Ala. Apr. 13, 2004) (noting that because of the Government's "press conferences, press releases, and statements created and/or played to the intense publicity surrounding the SEC investigation," the court allowed "for an opportunity for some response from the defense" and therefore "did not initially impose any restrictions upon extrajudicial statements"); *United States v. Koubriti*, 305 F. Supp. 723, 757 (E.D. Mich. 2003) (public admonishment of United States Attorney General for certain extra-judicial statements). In this case, the Court has concluded that the public comments at issue here do not warrant rejection of the Government's proposed protective order. However, a different set of facts in a different case might yield a different result.

### b. Waiver

Halloran also argues that the Government "waived any rights" to a protective order by waiting to seek judicial intervention until after "a local newspaper . . . published an article casting negative light on the government's investigation." (Aug. 30 Varghese Ltr. 2.) According to Halloran, "in the same way that a district court, absent extraordinary circumstances, should *not* modify a protective order relied upon by the parties, the Court should *not* grant one after-the-fact." (*Id.*) The Government counters that it had been negotiating with Defendants for two months on language for a mutually-acceptable protective order, and that it sought "Court intervention only when it became clear that no agreement could be reached and the risk of inappropriate dissemination had become plain." (Sept. 3 Anderson Ltr. 4.)

Rule 16(d)(1) itself imposes no time limit on when a protective order must be sought, and Halloran cites no authority from the Second Circuit suggesting that there is some time limit in which the Government must seek a Rule 16 protective order. *Cf. Dorsett v. Cnty. of Nassau*, 800 F. Supp. 2d 453, 460 (E.D.N.Y. 2011) (noting that Fed. R. Civ. P. 26(c) "makes no mention of a timeliness requirement for seeking a protective order"). Therefore, to determine whether the Government has truly waived its option of seeking a protective order, the Court starts with the definition of "waiver," which is "'an intentional relinquishment or abandonment of a known right or privilege.'" *Doe v. Marsh*, 105 F.3d 106, 111 (2d Cir. 1997) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). Here, Halloran has not explained how the Government intentionally relinquished its "right" to seek a protective order in this case. Indeed, as discussed above, the Government made clear at the second status conference back in July that it would be seeking a protective order in this case, at least as to "some" of the discovery in this case, including

54

discovery yet to be produced. (Conf. Tr. 5.)[18] Moreover, the Government has represented, with no objection from Defendants, that it had been negotiating with counsel for Defendants on language for a protective order for two months before seeking court intervention. (*See* Sept. 3 Anderson Ltr. 4.) Given this record, Halloran has failed to make the case that the Government intentionally forfeited its option under Rule 16(d)(1) to seek a protective order.

The same result holds even if the Court adopts Halloran's comparison of the Government's application for the protective order here to cases involving a litigant's effort to modify an existing protective order. It is true that courts have rejected modifications to protective orders in civil cases where "there has been reasonable reliance by a party or deponent," absent "a showing of improvidence in the grant of [the] order or some extraordinary circumstance or compelling need." *TheStreet.Com*, 273 F.3d at 229 (internal quotation marks omitted). In this context, "reliance is crucial." *Dorsett v. Cnty. of Nassau*, 289 F.R.D. 54, 64 (E.D.N.Y. 2012); *see also In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 255 F.R.D. 308, 318 (D. Conn. 2009) ("[T]he application of the strong presumption against modification is dependent upon a protective order's particular characteristics and whether it invites reasonable reliance on the permanence of the order."); 8 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2044.1 (3d ed. 2013) ("Even the Second Circuit recognizes that there must be a plausible showing of reliance on the order to narrow the grounds for modification."). Where a party "could not reasonably have relied on the continuation of a

---

[18] As noted above, the Government indicated at the first conference in this case that it had no plans to seek a protective order, but that it would revisit that view if circumstances changed. (Apr. 23 Conference Tr. 12.)

protective order a court may properly permit modification of the order." *TheStreet.Com*, 273 F.3d at 231.

