UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

   -v-

MALCOLM A. SMITH,
DANIEL J. HALLORAN,
VINCENT TABONE,
JOSEPH J. SAVINO,
NORAMIE JASMIN, and
JOSEPH DESMARET,

               Defendants.

Case No. 13-CR-297 (KMK)

OPINION AND ORDER

Appearances:

Douglas Benjamin Bloom, Esq.
Justin A. Anderson, Esq.
Assistant United States Attorneys
United States Attorney's Office, Southern District of New York
*Counsel for the Government*

Gerald Lawrence Shargel, Esq.
Ross Mitchell Kramer, Esq.
Winston & Strawn, LLP
New York, New York
*Counsel for Defendant Malcolm A. Smith*

Vinoo P. Varghese, Esq.
John Gilgun Mateus, Esq.
Varghese & Associates, P.C.
New York, New York
*Counsel for Defendant Daniel J. Halloran*

Grant Martin Lally, Esq.
Deborah Nirmala Misir, Esq.
Lally & Misir, LLP
Mineola, New York
*Counsel for Defendant Vincent Tabone*

KENNETH M. KARAS, District Judge:

Defendants move to dismiss portions of the Indictment.  In particular, Defendants challenge the application of the Travel Act, 18 U.S.C. § 1952, in this case, and the constitutionality of the Honest Services Fraud Statute, 18 U.S.C. § 1346, as applied here. Defendant Malcolm A. Smith ("Smith") also seeks to strike certain portions of the Indictment as prejudicial surplusage.  For the reasons described herein, these Motions are denied.[1]

## I.  Background

### A.  Factual Background

The following facts are taken from the Indictment that the Grand Jury returned against Defendants on April 18, 2013 ("the Indictment").  (*See* Dkt. No. 42.)[2]  For the sake of clarity and convenience, and in keeping with the Indictment's organizational format, the Court will separately describe the facts relevant to the two schemes and one conspiracy in which the Government alleges that Defendants were involved.

---

[1] Defendants also move for a severance.  These motions will be considered in a separate Opinion.

[2] In ruling on a motion to dismiss pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure, a court must accept as true all factual allegations contained in the indictment.  *See United States v. Litvak*, No. 13-CR-19, 2013 WL 5740891, at *2 (D. Conn. Oct. 21, 2013) ("In ruling on a motion to dismiss, a court views the indictment as a whole and assumes its factual allegations to be true." (citing *Boyce Motor Lines v. United States*, 342 U.S. 337, 343 n.16 (1952))); *United States v. Finazzo*, No. 10-CR-457, 2013 WL 619571, at *2 (E.D.N.Y. Feb. 19, 2013) ("[I]n deciding a motion to dismiss, the Court must consider only whether the allegations of the indictment, taken as true, are sufficient to establish a violation of the charged offense." (citing *United States v. Sampson*, 371 U.S. 75, 78–79 (1962))); *United States v. Yaron*, No. 10-CR-363, 2011 WL 3279054, at *2 (S.D.N.Y. July 28, 2011) ("In deciding a motion to dismiss under Rule 12(b), a court must accept all factual allegations in the indictment as true." (internal quotation marks omitted)).

### 1.  The Spring Valley Real Estate Project Scheme

What the Government has termed "the Spring Valley Real Estate Project Scheme" allegedly involved Defendant Noramie Jasmin ("Jasmin"), who was at all relevant times the Mayor of the Village of Spring Valley, in Rockland County, New York ("the Village"); Defendant Joseph Desmaret ("Desmaret"), who was at all relevant times the Village's Deputy Mayor; a cooperating witness ("the CW"); an undercover Federal Bureau of Investigation ("FBI") agent ("the UC"); and two other undercover FBI agents posing as the UC's associates ("the Straw Developers").  (Indictment ¶¶ 4, 5(a), 6–19.)

On or about August 5, 2011, during a meeting at a restaurant in Rockland County, Jasmin and the CW "discussed acquiring property for the Village through eminent domain and then selling that property to the CW."  (*Id.* ¶ 6.)  Approximately six months later, on or about February 3, 2012, Jasmin and the CW met again, this time at a hotel in Suffern, New York, and discussed Jasmin "using her authority as Mayor to sell a parcel of Village land to the CW to develop into a community center"  ("the Real Estate Project").  (*Id.*)  Jasmin told the CW that "[i]n exchange for her assistance," she wanted to be a "partner," and to "build [the community center] together."  (*Id.*)  Jasmin also offered to expedite the "zoning thing," and to facilitate "everything [going] smoothly for [the CW]."  (*Id.*)

Desmaret's involvement began on or about January 18, 2012, when he met the CW in the CW's car in Rockland County.  (*Id.* ¶ 7.)  The CW told Desmaret about the Real Estate Project, and asked Desmaret to vote to approve the Project in his capacity as a member of the Village Board of Trustees ("the Board").  (*Id.*)  After the CW asked "how much . . . it [would] take [him] to get it done," Desmaret told the CW to "[m]ake an offer."  (*Id.*)  The CW suggested $10,000; Desmaret asked for double that.  (*Id.*)  When Desmaret and the CW met in the CW's car again in

Suffern on or about February 28, 2012, "the CW paid Desmaret $5,000 in cash as partial payment of the bribe" described above.  (*Id.* ¶ 8.)  After the CW expressed concern that another party might approach Desmaret with a competing offer, Desmaret responded, "No, they won't get the vote . . . .  It's a done deal."  (*Id.*)

The next month, on or about March 20, 2012, the CW met with Jasmin at a hotel in Suffern, where they "discussed the financial stake each of them would have" in the Real Estate Project.  (*Id.* ¶ 9.)  The CW suggested that Jasmin receive a 20-percent stake in the Real Estate Project, but Jasmin replied, "Partnership is 50-50, right?"  (*Id.*)  Jasmin and the CW also discussed the manner in which the Real Estate Project would be presented to the Board, as well as the formation of a "series of companies with ownership interests in a single company" ("the Holding Company"), which would be used to "hide the identities of the [Project's] true owners." (*Id.* ¶¶ 9–10.)  Jasmin told the CW that she would provide him with a cellphone that he was to use "solely" for communications with her about the Real Estate Project.  (*Id.* ¶ 10.)

Three days after the March 20 meeting, on or about March 23, 2012, Jasmin handed the CW "an envelope containing the name and Social Security number of a relative in whose name Jasmin's interest in the Real Estate Project would be held," as well as "$600 in cash in order to register the Holding Company."  (*Id.* ¶ 10.)  The next month, on or about June 21, 2012, at a meeting in Manhattan, Jasmin provided the CW with the cellphone that she had promised him. (*Id.* ¶ 11.)  The month after that, on or about July 23, 2013, an application to incorporate the Holding Company was sent to the Delaware Department of State.  (*Id.* ¶ 12.)  The Holding Company was incorporated the next day.  (*Id.*)  On or about August 9, 2012, the CW met Jasmin at a hotel in Suffern and gave her $5,000 in cash as an advance on her share of the Real Estate Project's profits.  (*Id.* ¶ 13.)

On or about October 21–22, 2012, Jasmin, the CW, and the UC met at a hotel in White Plains, New York, along with the Straw Developers, during which meeting Jasmin, the CW, and the UC agreed that the Straw Developers "would appear before [the Board] posing as developers unrelated to the UC," in order to create the appearance of a competitive bid process.  (*Id*. ¶ 14.) Jasmin "coached" the UC and the Straw Developers "on how to make their presentations" to the Board, and indicated that she would act at the meeting as though she had never before met the UC.  (*Id*.)  Jasmin also "told the UC that she mailed a copy of the proposed contract" between the Village and the Holding Company for the Real Estate Project, and that the UC should bring that copy to the Board meeting.  (*Id*.)

On or about October 22, 2012, Jasmin and Desmaret attended the Board meeting in question, where the UC and the Straw Developers "presented separate plans" for the Real Estate Project.  (*Id*. ¶ 15.)  The Board considered the Real Estate Project at a meeting the next day, which meeting Jasmin and Desmaret also attended.  (*Id*.)  The minutes of that meeting reveal that Jasmin told the Board that she and other members of the Board had just "carefully interviewed" the potential developers, and that she wanted approval to negotiate a contract with the Holding Company, which she described as "a reputable company who is willing to work with the Village . . . ."  (*Id*.)  Both Jasmin and Desmaret voted in favor of Jasmin's proposal.  (*Id*.) Just over one month later, on or about November 28, 2012, the Village Attorney mailed the Holding Company a proposed contract for the sale of the Village property on which the Real Estate Project would be located.  (*Id*. ¶ 16.)  At no point did Jasmin disclose her prior relationship with the CW, the UC, and the Straw Developers, or her financial interest in the Holding Company; Desmaret similarly failed to disclose that he had "received money in exchange for his vote."  (*Id*. ¶ 15.)

5

On or about February 25, 2013, Jasmin met with the CW, again at a hotel in Suffern, and "agreed to use her office" as Mayor and a member of the Board "to assist in obtaining for the Holding Company a contract" for road work associated with the Real Estate Project, as well as $500,000 in related New York State funding. (*Id*. ¶ 18.) On or about March 6, 2013, Desmaret also met with the CW at a hotel in Suffern, and agreed to use his office as Deputy Mayor and a member of the Board to assist the Holding Company in obtaining the same, in exchange for which he received $500. (*Id*.) But this was not the only cash payment that Desmaret received from the CW in exchange for supporting the Real Estate Project; according to the Indictment, in addition to the initial $5,000 payment that he received on February 28, 2012, and the $500 payment that he received on March 6, 2013, both of which are described above, he also received payments in the following amounts, on or about the following dates, and in the following locations: $1,000 on April 27, 2012, in Suffern; $1,600 on August 9, 2012, in Suffern; $500 on October 23, 2012, in White Plains; $1,000 on December 12, 2012, in Suffern; and $900 on January 22, 2013, in Suffern. (*Id*. ¶ 19.)

## 2. The New York City Council Consulting Contract Bribe Scheme

The Government alleges that the "New York City Council Consulting Contract Bribe Scheme" involved Defendant Daniel Halloran ("Halloran"), who at all relevant times was a member of the New York City Council ("City Council"), representing the 19th Council District in Queens, New York; the CW; and the UC. (*Id*. ¶¶ 2, 20–25.)

This alleged scheme was hatched at a Manhattan restaurant, where Halloran and the CW met on or about September 7, 2012. (*Id*. ¶ 20.) Halloran explained to the CW that he was "seeking matching funds for his congressional campaign from the national Republican Party." (*Id*.) The CW offered to give Halloran money for his campaign, and later asked Halloran if he

could "obtain discretionary funding from the City Council budget for the CW . . . ." (*Id*.)

Halloran said that he could, listed "various projects that he funds through City Council

discretionary funding," and then stated, "So now you come in and tell me what we got to do.

Not an issue, not an issue." (*Id*.) Halloran also described "politics" as being "[n]ot about

whether or will," but "how much." (*Id*.) He continued, "[T]hat's our politicians in New York,

they're all like that . . . . And they get like that because of the drive that the money does for

everything else. You can't do anything without the fucking money." (*Id*.) After the CW paid

Halloran $7,500 in cash, Halloran remarked, "Money is what greases the wheels—good, bad, or

indifferent." (*Id*.)

Twenty days later, on or about September 27, 2012, Halloran and the CW met again, this

time at a Manhattan hotel and with the UC in attendance. (*Id*. ¶ 21.) "[T]he UC gave Halloran

$6,500 in checks made payable to his congressional campaign that were issued on the accounts

of other individuals." (*Id*.) In response to the CW's request for $20,000 from City Council

discretionary funds, Halloran replied, "Absolutely, that's easy, that's not even an issue . . . . I

might even be able to get you more." (*Id*.) Halloran then requested that the CW "provide him

with a tax identification number, the name and address of a corporation, and an application for

discretionary funding," which Halloran said that he wanted "so that there's no questions, it raises

no flags, and everybody's got it like it's gotta be. You do it the right way, not a problem, then

you will definitely have . . . my member item." (*Id*.) Afterwards, Halloran, the CW, and the UC

raised their glasses, at which point the CW said, "Pleasure doing business with you." (*Id*.)

Approximately three weeks after this toast, on or about October 18, 2012, the trio

reunited at a restaurant in Queens, where Halloran "suggested . . . that [he] give discretionary

money from the City Council to the UC and the CW by granting them a contract to perform

consulting work on a senior center in Queens" ("the Senior Center Project"). (*Id.* ¶ 22.) The UC communicated that he "did not intend to do any work on [the Senior Center Project]"—rather, he was seeking "basically a no show" job. (*Id.*) Halloran indicated that the Senior Center Project "might provide what the UC was looking for." (*Id.*) At some point during this meeting, the UC paid Halloran $800 in cash. (*Id.*)

Halloran followed up five days later, on or about October 23, 2012, emailing to the same Holding Company created at Jasmin's behest "a letter on . . . City Council letterhead . . . stating that [he] would allocate . . . discretionary funding up to $80,000 for the Senior Center Project." (*Id.* ¶ 23.) He sent text messages to the CW requesting at least $20,000 from the CW and the UC the same day. (*Id.*) Just over two weeks after that, on or about November 11, 2012, he emailed another letter to the Holding Company, also on City Council letterhead, "requesting that the Holding Company consult on the Senior Center Project," specifying that he would "allocate up to $80,000 in . . . discretionary funding for the Holding Company's work on the project." (*Id.* ¶ 24.) In other words, the Indictment suggests that Halloran planned to allocate $80,000 of City Council discretionary funding to the Senior Center Project, all of which would be paid to the Holding Company for its consulting work on the Project—work which the UC, as a representative of the Holding Company, had indicated that he had no intention of completing.

Just as was the case with Desmaret, the Indictment contains allegations that Halloran accepted payments in addition to the $7,500; $6,500; and $800 payments described above, including cash payments in the following amounts, on or about the following dates, and in the following locations: $10,000 on November 16, 2012, in Queens; $5,000 on January 25, 2013, in Manhattan; $500 on February 10, 2013, in Manhattan; and $15,000 on February 15, 2013, in Manhattan. (*Id.* ¶ 25.)

8

### 3.  The Conspiracy To Bribe New York City Political Party Officials

"The Conspiracy To Bribe New York City Political Party Officials" comes last in the

Indictment.  It allegedly involved several of the individuals who played a role in either the

Spring Valley Real Estate Project Scheme, the New York City Council Consulting Contract

Bribe Scheme, or both, including Halloran, the CW, and the UC, as well as several individuals

with less direct connections to those schemes.  (*Id*. ¶¶ 26–56.)  In order of appearance in the

Indictment, they are Smith, who was at all relevant times a Democratic member of the New

York State Senate ("the State Senate") and Chairman of the Independent Democratic

Conference; an unnamed Republican Party county committee chairman from one of the five

counties that make up the City of New York ("County Chairman #1"); Defendant Joseph J.

Savino ("Savino"), who was at all relevant times Chairman of the Bronx County Republican

Party; Defendant Vincent Tabone ("Tabone"), who was at all relevant times Vice Chairman of

the Queens County Republican Party; a fourth undercover FBI agent ("the UC-2"), posing as a

courier for the UC; and an unnamed New York State Senator, whose district encompassed the

Village ("the Spring Valley State Senator").  (*Id*. ¶¶ 1, 3, 26–56.)

Following the pattern set by the first two schemes, this conspiracy also allegedly began at

a restaurant.  On or about April 26, 2012, Smith and the CW met at a restaurant in Rockland

County, where Smith solicited a $10,000 contribution to his State Senate campaign, "discussed

the CW giving [him] an additional $100,000 for [him] to give to other State Senators in an effort

to win their support . . . for a State Senate leadership position," and assented to the CW's

proposed plan to "give money to an associate of the CW who . . . would give the money to other

people who would donate it to Smith's campaign in order to keep the CW's name off of Smith's

campaign finance disclosures."  (*Id*. ¶ 26.)  Smith also mentioned that he was "considering

9

running for New York City Mayor in 2013 on the Republican Party ballot." (*Id*.)  As a

registered Democrat, "Smith was not permitted to run for . . . Mayor as a Republican absent the

written consent of three of the City's five Republican Party county chairman," a requirement

mandated by New York Election Law § 6-120(3).  (*Id*. ¶ 1.)  When granted, this consent "is

commonly referred to as a 'Wilson Pakula certificate.'" (*Id*.)

Smith and the CW returned to the same restaurant about three-and-a-half months later, on

or about August 8, 2012.  (*Id*. ¶ 27.)  During this meeting, "the CW gave Smith $15,000 worth of

checks made out to Smith's campaign drawn on the accounts of various persons," telling Smith

"that the money came from the CW but that the CW was providing the money through other

people." (*Id*.)  The CW then restated his concern that his name not appear on any campaign

finance disclosure statements; in keeping with this request, "Smith later disclosed the checks on

his campaign finance filings as contributions from the people whose names appeared on the

checks," not from the CW.  (*Id*.)  Returning to the theme of his contemplated mayoral run, Smith

also told the CW that "he was meeting with the five New York City Republican Party county

committee leaders the following week to discuss obtaining a Wilson Pakula certificate from

each." (*Id*.)

Two weeks later, on or about August 22, 2012, the two met again, at a hotel in

Manhattan.  (*Id*. ¶ 28.)  They "discussed ways for Smith to provide funding to the Real Estate

Project" at the center of the Spring Valley Real Estate Project Scheme.  (*Id*.)  Smith asked the

CW if the Real Estate Project was "a religious thing, because that kind of ties their hands a little

bit." (*Id*.)  When the CW asked if "it [was] better if it's religious," Smith replied that it was not,

to which the CW replied, "Then it's not." (*Id*.)  They also discussed "possible sources of state

money," with Smith noting that there "are monies that can be redirected" for roads and infrastructure after the CW "suggested widening a road in front of the Real Estate Project." (*Id*.)

On or about November 16, 2012, Smith and the CW revisited Smith's mayoral designs. (*Id*. ¶ 29.) During a meeting with the CW and the UC at a White Plains hotel, Smith told the CW that County Chairman #1 "was supporting someone else." (*Id*.) After the CW suggested that he might be able to influence County Chairman #1, Smith responded, "If you can change him, call me. Seriously." He continued, "I need you to make that phone call . . . . If you can change him that would be huge." He added, "If you can switch him . . . that would be huge." (*Id*.) Later on that same day, the UC met with Halloran in Queens, who said that he knew County Chairman #1 well, and that "he could find out what it would take to obtain [his] support" for a mayoral candidate. (*Id*. ¶ 30.) "The UC and Halloran also discussed Halloran contacting Savino for the same purpose." (*Id*. ¶ 30.)

Still on the same day, the UC met with Smith again at a Manhattan hotel and reported on his earlier discussion with Halloran. (*Id*. ¶ 31.) In reference to County Chairman #1, Smith said that he "want[ed] him done," and that he wanted him to say, "You know what, Malcolm, we did make a commitment to you early on . . . . We're going back to that." (*Id*.) When the UC asked Smith if securing the support of County Chairman #1 was a "small thing," or "worth going to the bank [for]," Smith replied, "This is a big thing." (*Id*.) A similar discussion between Smith and the CW followed on or about January 25, 2013, in Rockland County, during which the CW told Smith that obtaining the Republican Party county committee leaders' support for his candidacy would cost "a pretty penny," and asked, "It's worth any price?" (*Id*. ¶ 32.) Smith cautioned the CW to talk to him before he "close[d] it," but reiterated that "it's worth it," because the CW "[knew] how big a deal it [was]." (*Id*.)

11

Also on or about January 25, 2013, the UC-2, "posing as a courier for the UC," met with Halloran in Manhattan to deliver $5,000 in cash in exchange for Halloran's agreement to arrange meetings with Savino and Tabone, in furtherance of securing their support for the Wilson Pakula certificates that Smith was seeking.  (*Id.* ¶ 33.)  The next week, on or about January 31, 2013, Halloran and the UC met at a Queens restaurant "to discuss making payments to [Tabone] and [Savino]," with Halloran telling the UC that Tabone wanted $100,000 for himself and $50,000 for the Queens County Republican Party, while Savino "would need to be paid only $15,000 or $20,000."  (*Id.* ¶ 34.)

Halloran arranged a meeting between himself, the UC, and Savino at a restaurant in Manhattan on or about the next day, February 1, 2013. (*Id.* ¶ 35.)  The three of them "discussed getting [Smith] on the Republican ballot as a [mayoral] candidate," with Savino telling the UC that if the UC purchased insurance from Savino's insurance agency or sent work to Savino's law firm, it would make things "very easy," also mentioning that "everybody needs to pay their mortgage."  (*Id.* ¶ 35.)  Halloran arranged another Manhattan meeting for later on the same day for himself, the UC, and Tabone, where they "discussed the possibility of Tabone obtaining a Wilson Pakula certificate for Smith."  (*Id.* ¶ 36.)

On or about February 5, 2013, Halloran spoke with the UC by telephone, reporting that he had spoken with Tabone and Savino, who had "agreed to do what [Halloran had] asked them [to do]."  (*Id.* ¶ 37.)  Three days after that, on or about February 8, 2013, Halloran met with the CW and the UC in Manhattan, and gave them the following instructions: "So, look, you gotta . . . get [Savino] business but put twenty-five in an envelope . . . .  [Tabone] is twenty-five up front, twenty-five when the Wilson Pakula is delivered."  (*Id.* ¶ 38.)  Tabone no longer "care[d] about [the Queens County Republican Party] getting anything . . . ."  (*Id.*)

12

On or about February 10, 2013, it was Smith's turn to meet with the UC and the CW. (*Id*. ¶ 39.)  In a hotel room in Manhattan, the UC told Smith that they "had all five" county committee leaders, and that Halloran had been "the one to make this whole thing happen."  (*Id*.)  The UC told Smith that he had "a number from every one of them," and that the total amount of money that Smith would have to pay out for their support would fall in the range of $200,000.  (*Id*.)  The CW also referenced the "financial needs" of the committee leaders who would be paid, which included "college tuition for one committee leader and mortgage payments for another."  (*Id*. ¶ 40.)  Smith acknowledged that there was "no question" that there had "been movement," referencing "[t]he conversations and the calls . . . that [Smith had] gotten from [the committee leaders] . . . ."  (*Id*.)  When the CW said that the committee leaders now wanted to support Smith, Smith said, "Oh, yeah."  (*Id*.)  They also "discussed the possibility of a prominent person endorsing" Smith.  (*Id*. ¶ 43.)  The CW told Smith that he "could deliver" the endorsement for the "right amount," to which Smith responded, "That's the one we need to do."  (*Id*.)

During the same conversation, Smith, the UC, and the CW fleshed out the specifics of their plan, which included making "an appropriate payment to [Tabone], whose support Smith thought was particularly important."  (*Id*. ¶ 39.)  They also discussed directing the payments to the committee leaders personally, instead of to the Republican Party; as the UC put it, he had "gone away from giving some donations to parties," as he "didn't want to get involved with that mess."  (*Id*. ¶ 40; *see also id*. ¶ 39.)  The UC also described to Smith how the UC was going to pay the committee leaders so that there were "no ties" to him, stating that he and the committee leaders were "going to go play golf somewhere, and [the committee leaders'] . . . golf bag[s] [would] be a little heavier when [they] . . . [left] the course."  (*Id*. ¶ 40.)  The UC also suggested that he might "lose a couple of bets" to the committee leaders, or that they would "go to Vegas,

and . . . cash in some chips, whatever.  An envelope, you know?"  (*Id*.)  Smith later "suggested that the payments be made via retainer agreements between the committee leaders and the UC, leaving no connection to Smith."  (*Id*. ¶ 42.)  The UC emphasized that he did not want any "written contracts to tie the UC and the committee leaders together," after which Smith proposed that the retainer agreements could be done "on a handshake."  (*Id*. ¶ 42.)

The UC and Smith also discussed the importance of making only partial payments to the committee leaders at first, to ensure that they made good on their Wilson Pakula promises.  (*Id*. ¶ 39.)  The UC told Smith that the payments would be "half up front," and the "other half" after the committee leaders "deliver[ed]."  (*Id*. ¶ 41.)  Smith weighed in, warning that he "wouldn't give them more than like ten . . . just to start out . . . ."  (*Id*.)  When Smith suggested "hav[ing] them sign a piece of paper or something," the UC responded, "No, no, I'm not signing anything," to which Smith replied, "That's true, you don't want to do that."  (*Id*. ¶ 42.)  After discussing the payments to the party committee leaders, the CW and the UC also asked Smith "to direct $500,000 in New York State funding for improvement of a road that would benefit the Real Estate Project," a request Smith characterized as "doable."  (*Id*. ¶ 44.)  Smith said that he would speak with the Spring Valley State Senator "to help get the funding allocated in the State budget."  (*Id*.)  Later on the same day, the UC, the CW, and Smith met with Halloran.  (*Id*. ¶ 45.)  Smith said to Halloran, "You've been busy," to which Halloran replied that it had been "a heavy lift."  (*Id*.)  After this meeting, Halloran and the UC met to follow up, and "discussed scheduling meetings with [Tabone] and [Savino] for the purpose of making payments to them."  (*Id*. ¶ 46.)  During this meeting, the UC paid Halloran $500 in cash.  (*Id*.)