Here, Halloran generally asserts that he and the other Defendants "reasonably relied on the fact that there was no protective order," but he has not explained how this reliance has affected, or would affect, his review of the discovery or his trial preparation. (Aug. 30 Varghese Ltr. 2.) Nor has he explained how this supposed reliance was reasonable in light of the Government's aforementioned comments at the second conference in this case about seeking a protective order and that it preferred to negotiate the terms of that order with counsel for Defendants. (*See* Sept. 3 Anderson Ltr. 4.) Given this undisputed set of facts, Defendants have not established that they were surprised by the request for the protective order or were justified in believing that the non-existence of such an order was going to be permanent.[19]

Furthermore, as explained above, the Government has substantiated the need and the timing of its request for a protective order. Therefore, to borrow the standard used in evaluating tardy applications for protective orders in civil cases, the Government has established that it has good cause for the timing of its request. *See D.J.'s Diamond Imports, LLC v. Brown*, No. 11-CV-2027, 2013 WL 1345082, at *3 n.5 (D. Md. Apr. 1, 2013) (noting in context of Fed. R. Civ. P. 26 that a late application for a protective order may be "excused for good cause"); *Consol. Rail Corp. v. Grand Trunk W. R.R. Co.*, No. 09-CV-10179, 2010 WL 2331039, at *1 (E.D. Mich. June 10, 2010) ("A party's failure to request a protective order prior to the time set for producing

---

[19] The situation might have been different, for example, if the Government had obtained a protective order covering only certain categories of discovery, and then sought to expand the scope of that coverage in a subsequent protective order. *See White*, 2004 WL 2399731, at *1, *6 (rejecting prosecution's request to modify protective order which initially covered only Title III materials, but which the prosecution later requested be expanded to cover grand jury materials, FBI interview reports, and other items).

the discovery may be excused for good cause."). The Government declared its intention to seek a protective order several months ago, hoping it could agree on such an order through informal discussions with counsel for Defendants. When that effort failed, and when discovery in this Case began to appear in media reports, the Government made the instant Application for judicial intervention. Under these circumstances, the Court concludes that the Government did not "waive" its option of seeking a protective order, and that the timing of its request is justified by good cause.

### c. Prejudice to Trial Preparation

Finally, Defendants argue that weighed against the Government's claims of good cause are "the logistics of complying with and enforcing the Government's request for a blanket protective order." (Aug. 28 Misir Ltr. 4.) In particular, Defendants argue that the Government's proposed blanket protective order would be "unduly burdensome," because it would require counsel to "review whom the discovery has been disclosed to, including co-counsel, law clerks, secretaries, contract workers, investigators, and transcription services," in order to obtain the signed acknowledgment that each is bound by the protective order. (*Id.*) On a related but separate note, Defendants argue that the proposed protective order violates their constitutional rights to defend themselves because the order "does not provide that information which is already in the public arena, or known to [Defendants] is excluded from the ambit of the order." (*Id.*) According to Defendants, such an order "places [Defendants] in the absurd position of not being able to speak publicly about [their] own business records in [their] criminal defense because they have been seized by the Government and then produced back to Defendant[s] as discovery and labeled 'confidential.'" (*Id.*) Also, Defendants claim that the proposed protective order hinders their ability to prepare their defense because it would bar counsel from discussing

57

the case with "learned members of the legal academic community and *amicus* counsel, and in being able to speak to members of the public similar to those who might serve in a jury." (*Id.*)

Defendants are, of course, correct that the Court should consider how burdensome a protective order would be on them, being particularly sensitive to the extent to which a protective order would hinder their efforts to defend themselves at trial. *See Davis*, 809 F.2d at 1210 (rejecting defendant's objection to protective order for failure to "demonstrate substantial prejudice"); *Carriles*, 654 F. Supp. 2d at 566 (noting that "a court must consider whether the imposition of the protective order would prejudice the defendant"). *See generally Press-Enter. I*, 464 U.S. at 508 ("No right ranks higher than the right of the accused to a fair trial."). However, Defendants have not substantiated their allegations that a protective order here would be unduly burdensome.