The meeting with Savino happened four days later, on or about February 14, 2013, at a restaurant in Manhattan, with Halloran, the UC, and the CW also in attendance.  (*Id*. ¶ 47.)  "At

one point during the evening, the UC and [Savino] stepped outside . . . [and into] the UC's car," where the UC paid Savino $15,000 in cash.  (*Id*.)  At this time, the UC and Savino "agreed that the UC would pay Savino an additional $15,000 after Savino signed a Wilson Pakula certificate for Smith."  (*Id*.)  To facilitate this payment, Savino, who is a lawyer, "proposed that he send the UC a retainer agreement for $15,000 in legal services."  (*Id*.)  The UC told Savino that if he needed "some bullshit number, or something, to call it," to just "invoice [him] for something," to which Savino responded, "Yeah, absolutely."  (*Id*.)  Savino also informed the UC that another county chairman was on board, so they "already [had] two."  (*Id*.)

Later during that same evening, "the UC spoke separately with [Tabone] at the same restaurant in Manhattan," and suggested paying him "[t]wenty now, twenty later," to which Tabone responded, "I was thinking twenty-five now, twenty-five later."  (*Id*. ¶ 48.)  Tabone also proposed sending the UC a retainer agreement for the money, but the UC said that rather than paying a lump sum retainer, "he would make an up-front payment and then pay the other 'half' later."  (*Id*.)  Tabone stated that he was "making [a] commitment" to get Smith a Wilson Pakula certificate; when the UC questioned whether he could deliver, Tabone responded, "I run the Queens County Republican Party.  Nobody else runs the party.  I run the party."  (*Id*.)  "During the conversation, Tabone frisked the UC in an apparent effort to make sure that the UC was not recording their conversation."  (*Id*.)  However, "[t]he UC was, in fact, recording the conversation."  (*Id*.)  The UC eventually paid Tabone $25,000 in cash.  (*Id*. ¶ 49.)  The next day, on or about February 15, 2013, the UC paid Halloran $15,000 in cash "in exchange for Halloran having arranged the meetings the day before with [Savino] and [Tabone]."  (*Id*. ¶ 50.)

On or about February 17, 2013, while the UC was in North Carolina, Smith and the UC discussed by telephone "how the UC should conduct a conversation with the Spring Valley State

Senator about the Real Estate Project," and discussed "paying a bribe" to ensure the support of County Chairman #1.  (*Id.* ¶ 51.)  Smith said that because he only needed three signatures to permit him to appear on the Republican Party ballot, and because County Chairman #1 would be the fourth chairman to sign a Wilson Pakula certificate, County Chairman #1 should receive "less" than Tabone and Savino, and that he should be told why this was so.  (*Id.*)

More than a month later, on or about March 21, 2013, Smith met with the UC and the CW in Smith's New York State Senate office in Albany, New York, where Smith "raised the subject of the $500,000 in state transportation funding that he had agreed to help the UC and the CW obtain" in connection with the Real Estate Project.  (*Id.* ¶ 52.)  Smith expressed surprise that the UC and the CW had not "see[n]" the Spring Valley State Senator, and asked, "Why don't you use him up for your little road stuff.  I bet ya he can."  (*Id.*)  He also communicated that he thought that he had "found another place for him to do it, too"—"[o]ut of multi-modal money," which was "outside the budget" and "always around."  (*Id.*)

The three then discussed the county committee leaders.  (*Id.* ¶ 53.)  The UC told Smith that the committee leaders were going to meet on April 3, "do their little kabuki dance," "discuss it," and that "they got a hundred thousand dollar reasons to come out and say hey, here we go." (*Id.*)[3]  Smith asked the UC if he had "[given] it to them already," to which the UC replied that he had given them, "like we discussed—half."  (*Id.*)  Discussing the possibility that the committee leaders might "screw" Smith and the UC, Smith said, "[W]hen you screw somebody over money

---

[3] Kabuki is a "400-year-old Japanese stage tradition" that "[political] [p]undits use . . . as a synonym for 'posturing.'"  Jon Lackman, *It's Time To Retire Kabuki: The Word Doesn't Mean What Pundits Think It Does*, Slate (Apr. 14, 2010), http://www.slate.com/articles/life/the_good_word/2010/04/its_time_to_retire_kabuki.html.

16

like that . . . you're looking over your shoulder all the rest of your life . . . ."  (*Id.*)  He continued,

"And any time you do that, imagine you came to me and said, Malcolm, they screwed me. . . .  I

got them already asking me about judgeships, because you know judgeships now come through

here, it comes through the governor."  (*Id.*)  Smith also said that the committee leaders would be

"screwed if they try to play the game and string it along."  (*Id.* ¶ 54.)  When the UC mentioned

that the "only thing" was that the committee leaders could "maybe" try to "shake[]" them down

"for a little bit more," Smith responded that he "wouldn't do. [He] wouldn't touch 'em."  (*Id.*)

Smith said that he would say, "I'm not giving you a freaking dime."  (*Id.*)  If he "even gave" the

committee leaders "a nickel more," they would "have to stand on the Empire State Building, and

drop every person [they] endorsed, and hold Malcolm up and say he's the best thing since sliced

bread.  Matter of fact, he's better than sliced bread."  (*Id.*)  The UC suggested that he could tell

the committee leaders that if they "want[ed] to up the ante a little bit on the back end," they

would "have to do more."  (*Id.* ¶ 55.)  Smith said, "Let's close the deal . . . .  I wouldn't do

anything with them until you close the first deal.  I would close it first."  (*Id.*)  After the UC

referenced his own possible naïveté in this "back world," Smith replied, "Business is business.

They understand."  (*Id.* ¶ 56.)  The UC then explained that the committee leaders were "crying

about what they [needed]," "all this stuff with . . . oh, I got a kid in college, I got debts . . . I got a

vacation home."  (*Id.*)  Smith replied, "You know what you do?  Tell him . . . I got a kid in

Albany that needs to be born.  So, when you birth him, when you birth my child up in Albany,

I'll . . . help you with your kid."  (*Id.*)

Approximately 11 days later, on April 1, 2013, the Government filed a sealed Complaint

against Smith, Halloran, Tabone, Savino, Jasmin, and Desmaret.  (*See* Dkt. Nos. 1–2.)  All six

were arrested the following day.  (*See* Dkt. No. 5.)

B.  Procedural Background

The Indictment that the Grand Jury returned on April 18, 2013, contains ten counts, only four of which are directly relevant to the instant Motions:

- Count One (New York City Political Party Official Bribery Conspiracy), which alleges that Smith, Halloran, Tabone, and Savino conspired to commit wire fraud and bribery in violation of 18 U.S.C. §§ 1343, 1346, and 1952, in violation of 18 U.S.C. § 371, (*see* Indictment ¶¶ 57–58);

- Count Two (Wire Fraud—New York City Political Party Officials), which alleges that Smith, Halloran, Tabone, and Savino, having devised and intending to devise a scheme and artifice to defraud, and to deprive New York City Republican Party county committees and members of the Republican Party of the honest services of leaders of such county committees, transmitted and caused to be transmitted telephone calls and text messages in interstate and foreign commerce for the purpose of executing such scheme and artifice, and attempting to do so, in violation of 18 U.S.C. §§ 1343, 1346, 1349, and 2, (*see* Indictment ¶¶ 62–65);

- Count Three (Travel and Use of Interstate Facilities to Commit Bribery—New York City Political Party Officials), which alleges that Smith, Halloran, Tabone, and Savino caused the UC to travel in interstate and foreign commerce and used and caused the use of the mail and facilities that transmitted telephone calls, text messages and emails, with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on, of bribery in violation of New York Penal Law §§ 200.45 and 200.50, and thereafter acted to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of the unlawful activity, in violation of 18 U.S.C. §§ 1952(a)(3) and 2, (*see* Indictment ¶¶ 64–65); and

- Count Four (Hobbs Act Extortion—New York State Transportation Money), which alleges that Smith knowingly obstructed, delayed, and affected commerce and the movement of an article and commodity in commerce, by extortion, as that term is defined in 18 U.S.C. § 1951(b)(2), and attempted so to do, as the UC and the CW paid bribes on Smith's behalf to obtain for Smith approval to run for New York City Mayor as a Republican in return for Smith using, and agreeing to use, his official position to help the UC and CW obtain New York State funds that would benefit the Real Estate Project, in violation of 18 U.S.C. § 1951, (*see* Indictment ¶¶ 66–67).

18

Halloran was the first Defendant to file a Motion To Dismiss, on August 6, 2013.  (*See* Dkt. Nos. 79–81.)  Smith was next, filing his Motion To Dismiss on September 3, 2013.  (*See* Dkt. Nos. 91–93.)  Halloran then filed a Motion to Join Co-Defendants' Motions To Dismiss on September 6, 2013,  (*see* Dkt. No. 103), and Tabone filed his Motion To Dismiss on September 9, 2013,  (*see* Dkt. Nos. 105–09).  Tabone and Halloran both filed Motions To Sever on September 20, 2013.  (*See* Dkt. Nos. 112–20.)  The Government filed its Memorandum in Opposition to Defendants' Motions To Dismiss and Motions To Sever on October 7, 2013,  (*see* Dkt. No. 128), in response to which Smith, Tabone, and Halloran submitted Reply Memoranda on October 21, 2013,  (*see* Dkt. Nos. 142–45).  The Court heard oral argument on Defendants' Motions on December 5, 2013.  (*See* Dkt. No. 164.)

## II.  Discussion

### A.  Standard of Review

Defendants have brought their Motions To Dismiss on the grounds that the Court lacks jurisdiction as to certain counts, and that certain counts fail to state an offense.  "[A]t any time while the case is pending," a defendant may move to dismiss an indictment on the grounds that it "fails to invoke the court's jurisdiction or to state an offense."  Fed. R. Crim. P. 12(b)(3)(B); *see also United States v. Litvak*, No. 13-CR-19, 2013 WL 5740891, at *2 (D. Conn. Oct. 21, 2013) (same).  "A defendant faces a high standard in seeking to dismiss an indictment, because an indictment need provide the defendant only a plain, concise, and definite written statement of the essential facts constituting the offense charged."  *United States v. Post*, 950 F. Supp. 2d 519, 527 (S.D.N.Y. 2013) (internal quotation marks and citations omitted) (citing Fed. R. Crim. P. 7(c)(1)) .  "It bears recalling that [the Second Circuit has] consistently upheld indictments that do little more than to track the language of the statute charged and state the time and place (in

19

approximate terms) of the alleged crime." *United States v. Bout*, 731 F.3d 233, 240 (2d Cir. 2013) (emphasis and internal quotation marks omitted).  "The indictment is sufficient if it 'contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and . . . enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" *Post*, 950 F. Supp. 2d at 527 (alteration in original) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)); *see also United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998) (same).  However, "[a] charge in an indictment is insufficient and must be dismissed when it does not describe conduct that is a violation of the criminal statute charged." *Litvak*, 2013 WL 5740891, at *2 (citing *Russell v. United States*, 369 U.S. 749, 764–65 (1962); *United States v. Pirro*, 212 F.3d 86, 93 (2d Cir. 2000)); *see also United States v. Aleynikov*, 676 F.3d 71, 75–76 (2d Cir. 2012) ("Since federal crimes are solely creatures of statute, a federal indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute." (citations and internal quotation marks omitted)).  Although a constitutional attack on an indictment technically may not be an argument that the indictment "fails to invoke the court's jurisdiction or to state an offense," a court may still address such an argument within the context of a Rule 12(b)(3)(B) motion, "because an indictment's defects can affect a defendant's substantive rights at trial." *Post*, 950 F. Supp. 2d at 527–28; *see also United States v. Hashmi*, No. 06-CR-442, 2009 WL 4042841, at *3, *6–7 (S.D.N.Y. Nov. 18, 2009) (considering defendant's argument that relevant statute was unconstitutionally vague alongside defendant's argument that indictment failed to allege essential elements of offense).

 B. <u>Analysis</u>

   Defendants collectively raise a multitude of arguments as to why the Court should dismiss all or part of Counts One, Two, Three, and Four.  Halloran argues that the Court should

dismiss the portion of Count One charging a conspiracy to violate the Travel Act, as well as all of Count Three, which charges a substantive Travel Act violation, insofar as they depend on underlying violations of New York Penal Law §§ 200.45 and 200.50, neither of which any Defendant could have violated as a matter of law based on the facts that the Government has alleged.  (*See* Def. Halloran's Mem. of Law in Supp. of His Mot. To Dismiss ("Halloran Mem.") 2–25.)  Tabone and Smith both make substantially similar arguments.  (*See* Def. Smith's Mem. of Law in Supp. of His Mot. to Dismiss ("Smith Mem.") 19–28; Def. Tabone's Mem. in Supp. of His Mot. To Dismiss ("Tabone Mem.") 3–15.)

Tabone also argues that the Court should dismiss the portion of Count One charging a conspiracy to violate 18 U.S.C. § 1343 ("the Wire Fraud Statute") and the Honest Services Fraud Statute, as well as all of Count Two, which charges a substantive violation of those statutes, for two reasons; first, because the Honest Services Fraud Statute is void for vagueness as applied to Defendants; and second, because he owed no fiduciary duty to the New York City Republican Party county committees or members of the Republican Party as a matter of law, which means that the Government failed to charge a crime within the statute's ambit.  (*See* Tabone Mem. 15–38.)[4]  In their Reply Memoranda, Halloran joins the second of these arguments,  (*see* Def. Halloran's Reply Mem. of Law in Supp. of His Mot. To Dismiss ("Halloran Reply Mem.")

---

[4] For the purposes of this Opinion, the Court will refer to the conduct prohibited by the Wire Fraud and Honest Services Fraud statutes in conjunction as "honest-services wire fraud," adopting a common convention that the Second Circuit employed in a recent case involving the subject.  *See United States v. Nouri*, 711 F.3d 129, 137 (2d Cir. 2013) ("Defendants contend the court's instructions on honest-services wire fraud were erroneous because the court failed to limit the definition of honest-services wire fraud to bribery and kickback schemes . . . ."), *cert. denied sub nom. Martin v. United States*, 134 S. Ct. 309 (2013).

10–15), while Smith joins both, (*see* Def. Smith's Reply Mem. of Law in Supp. of His Mot. To Dismiss ("Smith Reply Mem.") 1–7).[5]

Defendants also raise several additional arguments for dismissal, which are subsidiary to those described above only to the extent that Defendants have devoted significantly less briefing space to their development. Tabone argues that the portion of Count One charging honest-services-wire-fraud conspiracy, and all of Count Two, which charges substantive honest-services wire fraud, should be dismissed because they do not plead with sufficient particularity the charges against him, in violation of the Fifth and Sixth Amendments. (Tabone Mem. 38–39.)[6] Smith argues that the portion of Count One charging a Travel Act conspiracy, and all of Count Three, which charges a substantive Travel Act violation, should be dismissed for lack of federal jurisdiction, (*see* Smith Mem. 28–33); that Count Four, which charges a substantive violation of 18 U.S.C. § 1951 ("the Hobbs Act"), should be dismissed for failure to allege inducement, (*see id*. at 33–37); and that portions of paragraphs 26 and 27 of the Indictment should be stricken as prejudicial surplusage, (*see id*. at 37–40). The Court will address each argument in turn.

---

[5] In his Motion To Dismiss, Halloran "[did] *not* contest the honest services fraud basis for the conspiracy, though he reserve[d] the right to do so later." (Halloran Mem. 3.) For his part, Smith misconstrued the portions of the Indictment related to honest-services wire fraud in his Memorandum of Law, basing his arguments on the premise that "[t]he government's honest services fraud theory is that Smith, Halloran, Tabone and Savino engaged in a scheme to defraud the public of the honest services of officers of the Republican Party," (Smith Mem. 4), when in fact the Indictment alleges that those individuals "devised . . . a scheme . . . to defraud, and to deprive" not the public, but "New York City Republican Party county committees and members of the Republican Party of the honest services of leaders such county committees," (Indictment ¶¶ 59, 63). Recognizing his mistake, Smith addressed the Government's actual theory in his Reply Memorandum. (*See* Smith Reply Mem. 1–7.)

[6] Tabone also challenges the conspiracy and substantive honest-services-wire-fraud and Travel Act charges based on First Amendment and federalism principles at various points throughout his Memorandum of Law. The Court will address these arguments where appropriate.

### 1.  Failure To State a Travel Act Predicate Offense

All three moving Defendants seek dismissal of the conspiracy and substantive Travel Act violations charged in Counts One and Three.  The Travel Act provides in relevant part that, "[w]hoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with [the] intent to . . . promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and [who] thereafter performs or attempts to perform" such activity, shall be guilty.  18 U.S.C. § 1952(a)(3)(A).  The statute defines "unlawful activity" in pertinent part as "bribery . . . in violation of the laws of the State in which committed . . . ."  *Id.* § (b)(i)(2).  Where the Government charges Travel Act violations in reliance on underlying violations of state bribery laws, "the indictment must simply allege a predicate act which *would* violate state [bribery] law[s], and then the Government must prove at trial that such activity *was* unlawful under state [bribery] law[s]."  *United States v. Giampa*, No. 92-CR-437, 1992 WL 322028, at *5 (S.D.N.Y. Oct. 29, 1992) (emphasis added); *see also United States v. Salameh*, 152 F.3d 88, 152 (2d Cir. 1998) ("[T]he initial inquiry in a Travel Act case is whether the underlying activity violates a state law." (internal quotation marks omitted)).

Here, the Travel Act charges are predicated on Defendants' alleged violation of New York Penal Law Sections 200.45 and 200.50, which read as follows:

> A person is guilty of bribe giving for public office when he confers, or offers or agrees to confer, any money or other property upon a public servant or a party officer upon an agreement or understanding that some person will or may be appointed to a public office or designated or nominated as a candidate for public office.

N.Y. Penal Law § 200.45.

> A public servant or a party officer is guilty of bribe receiving for public office when he solicits, accepts or agrees to accept any money or other property from another

person upon an agreement or understanding that some person will or may be appointed to a public office or designated or nominated as a candidate for public office.

*Id.* § 200.50.

The Government's theory is fairly straightforward.  As described above, because Smith was a registered Democrat, New York state election law did not permit him to "run for Mayor as a Republican absent the written consent of three of the City's five Republican Party county chairmen."  (Indictment ¶ 1.)  This written consent "is commonly referred to as a 'Wilson Pakula certificate.'"  (*Id.*)  The Government alleges that "Smith agreed with . . . Halloran, [the UC], and [the CW] to bribe [Tabone and Savino]," respectively the Vice Chairman of the Queens County Republican Party and the Chairman of the Bronx County Republican Party, "in exchange for [their] authorization for Smith to appear on the 2013 New York City mayoral ballot as a Republican candidate . . . ."  (Government's Mem. of Law in Opp. to Defs.' Pretrial Mots. ("Government Mem.") 3.)  Under these facts, Smith and Halloran committed "bribe giving for public office" under § 200.45, because they "confer[red] . . . money . . . upon a . . . party officer upon an agreement or understanding that some person will or may be appointed to a public office or designated or nominated as a candidate for public office," while Tabone and Savino commited "bribe receiving for public office" under § 200.50 because they "accept[ed] . . . money . . . from another person upon an agreement or understanding that some person will or may be appointed to a public office or designated or nominated as a candidate for public office."

The requirement that an aspirant to the Mayor's office such as Smith obtain a Wilson Pakula certificate before being allowed to run on another party's ballot is derived from New York Election Law § 6-120, which reads in part as follows:

24

1.  A petition, except as otherwise herein provided, for the purpose of designating any person as a candidate for party nomination at a primary election shall be valid only if the person so designated is an enrolled member of the party referred to in said designating petition at the time of the filing of the petition.

2.  Except as provided in subdivisions three and four of this section, no party designation or nomination shall be valid unless the person so designated or nominated shall be an enrolled member of the political party referred to in the certificate of designation or nomination at the time of filing of such certificate.

3.  The members of the party committee representing the political subdivision of the office for which a designation or nomination is to be made . . . may, by a majority vote of those present at such meeting provided a quorum is present, authorize the designation or nomination of a person as candidate for any office who is not enrolled as a member of such party as provided in this section.  In the event that such designation or nomination is for an office to be filled by all the voters of the city of New York, such authorization must be by a majority vote of those present at a joint meeting of the executive committees of each of the county committees of the party within the city of New York, provided a quorum is present at such meeting.

N.Y. Elec. Law § 6-120.[7]

Defendants argue that the Travel Act counts must be dismissed, as they fail to allege predicate acts that would violate Section 200.45 and 200.50.  Boiled down to its essence, their argument is that "[t]hose statutes criminalize bribery in exchange for an 'appointment' to public office, or a 'designation' or 'nomination' as a candidate to public office.  A Wilson-Pakula

---

[7] The Government appears to read Section 6-120 as meaning that Smith could not have "run for Mayor as a Republican absent the written consent of *three of the City's five Republican Party county chairmen*," (Indictment ¶ 1 (emphasis added)), while the statute states that "such authorization must be by *a majority vote of those present at a joint meeting of the executive committees of each of the county committees of the party within the city of New York*, provided a quorum is present at such meeting," N.Y. Elec. Law § 6-120(3) (emphasis added).  Presumably, there are other members of the county committees' executive committees besides the chairmen; otherwise, it would not make sense to describe those bodies as committees.  As such, a situation could conceivably arise in which the committees' chairmen voted *against* granting a Wilson Pakula certificate, but the other executive committee members voted *for* granting such a certificate, with the net result being that the Wilson Pakula certificate was issued, despite the chairmen's opposition.  However, for the purposes of Defendants' Motions, this is a distinction without a difference; the Government's apparent reading of the statute does not in any way impact the Court's analysis, as will become clear throughout the course of this Opinion.

25

certificate is none of those things.  Rather, it is an 'authorization'—a very different thing under

New York law . . . ."  (Smith Mem. 19–20; *see also* Halloran Mem. 11, 18 ("The very language

of the Wilson Pakula statute indicates that the Wilson Pakula certificate is not the same as a

designation or nomination . . . .  A Wilson Pakula certificate . . . [is also] not a promise that

someone will be 'appointed to public office' . . . . "); Tabone Mem. 3 ("A Wilson Pakula

authorization has a precise meaning under New York State Election Law, and does not constitute

an appointment, nomination or designation for the purposes of the New York bribery statute

underpinning the Travel Act allegations.").)  In support of their argument, Defendants start with

the text of Section 6-120 itself, which states that the members of the party committees may

"*authorize the designation or nomination* of a person as candidate for any office," N.Y. Elec.

Law § 6-120(3) (emphasis added), thereby distinguishing between "authorization"—a function

performed by Wilson Pakula certificate—and "designation" or "nomination"—functions

performed, for example, by designating petition or primary election.  Defendants also cite to

New York case law, including two recent cases that they claim draw this same distinction:

*Bankoski v. Green*, 970 N.Y.S.2d 843 (App. Div. 2013), and *Potanovic v. French*, 885 N.Y.S.2d

90 (App. Div. 2009).

　　　　In *Bankoski*, the court referred to the Wilson Pakula certificates that were the subject of

the case as "*authorizing* respondents . . . to be *designated* as candidates on the ballot," and noted

that they "*authorized* the Unenrolled Candidates to be *designated* as candidates on the party's

primary ballot."  970 N.Y.S.2d at 844 (emphasis added).  The court also stated that, "[b]ecause

the Unenrolled Candidates were registered Republicans, they could not be *designated* as

candidates on the Conservative Party's primary ballot without *authorization* from the party

committee . . . ."  *Id.* (emphasis added) (internal quotation marks omitted) (citing N.Y. Elec. Law

§ 6-120(3)).  *Potanovic* affords additional support for Defendants' argument.  In concluding that there was "no conflict between the rules and regulations of the Conservative Party Committee of Dutchess County . . . and the rules and regulations of the Conservative Party Committee of the Town of Beekman," the court noted that the rules "establish that the Town Committee has the right to *nominate or designate* a nonparty candidate for a town office, but that candidate must be *authorized* by the County Committee during a Wilson–Pakula meeting."  *Potanovic*, 885 N.Y.S.2d at 91 (emphasis added).  In other words, it was essential to the court's holding that nomination and designation on the one hand and authorization on the other are separate functions.[8]  Thus, according to Tabone, "[t]he Wilson Pakula authorization merely puts the potential candidate in the same position as all other registered voters of that party.  It does not advance the potential candidate to the level of designation, nomination or appointment as a candidate for public office."  (Tabone Mem. 7–8.)  Instead, "[a]fter obtaining a Wilson Pakula authorization, a potential candidate must then present a petition signed by either 5% of the persons registered in the party, or by 7,500 persons, whichever is fewer[,] in order to qualify for the primary race."  (*Id.* at 9 (citing N.Y. Elec. Law § 6-136(2)(a)).)