First, the Government has agreed that any protective order here would not apply to "information in the public domain or independently obtained." (Sept. 3 Anderson Ltr. 5.) Second, Defendants' concern about having those who have assisted in the defense, and who will assist going forward, sign a memorandum certifying that they understand they are bound by the Protective Order is insufficient to reject a protective order. This type of procedure regularly has been used in criminal cases and explicitly approved by courts. *See, e.g., Carriles*, 654 F. Supp. 2d at 570 (approving the memorandum process requested by the Government here and adding a provision that "[i]f necessary to avoid disclosing trial strategy, Defendant may make such submission ex parte. This procedure addresses the Government's interests in preventing unwarranted disclosure of protected materials while only minimally affecting Defendant's ability to prepare for trial."); *Lindh*, 198 F. Supp. 2d at 743–44 ("[T]he procedures adopted herein, including the requirement of *ex parte* submissions [of memoranda of understanding] by the

defendant, are designed to minimize any burdens on defendant's Sixth Amendment right to prepare and present a full defense at trial"). And, while Defendants complain that they will have to ascertain who has worked with the discovery over the last several months, as discussed above, the Government has made its intentions about a protective order known to Defendants during these past several months, thus putting Defendants on notice about the possibility of this requirement. Moreover, Defendants have provided no particulars about the people who have, to date, assisted in their defense. So, while Defendants assert they have worked with "law clerks, secretaries, contract workers, investigators," and the like, they are silent about just how many such people they have employed in their defense, or how difficult it will be to determine their identity. There is every reason to believe that many of those who were on the defense team in July are still on the team. Also, Defendants have not explained the need to share discovery materials with *amicus* counsel, who presumably would be seeking leave to file memoranda on discrete legal issues that would not require them to be in the weeds of discovery. In any event, it is not clear that *amicus* counsel would be barred from signing the same memorandum that applies to other members of the defense team. And, finally, as discussed above, to the extent Defendants are arguing that they need to be able to use the discovery to defend themselves through the media, the claim falls flat. Therefore, the Court concludes that none of Defendants' objections justify rejection of a protective order in this case.

### 3. Scope of the Protective Order

While the Court has determined that the Government has established good cause for entry of a protective order, the question remains whether the Court should enter the particular Protective Order sought by the Government. As noted, "[p]rotective orders vary in range and type 'from true blanket orders (everything is tentatively protected until otherwise ordered) to

very narrow ones limiting access only to specific information after a specific finding of need.'"
*Bulger*, 283 F.R.D. at 52 (quoting *Poliquin v. Garden Way, Inc.*, 989 F.2d 527, 532 (1st Cir.
1993)). Blanket or umbrella protective orders can be "useful and expeditious in large scale
litigation," *see Int'l Equity Inv., Inc. v. Opportunity Equity Partners Ltd.*, No. 05-CV-2745, 2010
WL 779314, at *4 (S.D.N.Y. Mar. 2, 2010), *objections overruled*, 2010 WL 1459178 (S.D.N.Y.
Apr. 12, 2010), *aff'd*, 415 F. App'x 286 (2d Cir. 2011), but they can be overbroad and
unnecessary, *see Schiller v. City of New York*, Nos. 04-CV-7921, 04-CV-7922, 2007 WL
136149, at *19 (S.D.N.Y. Jan. 19, 2007). *See also Carriles*, 654 F. Supp. 2d at 565 (noting that
"umbrella" protective orders may be used in cases involving "thousands of documents," but that
such orders are "disfavored" (internal quotation marks omitted)). But, in determining what
degree of protection is appropriate, courts should ensure that a protective order "is no broader
than is necessary" to serve the intended purposes. *Lindh*, 198 F. Supp. 2d at 742.

      The Court concludes that a blanket protective order along the lines proposed by the
Government is appropriate here. As discussed above, the Government has demonstrated that
there is good cause for a protective order because of its compelling interest in ongoing
investigations into potentially serious criminal conduct that could be jeopardized by
dissemination of the discovery. This interest does not involve a single criminal episode, nor
does it derive from a single page, or even a handful of pages, from the discovery materials.
Rather, the interest is in several investigations that cover different targets, different crimes, and
different time periods. As such, it would be virtually impossible, let alone unduly burdensome,
for the Government to conduct a page-by-page, document-by-document review to single out
those portions of the discovery materials that must be shielded from the public and the media.
*See Cipollone v. Liggett Grp.*, 785 F.2d 1108, 1122 (3d Cir. 1986) (noting that the party seeking