In response, the Government does not dispute that a Wilson Pakula certificate is not a designation, nomination, or appointment.  Instead, the Government argues that it need not be for Defendants' conduct to violate the statutes:

> Section 200.45 and 200.50 bar bribery in connection with an "agreement or understanding" that someone "will or *may be*" appointed, nominated, or designated. The natural reading of that text is that bribery is barred with respect to both (i) *the*

---

[8] As Smith correctly notes, whether a Wilson Pakula certificate is an "appointment" within the meaning of the bribery statutes on which the Government premises its Travel Act charges is not at issue in this case, as New York City Mayor is an elected and not an appointed position.  (*See* Smith Mem. 21.)

> *guarantee* of an appointment, nomination, or designation; and (ii) *permission to seek or the possibility of obtaining* an appointment, nomination, or designation . . . .  The inclusion of the words "may be" in the statutory text—which are completely ignored by [Defendants]—expand the scope of the prohibited conduct to reach not just the *certainty* of obtaining an appointment, nomination, or designation, but also the *possibility* of obtaining such a benefit.

(Government Mem. 23 (first emphasis in original).)  The Government cites to three sources in support of its construction of the statute: the seventh edition of *Black's Law Dictionary*; *United States v. Dillard*, 214 F.3d 88 (2d Cir. 2000); and the New York Pattern Jury Instructions.  The Government states that *Black's Law Dictionary* defines "may" as "[i]s permitted to," "[h]as a possibility (to)," and "might," *see Black's Law Dictionary* 993 (7th ed. 1999), while *Dillard* reinforces that definition, noting in relation to a clause contained in 18 U.S.C. § 3156 that it "speaks to offenses that give rise to a possibility, rather than a certainty, that force may be used," which is "clear from its use of the terms 'susbtantial *risk* that physical force . . . *may* be used.'" *Dillard*, 214 F.3d at 92 (alteration in original) (quoting 18 U.S.C. § 3156(a)(4)(B)).  According to the Government, the New York Pattern Jury Instructions reinforce its position, as "[u]nder those instructions, bribery violates Sections 200.45 and 200.50 when the object of the bribery is that 'a person *would or might* be appointed to public office or designated or nominated as a candidate for public office.'" (Government Mem. 23 (quoting CJI2d[NY] Penal Law §§ 200.45, 200.50 (emphasis added)).)  These jury instructions "make plain that these laws are violated when the bribe is in exchange for (i) the promise of an appointment, designation, or nomination ('would be'); or (ii) other steps taken for the purpose of causing or creating the possibility of an appointment, designation or nomination ('might be')."  (Government Mem. 24.)

　　　　The Government further argues that "[t]his construction makes good sense, as it reflects that there are occasions where a public servant or party official can directly confer a benefit in

exchange for a bribe, such as an appointment, designation, or nomination that is solely within the discretion of that official," in addition to "occasions where a public servant or official can confer only eligibility for a benefit because the ultimate appointment, designation, or nomination lies beyond a single official's power." (*Id.* (citations omitted).)  As an example of the former type of situation, the Government notes that "the Chairman [sic] of the Nassau County Democratic and Republican Committees are given the authority to nominate a Commissioner of the Nassau County Board of Elections."  *Id.* (internal quotation marks omitted) (quoting *United States v. Margiotta*, 688 F.2d 108 (2d Cir. 1982), *overruled on other grounds by McNally v. United States*, 483 U.S. 350 (1987), *as recognized in United States v. Bahel*, 662 F.3d 610, 633 (2d Cir. 2011)).  As an example of the latter type of situation, the Government notes that, in one New York school district, "[t]he Superintendent's recommendation is a screening device which brings before the Board of Education all those [probationary teachers] who are qualified by objective standards for . . . appointment [to tenure,] which [appointment] is made by the Board alone."  *Id.* (internal quotation marks omitted) (quoting *Tischler v. Bd. of Educ. of Monroe Woodbury Cent. Sch. Dist. No. 1*, 323 N.Y.S.2d 508, 512 (App. Div. 1971)).  The Government contends that "[a] Wilson-Pakula certificate falls within the latter category of benefit for which bribery is prohibited under Sections 200.45 and 200.50":

> As the defendants acknowledge, a Wilson-Pakula certificate is permission, authorization or approval to seek a designation or nomination.  Upon the issuance of such a certificate, a non-party member "may be" nominated or designated as a candidate.  In other words, he or she is then "permitted to" seek a nomination or designation, or "might be" nominated or designated.  Conversely, absent such an authorization, a non-party member cannot be nominated or designated a candidate.

(*Id.* (citations omitted).)

Smith counters by stating that "the government's reading is not the most logical interpretation of Penal Law §§ 200.45 and 200.50."  (Smith Reply Mem. 7.)  "A more logical (and simpler) reading of the statute is that 'may be' simply indicates 'possibility,'" which is to say that the "will or may be" clause covers both: "(a) situations where a bribe is given in exchange for a definite agreement that a person 'will be' designated or nominated; and (b) situations where a bribe is given in exchange for an agreement that a person 'might be' designated or nominated, without a guarantee that the designation or nomination will occur." (*Id.* at 8.)  By including the word "may," the statute "brings within [its] ambit . . . situations where, for example, a party officer agrees to 'put a good word in for' or 'support' or 'campaign for' a person, without an 'agreement or understanding' that the person *will* be designated or nominated."  (*Id.*)  The inclusion of the second category of situations covered by the statute is "important . . . because in many instances 'a public servant or party officer' does not have the individual power or authority to guarantee that a person 'will' be designated or nominated." (*Id.*)  By including the word "may," "the statute is able to reach 'a public servant or a party officer' illicitly impacting the designation or nomination process, despite the fact that the public servant or party officer lacks the power to promise or guarantee that someone 'will be' designated or nominated."  (*Id.*)  According to Smith, "[a] simple example demonstrates why the government's interpretation is illogical.  Under the government's interpretation," the statutes would not apply "where a public servant accepted a bribe for agreeing to support a person's efforts to be designated or nominated, where the public servant explicitly stated that he or she could not guarantee that a designation or nomination would result," as "[i]n that case there is no agreement that the person 'will' be designated or nominated (no guarantee)."  (*Id.* at 9.)  Further, "under the government's reading of the statutes the term 'may be' applies to cases where

'permission, authorization or approval' is required—not to cases where there is an agreement relating to only the 'possibility' of designation or nomination." (*Id.*) Smith suggests that the Government's interpretation "is not a logical reading of the statutes, nor a reading that comports with the general intent of the statutes (to criminalize bribe giving or receiving in connection with an appointment, designation or nomination)." (*Id.*)

As the Court will discuss in detail below, it essentially agrees with Smith's interpretation. However, from Defendants' perspective, the problem with Smith's interpretation, whereby the word "may" encompasses a second category of "situations where a bribe is given in exchange for an agreement that a person 'might be' designated or nominated, without a guarantee that the designation or nomination will occur," is that the examples that he provides suggest that the granting of a Wilson Pakula certificate in exchange for money would fall well within this second category. Tabone and Savino allegedly "accepted a bribe for agreeing to support a person's efforts to be designated or nominated," "[did] not have the individual power or authority to guarantee that [Smith] '[would] be' designated or nominated," and might even have "explicitly stated" as much. Their role in granting the Wilson Pakula certificate could be likened to "support[ing]" Smith, thereby "illicitly impacting the designation or nomination process." Smith's interpretation is thus even *more* expansive than the interpretation that the Government urges the Court to adopt, and would encompass the conduct described in the Indictment.

Halloran does not offer a specific interpretation of the statute different from that which the Government or Smith puts forward. Instead, he argues that "[t]he original Wilson Pakula statute was passed in 1947, but no bribery charges were brought for payment in exchange for a Wilson Pakula from 1947 to 1965. This absence of evidence indicates that substantive New York bribery law before 1965 did not punish payment in exchange for a Wilson Pakula

31

certificate." (Halloran Reply Mem. 4 (internal quotation marks omitted).) Further, because the New York Court of Appeals noted in *People v. Bac Tran*, 603 N.E.2d 950 (N.Y. 1992), "that, in adopting the 1965 bribery laws," of which Sections 200.45 and 200.50 form two parts, "there was no intent to make substantive changes in existing law," "this implies that payment for a Wilson Pakula certificate is still not bribery today." (*Id.* (internal quotation marks omitted).) Halloran also asserts that "the bribery statutes [cannot] apply to payment for a Wilson Pakula certificate because, despite the 1965 legislature's knowledge of the Wilson Pakula statute and the specificity of the 1965 statutes, payment for a Wilson Pakula certificate was not noted in the laws' language." (*Id.*) Indeed, Halloran asserts that "there has never been a bribery prosecution for payment made for a Wilson Pakula certificate," which "means [that] in over 50 years of bribery statutes, no New York State prosecutor has argued that a payment made for a Wilson Pakula certificate violates New York law, a fact entitled to great weight." (*Id.* at 9.) In addition to these points, Halloran cites to two New York state bribery cases, *People v. Burke*, 371 N.Y.S.2d 63 (Sup. Ct. 1975), and *People v. Cunningham*, 390 N.Y.S.2d 547 (Sup. Ct. 1976). (*Id.* at 5–9.) He claims that "the government's argument is . . . incongruous with *Burke*, as the definition of 'may' that the government urge[s] here is one-step removed from the definition of 'may' inherently rejected by *Burke*," (*id.* at 6), and that the holding in *Cunningham* "undercuts the government's argument for an expansive interpretation of the term 'may,'" (*id.* at 7).

Tabone responds to the Government's interpretation of the statutes by arguing that, even if the Court were to "overlook the lack of State prosecution or other precedent . . . , and additionally were to overlook the Government's interference in a matter of traditional state concern, the Court would be hard pressed to find any conceivable way to limit the reach of the statute so it does not encompass a broad range of protected legal activity." (Def. Tabone's Reply

Mem. of Law in Supp. of His Mot. To Dismiss ("Tabone Reply Mem.") 15–16.)  According to Tabone, if the Court were "to adopt the expansive reading of the term 'may be' advocated by the Government, then nearly all conduct could, regardless of how attenuated, be potentially criminal," which would "have a chilling effect on the protected legal activities of countless party members, volunteers, consultants, attorneys, and other individuals involved in the political process," and "raise fairness concerns, as defendants do not have 'fair warning' that their conduct could be considered criminal." (*Id.* at 16.)  Tabone also argues that "[s]erious federalism concerns arise where there would be federal criminalization of conduct where the individual is innocent under state law." (*Id.*)  Additionally, he claims that "[c]ourts have long recognized that the interest in protecting the integrity, fairness, and efficiency of ballots and election processes as a means for electing public officials is a matter of traditional State concern," and here, "[t]he conduct at issue regards the internal functions and management of the Queens County Republican Party, which is governed by the laws and regulations of New York State and its own Party rules and regulations[,] . . . not those of the federal government." (*Id.* at 16–17.)  "[T]here is simply not sufficient Federal nexus to warrant the level of intrusion brought by this prosecution." (*Id.* at 17.)

The Parties have not cited to, and the Court has been unable to locate, any case in which the New York Court of Appeals has discussed Sections 200.45 and 200.50 in general, much less the precise meaning of the word "may" as it appears therein.  Further, the Parties have identified only one case, *People v. Cunningham*, 390 N.Y.S.2d 547 (Sup. Ct. 1976), in which any lower state court has purported to discuss either of those sections.  (*See* Halloran Reply Mem. 6 ("*Cunningham* is the only reported New York case of criminal charges brought under either [of] the bribery statutes.").)  The Court will analyze *Cunningham* in depth below, but for a variety of

reasons that the Court will explain, this case does not fully resolve the issue at hand.

Additionally, the Parties have not provided, and there does not appear to be, any legislative

history directly on point.

"Where state law is unsettled, [as it is here,] [the Court is] obligated to carefully predict

how the state's highest court would resolve the uncertainty or ambiguity." *In re Thelen LLP*,

736 F.3d 213, 219 (2d Cir. 2013), *certified question accepted sub nom. Thelen LLP v. Seyfarth*

*Shaw LLP*, 22 N.Y. 3d 1017 (Dec. 12, 2013) (internal quotation marks and alterations omitted).

"Where, as here, a state's highest court has not spoken on an issue, [the Court] give[s] proper

regard to the relevant rulings of a state's lower courts," and "[m]ay also consider decisions in

other jurisdictions on the same or analogous issues." *Id.* (internal quotation marks omitted).

"Other data [that the Court may consider] include . . . scholarly writings in the field, and any

other resources available to the state's highest court." *Michalski v. Home Depot, Inc.*, 225 F.3d

113, 116 (2d Cir. 2000).

According to the New York Court of Appeals, "[t]he starting point in any case of

[statutory] interpretation must always be the language itself, giving effect to the plain meaning

thereof." *Rosner v. Metro. Prop. & Liab. Ins. Co.*, 754 N.E.2d 760, 762 (N.Y. 2001) (internal

quotation marks omitted); *see also Criscione v. City of New York*, 762 N.E.2d 342, 345 (N.Y.

2001) ("Our analysis begins with the plain meaning of the relevant statutory provisions.").

"Meaning and effect should be given to all language of a statute.  Words are not to be rejected as

superfluous where it is practicable to give each a distinct and separate meaning." *Rosner*, 754

N.E.2d at 762 (internal quotation marks and alterations omitted); *see also Tall Trees Constr.*

*Corp. v. Zoning Bd. of Appeals of Huntington*, 761 N.E.2d 565, 568 (N.Y. 2001) ("Where the

language of a statute is clear and unambiguous, courts must give effect to its plain meaning;

34

words are not to be rejected as superfluous."); *Easylink Servs. Int'l Inc. v. N.Y. State Tax Appeals Tribunal*, 955 N.Y.S.2d 271, 273–74 (App. Div. 2012) ("[W]e give meaning and effect to all of the statutory language and apply the usual and ordinary meaning of the term . . . ."), *leave to appeal denied*, 992 N.E.2d 1093 (N.Y. 2013).  Additionally, "[i]n the absence of any controlling statutory definition," the New York Court of Appeals "construe[s] words of ordinary import with their usual and commonly understood meaning, and in that connection ha[s] regarded dictionary definitions as useful guideposts in determining the meaning of a word or phrase."  *Rosner*, 754 N.E.2d at 762 (internal quotation marks omitted); *see also De La Cruz v. Caddell Dry Dock & Repair Co.*, 997 N.E.2d 1223, 1225 (N.Y. 2013) ("In the absence of direct and specific evidence of the legislative intent regarding the term, a proper analysis may be informed by three sources: first and most importantly, the language of the statute . . . itself; second, precedent; and third, dictionary definition."); *Orens v. Novello*, 783 N.E.2d 492, 495 (N.Y. 2002) (relying on *Merriam–Webster's Collegiate Dictionary* and *Black's Law Dictionary* in determining meaning of term "lay member"); *Caldwell v. Alliance Consulting Grp., Inc.*, 775 N.Y.S.2d 92, 93 (App. Div. 2004) (relying on *Black's Law Dictionary* in determining meaning of term "parent").

As noted above, and as relevant to the facts alleged in the Indictment, Section 200.45 prohibits a "person" from conferring money "upon a public servant or a party officer upon an agreement or understanding that some person will or may be . . . designated or nominated as a candidate for public office," N.Y. Penal Law § 200.45, while Section 200.50 prohibits "[a] public servant or a party officer" from accepting money "from another person upon an agreement or understanding that some person will or may be . . . designated or nominated as a candidate for public office," *id.* § 200.50.  Because the Government bases its response to

35

Defendants' Motions on the word "may" in both statutes, the Court will begin its analysis by looking to dictionary definitions of that word.[9]

The fourth edition of *Black's Law Dictionary*, published in 1951, was the most recent edition to have been published as of 1965. It defines "may" in the following manner:

> An auxiliary verb qualifying the meaning of another verb by expressing ability, competency, liberty, permission, possibility, probability or contingency. Regardless of the instrument, however, whether constitution, statute, deed, contract or whatnot, courts not infrequently construe "may" as "shall" or "must" to the end that justice may not be the slave of grammar.

*Black's Law Dictionary* 1131 (4th ed. 1951) (citations omitted). Given that the fourth edition was published a full fourteen years before Sections 200.45 and 200.50 were enacted, the Court

---

[9] Although, as described above, New York courts regularly look to dictionary definitions in interpreting statutory language, the Court was unable to locate a case in which a New York court has specifically addressed whether the type of dictionary to which a court should refer in interpreting a statute is a dictionary in print at the time of the statute's enactment, or a dictionary in print at the time of the court's decision. However, absent any indication to the contrary, it seems fair to assume that a legislature intended that the terms that it employed in a statute would be given the meaning that such terms had at the time that they were used. What is more, the Supreme Court has taken this approach on multiple occasions, relying on dictionary definitions from the eras of the relevant statutes' enactments as interpretive tools. *See Sandifer v. U.S. Steel Corp.*, 134 S. Ct. 870, 876–77 (2014) ("Dictionaries *from the era of § 203(o)'s enactment* indicate that 'clothes' denotes items that are both designed and used to cover the body and are commonly regarded as articles of dress. That is what we hold to be the meaning of the word as used in § 203(o)." (emphasis added) (citations and emphasis omitted)); *Taniguchi v. Kan Pac. Saipan, Ltd.*, 132 S. Ct. 1997, 2003 (2012) ("It is telling that all the dictionaries cited above defined 'interpreter' *at the time of the statute's enactment* as including persons who translate orally, but only a handful defined the word broadly enough to encompass translators of written material. . . . Based on our survey of the relevant dictionaries, we conclude that the ordinary or common meaning of 'interpreter' does not include those who translate writings." (emphasis added)); *Negusie v. Holder*, 555 U.S. 511, 543 (2009) ("Under the ordinary meaning of the term 'persecution' *at the time of the statute's enactment in 1980 and its reenactment in 1996*, the act of persecution alone is sufficient to classify one's conduct as persecution." (emphasis added) (citing *Webster's Ninth New Collegiate Dictionary* 877 (1991) and *Webster's New Collegiate Dictionary* 855 (1975)).

36

finds it prudent also to refer to the fifth edition, published in 1979, fourteen years after the

statutes' enactment, which edition defines "may" in similar though slightly different terms:

> An auxiliary verb qualifying the meaning of another verb by expressing ability, competency, liberty, permission, possibility, probability or contingency. Regardless of the instrument, however, whether constitution, statute, deed, contract or whatever, courts not infrequently construe "may" as "shall" or "must" to the end that justice may not be the slave of grammar. However, as a general rule, the word "may" will not be treated as a word of command unless there is something in context or subject matter of act to indicate that it was used in such sense. In construction of statutes and presumably also in construction of federal rules word "may" as opposed to "shall" is indicative of discretion or choice between two or more alternatives, but context in which word appears must be controlling factor.

*Black's Law Dictionary* 883 (5th ed. 1979) (citations omitted). Another prominent

contemporary legal resource, *Ballentine's Law Dictionary*, the third edition of which was

published in 1969, four years after the statutes were passed, defines "may" as follows:

> 1. An auxiliary verb qualifying the meaning of another verb by expressing ability, contingency, liability, possibility or probability. Ordinarily a permissive, rather than a mandatory, term in a statute. Permissive rather than mandatory and, appearing in a constitutional provision, not to be construed as "shall," unless from the whole context, it plainly appears to be mandatory. Discretionary in its grammatical sense, but subject to construction as mandatory where the sense of the entire context impels such construction, as where used in a statute providing that when the bank commissioner has reasonable cause to consider a bank insolvent, he "may" immediately apply for a receiver. Frequently construed as mandatory where relating to the duty of a public officer.

> 2. A provision in a trust agreement that the trustee "may" use the principal for the beneficiary, has been regarded as mandatory.

*Ballentine's Law Dictionary* (3d ed. 1969) (citations omitted). *Webster's Third New*

*International Dictionary of the English Language, Unabridged* ("*Webster's Third*"), published in

1961, approximately four years before the statutes were enacted, provides the following

definition:

*intransitive verb*

> *obsolete* : to have power : to be able

*verbal auxiliary*

1.     *archaic* : have the ability or competence to : CAN

2.     a : have permission to
       <you *may* go now>
       <no one *may* enter without a ticket>
       <if I *may* interrupt to point out>

       : have liberty to
       <you *may* say what you please, I won't do it>
       <*may* I ask why it is forbidden>

       — used nearly interchangeably with *can*

       b: be in some degree likely to
       <you *may* be right>
       <they *may* get here in time after all>
       <*may* easily be the best play of the season>

       — used sometimes to avoid bluntness in a question
       <how old *may* you be>

       or request
       <*may* I help you, or are you already being waited on>

       — compare MIGHT

3.     — used in auxiliary function to express a wish or desire especially in prayer, imprecation, or benediction
       <*may* he reign in health>
       <*may* they all be damned>
       <*may* the best man win>

4.     — used in auxiliary function expressing purpose or expectation
       <I laugh that I *may* not weep>
       <flatters so that he *may* win favor>

       or contingency
       <he'll do his duty come what *may*>

38

or concession

<he *may* be slow but he is thorough>

— compare MIGHT

5.     : SHALL, MUST — used especially in deeds, contracts, and statutes

*Webster's Third New International Dictionary of the English Language, Unabridged*

("*Webster's Third*") (1961).

Here, it is clear from context that "may" is not being used in the statutes "to express a wish or desire especially in prayer, imprecation, or benediction," as in the phrase, "may he reign in health"; nor "to avoid bluntness in a question," as in the phrase, "how old may you be"; nor to express a "request," as in the phrase, "may I help you"; nor a "concession," as in the phrase, "he may be slow but he is thorough."  Further, nothing "in the context or subject matter" of the statute indicates that the word is being used in the sense of "shall" or "must," "a word of command," as the only statements in the statutes that ring of command are that a person "is" guilty of bribe giving, and a public servant or a party officer "is" guilty of bribe receiving, for engaging in the conduct that the statutes described.  As used in the statutes, the word "may" does not directly speak to what the parties engaged in the prohibited conduct may not do, as would be the case, for example, in a statute that provided that "public servants or party officers may not receive bribes."  Rather, the statutes employ "may" to describe the terms of the "agreement or understanding" of the parties so engaged.  Additionally, given that *Webster's Third* provides that "to have power" and "to be able" are "obsolete" meanings, and that "have the ability or competence to" is an "archaic" meaning, those definitions of the word should be set aside as well.  *Cf. Taniguchi*, 132 S. Ct. at 2003 ("Any definition of a word that is absent from many dictionaries and is deemed obsolete in others is hardly a common or ordinary meaning.");

*Villaverde v. Dir., Office of Workers' Comp. Programs*, 335 F. App'x 79, 81 (2d Cir. 2009)

("[The plaintiff] relies, in making [his] argument, on an obsolete definition . . . . His contention

is without merit."); *VDP Patent, LLC v. Welch Allyn Holdings, Inc.*, 623 F. Supp. 2d 364, 373

(S.D.N.Y. 2007) ("[T]he dictionary's . . . definition suggests that its relevance as the principal

meaning . . . is historic. Currently, the . . . reference is '*rare* or *disused*' . . . . Thus, the primary

dictionary definition advanced by plaintiff does nothing to persuade . . . .").

 Having eliminated the definitions described above, the remaining definitions from all

three sources can be grouped into three categories. The first category connotes permission or

liberty, and is probably closest to the definition that the Government advances. *See Black's Law

Dictionary* 1131 (4th ed. 1951) ("An auxiliary verb qualifying the meaning of another verb by

expressing . . . liberty, permission . . . ."); *Black's Law Dictionary* 883 (5th ed. 1979) ("An

auxiliary verb qualifying the meaning of another verb by expressing . . . liberty, permission . . .

."); *Webster's Third* (1961) ("have permission to . . . : have liberty to"). Under this category's

definitions, it might be said that, to fall within the statutes' prohibition, the money would have to

be exchanged "upon an agreement or understanding that some person will or has permission to

be designated or nominated as a candidate for public office."

 The second category connotes likelihood, possibility, probability, or contingency. *See

Black's Law Dictionary* 1131 (4th ed. 1951) ("An auxiliary verb qualifying the meaning of

another verb by expressing . . . possibility, probability, or contingency."); *Black's Law

Dictionary* 883 (5th ed. 1979) ("An auxiliary verb qualifying the meaning of another verb by

expressing . . . possibility, probability or contingency."); *Ballentine's Law Dictionary* (3d ed.

1969) ("An auxiliary verb qualifying the meaning of another verb by expressing . . .

contingency, . . . possibility or probability."); *Webster's Third* (1961) ("be in some degree likely

to").  Under the definitions contained in this category, it might be said that the money would

have to be exchanged "upon an agreement or understanding that some person will or is in some

degree likely to be designated or nominated as a candidate for public office."  In other words, the

object of the agreement or understanding would have to be to increase the likelihood or

probability that the person would be so designated or nominated.