a broad protective order need not "demonstrate to the court in the first instance on a document-by-document basis that each item should be protected"); *United States ex rel. Davis v. Prince*, 753 F. Supp. 2d 561, 566 (E.D. Va. 2010) (noting that a court need not "determine good cause on a document-by-document, or transcript-page-by-transcript-page, basis"). Nor could the Court make such a determination on its own, because it is in no position to know what small piece of information, if disclosed, might jeopardize the ongoing investigations. *Cf. CIA v. Sims*, 471 U.S. 159, 178 (1985) (noting in the intelligence context, "bits and pieces of data may aid in piecing together bits of other information even when the individual piece is not of obvious importance in itself" (internal quotation marks omitted)).

To be clear, in reaching this conclusion, the Court is in no way excusing the Government from meeting its burden in establishing good cause for the protective order. Nor has the Court failed to consider less restrictive alternatives, such as redaction, to balance the Parties' competing interests. But, "[i]t is . . . consistent with the proper allocation of evidentiary burdens for the [C]ourt to construct a broad 'umbrella' protective order upon a threshold showing by [the Government] of good cause." *Cipollone*, 785 F.2d at 1122; *see also Pearson v. Miller*, 211 F.3d 57, 73 (3d Cir. 2000) ("[I]n appropriate circumstances, a district court is empowered to issue umbrella protective orders protecting classes of documents after a threshold showing by the party seeking protection."). This is particularly true in a case which involves substantial amounts of discovery. *See Pansy*, 23 F.3d at 787 n.17 (stating that "because of the benefits of umbrella protective orders in cases involving large-scale discovery, the court may construct a broad umbrella protective order upon a threshold showing by the movant of good cause"); *In re Terrorist Attacks on September 11, 2001*, 454 F. Supp. 2d at 223 ("Defendant-by-defendant good cause determinations for individual protective orders at this juncture in this case, much less

document-by-document confidentiality determinations where no protective order has issued, would impose an enormous burden upon the Court and severely hinder its progress toward resolution of pretrial matters."); *Armour of Am. v. United States*, 73 Fed. Cl. 597, 599 (Fed. Cl. 2006) ("Federal courts have widely utilized umbrella or blanket protective orders, particularly in complex cases or cases involving large-scale discovery, upon a threshold showing of good cause by the party seeking protection."). Here, the Government represents, and Defendants do not dispute, that it has provided and will provide a vast amount and array of discovery materials, including audio recordings, transcripts, computer files, business records, telephone records, and other materials. "Given the large-scale nature of the discovery involved in this case and the attendant monumental burden on the [G]overnment involved in reviewing and making redaction decisions with respect to all these [materials], an umbrella protective order is appropriate." *Luchko*, 2007 WL 1651139, at *11. None of this means that Defendants will not be able to challenge the designation of certain documents, or otherwise request a modification of the Protective Order should circumstances change. And, needless to say, should the materials become part of judicial documents, or be introduced at a hearing or a trial, then the need for protection might well evaporate. *See Lindh*, 198 F. Supp. 2d at 744 (noting that the court would "reevaluate the balance struck [in the protective order] at the time of trial and consider anew whether there is any interest in non-disclosure sufficient to override the compelling interest in ensuring that all trial materials are publicly available"). For now, however, the Court will approve the Government's proposed protective order with the added provision that it will not limit information in the public domain or independently obtained.

### III. Conclusion

For the reasons stated above, the Government's application for a protective order is granted, as modified herein.

SO ORDERED.

Dated:      December __4__, 2013
            White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

Service List (via ECF):

Douglas B. Bloom, Esq.
Justin Anderson, Esq.
U.S. Attorney's Office, SDNY
New York & White Plains, NY
*Counsel For the Government*

Vinoo P. Varghese, Esq.
Varghese & Associates, P.C.
New York, NY
*Counsel for Defendant Daniel J. Halloran*

Deborah N. Misir, Esq.
Lally & Misir, LLP
Mineola, NY
*Counsel for Defendant Vincent Tabone*

Benjamin Ostrer, Esq.
Ostrer & Hoovler P.C.
Chester, NY
*Counsel for Defendant Noramie Jasmin*