Lastly, the third category, somewhat related to the second, connotes purpose or

expectation.  *Webster's Third* (1961) ("used in auxiliary function expressing purpose or

expectation . . . .").  Although it is harder to rephrase the statutes to emphasize the meaning that

this definition would give to their terms, such a restatement might require that the money be

exchanged "upon an agreement or understanding that some person will be designated or

nominated as a candidate for public office, or upon an agreement or understanding that the

purpose of or expectation resulting from the exchange is that the person will be so designated or

nominated."  To paraphrase the examples that *Webster's Third* provides for this category, one

might say that the parties to the agreement "exchange money so that some person may be

designated or nominated."

In choosing between these three categories, the Court does not consider the word "may"

in a vacuum.  As the New York Court of Appeals has explained, "[i]n the first instance, a

statutory term should be defined by the context of the statute rather than by the dictionary."

*Spota ex rel. Unkechaug Indian Nation v. Jackson*, 883 N.E.2d 344, 348 (N.Y. 2008); *see also*

*De La Cruz*, 997 N.E.2d at 1225 (noting that "proper analysis" of a statute includes review of

"precedent").  Here, because of the context in which the word "may" is used—specifically, its

juxtaposition with the word "will"—the Court finds that it is best defined by the second

category, as connoting likelihood, possibility, probability, or contingency.  As used in the

statutes, the word "will" conveys a sense of definiteness as to the future—the agreement or

understanding is that some person *will* be designated or nominated as a candidate for public

office.  There is no chance involved; the agreement or understanding is that the designation or

nomination affirmatively *will* come to pass.  But by including the word "may," the statutes'

drafters appear to have intended to include situations in which, despite the agreement or

understanding, there is an element of doubt as to whether the designation or nomination will in

fact ultimately occur.  It *may*; but it *may not*.  This interpretation is bolstered by the definition of

"will" contained in both the fourth and fifth editions of *Black's Law Dictionary*, which seem to

contemplate statutes' use of "will" and "may" in conjunction.  As both editions read: "An

auxiliary verb commonly having the mandatory sense of 'shall' or 'must.'  *It is a word of*

*certainty, while the word "may" is one of speculation and uncertainty*."  *Black's Law Dictionary*

1771 (4th ed. 1951) (emphasis added) (citation omitted); *see also Black's Law Dictionary* 1443

(5th ed. 1979) (same).[10]

---

[10] In support of its interpretation of the word "may," the Government cites to the New York state court system's criminal jury instructions.  (*See* Government Mem. 23.)  For Section 200.45, those instructions provide that the People are required to prove, *inter alia*, that the defendant conferred money upon a public servant or party officer "upon an agreement or understanding that a person would or *might* be . . . designated or nominated as a candidate for public office . . . ."  CJI2d[NY] Penal Law § 200.45 (emphasis added).  Similarly, for Section 200.50, those instructions provide that the People are required to prove, *inter alia*, that the defendant accepted money from another person "upon an agreement or understanding that a person would or *might* be . . . designated or nominated as a candidate for public office."  CJI2d[NY] Penal Law § 200.50 (emphasis added).  These jury instructions in fact support both the first and second definitional categories.  The fourth edition of *Black's Law Dictionary* defines "might" as follows: "The preterit of the word 'may.'  Equivalent to 'had power' or 'was possible' or 'have the physical or moral opportunity to be contingently possible.'"  *Black's Law Dictionary* 1143 (4th ed. 1951) (citation omitted).  The fifth edition provides substantially the same definition: "The past tense of the word 'may.'  Equivalent to 'had power' or 'was possible' or 'have the physical or moral opportunity to be contingently possible.'"  *Black's Law Dictionary* 895 (5th ed. 1979) (citation omitted).

Having settled on this interpretation of the word "may," based on the text and structure of the statutes, the Court now turns to the scant New York state case law to which the Parties have cited, to ensure that the conclusion that the Court has reached does not conflict with their holdings. *See De La Cruz*, 997 N.E.2d at 1225 (noting that a "proper analysis" of a statute's meaning includes review of "precedent"). The two cases in question are *People v. Burke*, 371 N.Y.S.2d 63 (Sup. Ct. 1975), and *People v. Cunningham*, 390 N.Y.S.2d 547 (Sup. Ct. 1976). Given that Halloran has argued that "the government's argument is . . . incongruous with *Burke*, as the definition of 'may' that the government urge[s] here is one-step removed from the definition of 'may' inherently rejected by *Burke*," (Halloran Reply Mem. at 6), and that *Burke* was decided one year before *Cunningham*, the Court will begin by considering that case.

In *Burke*, the defendant, John Burke ("Burke"), was charged under New York Election Law Section 448(3), a law no longer in force, which read in pertinent part as follows:

> Any person who . . . [m]akes, tenders or offers to procure, or cause any nomination or appointment for any public office or place, or accepts or requests any such nomination or appointment, upon the payment or contribution of any valuable consideration, or upon an understanding or promise thereof . . . [i]s guilty of a felony.

371 N.Y.S.2d at 64. According to the indictment, Congressman James Delaney and his challenger, James Eagan ("Eagan"), were both seeking the Republican Party's nomination for the Ninth Congressional District during the summer of 1974. *Id.* Burke was assisting Eagan with his campaign, and was also associated with him in a business venture seeking to obtain mortgage financing for a hotel. *Id.* "The gravamen of the charge [was] that . . . [Burke] met with Patrick Delaney, the latter being Congressman Delaney's son," and in the words of the indictment, "offered to cause [Eagan] to withdraw from (the) primary election, thereby causing James Delaney's nomination to be uncontested, if Patrick Delaney agreed to secure and secured

43

. . . financing for a mortgage on the [hotel]." *Id.* at 64–65 (internal quotation marks omitted). Tracking the language of the statute, the indictment alleged that "[Burke] offered to procure and cause the nomination of James Delaney as the candidate of the Republican Party . . . for the Ninth New York Congressional District upon the payment, understanding and promise of payment of a valuable consideration." *Id.* at 65 (internal quotation marks omitted).

Burke argued that the allegations "fail[ed] to charge a crime under the statute because [his] alleged offer to obtain the withdrawal of Eagan could not, as a matter of law, constitute an offer to 'procure' or 'cause' the nomination of Delaney as provided therein." *Id.* This was because "an Eagan withdrawal . . . could not prevent the possible designation of another candidate," through petition, write-in petition, or "filling of the vacancy by the committee on vacancies . . . ." *Id.* In other words, the agreement could not in fact have ensured Congressman Delaney's nomination, as ensuring the nomination was beyond Burke's and Eagan's power; rather, the agreement was to merely increase the likelihood that Congressman Delaney would receive it. The District Attorney did "[n]ot disput[e] the possibility of another candidate," but "argue[d] against dismissal by drawing the analogy to certain case law pertaining to the bribery offenses which holds those crimes to be complete upon the bribe receiver's promise to act, even though the contemplated result is beyond his authority to accomplish." *Id.* The court found the District Attorney's analogy to be "clearly inappropriate," as the bribery statutes that the District Attorney referenced were "materially different from the Election Law provision charged in th[e] indictment." *Id.* Under the former laws, "the crime of Bribe Receiving [was] committed when a public official corruptly agree[d] that his 'vote, opinion, judgment, action, decision or exercise of discretion as a public servant . . . be influenced,'" while the latter law employed in *Burke* was "not nearly as broad." *Id.* at 65–66. The conduct that Section 448(3) prohibited was "an offer to

44

'procure' or 'cause' a nomination," but what was alleged in the indictment was "merely an offer to obtain the withdrawal of a candidate. *This may well have affected the outcome of the contest but it is not what the statute prohibits.*" *Id.* at 66 (emphasis added). The court continued its analysis by quoting *People v. Willett*, 107 N.E. 707 (N.Y. 1915), a case that "confirm[ed] that the type of offer alleged in this case was never contemplated by the legislature as one to 'procure or cause' a nomination." *Burke*, 371 N.Y.S.2d at 66. A segment of the passage from *Willet* that the court quoted is reproduced below:

> [M]uch has been said and written about the power wielded by political leaders, or so-called "bosses" in the state and in the subdivisions thereof. In the second edition of "The American Commonwealth" by James Bryce . . . in discussing American politics and the power of individuals to control party nominations, he says: "There is usually some one person who holds more strings in his hand than do the others. Like them, he has worked himself up to power from small beginnings, gradually extending the range of his influence over the mass of workers and knitting close bonds with influential men, outside as well as inside politics, perhaps with great financiers or railway magnates whom he can oblige and who can furnish him with funds . . . . He dispenses places, rewards the loyal, punishes the mutinous, concocts schemes, negotiates treaties . . . . Another useful expedient has been borrowed from European monarchies in the sale of nominations and occasionally of offices themselves. A person who seeks to be nominated as a candidate for one of the more important offices, such as a judgeship or a seat in the state Senate or in Congress, is often required to contribute to the election fund a sum proportioned to the importance of the place he seeks, the excuse given for the practice being the cost of elections; and the same principle is occasionally applied to the gift of nonelective offices, the right of appointing to which is vested in some official member of a ring—e.g., a mayor."

*Id.* (some internal quotation marks omitted) (second and third alterations in original) (quoting *Willett*, 107 N.E. at 708–09). Discussing the legislative history of Section 448(3) and its predecessor, Section 775 of the Penal Law of 1909, the court then noted that the latter was "enacted . . . after the criminality of bargaining for office to be obtained by the appointment or nomination of a public officer or through a nomination at a political convention had been generally discussed and called to public attention by the press," and "when such corrupt

bargaining on the part of any person with power by reason of position or authority, official or otherwise, to make or control appointments or nominations, was quite universally condemned. The Legislature was attempting . . . to prevent bargaining in offices." *Id.* at 66–67.  But the court's analysis was "not to say that the conduct alleged in the indictment [was] legal.  The District Attorney ha[d] merely elected to proceed under the wrong provision of the Election Law." *Id.* at 67.  The court then pointed the District Attorney to a section of New York Election Law that criminalized "[f]raudulently or wrongfully do[ing] any act tending to affect the result of any election at a political caucus or of any primary election or convention . . . ." *Id.* (quoting N.Y. Elec. Law § 421).  However, because the indictment as it had been drafted remained deficient, the court granted Burke's motion to dismiss.  *Id.*

Presumably, Halloran relies on *Burke* as standing for the proposition that, under Section 448(3), it was not enough to make or accept an offer to *increase the likelihood or probability* that a person would receive a nomination or appointment; one had to make or accept an offer to *actually procure or cause* such a nomination or appointment, in the sense of *ensuring* such a result.  That is a fair reading of *Burke*, a case that was by its own terms driven by repeated reference to the specific language of the statute under which the indictment was issued.  It is also a reading of *Burke* that the Government does not appear to challenge.  Instead, the Government argues that "*Burke* addressed statutory language far different from the text at issue here, which language omits the critical 'may be' phrase." (Government Mem. 26.)  In response to the Government's argument, Halloran cites to two cases for the proposition that Sections 200.45 and 200.50 should be interpreted identically to Section 448(3), and that as a result, the holding in *Burke* should bar the application of Sections 200.45 and 200.50 to the facts alleged in the Indictment, whereby several Defendants allegedly agreed to increase the likelihood or

probability that Smith would be designated as a candidate for the Republican mayoral primary by providing him with a Wilson Pakula certificate, but whereby those Defendants also did not have the power, and therefore could not have agreed, to ensure his designation as a candidate, given that even after receiving the certificate, Smith still would have had to "present a petition signed by either 5% of the persons registered in the party, or by 7,500 persons, whichever is fewer[,] in order to qualify for the primary race." (Tabone Mem. 9 (citing N.Y. Elec. Law § 6-136(2)(a)).)

The two cases to which Halloran cites are *People v. Bac Tran*, 603 N.E.2d 950 (N.Y. 1992), and *Cunningham*, which is relevant to the instant discussion for other reasons as well. In *Tran*, the New York Court of Appeals considered New York Penal Law Section 200.00, a statute not at issue in this case, which criminalizes "bribery in the third degree," and which defines such bribery as occurring when a person "confers, or offers or agrees to confer, any benefit upon a public servant upon an agreement or understanding that such public servant's vote, opinion, judgment, action, decision or exercise of discretion as a public servant will thereby be influenced." N.Y. Penal Law § 200.00. Discussing the legislative history of Section 200.00, the court noted that "[p]redecessor statutes to Penal Law § 200.00 . . . required only the intent to influence a public official in the exercise of the official's powers," but that "[i]n 1965, as part of an extensive revision of the Penal Law, the Legislature removed the intent language and substituted the requirement of an 'agreement or understanding.'" *Tran*, 603 N.E.2d at 953. The court then stated that "[t]he legislative history of the 1965 revision of Penal Law § 200.00 indicates that the bribery laws were analyzed, re-appraised, condensed, regrouped and re-written, *but that there was no intent to make major substantive changes in existing law.*" *Id.* (emphasis added) (citations and internal quotation marks omitted) (quoting Second Interim Rep., N.Y.

47

Temp. Comm'n on Revision of Penal Law and Crim. Code, at 38 (1963); Comm'n Staff Notes, N.Y. Temp. Comm'n on Revision of Penal Law and Crim. Code, art. 205 (1964)).

This statement, as it relates to Halloran's argument, is unexceptional. Putting aside the potential problems with an argument that a change from a regime in which a defendant had to offer to ensure a nomination or appointment to one in which a defendant merely has to agree to increase the likelihood or probability that a person will be designated or nominated is "major" and "substantive"—an argument that Halloran does not make—the court in *Tran* was discussing New York State's bribery laws as a unified body. The court was not making the point that through the 1965 revision, each predecessor statute was replaced with a corresponding reconfigured statute, with no major substantive changes intended or effected between the two. The court was instead highlighting that even after the legislature's 1965 overhaul, the scope of the conduct covered by all of the reconfigured statutes, taken as a whole, was in most respects fundamentally the same. Thus, situations conceivably could have arisen in which an individual predecessor statute was substantively changed, such that its new iteration omitted from its coverage swaths of previously criminalized conduct, or included within its coverage conduct that its prior version had not, because that conduct nevertheless could have been criminalized in different revised statutes under the new regime, or criminalized in different predecessor statutes under the old. For example, the staff notes from the New York Temporary Commission on Revision of the Penal Law and Criminal Code ("the Bartlett Commission"), from which the *Tran* court quoted for the proposition that there was no intent to make "major substantive changes in existing law," *id.*, state that "[m]any of the present provisions are repetitive or unnecessarily narrow in scope and applicability," in the sentence immediately preceding the quoted passage.

48

Comm'n Staff Notes, N.Y. Temp. Comm'n on Revision of Penal Law and Crim. Code, art. 205 (1964).

What is more, the Bartlett Commission staff notes' general statement that proposed Article 205, which eventually became Article 200, was not intended to make any "major substantive changes in existing law" is belied by its commentary to individual proposed sections within that article.  For example, in relation to proposed Sections 205.15 and 205.20, which eventually became Sections 200.20 and 200.25, the staff notes state that the sections "*are intended to fill a gap in existing law*."  *Id.* art. 205.20 (emphasis added).  Similarly, in relation to proposed Section 205.25, which eventually became Section 200.30, the staff notes state that "[p]resent law . . . has no counterpart provision for the giver of the unlawful gratuity who, generally, is as culpable as the receiver thereof.  *Proposed § 205.25 is intended to fill that gap*."  *Id.* art. 205.30 (emphasis added).  Most importantly, in relation to proposed Sections 205.40 and 205.45, which eventually became Sections 200.45 and 200.50, the sections at issue here, the staff notes acknowledge that the revision "limits the 'consideration' to 'money or other property,' *but broadens the scope of illegal activity* to include 'nomination as a candidate.'"  *Id.* art. 205.45 (emphasis added).  In short, nothing about the *Tran* court's discussion of the legislative history of New York's bribery statutes suggests that *Burke*'s holding would apply to Sections 200.45 and 200.50, or that the Court's interpretation of the word "may" in those statutes is contrary to legislative intent.

Halloran leans more heavily on *Cunningham*.  Responding to the Government's claim that "*Burke* addressed statutory language far different from the text at issue here, which language omits the critical 'may be' phrase," (Government Mem. 26), Halloran argues that, while "[i]t is true that *Burke* did not deal with an application of the bribery statutes, but of the extant New

York Election Law § 448(3)," "*Cunningham* . . . points out that then-New York Election Law § 448(3) was inexorably linked to the bribery statutes . . . ." (Halloran Reply Mem. 5.) In the passage of *Cunningham* to which Halloran cites, the court discussed the meaning of the phrase "payment or contribution of any valuable consideration," in exchange for which Section 448(3) prohibited an offer to procure or cause a nomination or appointment for public office. *Cunningham*, 390 N.Y.S.2d at 554. In support of its finding that the phrase "impl[ied] a material benefit," instead of "includ[ing] the promise of a political benefit," the court cited to Section 200.45, which "limited its prohibition quite specifically to the conferring or agreement to confer 'any money or other property,' and thus excluded from its ambit the kind of political advantage relied upon" by the government in the count at issue. *Id.* Within the course of that comparison, the court stated the following:

> This construction is confirmed by the wording of Section 200.45 of the Penal Law, passed in 1965 as part of a comprehensive, carefully studied revision of the penal statutes, *which undertook quite purposefully to deal with precisely the same area of activity covered by Section 448(3) of the Election Law*. . . .

> It is true that the Practice Commentary noted the continuing existence of Section 448 of the Election Law. However, it is not easy to accept that the authors of the Penal Law *undertook deliberately to cover exactly the area of activity dealt with by Section 448(3)*, using very similar language except more contemporary in phrasing, with the understanding that significantly different consequences might follow from the application of the two sections.

*Id.* (emphasis added). But in reaching this conclusion, the court did not quote from or cite to a single piece of legislative history in support of its claim that, in enacting Section 200.45, the legislature "undertook quite purposefully to deal with precisely the same area of activity covered by Section 448(3) of the Election Law," or that it "undertook deliberately to cover exactly the area of activity dealt with by Section 448(3) . . . ." *Id.* In fact, the relevant legislative history contradicts these assertions. For example, the Bartlett Commission staff notes state that the

proposed sections that eventually became Sections 200.45 and 200.50 "*are derived from existing Penal Law § 1832*."  Comm'n Staff Notes, N.Y. Temp. Comm'n on Revision of Penal Law and Crim. Code, art. 205.45 (1964) (emphasis added)).  The Bartlett Commission staff notes also state that proposed Article 205, which eventually became Article 200, "draws together numerous sections *scattered throughout the existing Penal Law* which deal with various types of conduct, involving public and quasi-public servants, which amount to bribery or near bribery."  *Id.* art. 205.  The authoritative practice commentary to New York's Penal Laws, written by the Honorable William C. Donnino, himself a New York Supreme Court Justice, agrees.[11] According to Justice Donnino's commentary, "[t]he crimes of 'bribe giving for public office' and 'bribe receiving for public office' [Penal Law §§ 200.45, 200.50] are derived from the former Penal Law § 1832," William C. Donnino, *Practice Commentary*, McKinney's Penal Law § 200.00 (second alteration in original), a law that the *Burke* court did not even mention, much less interpret.  The "Historical and Statutory Notes" section of *McKinney's Consolidated Laws of New York* also states that the "Derivation" of Sections 200.45 and 200.50 was "Penal Law

---

[11] The New York Court of Appeals has relied on Justice Donnino's practice commentary to New York's penal laws no fewer than four times in the last two years alone.  *See People ex rel. Ryan ex rel. Shaver v. Cheverko*, 2 N.E.3d 233, 235 (N.Y. 2013) (citing to Justice Donnino's practice commentary to N.Y. Penal Law § 70.30); *People v. Brinson*, 995 N.E.2d 144, 147 (N.Y. 2013) (citing to Justice Donnino's practice commentary to N.Y. Penal Law § 70.30); *People v. Morales*, 982 N.E.2d 580, 585 (N.Y. 2012) (citing to Justice Donnino's practice commentary to N.Y. Penal Law § 490.10); *People v. Watson*, 981 N.E.2d 265, 268 (N.Y. 2012) (citing twice to Justice Donnino's practice commentary to N.Y. Penal Law § 220.00).  The Second Circuit has frequently relied on Justice Donnino's practice commentary as well.  *See, e.g., Ackerson v. City of White Plains*, 702 F.3d 15, 20 (2d Cir. 2012), *as amended* (Dec. 4, 2012) (citing to Justice Donnino's practice commentary to N.Y. Penal Law § 120.15); *Oouch v. U.S. Dep't of Homeland Security*, 633 F.3d 119, 125 n.10 (2d Cir. 2011) ("Practice commentary (written by a New York State judge) accompanying the statute indicates that the mental state applies across the entire statute."); *United States v. Ramirez*, 421 F. 3d 159, 165 (2d Cir. 2005) (citing to Justice Donnino's practice commentary to N.Y. Penal Law §§ 65.00, 65.05).

1909, § 1832 . . . ."  N.Y. Penal Law §§ 200.45, 200.50 (McKinney 2010).  Another recent treatise on New York state criminal offenses also describes Section 1832, not Section 448(3), as Section 200.50's predecessor statute.  *See* 35B N.Y. Jur. 2d Criminal Law § 1404 (2014) (describing *People v. Page*, 49 N.Y.S.2d 790 (Sup. Ct. 1944), in which the court applied Section 1832 to the actions of a state senator, as having "appl[ied] [the] predecessor statute" to Section 200.50).

In no other published case has a court cited to *Cunningham* for its interpretation of Section 448(3), Section 200.45, or the relationship between the two.  Further, if Section 448(3) were indeed the predecessor statute to Sections 200.45 and 200.50, it would seem particularly odd that the *Burke* court saw no reason to cite to either of those sections, given that both of those laws supposedly supplanted Section 448(3) a full ten years before *Burke* was decided.  In fact, the *Burke* court, citing to Section 200.10, part of the same chapter as Sections 200.45 and 200.50, specifically stated that "[t]he bribery statutes are *materially different* from the Election Law provision charged in this indictment," *Burke*, 371 N.Y.S.2d at 65 (emphasis added), which provision was Section 448(3).[12]

--------

[12] In a recent article, one commentator described Sections 200.45 and 200.50 as the "Penal Law counterparts" to the election-law offense of "Corrupt Use of Position or Authority," which was originally "1882's N.Y. Penal Law § 775, later N.Y. Election Law § 448, now Election Law § 17-158 . . . ."  Lawrence N. Gray, *Ballot Rigging—How It's Done in New York*, N.Y. St. B.J., May 2013, at 32, 33.  This may clear up some of the confusion created by the passage from *Cunningham* discussed above.  However, the fact that Sections 200.45 and 200.50 may be the penal law counterparts to Section 448(3)'s successor statute does not suggest that the *Burke* court's interpretation of the language of Section 448(3) should bear on this Court's interpretation of Section 200.45 and 200.50, considering the significant differences between the language of the statutes.  *Cf. Burke*, 371 N.Y.S.2d at 65 ("The bribery statutes are materially different from the Election Law provision charged in this indictment.").

Section 1832, titled "Corrupt bargain for appointment," which appears to have been the actual predecessor to Sections 200.45 and 200.50, read as follows:

> 1. A person who gives or offers to give, any gratuity or reward, in consideration that himself or any other person shall be appointed to a public office, or to a clerkship, deputation, or other subordinate position, in such an office, or shall be permitted to exercise, perform, or discharge any prerogatives or duties, or to receive any emoluments, of such an office, is guilty of a misdemeanor.

> 2. A person who asks or receives, or agrees to receive, any gratuity, or reward, or any promise thereof, for appointing another person, or procuring for another person an appointment, to a public office or to a clerkship, deputation, or other subordinate position in such an office, is guilty of a misdemeanor. If the person so offending is a public officer, a conviction also forfeits his office.

N.Y. Penal Law § 1832 (repealed 1965). Insofar as Section 1832, and not Section 448(3), is the predecessor statute to Sections 200.45 and 200.50, and insofar as decisions by courts applying Section 1832 should therefore inform the Court's analysis, at least one court applying that statute found it potentially applicable to the same type of indirect relationship between the act that a bribe-receiver offered to perform and the appointment or nomination that a bribe-giver sought to attain that the *Burke* court found insufficient to support an indictment under Section 448(3). In *People v. Page*, 49 N.Y.S.2d 790 (Sup. Ct. 1944), a state senator was charged with, among other offenses, violation of Section 1832, stemming from an alleged scheme in which he would recommend various clerks and stenographers for appointment to positions at the State Senate, in exchange for which those employees would then pay the state senator a portion of their salaries. The court noted that the testimony of the Clerk of the Senate was "that all such designations made by [the state senator] had to meet with [the Clerk's] approval and also that of the temporary President of the Senate . . . ." *Id.* at 793–94. In other words, the state senator did not have the power to ensure the appointments of the clerks and stenographers, nor was the allegedly illicit agreement for him to do so. Rather, the object of the understanding was for the state

senator, through his recommendation, to increase the likelihood or probability of such appointments.  And yet, the court found that "sufficient evidence [was] in the record to compel the trial of the issue whether or not [the state senator] did or did not make a corrupt bargain with any of the persons suggested by him for appointment as clerks and stenographers in violation of Section 1832 of the Penal Law."  *Id.* at 795.  The state senator's actions raised a triable issue as to whether he had agreed to "procure" appointments for the clerks and stenographers.  Therefore, it appears as though under the statute that seems to have been the actual predecessor to Sections 200.45 and 200.50, *Burke*'s holding would have been inapplicable.

However, returning to *Cunningham*, even assuming that Section 448(3) was the predecessor statute to Sections 200.45 and 200.50, and that the holdings in *Burke* and *Cunningham* are therefore relevant to the instant analysis, the *Cunningham* court, in interpreting Section 448(3), actually considered the same issue as had the *Burke* court in relation to the scope of the phrase "procure[] or cause"—*but reached the opposite conclusion*.  A brief summary of *Cunningham*'s facts is necessary before describing that conclusion.  There, the charges against the defendants, Patrick J. Cunningham ("Cunningham") and Anthony J. Mercorella ("Mercorella"), "ar[ose] out of circumstances attending Mr. Mercorella's nomination by the Democratic Party in the Bronx County as a candidate for Judge of the Civil Court in 1975." *Cunningham*, 390 N.Y.S.2d at 549.  It was "alleged that Mr. Cunningham, County Leader of the Bronx Democratic Party, tendered his support for the Democratic nomination for Judge of the Civil Court in return for a promise by Mr. Mercorella, a City Councilman, that he would resign that position at a time that would result in a political benefit to the Regular Democratic Organization."  *Id.*  The defendants "challenge[d] the applicability of the section on the claim that no individual, however influential, could 'cause the nomination' of a person when the law

reposes that power in the enrolled voters of a party to be exercised in a primary election." *Id.* at

554.  The court rejected that challenge:

> This is a variation of the argument first advanced in the leading case of *People v. Willett*, [107 N.E. 707 (N.Y. 1915),] where it was rejected by the Court of Appeals as applied to a nomination in a judicial convention.
>
> Undoubtedly the power of any individual, however influential, to deliver a nomination in a contested primary is significantly less than the power that might be exercised at a judicial convention.  Indeed the recent political history of Bronx County refutes the notion that even Mr. Cunningham had the unqualified power to "cause" such a nomination.  The language of the section is in fact not well suited to a primary election and the attack made upon its application is a substantial one.
>
> *However, to accept the interpretation urged by the defendants would leave so wide a gap in the intended statutory protection against corrupt practices in nominations for public office that it could be adopted only if there were no reasonable alternative.*  Recognizing the inaptness of the language of the section to the situation presented, I nonetheless believe that the principle of the Willet case may be applied reasonably to primary elections.

*Id.* (emphasis added).  Thus, in the case on which Halloran relies for the notion that Section

448(3) and Sections 200.45 and 200.50 should be identically interpreted—a case that was

decided one year *after Burke*—the court broadly construed Section 448(3)'s phrase, "procure[]

or cause," to include a situation in which a person offered to merely increase the likelihood or

probability that another person would receive a nomination or appointment, even when that

person did not have the ability to ensure such nomination or appointment because of the

attendant legal structure governing how such nomination or appointment was effected.[13]

Therefore, to the extent that *Cunningham* supports the notion that Section 448(3) and Sections

---

[13] The court nonetheless granted the defendants' motion to dismiss on the separate ground that "the language in Section 448(3)—'payment or contribution of any valuable consideration, or upon an understanding or promise thereof'—[did not] mean[] [and could not] reasonably . . . be construed to mean the conferring of a political benefit of the kind described." *Cunningham*, 390 N.Y.S.2d at 554.

200.45 and 200.50 should be identically interpreted—a notion that the Court finds implausible, for the reasons stated above—its holding nonetheless suggests that the latter two statutes should both be interpreted in the manner that the Court has found that they should, based on their text and structure, and not in the manner that Halloran suggests.

Although *Burke* did not discuss Sections 200.45 and 200.50 at all, and *Cunningham* discussed Section 200.45 only peripherally, and, perhaps, erroneously, a federal district court has more recently interpreted the statutes in a manner that supports the Court's construction.  In *Eisert v. Town of Hempstead*, 918 F. Supp. 601 (E.D.N.Y. 1996), the plaintiffs, Angela Eisert ("Eisert") and Thomas Myles ("Myles"), "residents of Nassau County, took a civil service examination in 1987 in order to apply for the position of Assistant to the Commissioner of Purchasing for the Town of Hempstead." *Id.* at 605.  Myles received the second-highest and Eisert received the third-highest score on the examination.  *Id.*  Pursuant to New York Civil Service Law § 61, the appointing officer, here Frank Lauria ("Lauria"), was "required to fill the position with one of the top three scorers," a "method of selection . . . referred to as the 'rule of three.'" *Id.*  However, also pursuant to Section 61, "[i]f one of the top three scorers [were to] decline[] the position, his or her application [would be] replaced with that of the next highest scorer," a process that would be repeated until the appointing officer had a pool of three applicants from which to choose.  *Id.*  After interviewing for the position, "Eisert called Lauria's office to inquire as to whether a final hiring decision had been made," and was "informed by Lauria's secretary that both Morton Yuter ["Yuter"], the applicant with the highest test score, and Myles had declined the position . . . ." *Id.*  "According to the plaintiffs, . . . Yuter . . . was eliminated from the pool of three after volunteering that he would be unavailable to begin working for three weeks." *Id.*  "[P]laintiffs assert[ed] that Yuter was never informed that time

was of the essence with respect to the job"—"[r]ather, the defendants," the Town of Hempstead,

the Town of Hempstead Civil Service Commission, the Nassau County Republican Committee,

and the Town of Hempstead Republican Committee, "were looking for an excuse to disregard

[Yuter's] application [so that they could consider] John Meehan ["Meehan"], the fourth highest

scorer for the position." *Id.* The plaintiffs further alleged that "Meehan was then bribed to

decline the offer so that the defendants could consider Gary Parisi ["Parisi"], the fifth highest

scorer and a Republican Committeeman who already occupied the position of Assistant to the

Commissioner of Purchasing, in a provisional capacity." *Id.* Based on these events, the

plaintiffs filed causes of action against the defendants "alleging that they were denied

employment in violation of their First Amendment rights to free association, the RICO statute

and related state law." *Id.* In their summary judgment motion, the Nassau County Republican

Committee and the Town of Hempstead Republican Committee argued, *inter alia*, that the

plaintiffs were "unable to establish the required elements necessary to prove a civil RICO

claim," as the plaintiffs were "unable to demonstrate two or more predicate acts which

constitute[d] a pattern of racketeering activity . . . ." *Id.* at 612.

   One of the alleged predicate acts was the defendants' violation of Sections 200.45 and

200.50. *Id.* According to the court, "[r]acketeering activity is defined under RICO to include

bribery as defined under state law. According to New York Penal Law §§ 200.45 and 200.50 it

is unlawful to give a bribe for public office or for a public officer to receive a bribe." *Id.*

(citations omitted). "Applying [those] standards," the court then held that "the plaintiffs ha[d]

stated sufficient predicate acts to support a civil RICO claim." *Id.* at 613. "[T]he plaintiffs

allege[d] that the defendants bribed John Meehan so that he would decline the position as

Assistant to Commissioner of Purchasing [so] Parisi could be considered." *Id.* Along with a

57

mail-fraud claim that the plaintiffs also asserted, the defendants' conduct "constitute[d] multiple predicate acts sufficient to satisfy RICO." *Id.*

Only a violation of Section 200.45, and not Section 200.50, could have been in play as a predicate act, as the defendants were alleged to have bribed Meehan, not to have received any bribes themselves. The court's opinion does not provide any biographical details about Meehan, but the parties' submissions or the court's factfinding in a different procedural setting must have established that Meehan was a "public servant or a party officer," or else the statute would not have applied in the first instance. However, assuming that Meehan was in fact a public servant or a party officer, Meehan clearly did not have the power to ensure that Parisi would be appointed. He was not the appointing officer; that role fell to Lauria. Meehan was, instead, merely another candidate for the position, the withdrawal of whom would not guarantee, but which would increase the likelihood or probability, of Parisi's appointment. And yet, the court found that the plaintiffs' claim that the defendants had violated Section 200.45 qualified as a civil RICO predicate act and survived the defendants' challenge on summary judgment. Based on the foregoing analysis, the Court finds that what little precedent exists supports its interpretation of the plain meaning of Sections 200.45 and 200.50.

Defendants' remaining arguments—those not explicitly based on the case law discussed above—must also be addressed, if briefly. First, Halloran's argument that, because "the original Wilson Pakula statute was passed in 1947," and because "no bribery charges were brought for payment in exchange for a Wilson Pakula from 1947 to 1965," "[t]his absence of evidence indicates that substantive New York bribery law before 1965 did not punish payment in exchange for a Wilson Pakula certificate," (Halloran Reply Mem. 4 (internal quotation marks omitted)), is unpersuasive. Halloran has not presented any evidence demonstrating that any

public servants or party officers were even alleged to have received money in exchange for their role in granting a Wilson Pakula certificate during this time period, such that the factual basis for a prosecution for such conduct under Sections 200.45 and 200.50 could have been laid.  Further, even if such events had transpired, it is entirely possible that, for any number of reasons, any state prosecutor the attention of whom was directed to such events might have exercised his or her prosecutorial discretion to decline to take the case.  *Cf.* Norman Abrams, *The Distance Imperative: A Different Way of Thinking About Public Official Corruption Investigations/Prosecutions and the Federal Role*, 42 Loy. U. Chi. L.J. 207, 223 (2011) ("Investigation and prosecution by the local police and prosecutor should present no problems unless the individual is somehow enmeshed in local politics, has important local 'connections,' or the particular corruptive activity is part of a larger pattern that itself is tied to local politics and local influential people."); U.S. Dep't of Justice, U.S. Att'ys' Manual § 9-110.330 (2009) ("The prosecution of significant political or governmental individuals may pose special problems for local prosecutors.").

Additionally, Halloran's argument that, "despite the 1965 legislature's knowledge of the Wilson Pakula statute and the specificity of the 1965 statutes, payment for a Wilson Pakula certificate was not noted in the laws' language," (Halloran Reply Mem. 4), misses the mark.  For one, the language that Sections 200.45 and 200.50 employ is broad and general, not narrow and specific, presumably designed to encompass a large swath of unspecified conduct.  Moreover, it is axiomatic that a legislature's failure to specify every conceivable situation to which a particular statute might apply does not bar the statute's application to those situations.  *See, e.g., Perez v. Hoblock*, 368 F.3d 166, 175 (2d Cir. 2004) ("We have clearly held . . . that a statute or regulation is not required to specify every prohibited act."); *JWJ Indus., Inc. v. Oswego Cnty.*,

No. 09-CV-740, 2012 WL 5830708, at *6 (N.D.N.Y. Nov. 16, 2012) ("[A] statute is not required to specify every prohibited act."), *aff'd*, 538 F. App'x 11 (2d Cir. 2013); *Kuck v. Danaher*, 822 F. Supp. 2d 109, 134 (D. Conn. 2011) ("[The statute] enumerates certain categories of individuals who are automatically ineligible to hold a pistol permit.  However, the legislature cannot possibly be expected to anticipate in advance every circumstance in which a person could potentially pose a danger to the public if entrusted with a firearm."); *Fuchs Sugars & Syrups, Inc. v. Amstar Corp.*, 402 F. Supp. 636, 639 (S.D.N.Y. 1975) ("It is impossible for a legislature to devise codes so all-encompassing as to predict every case to which the general principle should apply."); Jonathan R. Siegel, *Judicial Interpretation in the Cost-Benefit Crucible*, 92 Minn. L. Rev. 387, 420 (2007) ("[L]egislatures, which act generally and in advance, . . . cannot anticipate every circumstance to which statutes will apply . . . ."); Neil Kinkopf, Review Essay, *The Progressive Dilemma*, 75 Notre Dame L. Rev. 1493, 1534 (2000) ("It would . . . be preposterous to imagine that a legislature could so thoroughly anticipate and codify every possible circumstance in advance and so render all executive and administrative action ministerial.").  For the same reasons, Halloran's argument that "in over 50 years of bribery statutes, no New York State prosecutor has argued that a payment made for a Wilson Pakula certificate violates New York law," (Halloran Reply Mem. 9), also fails.[14]

---

[14] In support of his argument that the lack of prosecutions under New York's bribery statutes for payments made in exchange for Wilson Pakula certificates is "entitled to *great* weight," Halloran cites to *Cunningham*, 390 N.Y.S.2d at 555.  (Halloran Reply Mem. 9 (emphasis added).)  However, what *Cunningham* actually states is that "the settled judgment of prosecutors over so long a period of time, particularly in relation to a section that at best is ambiguous, is entitled to *some* weight."  *Cunningham*, 390 N.Y.S.2d at 555 (emphasis added).

The Court finds equally unpersuasive Tabone's argument that, under the Government's preferred reading of Sections 200.45 and 200.50, "nearly all conduct could, regardless of how attenuated, be potentially criminal," which would "have a chilling effect on the protected legal activities of countless party members, volunteers, consultants, attorneys, and other individuals involved in the political process," and "raise fairness concerns, as defendants do not have 'fair warning' that their conduct could be considered criminal."  (Tabone Reply Mem. 15–16.)  Tabone does not cite to any authority in support of this argument, nor has he identified any "protected activity" that would be implicated by the Court's application of the statute to this case, or to any others.  Further, the New York legislature has limited Sections 200.45 and 200.50 in ways that Tabone ignores.  For example, in order to be exposed to potential liability under the statutes, the "party members, volunteers, consultants, attorneys, and other individuals" to whom Tabone refers would have to confer money on a public servant or party officer, or, if receiving money, would have to be public servants or party officers themselves.  As to the "fairness concerns" to which Tabone refers, "[t]he Due Process clause requires only that the law give sufficient warning that men [and women] may conduct themselves so as to avoid that which is forbidden, and thus not lull the potential defendant into a false sense of security, giving him [or her] no reason even to suspect that his [or her] conduct might be within its scope."  *Ortiz v. N.Y.S. Parole in Bronx, N.Y.*, 586 F.3d 149, 159 (2d Cir. 2009) (internal quotation marks omitted).  Tabone has not provided the Court with any support for the idea that Defendants had "no reason even to suspect" that their conduct might have run afoul of Sections 200.45 and 200.50.

Finally, Tabone's argument that "[s]erious federalism concerns arise where there would be federal criminalization of conduct where the individual is innocent under state law," (Tabone

Reply Mem. 16), begs the question.  A successful Travel Act prosecution *requires* a showing

that a defendant's conduct would have violated a pertinent *state* law; if no such showing can be

made, no Travel Act charge can lie.  *See Salameh*, 152 F.3d at 152 ("[T]he initial inquiry in a

Travel Act case is whether the underlying activity violates a state law." (internal quotation marks

omitted)).  The Court's entire analysis has been dedicated to answering the question of whether,

assuming all the facts alleged in the Indictment to be true, Defendants' conduct would have

violated the applicable state law, here Sections 200.45 and 200.50.  The Court answers that

question in the affirmative.  Relatedly, in response to Tabone's argument that "[c]ourts have

long recognized that the interest in protecting the integrity, fairness, and efficiency of ballots and

election processes as a means for electing public officials is a matter of traditional State

concern," and that here, "[t]he conduct at issue regards the internal functions and management of

the Queens County Republican Party, which is governed by the laws and regulations of New

York State and its own Party rules and regulations[,] . . . not those of the federal government,"

(Tabone Reply Mem. 16–17), the Court simply notes that the predicate offenses upon which the

Travel Act charges depend are New York state penal laws.

Based on all of the foregoing, including the statutes' text and structure, and the relevant

precedent and legislative history, the Court finds that the word "may" as used in Sections 200.45

and 200.50 connotes likelihood, possibility, probability, or contingency, and that the statutes

therefore criminalize, *inter alia*, the exchange of money between a person and a public servant or

party official upon an agreement or understanding that a person is in some degree more likely to

be designated or nominated as a candidate for public office.  In other words, the object of the

agreement must only be to increase the likelihood or probability that the person will be so

designated or nominated.  And based on the facts alleged in the Indictment, the Court finds that

Defendants' conduct satisfies this element.  Even though a Wilson Pakula certificate is not itself a designation or a nomination, Smith could not have ultimately secured the designation or nomination that he was seeking without it.  Thus, the object of the agreement or understanding into which Defendants allegedly entered was to make it more likely or probable that Smith would be designated as a Republican primary candidate for Mayor, which would in turn make it more likely or probable that he would be the Party's eventual nominee.  Accordingly, Defendants' Motions To Dismiss the Indictment's Travel Act counts for failure to allege a violation of a predicate state offense are denied.

## 2.  Unconstitutional Vagueness of the Honest Services Fraud Statute as Applied

Tabone argues that "the Honest Services Fraud Statute is unconstitutionally void for vagueness, as applied to [him], and accordingly the Court should dismiss the Indictment." (Tabone Mem. 15.)[15]  "The void-for-vagueness doctrine derives from the constitutional guarantee of due process . . . ."  *Mannix v. Phillips*, 619 F.3d 187, 197 (2d Cir. 2010).  A criminal statute is unconstitutionally vague if it (1) "fails to provide a person of ordinary intelligence fair notice of what is prohibited," or (2) "is so standardless that it authorizes or

---

[15] As noted previously, Smith initially misconstrued the portions of the Indictment related to honest-services wire fraud in his Memorandum of Law, assuming that "[t]he government's honest services fraud theory is that certain of the Defendants engaged in a scheme to defraud the public of the honest services of officers of the Republican Party," (Smith Mem. 4), when in fact the Government's theory is that Defendants "devised . . . a scheme . . . to defraud, and to deprive" not the public, but "New York City Republican Party county committees and members of the Republican Party of the honest services of leaders such county committees,"  (Indictment ¶¶ 59, 63).  After realizing his error, Smith did address the vagueness issue in his Reply Memorandum, but did so briefly, in fewer than two full pages.  (*See* Smith Reply Mem. 6–7.)  Thus, the section of this Opinion in which the Court considers the argument that the Honest Services Fraud Statute is unconstitutionally vague as applied to Defendants primarily addresses arguments that Tabone makes.  However, the Court will also address the arguments that Smith makes in his Reply Memorandum where appropriate.

encourages seriously discriminatory enforcement." *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 130 S. Ct. 2705, 2718 (2010) ("A conviction fails to comport with due process if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." (internal quotation marks omitted) (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)); *see also Farrell v. Burke*, 449 F.3d 470, 486 (2d Cir. 2006) ("When the challenge is vagueness as-applied, there is a two-part test: a court must first determine whether the statute gives the person of ordinary intelligence a reasonable opportunity to know what is prohibited and then consider whether the law provides explicit standards for those who apply it." (internal quotation marks omitted)).

As to the "fair notice" prong of the vagueness test, a court must "ask whether the law presents an ordinary person with sufficient notice of or the opportunity to understand what conduct is prohibited and proscribed, not whether a particular plaintiff actually received a warning that alerted him or her to the danger of being held to account for the behavior in question." *Dickerson v. Napolitano*, 604 F.3d 732, 745–46 (2d Cir. 2010) (citation and internal quotation marks omitted); *see also Thibodeau v. Portuondo*, 486 F.3d 61, 67 (2d Cir. 2007) (same); *Farrell*, 449 F.3d at 486 (same); *United States v. Lahey*, No. 10-CR-765, 2013 WL 4792852, at *6 (S.D.N.Y. Aug. 8, 2013) (same).  In other words, "[t]he standard is an objective one." *Dickerson*, 604 F.3d at 745; *see also Lahey*, 2013 WL 4792852, at *6 (same).  "[But the] test does not demand meticulous specificity in the identification of the proscribed conduct. Rather, it requires only that the statutory language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." *United States v. Coppola*, 671 F.3d 220, 235 (2d Cir. 2012) (internal quotation marks omitted); *see also Arriaga*

*v. Mukasey*, 521 F.3d 219, 224–25 (2d Cir. 2008) (same).  Put another way, the fair-warning

principle is violated if a judicial construction of a criminal statute is "'unexpected and

indefensible by reference to the law which had been expressed prior to the conduct in issue.'"

*Ortiz*, 586 F.3d at 159 (quoting *Rogers v. Tennessee*, 532 U.S. 451, 461 (2001)).  "Second

Circuit precedent on the meaning of an 'unexpected and indefensible' interpretation of [a] . . .

law is both clear and longstanding," and teaches that the Due Process Clause "'requires only that

the law give sufficient warning that men [and women] may conduct themselves so as to avoid

that which is forbidden, and thus not lull the potential defendant into a false sense of security,

giving him [or her] no reason even to suspect that his [or her] conduct might be within its

scope.'"  *Id.* (quoting *Rubin v. Garvin*, 544 F.3d 461, 469 (2d Cir. 2008)).  "[T]he unavoidable

ambiguities of language do not transform every circumstance in which judicial construction is

necessary into a violation of the fair notice requirement."  *Id*.  Thus, fair notice "'is not a

principle designed to convert into a constitutional dilemma the practical difficulties in drawing

criminal statutes both general enough to take into account a variety of human conduct and

sufficiently specific to provide fair warning that certain kinds of conduct are prohibited.'" *Id*.

(quoting *Colten v. Kentucky*, 407 U.S. 104, 110 (1972)).  "'Many statutes will have some

inherent vagueness, for in most English words and phrases there lurk uncertainties.'"  *Id*.

(quoting *United States v. Herrera*, 584 F.2d 1137, 1149 (2d Cir. 1978)).

     Importantly, it is not only the language of a statute that can provide the requisite fair

notice; judicial decisions interpreting that statute can do so as well.  *See Screws v. United States*,

325 U.S. 91, 104 (1945) ("For the specific intent required by the Act is an intent to deprive a

person of a right which has been made specific *either* by the express terms of the Constitution or

laws of the United States *or* by decisions interpreting them." (emphasis added)); *United States v.*

*Lanier*, 520 U.S. 259, 266 (1997) ("[D]ue process bars courts from applying a novel construction

of a criminal statute to conduct that neither the statute *nor any prior judicial decision* has fairly

disclosed to be within its scope.") (alteration in original) (emphasis added) (internal quotation

marks omitted)); *Ortiz*, 586 F.3d at 158 (same).  Further, such judicial decisions need not have

been issued by the Supreme Court.  *See Lanier*, 520 U.S. at 268–69 ("[W]e think it unsound to

read [Supreme Court precedent] as reasoning that only this Court's decisions could provide the

required warning. . . .  [D]isparate decisions in various Circuits might leave the law insufficiently

certain even on a point widely considered, [but] such a circumstance may be taken into account

in deciding whether the warning is fair enough, without any need for a categorical rule that

decisions of the Courts of Appeals and other courts are inadequate as a matter of law to provide

it."); *Ponnapula v. Spitzer*, 297 F.3d 172, 183–84 (2d Cir. 2002) (relying on New York State

court decisions interpreting New York State larceny statute to find that defendant was on fair

notice that his actions were unlawful).  Additionally, judicial decisions can provide a defendant

with notice even when the facts at issue in those decisions were not "fundamentally similar" or

"materially similar" to the facts of the defendant's case.  *See Lanier*, 520 U.S. at 269 ("[W]e

have upheld convictions . . . despite notable factual distinctions between the precedents relied on

and the cases then before the Court, so long as the prior decisions gave reasonable warning

. . . .") (collecting cases).

   As to the second prong of the vagueness test, regarding "discriminatory enforcement," a

statute will be struck down on this ground if it provides "virtually unlimited" or "unfettered"

discretion "to those who enforce it."  *Lahey*, 2013 WL 4792852, at *6; *see also City of Chicago*

*v. Morales*, 527 U.S. 41, 63 (1999) (plurality opinion) (striking down ordinance in part because

of the "vast amount of discretion granted to the police in its enforcement"); *Hayes v. N.Y. Att'y*

*Grievance Comm.*, 672 F.3d 158, 169 (2d Cir. 2012) ("A regulation will encounter valid vagueness objection if it accords 'unfettered discretion' to those who enforce it . . . ."). However, the Constitution "does not ban *all* discretion on the part of police officers and prosecutors as effective law enforcement often requires the exercise of some degree of police judgment." *Thibodeau*, 486 F.3d at 69 (internal quotation marks and alterations omitted). A statute will survive an as-applied vagueness challenge based on the second prong "if the conduct at issue falls within the core of the statute's prohibition, so that the enforcement before the court was not the result of the unfettered latitude that law enforcement officers and factfinders might have in other, hypothetical applications of the statute." *Farhane*, 634 F.3d at 139–40 (internal quotation marks omitted); *see also Kuck*, 822 F. Supp. 2d at 134 ("[A] statute that provides what may be unconstitutionally broad discretion if subjected to a facial challenge may still be upheld as constitutional on an as-applied challenge if the particular enforcement at issue [is] consistent with the core concerns underlying the [statute] such that the enforcement did not represent an abuse of discretion under the statute." (second and third alterations in original) (internal quotation marks omitted)).

Lastly, it should be noted that in regard to vagueness challenges in general, "[the Supreme Court has] said that when a statute interferes with the right of free speech or of association, a more stringent vagueness test should apply." *Humanitarian Law Project*, 130 S. Ct. at 2719 (internal quotation marks omitted); *see also Commack Self-Serv. Kosher Meats, Inc. v. Hooker*, 680 F.3d 194, 213 (2d Cir. 2012) ("The degree of vagueness tolerated in a statute varies with its type: . . . laws that might infringe [other] constitutional rights [are held] to the strictest [vagueness test] of all. When a statute is capable of reaching expression sheltered by the First Amendment, the [vagueness] doctrine demands a greater degree of specificity than in other

contexts." (last alteration in original) (internal quotation marks omitted)). "But perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Humanitarian Law Project*, 130 S. Ct. at 2719 (internal quotation marks omitted); *see also Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 179 (2d Cir. 2006) (same).

Before addressing Tabone's as-applied vagueness challenge to the Honest Services Fraud Statute, it might be useful to briefly explain the relationship between the Wire Fraud and Honest Services Fraud statutes, and to summarize the Supreme Court's holding in *Skilling v. United States*, 130 S. Ct. 2896 (2010), its most recent case directly addressing the constitutional issues that Tabone's argument implicates, although both subjects are well-trodden ground. As to the statutes' relationship, the Wire Fraud Statute criminalizes "devis[ing] or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises," where the devisor "transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice . . . ." 18 U.S.C. § 1343. By contrast, the Honest Services Fraud Statute does not directly criminalize any conduct; it is merely a definitional statute, providing that, "[f]or the purposes of this chapter"—a chapter that includes the Wire Fraud Statute—"the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346.[16] Here, the Government has essentially charged Defendants with conspiring to violate and actually violating the Wire Fraud Statute, relying on the definition of

---

[16] *See generally* Julie Rose O'Sullivan, *The Federal Criminal "Code": Return of Overfederalization*, 37 Harv. J.L. & Pub. Pol'y 57, 65–67 (2014); C.J. Williams, *What Is the Gist of the Mail Fraud Statute?*, 66 Okla. L. Rev. 287, 299–301 (2014); Lisa Kern Griffin, *The Federal Common Law Crime of Corruption*, 89 N.C. L. Rev. 1815, 1815–1826 (2011).

"scheme or artifice to defraud" contained in the Honest Services Fraud Statute; which is to say that the Government has charged Defendants with conspiring to devise or intend to devise, as well as actually devising or intending to devise, a scheme or artifice to deprive another of the intangible right of honest services.

*Skilling* involved "the prosecution of Jeffrey Skilling ["Skilling"], a longtime Enron executive, for crimes committed before the corporation's collapse," and his subsequent conviction for "conspiracy to commit 'honest-services' wire fraud" in violation of 18 U.S.C. §§ 371, 1343, and 1346. 130 S. Ct. at 2907. Skilling argued that, "if not interpreted to exclude his actions," which did not include the giving or receiving of bribes or kickbacks, the Honest Services Fraud Statute "should be invalidated as unconstitutionally vague." *Id.* at 2912. The Supreme Court agreed. But, concluding that "there is no doubt that Congress intended § 1346 to reach *at least* bribes and kickbacks," and that "[r]eading the statute to proscribe a wider range of conduct . . . would raise the due process concerns underlying the vagueness doctrine," the Court held "that § 1346 criminalizes *only* [bribes and kickbacks]," in order to "preserve the statute without transgressing constitutional limitations." *Id.* at 2931. En route to its holding that honest-services wire fraud requires a *quid pro quo*, the Court noted that honest-services wire fraud also requires the violation of a fiduciary duty. *See id.* at 2930 (describing the "doctrine's solid core" as involving "offenders who, *in violation of a fiduciary duty*, participated in bribery or kickback schemes" (emphasis added)); *id.* at 2931 n.41 ("Justice Scalia emphasizes divisions in the Courts of Appeals regarding the source and scope of fiduciary duties. But these debates were rare in bribe and kickback cases. The existence of a fiduciary relationship, under any definition of that term, was usually beyond dispute . . . ."); *accord United States v. Nouri*, 711 F.3d 129, 137 n.1 (2d Cir.) (rejecting the defendant's challenge to the district court's jury

69

instruction that the defendant had owed a duty of honest services to his employer, as "[t]he existence of a fiduciary relationship between an employee and employer is beyond dispute, and the violation of that duty through the employee's participation in a bribery or kickback scheme is within the core of actions criminalized by § 1346"), *cert. denied sub nom. Martin v. United States*, 134 S. Ct. 309 (2013); *United States v. Milovanovic*, 678 F.3d 713, 722 (9th Cir. 2012) (en banc) ("A close examination of the Supreme Court's opinion in *Skilling* reveals that embedded in the Court's holding . . . is the implication that a breach of fiduciary duty is an element of honest services fraud.  Justice Scalia's characterization of the holding . . . is premised on the Court's holding that a breach of fiduciary duty is a requisite element of honest services fraud.  This interpretation is further evidenced by the manner in which the majority responded to Justice Scalia's concurrence . . . ."), *cert. denied*, 133 S. Ct. 929 (2013); *Stinn v. United States*, 856 F. Supp. 2d 531, 537 (E.D.N.Y. 2012) ("After acknowledging that courts had not consistently applied § 1346, the [Supreme] Court nevertheless found that the 'solid core' of honest services precedent involved 'offenders who, in violation of a fiduciary duty, participated in bribery or kickback schemes.'"), *aff'd*, 515 F. App'x 4 (2d Cir. 2013), *cert denied*, — S. Ct. —, 2014 WL 684147 (Feb. 24, 2014).

   It is this facet of *Skilling* on which Tabone rests his argument.  He claims that "nothing in the text of the honest services fraud statute, or the history of the enforcement of the statute could give fair warning to a political party member that he might be violating a penal statute by advocating a particular political act in exchange for money."  (Tabone Mem. 16.)  He further contends that "[t]he core issue is that the statute does not adequately define what behavior it bars and facilitates arbitrary prosecutions."  (*Id*. at 24.)  According to Tabone, "an examination of . . . honest services doctrine reveals that there is disagreement among the circuit courts" as to

"[which] fiduciaries [are] subject to the honest services fraud [sic], what obligations the fiduciary owed, whether something beyond a mere fiduciary duty was need [sic] to establish honest services fraud or the source of the fiduciary obligation (state law, federal law or general principles)." (*Id.* (citing *Skilling*, 130 S. Ct. at 2938 (Scalia, J., concurring) ("Does it apply only to public officials? Or in addition to private individuals who contract with the public? Or to everyone, including the corporate officer here?")).) "Thus, [according to Tabone,] the Statute should be held as unconstitutionally vague to the ambiguity which continues to remain as to the criterion for guilt." (Tabone Mem. 24.)

Tabone's argument is not frivolous. As noted above, in his *Skilling* concurrence, Justice Scalia underscored his concerns with the statute's vagueness in specific relation to what he believes is the indeterminate source and scope of the requisite fiduciary duty. *See Skilling*, 130 S. Ct. at 2936–39 (Scalia, J., concurring). His opinion takes on added weight when one considers that the majority's response to the concern that Justice Scalia expressed was not disagreement with his premise, but that the issue did not need to be squarely addressed at the time, as "[t]he existence of a fiduciary relationship, under any definition of that term, was usually beyond dispute" in bribery and kickback cases. *Id.* at 2930 n.41. There, it was beyond dispute that Skilling himself had owed a fiduciary duty to Enron and its shareholders. Additionally, the Second Circuit has cited to Justice Scalia's *Skilling* concurrence, as well as his dissent from the Supreme Court's denial of certiorari in *Sorich v. United States*, 555 U.S. 1204 (2009) (Scalia, J., dissenting from denial of certiorari), in contrasting the Honest Services Fraud Statute with the Hobbs Act, noting that the former "provides no textual guidance about the duties whose violation will amount to a deprivation of honest services," and that it "references, at best, only a general and undefined fiduciary standard." *Coppola*, 671 F.3d at 235–36.

Many as-applied vagueness challenges involve attacks on statutory language that "tie[] criminal culpability to whether the defendant's conduct was 'annoying' or 'indecent'—wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *Humanitarian Law Project*, 130 S. Ct. at 2720 (internal quotation marks omitted); *see also Williams*, 553 U.S. at 306 (same) (collecting cases).  What makes the resolution of Tabone's argument more difficult is that the term "fiduciary duty" has different meanings in different contexts.  Tabone essentially asks, how could a person of ordinary intelligence have determined that he violated a fiduciary duty to the New York City Republican Party county committees and members of the Republican Party, when that person could have had no way of knowing to what body of law to look for the source of that duty?  Tabone conceivably could have owed a fiduciary duty to those entities and individuals under federal but not state law, or under state law but not federal; under general trust but not agency law, or under agency law but not general trust.  *See Skilling*, 130 S. Ct. at 2936–37 (Scalia, J., concurring) ("The decision *McNally* reversed had grounded the duty in general (not jurisdiction-specific) trust law, a *corpus juris* festooned with various duties.  Another pre-*McNally* case referred to the general law of agency, which imposes duties quite different from those of a trustee." (citations omitted)).  From which of these bodies of law must Tabone's fiduciary duty, his violation of which the Honest Services Fraud Statute requires, have derived?

Further, even if a person of ordinary intelligence could have determined which body of law to which to look, how could that person have determined what type of fiduciary duty Tabone would have had to have breached to expose himself to liability?  *Cf. id.* (Scalia, J., concurring) ("Moreover, 'to say that a man is a fiduciary only begins [the] analysis; it gives direction to further inquiry . . . .  What obligations does he owe as a fiduciary?'" (alterations in original)

(quoting *S.E.C. v. Chenery Corp.*, 318 U.S. 80, 85–86 (1943)).  Would it matter that Tabone

owed and violated a duty of care, but not a duty of loyalty; or a duty of loyalty, but not a duty of

care?  *See Prudential Ret. Ins. & Annuity Co. v. State St. Bank & Trust Co.*, No. 07-CV-8488,

2012 WL 5868301, at *1 (S.D.N.Y. Nov. 19, 2012) ("[The Court] awarded [the plaintiff

damages], finding that [the defendant] (1) violated its duty of care, skill, prudence and diligence;

[but] (2) did not violate its duty of loyalty . . . .").

 This discussion makes clear that difficulty inheres in any attempt to describe in the

abstract the "fiduciary duty" the violation of which all honest-services-wire-fraud prosecutions

might require.  However, as noted above, Tabone's claim is that the Honest Services Fraud

Statute is unconstitutionally vague *as applied to him*; as a result, the Court need not concern

itself with the statute's facial vagueness.  The principal difference between as-applied- and

facial-vagueness inquiries is that the first requires that a court address only the application of the

challenged statute to the person challenging the statute based on the charged conduct, while the

second requires that a court also address the application of the challenged statute to others based

on different conduct.  *See Humanitarian Law Project*, 130 S. Ct. at 2719 ("[I]n spite of its own

statement that it was not addressing a 'facial vagueness challenge,' the Court of Appeals

considered the statute's application to facts not before it. . . .  [T]he Court of Appeals

contravened the rule that a plaintiff who engages in some conduct that is clearly proscribed

cannot complain of the vagueness of the law as applied to the conduct of others." (citations,

internal quotation marks, and some alterations omitted)); *see also id.* at 2709 ("Although the

statute may not be clear in every application, the dispositive point is that its terms are clear in

their application to plaintiffs' proposed conduct.  Most of the activities in which plaintiffs seek

to engage readily fall within the scope of [the statutory language]. . . .  Plaintiffs' resort to

hypothetical situations testing the limits of [the statutory language] is beside the point because this litigation does not concern such situations."). Thus, the Court's overarching inquiry is not into whether the term "fiduciary duty" is sufficiently clear in *every* application; its inquiry is into whether the term "fiduciary duty" is clear in *this* application. *See VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179, 189 (2d Cir. 2010) ("[I]n the context of an as-applied vagueness challenge, a court's analysis should be confined to the litigant's *actual* conduct, and a court should not analyze whether a reasonable person would understand that certain hypothetical conduct or situations violate the statute."); *Perez*, 368 F.3d at 175 ("The evaluation of whether [a regulation] is vague as applied to [a plaintiff] must be made with respect to [the plaintiff's] actual conduct and not with respect to hypothetical situations at the periphery of the [regulation's] scope or with respect to the conduct of other parties who might not be forewarned by the broad language." (fourth alteration in original) (internal quotation marks omitted)).

The specific manner in which Tabone raises his as-applied-vagueness challenge requires the Court to answer several related questions. First, are there sources of law and types of fiduciary duties derived from those sources of law that a person of ordinary intelligence would have a reasonable opportunity to know can be the subject of this type of honest-services-wire-fraud prosecution, and which therefore form the core of the term "fiduciary duty" as it is used in relation to the statute? Second, does the source and type of fiduciary duty that the Government alleges Tabone violated in this case fall within that core? Third, would a person of ordinary intelligence have had a reasonable opportunity to know that the source and type of fiduciary duty upon which the Government relies could be applied to Tabone's relationship with the county committees and members of the Republican Party to find that he owed the duty? If the answer to these three questions is yes, then Tabone's void-for-vagueness challenge must fail. Because the

74

statute itself says nothing whatsoever about fiduciary duties, *see Coppola*, 671 F.3d at 235, the Court turns to the judicial decisions interpreting it for guidance.

Turning to the first question, a good starting point is the Second Circuit's en banc decision in *United States v. Rybicki*, 354 F.3d 124 (2d Cir. 2003), a case which predates *Skilling*, but upon which the Second Circuit nevertheless continues to rely even in *Skilling*'s wake, in particular for its discussion of the fiduciary duties that support honest-services-wire-fraud prosecutions. *See, e.g.*, *Nouri*, 711 F.3d at 137 n.1 ("The 'existence of a fiduciary relationship' between an employee and employer is 'beyond dispute,' and the violation of that duty through the employee's participation in a bribery or kickback scheme is within the core of action criminalized by § 1346." (citing, *inter alia*, *Rybicki*, 287 F.3d at 261)).  Honest-services-fraud cases can be fairly divided into two categories, based on the identities of those allegedly effecting the deprivation and those who are so deprived: cases involving "public servant[s] [who] defraud[] the citizenry of its right to honest service[s]," and cases involving private actors, such as "employee[s] [who] defraud[] [their] employer[s] of honest services."  Eliza P. Nagel, Note, *For the People or Despite the People: The Threat of Corporations' Growing Power Through* Citizens United *and the Demise of the Honest Services Law*, 63 Rutgers L. Rev. 725, 733 (2011); *see also Rybicki*, 354 F.3d at 133 ("Over time, the honest services doctrine became applicable to four general categories of defendants: [1] government officials who defraud the public of their own honest services; [2] elected officials and campaign workers who falsify votes and thereby defraud the electorate of the right to an honest election; [3] private actors who abuse fiduciary duties by, for example, taking bribes; and [4] private actors who defraud others of certain intangible rights, such as privacy." (internal quotation marks omitted)); Douglas Zolkind, Note, *The Case of the Missing Shareholders: A New Restriction on Honest Services Fraud in*

United States v. Brown, 93 Cornell L. Rev. 437, 439 (2008) ("[Under Section 1346,] [i]n the public sector, the general public has a right to the honest services of its public officials[,] [while in] the private sector . . . employees owe the right of honest services to their employers." (footnotes omitted)); Geraldine Szott Moohr, *Mail Fraud Meets Criminal Theory*, 67 U. Cin. L. Rev. 1, 3–4 (1998) ("[S]ome courts have developed two honest services offenses, those involving public officials and those involving private employees."). As is true of this case, *Rybicki* fell into the latter category.[17]

    *Rybicki* involved the prosecution of two personal-injury lawyers for honest-services-mail-and-wire fraud. 354 F.3d at 127. The lawyers were convicted, based on their participation in a scheme whereby they "arranged for payments to be made to claims adjusters employed by insurance companies that had insured against injuries sustained by [their] clients." *Id*. "The payments[] [were] designed to induce the adjusters to expedite the settlement of the clients' claims . . . ." *Id*. "Each of the insurance companies maintained a written policy that prohibited the adjusters from accepting any gifts or fees and required them to report the offer of any such gratuities." *Id*. "The payments were nonetheless accepted by the adjusters and . . . not reported to their employers." *Id*. The defendants challenged their convictions on the grounds that "section 1346's expansion of the definition of 'scheme or artifice to defraud' to include a scheme

---

[17] As noted, the Government does not claim that Tabone or Savino were public officials, or that they owed fiduciary duties to the public; instead, they claim that both owed their "honest services" to the "New York City Republican Party county committees and members of the Republican Party . . . ." (Indictment ¶ 63; *see also* Government Mem. 9 ("As Tabone rightly notes, . . . the Indictment does not allege that the defendants violated a fiduciary duty owed to the public, rather, it alleges that they deprived the New York City Republican Party county committees and members of the Republican Party of the honest services of leaders of such county committees." (citations and internal quotation marks omitted)).)

or artifice to deprive another of 'the intangible right of honest services' is unconstitutionally

vague." *Id.* at 128.  The court rejected this argument:

> In sum, we conclude from the cases in the various circuits that had employed an 'honest services' theory prior to Congress's enactment of section 1346 that the term 'scheme or artifice to deprive another of the intangible right to honest services' in section 1346 when applied to private actors, means a scheme or artifice to use the mails or wires to enable an officer or employee of a private entity (*or a person in a relationship that gives rise to a duty of loyalty comparable to that owed by employees to employers*) purporting to act for and in the interests of his or her employer (*or of the other person to whom the duty of loyalty is owed*) secretly to act in his or her or the defendant's own interests instead . . . .

*Id.* at 141–42 (emphasis added) (footnote omitted).  Within the first parenthetical, the court

included a footnote, which reads as follows:

> Although the bulk of the . . . honest-services cases involved employees, *we see no reason the principle they establish would not apply to other persons who assume a legal duty of loyalty comparable to that owed by an officer or employee to a private entity.  See, e.g., United States v. Szur*, 289 F.3d 200, 208–12 (2d Cir. 2002) (affirming honest services mail- and wire-fraud convictions of principals of a brokerage and issuer of securities who conspired to pay stock brokers excess compensation, not disclosed to their customers, for selling the issuer's securities); *United States v. Manas*, 272 F.3d 159, 161–63 (2d Cir. 2001) (reviewing sentences of defendants convicted of, *inter alia*, honest services fraud for a broker bribery scheme similar to that at issue in *Szur*) . . . ; *United States v. Ervasti*, 201 F.3d 1029, 1032–36 (8th Cir. 2000) (upholding honest services mail- and wire-fraud convictions of principals of a payroll processing company who failed to make payments to the IRS on behalf of customers, instead using the funds to pay their own expenses); *United States v. Sancho*, 157 F.3d 918 (2d Cir. 1998) (upholding honest-services wire-fraud conviction of a defendant who offered a bribe to an FBI agent posing as a financial consultant retained to perform due diligence on the defendant in connection with the issuance of a letter of credit, in exchange for a falsely positive due diligence report) . . . ; *United States v. Cochran*, 109 F.3d 660, 667–68 (10th Cir. 1997) (analyzing, for honest-services fraud purposes, the duty owed by an investment banker hired to advise and assist a state in issuing bonds).

*Id.* at 162 n.17 (emphasis added) (some citations omitted).

As to the types of fiduciary duty the violation of which is sufficient to support an honest-

services-wire-fraud prosecution, it is clear from the Second Circuit's holding and canvassing of

the case law in *Rybicki* that the duty of loyalty is unquestionably one such type.  *See also*

*Milovanovic*, 678 F.3d at 724 ("[W]e agree with the Second Circuit that, although the bulk of the

pre-*McNally* honest-services cases involved employees, we see no reason the principle they

establish would not apply to other persons who assume a legal duty of loyalty comparable to that

owed by an officer or employee to a private entity." (brackets and internal quotation marks

omitted)).  Thus, the Court finds that a person of ordinary intelligence would have a reasonable

opportunity to know that the duty of loyalty is a type of fiduciary duty that falls within the core

of that term as used in relation to the Honest Services Fraud Statute.

However, the Court must also determine the core sources of law from which this duty of

loyalty may be derived.  To make this determination, the Court begins by looking to the sources

of law upon which the courts relied in finding the existence of a duty of loyalty in the cases to

which the Second Circuit cited in its *Rybicki* footnote.  In the first of these cases, *United States v.*

*Szur*, 284 F.3d 200 (2d Cir. 2002), the Second Circuit upheld district court jury instructions that

"explained the circumstances under which the brokers would be under a legal duty to disclose

the commissions to their clients," "track[ing] . . . [the Second Circuit's] opinion in *United States*

*v. Chestman*, 947 F.2d 551, 568–69 (2d Cir. 1991) (en banc) . . . ."  289 F.3d at 210.  The

relevant portion of *Chestman*, in turn, "[took its] cues as to what is required to create the

requisite relationship from the securities fraud precedents and the common law."  *Chestman*, 947

F.2d at 568 (emphasis omitted).  The *Chestman* court described "hornbook fiduciary relations"

such as "those existing between attorney and client, executor and heir, guardian and ward,

principal and agent, trustee and trust beneficiary, and senior corporate official and shareholder,"

citing to law review articles from the *American Criminal Law Review* and the *California Law*

*Review*, as well as *Black's Law Dictionary*, as its sources.  *Id.*  *Chestman* also noted that "[a]t the

78

heart of the fiduciary relationship lies reliance, and de facto control and dominance," citing extensively to New York law, as well as definitions of fiduciary and like relationships contained in ERISA and the Second Restatement of Agency.  *Id*. at 568–69.  Thus, the source of the fiduciary relationship in *Szur* was derived from state, federal, and common law.

In *United States v. Manas*, 272 F.3d 159 (2d Cir. 2001), the Second Circuit upheld the convictions of defendants found guilty of honest-services wire fraud based on their scheme to "defraud . . . fictitious customers of the value of an honest broker's services by agreeing to pay [their] agent a kickback in exchange for his sale of . . . stock to such customers at an artificially inflated price."  *Id.* at 163.  However, the court did not discuss the source of the duty that the broker owed.  The Eighth Circuit's decision in *United States v. Ervasti*, 201 F.3d 1029 (8th Cir. 2000), is also of little help.  There, the court upheld a jury instruction that "[o]ne whose business allows him or her to handle the money or property of another must act with responsibility and loyalty," *id.* at 1036, but in doing so, the court did not discuss the source of law upon which the trial court relied for that instruction.  It would not have made sense for the court to have done so anyway, as the opinion "reject[ed] the . . . contention that § 1346 requires the breach of a fiduciary duty," *id.*, a holding that *Skilling* appears to have rejected, *see Milovanovic*, 678 F.3d at 722.  Like the court in *Ervasti*, the court in *United States v. Sancho*, 157 F.3d 918 (2d Cir. 1998), *overruled on other grounds by Rybicki*, 354 F.3d 124, also found that "Section 1346 does not require the existence of a fiduciary relationship."  *Id.* at 921.  However, it also held that it had "no doubt that, *under New York law*, a consultant employed by [his employer] . . . would be under a legal duty not to conceal [a] discovery [of a fraud] from [his employer], and not to conceal his receipt of a bribe intended to induce him to conceal his discovery."  *Id.* (emphasis added).  Thus, to the extent anything can be drawn from *Sancho*, it is additional reliance on state

79

law to determine the existence of the necessary duty.  Lastly, the source of law upon which the

court relied in *United States v. Cochran*, 109 F.3d 660 (10th Cir. 1997), in its fiduciary-duty

analysis appears to have been what Justice Scalia described in his *Skilling* concurrence as a

"federal, common-law fiduciary duty . . . ."  *Skilling*, 130 S. Ct. at 2937 (Scalia, J., concurring).

　　　These cases highlight what Justice Scalia emphasized in his *Skilling* concurrence: that

courts have looked to a smorgasbord of sources to find the fiduciary duty that, after *Skilling*,

presumably underpins all honest-services-fraud prosecutions.  These cases, as well as others

from within the Second Circuit and elsewhere, also seem to suggest that state law will likely be a

*sufficient*, but not *necessary*, source of that duty, as such duty may derive from other sources as

well.  *See Bahel*, 662 F.3d at 633 ("[T]he Ninth Circuit has rejected the notion that a deprivation

of honest services requires a [sic] underlying violation of state law in a domestic case . . . .  [A

case expressing the contrary position] is also at odds with precedent in our Circuit."); *United

States v. Ruiz*, 589 F.3d 1310, 1312–13 (10th Cir. 2009) ("[E]ven if a predicate state law

violation is required for a federal honest services fraud conviction, Mr. Ruiz's conduct clearly

violated New Mexico law."); *United States v. Sorich*, 523 F.3d 702, 712 (7th Cir. 2008) ("[W]e

have never held that only state law can supply a fiduciary duty between public official and

public or between employee and employer in honest services cases.  Indeed, our case law, and

the case law of the vast majority of circuits, shows that other sources can create a fiduciary

obligation." (citation omitted) (collecting cases)); *United States v. Sawyer*, 239 F.3d 31, 41–42

(1st Cir. 2001) ("Because the duty of honest services owed by government officials derives from

fiduciary duties at common law as well as from statute, there is no need to base a prosecution

under § 1341 on allegations that the defendant also violated state law." (citation omitted));

*United States v. Martin*, 195 F.3d 961, 966 (7th Cir. 1999) ("[The defendant] . . . join[s] [his co-

defendant's] . . . argument . . . that the fiduciary duty the breach of which is charged as mail

fraud must have its source in state law . . . . [That position] is contrary to the law in this circuit,

and in the other circuits to have addressed the question." (citations omitted) (collecting cases));

*Margiotta*, 688 F.2d at 124 ("At the outset, we reject [the] contention that absent a showing of a

violation of New York statute or a duty imposed by New York law, a defendant may not be

found guilty of using the mails in furtherance of a scheme to defraud on the basis of a breach of

a fiduciary duty to the citizenry."); *United States v. Triumph Capital Grp., Inc.*, 260 F. Supp. 2d

444, 461–62 (D. Conn. 2002) ("[T]he court agrees with the reasoning of other circuits that the

theft of honest services element of a mail or wire fraud prosecution does not need to be grounded

in state law.") (collecting cases).  However, at least one circuit has suggested that state law *must*

be the source of the fiduciary duty allegedly breached.  *See United States v. Brumley*, 116 F.3d

728, 734 (5th Cir. 1997) (en banc) ("Under the most natural reading of the statute, a federal

prosecutor must prove that the conduct of a state official breached a duty respecting the

provision of services owed to the official's employer under state law.  Stated directly, the official

must act or fail to act contrary to the requirements of his job under state law.  This means that if

the official does all that is required under state law, alleging that the services were not otherwise

done 'honestly' does not charge a violation of the mail fraud statute.  The statute contemplates

that there must first be a breach of a state-owed duty."); *cf. Sorich v. United States*, 129 S. Ct.

1308, 1309 (2009) (Scalia, J., dissenting from denial of certiorari) ("The Fifth Circuit has held

that the statute criminalizes only a deprivation of services that is unlawful under state law . . . ."

(citing *Brumley*, 116 F.3d at 735)).[18]  But at least one other circuit has suggested that federal law

---

[18] In *United States v. Murphy*, 323 F.3d 102 (3d Cir. 2003), the Third Circuit
characterized its case law interpreting honest-services fraud as having "emphasized the need to

is the source of the fiduciary duty at issue.  *See United States v. Frost*, 125 F.3d 346, 366 (6th Cir. 1997) ("Federal law governs the existence of fiduciary duty under the mail fraud statute."); *see also United States v. Weyhrauch*, 548 F.3d 1237, 1244 (9th Cir. 2008) ("The majority of circuits . . . have held that the meaning of 'honest services' is governed by a uniform federal standard inherent in § 1346 . . . ."), *vacated and remanded*, 561 U.S. 476 (2010) (vacating and remanding in light of *Skilling*); *United States v. deVegter*, 198 F.3d 1324, 1329 (11th Cir. 1999) ("The nature and interpretation of the duty owed is a question of federal law.").

Thus, "[t]he relationship between state law and the federal honest services statute is unsettled."  *United States v. Urciuoli*, 513 F.3d 290, 298 (1st Cir. 2008); *see also Ruiz*, 589 F.3d at 1312 ("We recognize that the courts of appeals currently disagree whether the federal honest services fraud statute . . . requires a predicate state law violation . . . ."); *Sorich*, 129 S. Ct. at 1310 (Scalia, J., dissenting from denial of certiorari) ("The present case in which certiorari is sought implicates [a] limiting principle[] that the Courts of Appeals have debated—whether the crime of deprivation of 'honest services' requires a predicate violation of state law . . . ."); *Rybicki*, 354 F.3d at 163 (Jacobs, J., dissenting) ("Is the source of [the fiduciary] duty state or federal law?  The majority does not say, and other circuits are split.").  The circuits appear to be split into three camps: those that permit the fiduciary duty to be derived from various sources,

---

establish a violation of state law . . . to serve as a limiting principle on the federal prosecution of local political actors."  *Id.* at 104.  However, in the same opinion, it also held that, "[w]ithout the anchor of a fiduciary relationship established by state *or* federal law, it was improper for the District Court to allow the jury to create one." *Id.* (emphasis added).  The court further noted that the defendant had "urge[d] [it] to address the issue [that it had] reserved in a footnote in [an earlier case]: Whether a violation of a state-law created fiduciary duty is *required* to sustain an honest services fraud conviction."  *Id.* at 117.  But the court found that, "[a]lthough federalism concerns are paramount in federal prosecutions of local political party officials," it did "not think that [the] case require[d] [it] to resolve that question."  *Id.*

including state, federal, and common law; those that require the fiduciary duty to be derived

from state law; and those that require the fiduciary duty to be derived from federal law.

      As noted, the Supreme Court has recognized the possibility that if "disparate decisions in

various Circuits . . . leave the law insufficiently certain even on a point widely considered, such a

circumstance [could] be taken into account in deciding whether [due process notice] is fair

enough." *Lanier*, 520 U.S. at 269.  For example, if a situation arose in which a defendant was

charged with honest-services wire fraud, and the fiduciary duty that the defendant allegedly

breached existed under federal law, but not under state law, or vice-versa, the fair-notice

concerns that Defendants discuss in their Memoranda could potentially bar prosecution.  But this

is not such a situation; or, at the very least, it does not appear to be such a situation at this stage

of the litigation.  There is no reference in the Indictment to the source of the fiduciary duty on

which the honest-services-fraud charges are based.  The Indictment alleges only that Defendants

engaged in a scheme or artifice to "deprive New York City Republican Party county committees

and members of the Republican Party of the honest services of leaders of such county

committees."  (Indictment ¶¶ 59, 63.)  The Government's Memorandum of Law also is silent on

this point.  In responding to Tabone's argument that any duty that he had to his party and its

members was too vague to form the basis for a prosecution, the Government writes only that

"[i]t is the most basic tenet of agency law that all fiduciaries owe a duty to their principal, and

that duty includes the duty to refrain from accepting secret personal cash payments in exchange

for action on behalf of the principal," without citing to any cases, statutes, or other authority in

support of that assertion, (Government Mem. 36).[19]

_____

[19] The Government does cite to Section 6-120(3) of New York Election Law, which it
characterizes as "empower[ing] party officers to act as gatekeepers for their ballot lines."

However, regardless of whether the fiduciary duty at issue in this case is based on state or federal law, Defendants have not cited to any law suggesting any daylight between the two that would create a notice issue here.  In other words, Defendants have not provided the Court with any authority suggesting that Tabone may have owed a fiduciary duty to his county committee and members of the Republican Party under state law, but not under federal law, or the other way around.  In fact, in his initial Memorandum of Law, which was written under the erroneous assumption that the Government had based the honest-services-fraud charges in the Indictment on a fiduciary duty that Tabone allegedly owed to the public, as opposed to his own county committee and members of the Republican Party, Tabone admitted that he did in fact owe such a duty of loyalty.  (*See* Tabone Mem. 34 ("At best, Tabone owes a duty of loyalty to his local political party which candidly he has served ably and on a pro bono basis for decades . . . ."); *id*. at 36 ("[F]urther, he could not have deprived the Republican Party, its county committee or its members of any honest services since he owed only a duty of loyalty to the party."); *id*. at 37 ("Moreover, Tabone only owed, at best a duty of loyalty to the political party of which he is a member within his own County.").)  Looking to the governing state and federal law on fiduciary duty, and applying that law to the facts of the Indictment, the Court concludes that a person of

_____

(Government Mem. 36.)  As described above in connection with the Court's analysis of Defendants' challenges to the Travel Act charges, Section 6-120(3) governs the manner in which a Wilson Pakula certificate may issue in connection with an election for "an office to be filled by all the voters of the city of New York . . . ."  N.Y. Elec. Law § 6-120(3).  However, the Government does not appear to be citing to Section 6-120(3) as the source of the fiduciary duty that Tabone owed to his county committee and members of the Republican Party.  Rather, the Government appears to be citing to Section 6-120(3) for the proposition that, in making a decision as to whether to issue Smith a Wilson Pakula certificate, Tabone was acting on behalf of the county committees and members of the Republican Party, his alleged "principal[s]," and not in his individual capacity.  (*See* Government Mem. 36 ("It is risible for Tabone to assert that his duty not to accept bribes in exchange for *the exercise of power conferred on him by statute* is simply too vague to support a prosecution." (emphasis added)).)

84

ordinary intelligence would have had a reasonable opportunity to have been on notice of what Tabone has conceded—that he could have owed a fiduciary duty to his county committee and members of the Republican Party.

Under New York law, "[a] fiduciary relationship exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *EBC I, Inc. v. Goldman, Sachs & Co.*, 832 N.E.2d 26, 31 (N.Y. 2005) (internal quotation marks omitted) (quoting Restatement (Second) of Torts § 874 cmt. a). "Such a relationship" is "necessarily fact-specific," and is "grounded in a higher level of trust than normally present . . . between those involved in arm's length business transactions." *Id*. "At the heart of the fiduciary relationship lies reliance, and de facto control and dominance." *N. Shipping Funds I, LLC v. Icon Capital Corp.*, 921 F. Supp. 2d 94, 101 (S.D.N.Y. 2013) (internal quotation marks omitted) (applying New York law); *see also Marmelstein v. Kehillat New Hempstead*, 892 N.E.2d 375, 378 (N.Y. 2008) ("[W]e have noted that two essential elements of a fiduciary relation are . . . de facto control and dominance" (second alteration in original) (internal quotation marks omitted)). "[A] court will [also] look to whether a party reposed confidence in another and reasonably relied on the other's superior expertise or knowledge." *Wiener v. Lazard Freres & Co.*, 672 N.Y.S.2d 8, 14 (App. Div. 1998). Although such relationships often grow out of contractual agreements, "it is fundamental that fiduciary liability is not dependent solely upon an agreement or contractual relation between the fiduciary and the beneficiary but results from the relation." *EBC I, Inc.*, 832 N.E.2d at 31 (internal quotation marks omitted) (quoting Restatement (Second) of Torts § 874 cmt. b); *see also Frank v. Sobel*, 831 N.Y.S.2d 151, 151 (App. Div. 2007) ("Since the purported agreement between the parties does not expressly or otherwise provide for either an agency or fiduciary relationship, the court

85

must look to the relationship between the parties."); *Wiener*, 672 N.Y.S.2d at 14 ("[I]t is not mandatory that a fiduciary relationship be formalized in writing, and any inquiry into whether such obligation exists is necessarily fact-specific to the particular case. . . . Thus, the ongoing conduct between parties may give rise to a fiduciary relationship that will be recognized by the courts." (citations omitted)). Importantly, "[f]iduciary duties arise regardless of whether the party in whom trust is reposed is a volunteer or is compensated." *Schneiderman v. Lower Esopus River Watch, Inc.*, 39 Misc. 3d 1241(A) (N.Y. Sup. Ct. 2013) (citing Restatement (Third) of Agency § 8.01 cmt. c (noting that "the fiduciary principle is applicable to gratuitous agents as well as to agents who expect compensation for their services")); *cf. Strax v. Murray Hill Mews Owners Corp.*, 809 N.Y.S.2d 759, 761 (App. Term 2005) (upholding trial court's finding that uncompensated member of board of directors of cooperative-apartment corporation undertook "brokerage services or legal work . . . in her capacity as a director and volunteer . . . *in accordance with her fiduciary duties toward the board and cooperative*" (emphasis added) (second alteration in original) (internal quotation marks omitted)).

The duty of loyalty is one type of fiduciary duty. *See Cornwell v. NRT N.Y. LLC*, 944 N.Y.S.2d 132, 133 (App. Div. 2012) ("It is well settled that a real estate broker is a fiduciary with a duty of loyalty and an obligation to act in the best interests of the principal."); *Estate of Silverstein v. Goodman*, 827 N.Y.S.2d 50, 50 (App. Div. 2006) ("Respondents . . . breached their fiduciary duty of loyalty . . . ." (internal quotation marks omitted)); *Exec. Fashions, Inc. v. Howard*, 689 N.Y.S.2d 480, 480 (App. Div. 1999) (describing duty owed by plaintiff company's directors as "their fiduciary duty of loyalty" to the company). "[I]t is elemental that a fiduciary owes a duty of undivided and undiluted loyalty to those whose interests the fiduciary is to protect. . . . This is a sensitive and inflexible rule of fidelity . . . ." *Birnbaum v. Birnbaum*, 539

86

N.E.2d 574, 576 (N.Y. 1989) (citations omitted); *see also In re Estate of Wallens*, 877 N.E.2d 960, 962 (N.Y. 2007) ("It is . . . well settled that a fiduciary owes a duty of undivided and undiluted loyalty to those whose interest the fiduciary is to protect." (internal quotation marks omitted)). "The duty of loyalty derives from the prohibition against self-dealing that inheres in the fiduciary relationship." *In re Perry H. Koplik & Sons, Inc.*, 499 B.R. 276, 289 (S.D.N.Y. 2013) (internal quotation marks omitted) (applying New York state law). Simply stated, the duty of loyalty "requir[es] avoidance of situations in which a fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty." *Birnbaum*, 539 N.E.2d at 576. Based on this principle, New York courts recognize actions for breach of an implied duty of loyalty. *See, e.g., Ross v. Moyer*, 730 N.Y.S.2d 318, 319 (App. Div. 2001) (reversing trial court's summary judgment order dismissing cause of action for "breach of implied duty of loyalty").

The Parties have not identified, and there does not appear to be, any meaningful difference between the New York law described above and federal common law as to the standard governing the existence of a fiduciary duty in this case. *See, e.g., Milovanovic*, 678 F.3d at 722 ("A fiduciary is generally defined as a person who is required to act for the benefit of another person on all matters within the scope of their relationship; one who owes to another the duties of good faith, trust, confidence, and candor. And courts have held that 'fiduciary' encompasses informal fiduciaries." (citation, internal quotation marks, brackets, and ellipsis omitted)); *Szur*, 289 F.3d at 210 (upholding jury instructions stating that "[a]t the heart of the fiduciary relationship lies reliance and de facto control and dominance"); *Frost*, 125 F.3d at 366–67 (quoting the *Restatement (Second) of Agency* for the proposition that "agency" is "the fiduciary relation which results from the manifestation of consent by one person to another that

the other shall act on his behalf and subject to his control, and consent by the other so to act" (internal quotation marks omitted) (quoting Restatement (Second) of Agency § 1)); *Chestman*, 947 F.2d at 568 ("At the heart of the fiduciary relationship lies reliance, and de facto control and dominance.  The relation exists when confidence is reposed on one side and there is resulting superiority and influence on the other." (citations, internal quotation marks, and brackets omitted)).[20]   Additionally, federal courts applying federal common law have found that a party can owe a fiduciary duty even where the party is not financially compensated for the services that the party provides.  *See, e.g.*, *United States v. Nelson*, 712 F.3d 498, 509 (11th Cir. 2013) (holding that a public official owed a fiduciary duty to the public "to make governmental decisions in the public's best interest," even though the official was not paid for his work and worked only part time); *United States v. Delle Donna*, 552 F. Supp. 2d 475, 490–94 (D.N.J.

---

[20] The court in *Milovanovic* observed that the Ninth Circuit "currently ha[d] no pattern instruction regarding the elements of a fiduciary duty," but noted that it thought that juries in the Ninth Circuit should be instructed along the following lines:

> A "fiduciary" obligation exists whenever one person—the client—places special trust and confidence in another person—the fiduciary—in reliance that he will exercise his discretion and expertise with the utmost honesty and forthrightness in the interests of the client, such that the client relaxes the care and vigilance which he would ordinarily exercise, and the fiduciary knowingly accepts that special trust and confidence and thereafter undertakes to act on behalf of the client based on such reliance.

> Of course, the mere fact that a business relationship arises between two persons does not mean that either owes a fiduciary obligation to the other.  If one person engages or employs another and thereafter directs or supervises or approves the other's actions, the person so employed is not necessarily a fiduciary.  Rather, as previously stated, it is only when one party places, and the other accepts, a special trust and confidence—usually involving the exercise of professional expertise and discretion—that a fiduciary relationship arises.

678 F.3d at 723 n.9.

2008) (holding that a political candidate and his wife, both of whom ran certain campaign committees, owed a fiduciary duty to those committees and to the campaign itself, even though the committees and the campaign were presumably not obligated to pay the candidate and his wife for their services).

Applying this law to the allegations in the Indictment, the Court concludes that there was fair notice that Tabone could have owed and violated a duty of loyalty to the county committees and members of the Republican party.  It is certainly conceivable that once Tabone became the Vice Chairman of the Queens County Republican Party, regardless of whether he took an oath of office or signed a contractual agreement, he had a duty, based on the nature of the relationship itself, to "act for . . . the benefit of" those entities and individuals "within the scope of the relation."  "Reliance" is straightforward—it was the task of Tabone and his fellow executive committee members to decide, as relevant here, whether to provide a Wilson Pakula certificate and to whom to provide it in the context of the New York City mayoral race, *see* N.Y. Elec. Law § 6-120(3), and the committee and the members of the Party that it served necessarily relied on him to execute this important function.  "[D]e facto control and dominance" is also clear; according to the Indictment, when the UC questioned whether Tabone could deliver on his commitment to get Smith a Wilson Pakula certificate, Tabone allegedly responded, "I run the Queens County Republican Party.  Nobody else runs the party.  I run the party."  (Indictment ¶ 48.)  *See Milovanovic*, 678 F.3d at 724 (holding that indictment sufficiently alleged breach of fiduciary duty, and that the sufficiency of the evidence of such a breach would be decided at trial).  By allegedly agreeing to grant Smith a Wilson Pakula certificate because of bribes he had received, as opposed to doing so exclusively because he thought that such a grant would be in the best interests of the committee and members of the Party, Tabone failed to "avoid[] [a]

situation[] in which [his] personal interest possibly conflict[ed] with the interest of those [to whom he] owed a fiduciary duty." *Birnbaum*, 539 N.E.2d at 576.

In further support of the Court's fair notice determination, at least one New York court has explicitly found that political party officials owe fiduciary duties to the members of their parties, as opposed to the citizenry at large, at least under certain circumstances. In *Harding v. Harrington*, 484 N.Y.S.2d 571 (Sup. Ct.), *aff'd*, 479 N.Y.S.2d 480 (App. Div. 1984), the plaintiff, a vice president and executive member of the New York State Liberal Party, brought an action seeking to compel the chairman and secretary of that party to call a meeting of the state committee in accordance with party rules "for the purpose of nominating candidates and electors for president and vice-president of the United States and to organize the State Committee and to consider such other matters as may lawfully come before that meeting," which they had apparently refused to do. *Id.* at 574. The court granted the plaintiff's application, finding that "[m]embers of a political party have a right to nominate presidential electors irrespective of their leaders' view or the success of their leaders' political negotiations; *and party officials who have the power to call such a meeting necessary to such purpose have a fiduciary obligation to party members to do so*." *Id.* at 573 (emphasis added). The court's juxtaposition of the party members' "right to nominate presidential electors" on behalf of themselves and the party with the leaders' interest in "[their own] view" and "the success of [their own] political negotiations" demonstrate that the court believed the failure to call the meeting on behalf of the party members to be a violation of the duty of loyalty.

There does not appear to be any authority to the contrary in the Second Circuit. For example, in *United States v. Margiotta*, 688 F.2d 108 (2d Cir. 1982), the Government charged Joseph Margiotta, who was the "long-time Chairman of the Republican Committees of both

Nassau County and the Town of Hempstead," but not an elected public official, with violation of 18 U.S.C. § 1341, based on his alleged breach of the fiduciary duty that he owed to Nassau's and Hempstead's "general citizenry."  *Id.* at 111, 123.  *Margiotta* has been "widely criticized by practically everybody," *United States v. Adler*, 274 F. Supp. 2d 583, 586 (S.D.N.Y. 2003), but that criticism is not directed at the statement in one of the arguments Margiotta raised on appeal: that "*his fiduciary duty to the Republican Party, which [arose] from his position as a party officer*, would be impaired by a finding of a fiduciary duty to the citizenry requiring disinterested conduct."  *Margiotta*, 688 F.2d at 125 (emphasis added).  The court rejected that argument, but appears to have agreed with its premise, noting that "New York law supports the position that a party officer, *who owes a duty to his [or her] party and its followers*, may owe certain minimum duties to the public as well, as a result of the other obligations he [or she] assumes."  *Id.* (emphasis added).[21]  Moreover, *Harding* and *Margiotta* are not the only cases in which courts have suggested that party officials bear certain responsibilities to their parties and the members of those parties similar or identical to those of a fiduciary.  *See, e.g., Igneri v. Moore*, 898 F.2d 870, 874–76 (2d Cir. 1990) ("But as the holders of an official party post, chairmen are a step beyond the mere influential voter: They have the ability to convey the party's imprimatur and, in some cases, to allocate its funds."); *Application of Roosevelt*, 160 N.Y.S.2d 747, 749–50 (Sup. Ct.) ("The [Republican Party] county committee and its chairman are, in a sense, trustees of

---

[21] In citing to *Margiotta* for the proposition that a party officer may owe a fiduciary duty to his or her party and its followers, the Court reaches no conclusion as to whether *Margiotta*'s central premise—that a party officer who is not a public official can be prosecuted for honest-services wire fraud based on his or her violation of a fiduciary duty owed to the "general citizenry" under certain circumstances—remains good law in the Second Circuit.  The Government has given no indication anywhere in its Memorandum of Law that this is a theory of liability that it plans to pursue in this case.

party interests for the registered voters of the party in that county."), *aff'd*, 163 N.Y.S.2d 403 (App. Div. 1957), *aff'd sub nom. In re Roosevelt*, 148 N.E.2d 895 (N.Y. 1958).

Further, Defendants have cited no case law to suggest that their characterization of "political parties . . . created under New York State Election Law" as "voluntary, unincorporated associations that are not publicly funded," (*see* Tabone Mem. 19), is legally significant.  Just because such associations may "derive[] [their] powers and rights from the State," does not mean that the "State is the only governmental body which can determine the parameters of its political parties' conduct."  (*See id.*)  Corporations too are state creatures, in which their states of incorporation retain considerable or even primary interest.  *See In re Three Grand Jury Subpoenas Duces Tecum Dated January 29, 1999*, 191 F.3d 173, 177 (2d Cir. 1999) (describing Supreme Court precedent as holding that "a corporation [is] a creature of the state with powers limited by the state . . . ." (internal quotation marks omitted)); *In re Gimbel*, 77 F.3d 593, 599 (2d Cir. 1996) ("[A] corporation . . . [is] a creature of the state, born of the law of the state . . . whose very existence is defined by the state . . . ."); *SungChang Interfashion Co., Ltd. v. Stone Mountain Accessories, Inc.*, No. 12-CV-7280, 2013 WL 5366373, at *5 (S.D.N.Y. Sept. 25, 2013) ("Because a corporation is a creature of state law whose primary purpose is to insulate shareholders from legal liability, the state of incorporation has the greater interest in determining when and if that insulation is to be stripped away." (internal quotation marks omitted)).  But it would be nonsensical to suggest that the federal government may not regulate their conduct, or the conduct of their officers, on these grounds.

Defendants' invocation of a pre-*Skilling* Department of Justice Manual in support of its vagueness argument is also misplaced.  (*See* Tabone Mem. 16.)  They claim that "the U.S. Department of Justice has itself stated in the past that applicability of the honest services theory

92

of mail and wire fraud does not apply to election fraud schemes." (*Id*. at 16.)  And yet, "[d]espite this position, the Agency is now in this case, prosecuting purported election related fraud under honest services." (*Id*. at 17.)  This could be understood as an argument that the Manual represented some kind of promise not to prosecute in certain situations; a promise on which Defendants reasonably relied.  As an initial matter, the scheme at issue in this case involving Tabone is not one of the "election fraud" schemes to which the manual refers.  True, both those schemes and this one share the common fact of an election; but the comparison ends there.  The section of the Manual on which Tabone relies describes "schemes to deprive citizens of fair elections," which are supposedly exempt from coverage under the Honest Services Fraud Statute because "such schemes do not include an intent to deprive any identifiable victim of the honest services of a fiduciary." (*Id*. at 16.)  However, the Government does not claim here that Defendants deprived unidentifiable victims of their intangible right to *fair elections*; the relevant charges allege that Defendants deprived the New York City Republican Party county committees and members of the Republican Party of the *honest services of their leaders*.  In any event, as the Government correctly notes, the Manual does not have the power to provide substantive rights to criminal defendants.  *See United States v. Piervinanzi*, 23 F.3d 670, 682 (2d Cir. 1994) ("[Defendant] argues that Department of Justice guidelines set forth in the United States Attorneys' Manual . . . support a narrower reading of the statute. . . .  These guidelines, however, provide no substantive rights to criminal defendants.").  Finally, Defendants' reference to the lack of past prosecutions substantially or materially similar to this one is also not dispositive, as defendants "can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

For all of these reasons, the Court finds that a person of ordinary intelligence would have had a reasonable opportunity to be on notice that Tabone owed a fiduciary duty to his county committee and members of the Republican Party under state, federal, or common law. Having reached this determination on the first prong of the unconstitutional vagueness test, the Court need address the second prong only briefly. Because the Court finds that "the conduct at issue"—Tabone's alleged receipt of a bribe or kickback in exchange for official action, in violation of a state law fiduciary duty of loyalty—"falls within the core of the statute's prohibition," "the enforcement before the court [is] not the result of the unfettered latitude that law enforcement officers and factfinders might have in other, hypothetical applications of the statute." *Farhane*, 634 F.3d at 139–40 (internal quotation marks omitted); *see also Kuck*, 822 F. Supp. 2d at 134 (noting that a statute will survive an as-applied vagueness challenge "if the particular enforcement at issue is consistent with the core concerns underlying the statute . . . ." (internal quotation marks and alterations omitted)).[10]

Lastly, in his Memorandum of Law, Tabone also argues that application of the Honest Services Fraud Statute to his conduct "clearly impede[s] upon [his] overlapping First Amendment interests of the right to freedom of speech, association and the right not to be

---

[10] The Court has focused on describing the standards for determining the existence of a fiduciary duty under state and federal common law. To the extent that *Brumley* can be read to suggest that, in an honest-services-fraud prosecution, the Government might be required to prove that a defendant breached a duty imposed by a state criminal statute, as opposed to a duty imposed by state common law, and to the extent that *Brumley*'s holding in that regard would survive *Skilling*, this does not alter the Court's analysis, as based on the facts alleged in the Indictment, it is plausible for the Government to claim that Defendants might have breached duties imposed by New York Penal Law Sections 200.45 and 200.50, as the Court described in the first part of this Opinion. *See Brumley*, 116 F.3d at 728 ("We decide today that services must be owed under state law and that the government must prove in a federal prosecution that they were in fact not delivered. We do not reach the question of whether a breach of a duty to perform must violate the criminal law of the state.").

compelled to associate with any particular group." (Tabone Mem. 17.)  This claim could be construed as encouragement for the Court to apply a heightened standard of review to Tabone's void-for-vagueness challenge, a standard the Court must apply in such situations whenever the statute at issue implicates protected free speech or association. *See Humanitarian Law Project*, 130 S. Ct. at 2719.  But to the extent that Tabone is attempting to raise an as-applied or facial First Amendment challenge to the statute, he fundamentally misconstrues the statute's thrust. The statute does not criminalize mere association with a political party, or advocacy for certain political candidates.  In fact, in this case, the statute is being applied to alleged bribes offered and received in return for certain conduct.  Just because this alleged *quid pro quo* arrangement involved political-party officials, they are not entitled to immunity for their actions under the guise of protected speech.  *See Rybicki*, 354 F.3d at 150–51 (Raggi, J., concurring in the judgment) ("The conduct at issue—fraud—enjoys no constitutional protection, whether the deceitful scheme is aimed at a victim's property or at his intangible right to honest services."); *see also United States v. Stevens*, 559 U.S. 460, 468–69 (2010) ("From 1791 to the present . . . the First Amendment has permitted restrictions upon the content of speech in a few limited areas . . . .  [The prevention and punishment of these] historic and traditional categories long familiar to the bar[,] including. . . fraud . . . and speech integral to criminal conduct . . . . have never been thought to raise any Constitutional problem." (citations and internal quotation marks omitted)); *Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 619–20 (2003) (noting that fraud is not conduct protected by the First Amendment); *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 497–98 (1949) ("It rarely has been suggested that the constitutional freedom for speech and press extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute.  We reject [that] contention now."); *United States v.*

*Presgraves*, 658 F. Supp. 2d 770, 779 (W.D. Va. 2009) ("Because § 1346 does not implicate First Amendment concerns, the defendant's facial challenge is precluded . . . .").

Therefore, based on the foregoing analysis, the Court finds that the Honest Services Fraud Statute is not unconstitutionally vague as applied to Defendants.[20]

### 3.  Federalism Challenge to the Application of the Honest Services Fraud Statute

Tabone also argues that "the instant case also raises federalism concerns, as the Government's prosecution of [Tabone] under honest services fraud rests upon the imposition of a 'fiduciary duty' where the State laws do not recognize one."  (Tabone Mem. 14.)  In support of this argument, Tabone cites to *Brumley*, 116 F.3d 728, for the proposition that "serious federalism concerns arise where there would be federal criminalization of conduct where the individual is innocent under state law."  (*Id.*)  Tabone also claims that, "[i]n New York, there is no state law requiring a party official or leader to serve his party and other party members 'honestly.'" (*Id.* at 14–15.)  However, Tabone's federalism challenge fails for the same reason as does his as-applied vagueness challenge.  As the Court explained above, New York law recognizes that party officials like Tabone can owe a fiduciary duty to their parties and the members of those parties.  And, to the extent that Section 1346 incorporates state law in defining Tabone's fiduciary duties, Tabone has not explained why there is a valid basis to dismiss the charges brought under this statute.  As such, Tabone's federalism argument is unpersuasive.  *Cf. Rybicki*, 354 F.3d at 153 n.3 (Raggi, J., concurring in the judgment) ("To the extent our

---

[20] To be clear, the Court's ruling here is based on the allegations in the Indictment, which are assumed to be true only for the purposes of resolving the instant Motions.  What remains to be seen is what evidence the Government might offer at trial.  This could open the door to a later as-applied challenge, to litigation over the charge to be given to the jury, and to post-trial motions, if there is a conviction.

dissenting colleagues also sound a federalism alarm to § 1346, warning that application of the statute to the public sector invites federal prosecutors to police honesty in the corridors of state government, I am not persuaded that this threatens the Republic." (citation and internal quotation marks omitted)); *United States v. Geddings*, No. 06-CR-136, 2006 WL 4877548, at *4 (E.D.N.C. Sept. 6, 2006) ("[D]efendant argues that applying [18 U.S.C. § 1346] in this case violates the Constitutional principle[] of Federalism . . . because [such] application . . . impinges the power of the Federal government upon the proper realm of the State of North Carolina . . . .  The Fourth Circuit has expressly rejected this argument in the context of an honest services fraud prosecution." (internal quotation marks omitted)); *United States v. Warner*, No. 02-CR-506, 2004 WL 1794476, at *2 (N.D. Ill. Aug. 11, 2004) ("[The defendant] claims that [Section 1346] . . . violates core federalism principles.  Courts, including this one, however, have routinely rejected such challenges to the application of 'honest services' fraud.").

### 4.  Failure To Charge a Crime Within the Ambit of the Honest Services Fraud Statute

Defendants also argue that, even if the Court were to "determine[] that the Honest Services statute is not unconstitutionally vague, the Court should dismiss . . . those portions of the Indictment alleging a violation of the Honest Service statute for failure to charge a crime," as "breach of a fiduciary duty by a volunteer political party member to his political party does not fall within the ambit of the federal honest services fraud statute."  (Tabone Mem. 24–25; *see also* Smith Reply Mem. 1–6; Halloran Reply Mem. 10–15.)  The Court finds none of the points that Defendants raise in support of this argument to be convincing.  Tabone's efforts to analogize this case to pre-*Skilling* "honest elections" cases, and his citation to a Department of Justice Manual describing them, fail for the same reasons described above in the context of constitutional

vagueness.  (*See* Tabone Mem. 26–27.)  The Sixth Circuit may have been correct when it held,

four years before *Skilling*, that "Congressional enactment of § 1346 did not revive those cases

involving prosecutions under the mail fraud statute for deprivations of the intangible right of

honest elections."  *United States v. Turner*, 465 F.3d 667, 674 (6th Cir. 2006).  But to reiterate,

that is not the Government's theory here, and the Manual cannot provide Defendants with

substantive criminal rights regardless.  Additionally, Defendants' invocation of the First

Amendment and the lack of past prosecutions under substantially similar circumstances also fails

for the reasons described above in the Court's analysis of Defendants' vagueness claim.  The

Court is equally unpersuaded by Defendants' repeated references to Tabone's status as an

"unpaid party volunteer."  (*See, e.g.,* Tabone Mem. 28–29.)  As noted previously, "[f]iduciary

duties [can] arise regardless of whether the party in whom trust is reposed is a volunteer or

compensated."  *Lower Esopus River Watch, Inc.*, 39 Misc. 3d at 1241(A); *see also Nelson*, 712

F.3d at 509.

Finally, the Court finds Defendants' slippery-slope arguments to be wanting.  According

to Tabone, "[t]he Government's theory of honest services fraud . . . is unprecedented, extreme

and Kafkaesque, and taken to its logical reaches would impermissibly empower federal

prosecutors to criminalize garden-variety unethical or immoral behavior in private

relationships." (Tabone Mem. 25.)  Tabone frets that the theory's "logical extreme" could

encompass the prosecution of "volunteer members of the local Boy Scouts for disloyalty to the

local Troop . . . ."  (*Id.* at 26.)  Smith joins in this parade of horribles, "submit[ting] that a federal

prosecution would be improper if an officer of the Long Island Beekeeper's Club . . . or the

Metropolitan Postcard Club of New York City . . . accepted cash, and engaged in interstate

telephone calls, in exchange for an agreement to change club policy."  (Smith Reply Mem. 4 n.2

(internal quotation marks omitted).)  Thus, according to Smith, the Government's "expansive theory of honest services fraud" would also allow for the prosecution of "officers of the New York Young Republican Club . . . if they . . . accepted cash bribes in exchange for agreeing to post a story favoring a certain candidate on the Club's facebook [sic] page, or accepted a kickback in deciding where to hold a club fundraiser."  (*Id.*)

There is no doubt that the broad reach of fiduciary duty law means that Section 1346 casts a potentially substantial shadow.  *Milovanovic*, 678 F.3d at 722.  Indeed, this concern was at the heart of Justice Scalia's concurrence in *Skilling*, his dissent from the denial of certiorari in *Sorich*, and Judge Jacobs' dissent in *Rybicki*.  And, it may be that the federal government could be stopped in its tracks from relying on Section 1346 in certain cases at the outer reaches of such law—whether against Long Island apiarists, Manhattan philatelists, or anyone else.  But, for now, Justice Scalia's and Judge Jacobs' views are in the minority, *see United States v. Brooks*, No. 06-CR-550, 2009 WL 3644212, at *11–12 (E.D.N.Y. Oct. 27, 2009), and there is no binding authority holding that Section 1346 is facially unconstitutional on vagueness grounds.  Therefore, the question of whether Boy Scouts and Young Republicans might be improperly indicted (or convicted) under Section 1346 will have to await another day.  Here, however, the Court concludes that, under binding caselaw, there was proper notice that Tabone could have owed the committees that and Party members whom he served a duty of loyalty.  *Cf. Nelson*, 712 F.3d at 508 ("[W]e are mindful of the Supreme Court's observation that defendants charged with bribery or kickbacks face an uphill climb in arguing that they did not and could not reasonably

understand that their conduct was illegal under the statute.").  Therefore, the Court rejects

Defendants' as-applied challenge.[21]

### 5.  Failure To State the Honest-Services-Wire-Fraud Charges with Sufficient Particularity

Tabone argues that "the Indictment does not allege with any clearness, particularity, or

certainty, as required by [Federal Rule of Criminal Procedure 7(c)], the essential facts

constituting the offense [that he] is charged with under the Honest Services Statue [sic]."

(Tabone Mem. 38.)  This argument is without merit.  Rule 7(c) provides that, in general, an

indictment "must be a plain, concise, and definite written statement of the essential facts

constituting the offense charged . . . ."  Fed. R. Crim. P. 7(c)(1) .  The Second Circuit has held

that an indictment is sufficient under Rule 7(c) "when it charges a crime with sufficient precision

to inform the defendant of the charges he must meet and with enough detail that he may plead

double jeopardy in a future prosecution based on the same set of events."  *Bout*, 731 F.3d at

240–41 (internal quotation marks omitted).  The Second Circuit has also "consistently upheld

indictments that do little more than to track the language of the statute charged and state the time

and place (*in approximate terms*) of the alleged crime."  *Id*. at 240 (internal quotation marks

omitted).  However, the Second Circuit has also "note[d] the Supreme Court's caveat that when

the definition of an offense includes generic terms, it is not sufficient that the indictment shall

charge the offence [sic] in the same generic terms as in the definition; but it must state the

species . . . it must descend to particulars."  *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d

---

[21] Of course, it remains to be seen whether the Government will be able to prove all of this at trial, but that is a jury question.

Cir. 1992) (internal quotation marks omitted) (quoting *Russell v. United States*, 369 U.S. 749, 765 (1962)).

Tabone states that the conspiracy- and substantive-honest-services-wire-fraud counts "are premised upon the general conclusory allegation that [he], along with [Smith], [Halloran], and [Savino], allegedly schemed to 'deprive New York City Republican Party county committees and members of the Republican Party of the honest services of leaders of such county committees,'" but that the Indictment "fails to provide any clarification as to whether Mr. Tabone's alleged deprivation of 'honest services' is the deprivation of Mr. Tabone's own honest services to the party, or a deprivation which Mr. Tabone allegedly furthered." (Tabone Mem. 39.) Therefore, "[t]he language of the Indictment is unclear and confusing, leading to numerous interpretations of the possible 'deprivation of honest services' Mr. Tabone is accused of." (*Id.*)

The Indictment in this Case is a "speaking indictment" (to put it mildly) containing extensive descriptions of the precise conduct in which Defendants are alleged to have participated. (Government Mem. 40.) As for the conspiracy count, it is apparent that the Government is charging Tabone with conspiracy to deprive the New York City Republican Party county committees and members of the Republican Party of his own honest services, as well as those of Savino. The same holds true for the substantive count. Further, Tabone's claim that the Indictment is unclear in this regard is undermined by the arguments that he raises in his own papers. In a section of his Memorandum of Law entitled, "Breach of a Fiduciary Duty by a Volunteer Political Party Member to His Political Party Does Not Fall Within the Ambit of the Federal Honest Services Fraud Statute," he references "[t]he Federal Government's indictment of Mr. Tabone and Jay Savino, the Bronx Republican Party chairman," which he claims has "disrupted the New York City Mayor's race by chilling the ordinary cross-endorsement of

101

candidates by the political parties through the Wilson-Pakula process." (Tabone Mem. 26.)
Several pages later, he writes that he "was an unpaid party volunteer and is not a 'public official'
or otherwise elected or appointed to public office such that he owes a fiduciary duty to the
Republican Party, its county committee and its members which would subject him to liability
under the Honest Services Fraud Statute . . . ." (*Id.* at 28.) In any event, all of the legal
challenges to the conspiracy- and substantive-honest-services-wire-fraud charges that Tabone
raises would apply equally to the honest services that he allegedly owed, as well as the honest
services that Savino allegedly owed, and as a result, he has not suffered any prejudice in making
out his defense. *See United States v. Stringer*, 730 F.3d 120, 124 (2d Cir. 2013) ("When the
charges in an indictment have stated the elements of the offense and provided even minimal
protection against double jeopardy, this court has repeatedly refused, in the absence of any
showing of prejudice, to dismiss . . . charges for lack of specificity." (alteration in original)
(internal quotation marks omitted)), *cert denied*, 134 S. Ct. 710 (2013), *reh'g denied*, — S. Ct.
—, 2014 WL 684553 (Feb. 24, 2014).

### 6.  Lack of Federal Jurisdiction for the Travel Act Charges

The Court will not address Defendants' jurisdictional challenge to the Indictment's
Travel Act charges in this Opinion for the reasons that the Court and the Parties discussed at oral
argument, including the Court's concern that to do so at this stage would be premature.
(*See* Oral Argument Tr. 56–60, 111–13, Dec. 5, 2013 ("Oral Argument Tr.").) However,
Defendants shall be permitted to renew their application to dismiss the Indictment on these
grounds at a later date, through a motion submitted through Rule 29 of the Federal Rules of
Criminal Procedure or any other appropriate vehicle.

### 7.  Failure To Allege Inducement for the Hobbs Act Charge

Smith also argues that "Count Four, charging Hobbs Act extortion, should be dismissed because there is no allegation that Smith 'induced' anyone to confer a benefit on his behalf." (Smith Mem. 33.)  However, as Smith himself points out, in *Evans v. United States*, 504 U.S. 255 (1992), "a divided Supreme Court held that an affirmative act of inducement by a public official is not a necessary element of extortion under color of official right."  (Smith Mem. 33.)[22] As the Government notes, "the *Evans* Court directly rejected the then-prevailing Second Circuit precedent that Smith asks this Court to apply."  (Government Mem. 34.)  Both Smith and the Government are correct.  In *Evans*, the Supreme Court held that "the Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts."  504 U.S. at 268.  Because this Court is bound to apply Supreme Court precedent, and because the Supreme Court has held that the Government need not allege that a defendant has induced anyone to confer a benefit on his or her behalf to make out a facially sufficient Hobbs Act extortion charge, the Court cannot of course dismiss the Indictment for its alleged failure to do so.  Accordingly, Smith's Motion To Dismiss Count Four on these grounds is denied.

### 8.  Prejudicial Surplusage

Finally, Smith argues that portions of Paragraphs 26 and 27 of the Indictment should be stricken as prejudicial surplusage.  Federal Rule of Criminal Procedure 7(d) provides that, "[u]pon the defendant's motion, the court may strike surplusage from the indictment or information."  Fed R. Crim. P. 7(d).  "Motions to strike surplusage from an indictment are

---

[22] Smith claims that he "believe[s] that *Evans* was wrongly decided, and . . . wish[es] to preserve the issue for potential review by the Supreme Court."  (Smith Mem. 33.)

granted only when the challenged phrases are not relevant to the crime charged and are inflammatory and prejudicial." *United States v. Ferguson*, 676 F.3d 260, 290 n.34 (2d Cir. 2011) (internal quotation marks omitted); *see also United States v. Mostafa*, — F. Supp.2d —, 2013 WL 4714158, at *11 (S.D.N.Y. Aug. 30, 2013) (same). "Courts have held that statements providing background are relevant and need not be struck." *Mostafa*, 2013 WL 4714158, at *11; *see also United States v. Kassir*, No. 04-CR-356, 2009 WL 995139, at *2 (S.D.N.Y. Apr. 9, 2009) ("[T]he leadership of the organization that Defendant is charged with supporting is relevant and admissible as background information."). "If evidence of the allegation is admissible and relevant to the charge, then regardless of how prejudicial the language is, it may not be stricken." *Kassir*, 2009 WL 995139 (internal quotation marks omitted) (quoting *United States v. Scarpa*, 913 F.2d 993, 1013 (2d Cir. 1990)). Additionally, because the standard for striking surplusage is an "exacting" one, "only rarely is alleged surplusage stricken from an indictment." *Id.* (internal quotation marks omitted). "[I]t has long been the policy of courts within the Southern District to refrain from tampering with indictments." *United States v. Bin Laden*, 91 F. Supp. 2d 600, 621 (S.D.N.Y. 2000) (internal quotation marks omitted).

The paragraphs in question read as follows, with the portions of each that Smith wants stricken italicized:

> 26. On or about April 26, 2012, MALCOLM A. SMITH, the defendant, met the CW at a restaurant in Rockland County, New York. During that meeting, SMITH solicited a $10,000 contribution to his campaign for State Senate from the CW and discussed the CW giving SMITH an additional $100,000 for SMITH to give to other State Senators in an effort to win their support of SMITH for a State Senate leadership position. During the same meeting, SMITH stated that he was considering running for New York City Mayor in 2013 on the Republican Party ballot. *At the end of the meeting, the CW told SMITH that the CW would give money to an associate of the CW who, in turn, would give the money to other people who would donate it to SMITH's campaign in order to keep the CW's name off of SMITH's campaign finance disclosures. SMITH responded: "Okay."*

    27.  On or about August 8, 2012, MALCOLM A. SMITH, the defendant, met the CW at the same Rockland County restaurant.  *During the meeting, the CW gave SMITH $15,000 worth of checks made out to SMITH's campaign drawn on the accounts of various persons.  The CW told SMITH, in substance, that the money came from the CW but that the CW was providing the money through other people.  The CW told SMITH, in substance, that the CW did not want the CW's name to appear on any campaign finance disclosures.  SMITH said, in substance, that the CW's name would not appear on any disclosure statements.  In fact, SMITH later disclosed the checks on his campaign finance filings as contributions from the people whose names appeared on the checks and not the CW.*  During the meeting, SMITH told the CW, in substance, that he was meeting with the five New York City Republican Party county committee leaders the following week to discuss obtaining a Wilson Pakula certificate from each.

(Indictment ¶¶ 26–27 (emphasis added).)  Smith claims that the italicized portions "contain a serious allegation of campaign finance fraud, and conspiracy to commit campaign finance fraud," an "allegation . . . both irrelevant to the crimes charged and highly prejudicial," whereas "[t]he non-italicized portions . . . continue the narrative relevant to the alleged conspiracy . . . ." (Smith Mem. 37–38.)  In response, the Government argues that the allegations contained in Paragraphs 26 and 27 "are admissible as direct evidence in this case," as "[t]hey provide essential background to the relationship between the CW and Smith, dispelling any notion that, outside the context of the bribery scheme at the heart of the indictment, theirs was anything but a corrupt relationship."  (Government Mem. 39.)  Further, "they help explain why Smith was willing to speak as frankly as he did to the CW and make clear that he was not speaking hypothetically or jokingly about the corrupt arrangement with the CW."  (*Id*.)  Perhaps more importantly, the Government argues that "[i]n any event, it is impossible to judge the admissibility of evidence of the challenged allegations at this point in the proceedings," and as a result, "the Court should deny Smith's motion as premature."  (*Id*.)

    It is unclear why the Government would need to prove that the relationship between the CW and Smith was "anything but . . . corrupt."  But the Government's other arguments are

persuasive.  For example, building on one of the other reasons the Government put forth in its Memorandum of Law, the fact that the CW requested that his name be kept off campaign finance forms, and the fact that Smith honored this request, might help establish that the CW and Smith had a working relationship whereby the understanding was that when something was discussed during a meeting, it got done.  *Cf. United States v. Pipola*, 83 F.3d 556, 566 (2d Cir. 1996) (finding that district court properly admitted evidence of discussions between defendants about uncharged crimes in which they had previously engaged because "[o]ne legitimate purpose for presenting evidence of extrinsic acts is to explain how a criminal relationship developed," "this sort of proof furnishes admissible background information in a conspiracy case," and "[s]uch proof may also be used to help the jury understand the basis for the co-conspirators' relationship of mutual trust"); *United States v. Peña*, — F. Supp.2d —, 2013 WL 5693831, at *4 (S.D.N.Y. Oct. 11, 2013) (finding statements suggesting that the defendant was involved in uncharged offenses admissible in part because "evidence of [the defendant's] actions . . . establish[ed] a longstanding relationship with the cooperating witness"); *United States v. Borrero*, No. 13-CR-58, 2013 WL 5797126, at *5 (S.D.N.Y. Oct. 28, 2013) (finding admissible statements concerning "other crimes" because such statements were "needed to explain the basis of the relationship and provide[d] background for the jury's understanding as to how and why there [was] trust" in the defendant's skills by certain members of a robbery crew); *United States v. Guerrero*, 882 F. Supp. 2d 463, 492 (S.D.N.Y. 2011) ("[E]vidence related to the defendants' prior illicit transactions with their co-conspirators . . . is plainly admissible to explain the develop of the illegal relationship between the defendants and their co-conspirators and explain [t]he mutual trust that existed between the coconspirators (including the cooperating Government Witnesses).").

Nevertheless, the Court is cognizant of the risk that this language could unfairly prejudice Smith at trial, and that it could be impermissibly used as character evidence to suggest that because Smith had corrupt dealings with the CW in another context, he had corrupt dealings with the CW in the context of the alleged scheme to obtain a Wilson Pakula certificate, which means that such evidence could be inadmissible at trial. *See* Fed. R. Evid. 404. However, "[t]here is little or no purpose in attempting to predict in advance of trial what evidence will prove admissible or how specific allegations relate to the overall charges." *United States v. Butler*, 351 F. Supp. 2d 121, 124 (S.D.N.Y. 2004). Accordingly, Smith's Motion To Strike prejudicial surplusage from the Indictment is denied at this time, but without prejudice to renewal before trial.

### III.  Conclusion

For the reasons given herein, Defendants' Motions To Dismiss and To Strike Portions of the Indictment as Surplusage are denied.


SO ORDERED.

Dated:       April ____, 2014
             White Plains, New York

                                        _____
                                        KENNETH M. KARAS
                                        UNITED STATES DISTRICT JUDGE