UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DANIEL J. HALLORAN,

                               Petitioner,

      v.

UNITED STATES OF AMERICA,

                             Respondent.

No. 13-CR-297 (KMK)
No. 18-CV-1559 (KMK)

OPINION & ORDER

Appearances:

Jonathan I. Edelstein, Esq.
Edelstein & Grossman
New York, NY
*Counsel for Petitioner*

Jamie E. Bagliebter, Esq.
Office of the United States Attorney for the Southern District of New York
New York, NY
*Counsel for Respondent*

KENNETH M. KARAS, United States District Judge:

In July 2014, Daniel J. Halloran ("Halloran" or "Petitioner") was convicted at trial of bribery and related corruption offenses and, in March 2015, was sentenced to 120 months' imprisonment. Halloran, who is counseled, has filed a Petition, pursuant to 28 U.S.C. § 2255, to vacate, set aside, or correct his sentence (the "Petition"). (*See* Mot. Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody ("Pet.") (Dkt. No. 541); Mem. of Law in Supp. of Def.'s Pet. to Vacate his Conviction Pursuant to 28 U.S.C. § 2255 ("Pet'r's Mem.") (Dkt. No. 542).)[1] Petitioner has also filed a Motion for Discovery Under Rule 6 of the Rules Governing Section 2255 Proceedings (the "Discovery Motion") seeking additional

---

[1] All record citations in this Opinion are to No. 13-CR-297.

documents and records from both the Government and third parties. (Dkt. No. 559).) For the reasons stated herein, both the Petition and the Discovery Motion are denied.

## I. Factual History

On April 18, 2013, a grand jury returned Indictment S1 13-CR-297 ("Indictment"), (Dkt. No. 42), charging Petitioner with two counts of wire fraud, in violation of 18 U.S.C. §§ 1343, 1346, 1349; two counts of bribery, in violation of the Travel Act, 18 U.S.C. § 1952; and one count of conspiracy to commit both substantive offenses, in violation of 18 U.S.C. § 371. (*See* Indictment ¶¶ 57–65, 68–69.) Several co-defendants were also charged with these and other offenses. (*Id.*)

The evidence adduced at trial established that Halloran, a member of the New York City Council from 2010 to 2013, was involved in two related bribery schemes. *See United States v. Halloran*, 821 F.3d 321, 325 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 1118 (2017).

In the first scheme, the "Discretionary Funds Scheme," Halloran accepted bribes in exchange for his agreement to divert public funds to the bribe-payers. *Id.* In August and September 2012, Halloran met Moses Stern ("Stern") and a person purportedly named "Raj"—both of whom posed as real estate developers but who were actuality working with the FBI (Raj as an undercover agent and Stern as a cooperating witness). *Id.* at 326. Stern offered Halloran a bribe in exchange for a city-funded contract. *Id.* Halloran was to use his authority over "member items"—pools of public money that City Council members may allocate to charitable organizations—to direct funding to an entity controlled by Stern. *Id.* Stern paid Halloran $7,500 in cash as a down payment. *Id.* at 341. At later meetings, the three discussed possible charitable conduits for the money, and they ultimately agreed that Halloran would allocate funds to a charity under his control that would allow Raj and Stern to extract the money through a "no-

show job." *Id.* at 326. On October 23, 2012, Halloran sent letters written on City Council letterhead to three local charities under his control stating that, in connection with acquiring a "community facility" for those charities, Halloran would allocate some $80,000 in discretionary funding. *Id.* at 326–27. On November 15, 2012, Halloran sent a second letter, also written on City Council letterhead, to Raj's company, requesting its assistance with the fraudulent community facility project and reiterating that Halloran would allocate up to $80,000 in discretionary funding. *Id.* at 327; (*see also* Trial Tr. ("Tr.") 600.) After receiving the second letter, Raj paid Halloran $15,000 in cash. *Halloran*, 821 F.3d at 327.

In the second scheme, the "Wilson-Pakula Scheme," Halloran worked with Stern, Raj, and others to bribe Republican party officials to help Malcom Smith ("Smith"), a Democrat, obtain the Republican Party's nomination for New York City mayor. *Id.* To compete for the nomination, Smith would require an authorization, known as a "Wilson-Pakula,"[2] from a Republican Party executive committee. *Id.*; *see also* N.Y. Elec. Law § 6–120(3). In practice, this required securing the votes of at least three of the Republican Party chairs representing the five boroughs of New York City. *Halloran*, 821 F.3d at 327. Pursuant to Halloran's instructions, Raj paid bribes to two such leaders, those of Queens and the Bronx. *Id.* at 329.

On July 29, 2014, following trial, a jury found Halloran guilty of all five counts with which he was charged. *Id.* at 330. At sentencing, the Court imposed a sentence of 120 months' imprisonment followed by two years of supervised release. *Id.*

---

[2] Under New York's "Wilson–Pakula Law," a candidate seeking the nomination of a party of which he is not a member must obtain the consent of a designated committee of that party before competing in that party's primary election. In the world of New York politics, this consent is known as a "Wilson–Pakula." *See Halloran*, 821 F.3d at 327.

Halloran filed a direct appeal.  On April 28, 2016, the Second Circuit affirmed.  *Id.* at 343.  On February 21, 2017, the Supreme Court denied certiorari.  *See Halloran v. United States*, 137 S. Ct. 1118 (2017).  The instant Petition and related Discovery Motion followed.

## II.  Discussion

### A.  Standard of Review

A prisoner in federal custody may move to vacate, set aside, or correct his sentence only "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack."  28 U.S.C. § 2255(a).[3]  "Because collateral challenges are in tension with society's strong interest in the finality of criminal convictions, the courts have established rules that make it more difficult for a defendant to upset a conviction by collateral, as opposed to direct, attack."  *Yick Man Mui v. United States*, 614 F.3d 50, 53 (2d Cir. 2010) (citation and quotation marks omitted).  To prevail on a collateral attack of a final judgment under § 2255, a petitioner must demonstrate the existence of a "constitutional error . . . or an error of law or fact that constitutes a fundamental defect which inherently results in a complete miscarriage of justice."  *United States v. Bokun*, 73 F.3d 8, 12 (2d Cir. 1995) (citation and quotation marks omitted); *accord Cuoco v. United States*, 208 F.3d 27, 30 (2d Cir. 2000); *Rodriguez v. United States*, No. 11-CV-2957,

---

[3] 28 U.S.C. § 2255(a) provides:

A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

2013 WL 6171618, at *1 (S.D.N.Y. Nov. 25, 2013), *aff'd*, 679 F. App'x 41 (2d Cir. 2017).

In ruling on a § 2255 petition, the district court is required to hold a hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). Nor is a hearing required where the petitioner's allegations are "vague, conclusory, or palpably incredible." *Gonzalez v. United States*, 722 F.3d 118, 130–31 (2d Cir. 2013) (citing *Machibroda v. United States*, 368 U.S. 487, 495 (1962)). To justify a hearing, the petition "must set forth specific facts supported by competent evidence, raising detailed and controverted issues of fact that, if proved at a hearing, would entitle [the petitioner] to relief." *Id.* at 131.

B. Analysis

Petitioner argues that (1) the evidence was insufficient, and the jury instructions erroneous, as to each of his offenses of conviction in light of the Supreme Court's subsequent decision in *McDonnell v. United States*, 136 S. Ct. 2355 (2016); (2) the Government committed a reversible *Brady* or *Giglio* violation; and (3) the "integrity of the trial was compromised by prosecutorial misconduct." (Pet. 4, 6, 8.) The Court addresses each argument to the extent necessary.

1. *McDonnell* Claim

Petitioner argues that his convictions must be overturned, or in the alternative that he is entitled to a new trial, because the evidence was insufficient, and the jury instructions were overbroad and thus erroneous, as to each of the offenses of conviction in light of *McDonnell*. (Pet'r's Mem. 12–26; Reply Mem. Of Law In Further Supp. Of Def.'s Pet. To Vacate His Conviction Pursuant to 28 U.S.C. § 2255 ("Pet'r's Reply") (Dkt. No. 561) 1–12.)

<u>a. Holding in *McDonnell*</u>

The Court begins by reviewing the Supreme Court's decision in *McDonnell*. There, Robert McDonnell ("McDonnell"), the former Governor of Virginia, was charged, as relevant here, with honest services wire fraud, in violation of 18 U.S.C. § 1343.[4] *McDonnell*, 136 S. Ct. at 2365. The Government's theory of the case was that McDonnell accepted bribes from a businessman in exchange for arranging certain meetings and hosting certain events to promote the businessman's product. *Id.* at 2361, 2364–66. Critically, "[t]he parties agreed that they would define honest services fraud with reference to the federal bribery statute," which requires proof that McDonnell had "committed or agreed to commit an 'official act'" in exchange for bribes. *Id.* at 2365 (citation omitted).[5] That statute, in turn, defines "official act" as "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at

---

[4] 18 U.S.C. § 1343 provides, in relevant part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

*Id.* As defined by 18 U.S.C. § 1346, "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." *Id.*

[5] The federal bribery statute provides, in relevant part:

> Whoever . . . being a public official or person selected to be a public official, directly or indirectly, corruptly demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally or for any other person or entity, in return for . . . being influenced in the performance of any official act . . . shall be fined under this title or not more than three times the monetary equivalent of the thing of value, whichever is greater, or imprisoned for not more than fifteen years, or both, and may be disqualified from holding any office of honor, trust, or profit under the United States.

18 U.S.C. § 201(b).

any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit." 18 U.S.C. § 201(a)(3). In accordance with the parties' agreement, the District Court instructed the jury that it must find that McDonnell agreed "to accept a thing of value in exchange for official action." *McDonnell*, 136 S. Ct. at 2366. However, the District Court also instructed the jury—at the request of the Government and over McDonnell's objections—that the term "official act" encompassed "acts that a public official customarily performs," including acts "in furtherance of longer-term goals" or "in a series of steps to exercise influence or achieve an end." *Id.*

On appeal, the Supreme Court rejected the District Court's interpretation of "official act." Instead, it held:

> The "question, matter, cause, suit, proceeding or controversy" [as defined in 18 U.S.C. § 201(a)(3)] must involve a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee. It must also be something specific and focused that is "pending" or "may by law be brought" before a public official. To qualify as an "official act," the public official must make a decision or take an action on that "question, matter, cause, suit, proceeding or controversy," or agree to do so. That decision or action may include using his official position to exert pressure on another official to perform an "official act," or to advise another official, knowing or intending that such advice will form the basis for an "official act" by another official. Setting up a meeting, talking to another official, or organizing an event (or agreeing to do so)—without more—does not fit that definition of "official act."

*Id.* at 2371–72. Applying that holding, the Court concluded that the jury had been incorrectly instructed on the meaning of "official act," that the error was not harmless in light of the Government's theory of the case, and, accordingly, that McDonnell's conviction must be vacated. *Id.* at 2374–75.

### b.  Effect of *McDonnell* on Petitioner's Counts of Conviction

Here, Petitioner was charged with, and convicted of, five offenses:

(1) bribery, in violation of the Travel Act, 18 U.S.C. § 1952, as to the Discretionary Funds Scheme;

(2) bribery, in violation of the Travel Act, 18 U.S.C. § 1952, as to the Wilson-Pakula Scheme;

(3) wire fraud (under both property and honest services theories), in violation of 18 U.S.C. §§ 1343, 1346, 1349, as to the Discretionary Funds Scheme;

(4) honest services wire fraud, in violation of 18 U.S.C. §§ 1343, 1346, 1349, as to the Wilson-Pakula Scheme; and

(5) conspiracy, in violation of 18 U.S.C. § 371, as to the Wilson-Pakula Scheme.

(*See* Indictment ¶¶ 57–65, 68–71.)[6]  Petitioner argues that each of his counts of conviction is undermined by *McDonnell* because that case applies "to all permutations under which a scheme involving alleged official acts may be charged, and not only the specific charges of bribery and/or fraud." (Pet'r's Mem. 19.)  In support, Petitioner relies on the Second Circuit's recent decisions in *United States v. Silver*, 864 F.3d 102 (2d Cir. 2017) ("*Silver I*"), *cert. denied*, 138 S. Ct. 738 (2018), and *United States v. Skelos*, 707 F. App'x 733 (2d Cir. 2017), both of which vacated bribery-related jury instructions in light of *McDonnell*.

The Government acknowledges that the fourth count of conviction listed above (i.e., the conviction for honest services wire fraud as to the Wilson-Pakula Scheme) is affected by *McDonnell*.  (Mem. Of Law of the United States of America in Opp. To Pet'r Daniel Halloran's Mot. To Vacate His Conviction Pursuant To 28 U.S.C. § 2255 ("Gov't Mem.") (Dkt. No. 554) 22.)  As to the other four counts of conviction, however, the Government argues that *McDonnell* has no effect.  The Government emphasizes that although *McDonnell* narrowed the interpretation of "official act" as defined in 18 U.S.C. § 201(a)(3), "not all federal bribery statutes identify 'official act,' much less official act as defined in § 201(a)(3), as the necessary *quo* for bribery." *United States v. Ng Lap Seng*, 934 F.3d 110, 132 (2d Cir. 2019); *see also United States v.*

---

[6] The Court notes that this list does not reflect the organization of the counts charged against Petitioner in the Indictment.

*Boyland*, 862 F.3d 279, 291 (2d Cir. 2017) (holding that the *McDonnell* standard as to § 201 does not apply to 18 U.S.C. § 666, which "is more expansive than § 201"), *cert. denied*, 138 S. Ct. 938 (2018). In particular, the Government defends the first two counts of conviction listed above (for violations of the Travel Act) on the grounds that they were predicated on underlying violations of New York law that do not contain the phrase "official act" or refer to 18 U.S.C. § 201's use of such phrase. Further, although the jury instructions for the third and fifth counts listed above (for wire fraud as to the discretionary funding scheme and conspiracy as to the Wilson-Pakula scheme) both included a (now inaccurate) definition of "official act," the jury, using a special verdict form, convicted Halloran for these counts on an independent basis that did not rely on the definition of "official act."

The Court discusses the Parties' arguments, and the effect of *McDonnell,* with respect to each of the counts of conviction in turn.

i.  First and Second Counts

The Travel Act, 18 U.S.C. § 1952(a), "is a substantive offense that . . . punishes individuals for using [the] facilities of interstate . . . commerce to further certain unlawful activities." *United States v. Jenkins*, 943 F.2d 167, 173 (2d Cir. 1991), *cert. denied*, 502 U.S. 1014 (1991). Unlawful activities include "extortion[] [or] bribery . . . in violation of the laws of the State in which committed." 18 U.S.C. § 1952(b)(2). "In requiring a predicate state offense, the Travel Act incorporates the 'substantive offense.'" *United States v. Tagliaferri*, 648 F. App'x 99, 102 (2d Cir. 2016) (citation omitted); *see also United States v. Szur*, 289 F.3d 200, 210–11 (2d Cir. 2002) (using New York state law to define the parameters of the offense in Travel Act case). Nowhere is the phrase "official act" used or suggested in the language of the Travel Act.

Here, Petitioner's first Travel Act conviction was based on the Discretionary Funds Scheme. For this scheme, as charged in the Indictment, the underlying (i.e. "predicate") state law offenses were New York Penal Law §§ 200.10 ("Section 200.10") and 200.11 ("Section 200.11"). (Indictment ¶ 71.)[7] Neither of these offenses uses the term "official act," *see* N.Y. Penal Law §§ 200.10–11, and the jury charge matched the statutory language, (*see* Tr. 4079–80.)

Petitioner's second Travel Act conviction, based on the Wilson-Pakula Scheme, operated similarly. For this scheme, as charged in the Indictment, the underlying state law offenses were New York Penal Law §§ 200.45 ("Section 200.45") and 200.50 ("Section 200.50"). (Indictment ¶ 65.)[8] Neither of these state law offenses uses the term "official act"; rather, each enumerates two specific illegal behaviors. *See* N.Y. Penal Law §§ 200.45, 200.50. Again, the jury charge matched the statutory language. (*See* Tr. 4076–79.)

---

[7] Section 200.10 provides: "A public servant is guilty of bribe receiving . . . when he or she solicits, accepts or agrees to accept any benefit from another person upon an agreement or understanding that his or her vote, opinion, judgment, action, decision or exercise of discretion as a public servant will thereby be influenced." N.Y. Penal Law § 200.10.

Section 200.11 provides: "A public servant is guilty of bribe receiving . . . when he or she solicits, accepts or agrees to accept any benefit valued in excess of five thousand dollars from another person upon an agreement or understanding that his or her vote, opinion, judgment, action, decision or exercise of discretion as a public servant will thereby be influenced." N.Y. Penal Law § 200.11.

[8] Section 200.45 provides: "A person is guilty of bribe giving for public office when he confers, or offers or agrees to confer, any money or other property upon a public servant or a party officer upon an agreement or understanding that some person will or may be appointed to a public office or designated or nominated as a candidate for public office." N.Y. Penal Law § 200.45.

Section 200.50 provides: "A public servant or a party officer is guilty of bribe receiving for public office when he solicits, accepts or agrees to accept any money or other property from another person upon an agreement or understanding that some person will or may be appointed to a public office or designated or nominated as a candidate for public office." N.Y. Penal Law § 200.50.

Petitioner argues that each of the New York offenses upon which the Travel Act charges was based "is sufficiently analogous to 18 U.S.C. § 201," and, accordingly, that *McDonnell* undermines the Travel Act convictions. (Pet'r's Reply 1; *see also* Pet'r's Mem. 19 (arguing that the New York statutes are "textually very similar to [§] 201").) In particular, Petitioner contends that the New York offenses, are "obviously intended to encompass . . . activities . . . that involve the [formal] exercise of a public servant's official authority." (Pet'r's Reply at 2.) Petitioner also argues that, separate from the statutory text, the constitutional concerns that animated *McDonnell* also "militate in favor of the 'official act' limitations being imposed in order to prevent innocuous activities . . . from becoming crimes when done by public officials, and to ensure that the scope of the statute is defined with sufficient definiteness so that ordinary people can understand what is prohibited." (*Id.* at 2–3.)

In theory, Petitioner's arguments with respect to the proper interpretation of Sections 200.10 and 200.11 (the state bribery statutes upon which Petitioner's first Travel Act conviction, for involvement in the Discretionary Funds Scheme, relied) may have merit. Although these statutes do not use the specific phrase "official acts," the conduct they describe appears to be substantively identical to the interpretation the Supreme Court has given to that term. Sections 200.10 and 200.11 prohibit public officials from exchanging, for a bribe, their "vote, opinion, judgment, action, decision or exercise of discretion as a public servant." N.Y. Penal Law §§ 200.10, 200.11. A public servant's "vote," "opinion," or "judgment," are surely examples of official acts within the meaning of *McDonnell*, as they "connote a formal exercise of governmental power." *McDonnell*, 136 S. Ct. at 2368. And while the remaining terms ("decision or exercise of discretion as a public servant") are more ambiguous, these phrases too suggest a formal response to some "'question' or 'matter' . . . similar in nature to a 'cause, suit,

proceeding or controversy.'" *Id.* at 2369. Indeed, New York's First Department has already concluded that § 201(c) "is 'essentially similar'" to Section 200.10. *In re Biaggi*, 539 N.Y.S.2d 744, 746 (App. Div. 1989). It is therefore reasonable to suggest that the Court's guidance in *McDonnell*—while concerning the construction of a federal statute—may also reflect an appropriate interpretation of Sections 200.10 and 200.11.

For the purposes of this Petition, however, the substantive similarity between Sections 200.10 and 200.11 and 18 U.S.C. § 201 is academic. This is so because this Court's jury instructions with respect to this count precisely mirrored the statutory language contained in Sections 200.10 and 200.11. Jurors were, in fact, repeatedly instructed that, to find a violation of the Travel Act based on the Discretionary Funds Scheme, they must find a solicitation or agreement to influence a "public servant's vote, opinion, judgment, action, decision or exercise of discretion as a public servant." (Tr. 4080–82.) These instructions therefore stand in sharp contrast to the jury instructions in *McDonnell,* where the district judge defined "official acts" as "acts that a public official customarily performs, including acts in furtherance of longer-term goals or in a series of steps to exercise influence or achieve an end." *McDonnell,* 136 S. Ct. at 2366 (citation and quotation marks omitted); *see also Skelos*, 707 F. App'x at 736–37 (finding that a district judge erroneously defined "official act" as "any act taken under color of official authority"); *Silver I*, 864 F.3d at 118 (finding that a district judge erroneously defined "official act" as "any action taken or to be taken under color of official authority"). In other words, insofar as Sections 200.10 and 200.11 are substantively similar to § 201, this Court's instructions fully accounted for that substantive meaning. There was, therefore, no error and no reason to believe that the jury's understanding of the underlying state offenses (and thus the Travel Act) was overly broad or inaccurate. *See United States v. Alfisi*, 308 F.3d 144, 150 (2d Cir. 2002)

("Where a district court's jury instructions accurately track the language and meaning of the relevant statute, we generally will not find error." (citation omitted)).

Petitioner's claims with respect to his second Travel Act conviction (that which was based on the Wilson-Pakula Scheme and relied on Sections 200.45 and 200.50 as the underlying state law offenses) fail for similar reasons. These statutes (Sections 200.45 and 200.50) prohibit public officials from soliciting or accepting a bribe, or agreeing to do so, in exchange for "an agreement . . . that some person will or may be appointed to a public office or designated or nominated as a candidate for public office." N.Y. Penal Law §§ 200.45, 200.50. Importantly, in contrast to § 201(a)(3), Sections 200.45 and 200.50 do not mention "official acts." Indeed, they depart entirely from listing a general category of actions which officials may not exchange for bribes; rather, these statutes enumerate two specific actions: entering an agreement that someone may be (1) "appointed to a public office" or (2) "designated or nominated as a candidate for public office." Both textually and substantively, Sections 200.45 and 200.5 therefore differ from § 201 (and even Sections 200.10 and 200.11) in crucial respects.

The Second Circuit has explained "the *McDonnell* 'official act' standard, derived from the *quo* component of bribery as defined by § 201(a)(3), does not necessarily delimit the *quo* components of other bribery statutes." *Ng Lap Seng*, 934 F.3d at 132–33. Thus, where the text of some other bribery statute differs meaningfully from by § 201, "*McDonnell's* 'official act' standard does not pertain." *Id.* at 134; *see also United States v. Thiam*, 934 F.3d 89, 94 (2d Cir. 2019) (noting that "*Silver* . . . provides no support for applying *McDonnell* beyond honest services fraud and Hobbs Act extortion charges"), *cert. denied*, No. 19-CV-594, 2019 WL 6689707 (Dec. 9, 2019); *Boyland*, 862 F.3d at 291 (holding that the *McDonnell* standard as to § 201 does not apply to 18 U.S.C. § 666, which "is more expansive than § 201"); *cf. McDonnell*,

136 S. Ct. at 2365 (noting that "[t]he parties agreed that they would define honest services fraud with reference to [§ 201]"); *Skelos*, 707 F. App'x at 738 (vacating § 666 conviction because the "jury was charged, at the government's request, on a § 666 theory based on 'official acts,' the definition of which is cabined by . . . *McDonnell*"); *Silver I*, 864 F.3d at 118, 124 (vacating honest services fraud and extortion convictions in light of *McDonnell* where the jury instructions relied on an impermissibly broad definition of the specific phrase "official act").[9] Such is the case with respect to Sections 200.45 and 200.50.

Accordingly, the Court concludes that *McDonnell* does not disturb Petitioner's first and second counts of conviction (i.e. the Travel Act counts).

### ii. Third and Fifth Counts

The federal wire fraud statute criminalizes the use of "wire, radio, or television communication in interstate or foreign commerce" for the purpose of executing a "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1343. Congress also has clarified that "[f]or the purposes of this chapter, the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346.

Here, with respect to Petitioner's third count of conviction (wire fraud as to the Discretionary Funds Scheme), Petitioner was charged, and the jury was instructed, that the Government could prove the charge based *either* on an honest services fraud theory (which,

---

[9] Indeed, in the only other case this Court has found on the question of whether *McDonnell* applies to the Travel Act, the court concluded that it did not. *See United States v. Williams*, No. 17-CR-137, 2017 WL 2713404, at *6 (E.D. Pa. June 13, 2017) (holding that, because the defendant was charged "with violating the Travel Act contrary to Pennsylvania bribery law — not federal bribery law . . . *McDonnell*'s construction of 'official acts is inapplicable" (citations omitted)).

under *McDonnell*, requires proof of an "official act") *or* a money-or-property-fraud theory (which does not). (Tr. 4085, 4089; Indictment 25 (charging Petitioner via alternative means).) The jury expressly found Petitioner guilty of wire fraud based on the both theories. (*See* Tr. 4143–44.) Therefore, regardless of *McDonnell*'s effect on the honest services fraud theory, Petitioner was validly convicted of the wire fraud count based on the money-or-property-fraud theory. This count of conviction is therefore unaffected by *McDonnell*. *See United States v. Farhane*, 634 F.3d 127, 148–49 (2d Cir. 2011) (affirming a conviction where the jury specified two theories of liability and the evidence for at least one was found to be sufficient), *cert. denied*, 565 U.S. 1088 (2011); *United States v. Masotto*, 73 F.3d 1233, 1241 (2d Cir. 1996) (same), *cert. denied*, 519 U.S. 810 (1996).

Petitioner's challenge to his fifth count of conviction (for conspiracy as to the Wilson-Pakula Scheme) fails for similar reasons. The general conspiracy statute criminalizes conspiracy "either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose." 18 U.S.C. § 371. Here, the jury was given two alternative theories for what constituted the underlying "offense against the United States," and accordingly, had two alternative means of reaching its verdict. The jury was instructed that, to convict, it had to find *either* that Petitioner conspired to commit honest services fraud (as in the fourth count, discussed below) or Travel Act bribery (as in the second count, discussed above). (Tr. 4047.) In accordance with this instruction, the special verdict form required the jury to indicate that it found that at least one object of the conspiracy was honest services fraud, *or* that at least one object of the conspiracy was Travel Act bribery. (Tr. 4142–43.) The jury returned a verdict of guilty as *to both*. (*Id.*) As noted, *supra* Section II.B.1.b.ii, Travel Act bribery does not require proof of an "official act" and is unaffected by *McDonnell*. Therefore,

15

regardless of *McDonnell*'s effect on an honest services wire fraud conviction, Petitioner was validly convicted of conspiracy to commit Travel Act bribery. *See Farhane*, 634 F.3d at 148–49 (affirming a conviction based on sufficiency of the evidence for at least one theory of liability).

Accordingly, the Court concludes that *McDonnell* does not disturb Petitioner's third or fifth counts of conviction.

### iii.  Fourth Count

As noted, the Government acknowledges that Petitioner's fourth count of conviction, for honest services wire fraud as to the Wilson-Pakula Scheme, is affected by the holding in *McDonnell*.  (Gov't Mem. 22).  This Court agrees.  In its jury charge with respect to this count, the Court explained that "the term 'official act' includes the decisions or actions generally expected of an official . . . [and] includes acts taken by an official under the color of his office." (Tr. 4061–62).  This charge is analogous to the instructions subsequently held to be improper in *McDonnell*, *Skelos*, and *Silver I*.  *See McDonnell*, 136 S. Ct. at 2366 (rejecting the district court's definition of "official acts" as "acts that a public official customarily performs"); *see also Skelos*, 707 F. App'x at 736 (rejecting the district court's definition of "official act" as "any act taken under color of official authority"); *Silver I*, 864 F.3d at 111 (same).  The jury instructions with respect to this Count were therefore erroneous.

However, the mere conclusion that a jury instruction was incorrect in light of intervening precedent does not itself necessitate vacatur.  On the contrary, "[e]ven where charging error is identified, however, [the court] will not reverse a conviction if the government can show harmlessness, i.e., show that it is 'clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.'" *Ng Lap Seng*, 934 F.3d at 129 (italics removed) (quoting *United States v. Botti*, 711 F.3d 299, 308 (2d Cir. 2013)); *see also United*

*States v. Frady*, 456 U.S. 152, 169 (1982) (holding that, to demonstrate prejudice, a habeas petitioner must show that "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process, not merely whether the instruction is undesirable, erroneous, or even universally condemned" (citation and quotation marks omitted)).  The Court must therefore analyze whether the error in Petitioner's jury instructions (for honest services wire fraud as to the Wilson-Pakula Scheme) contributed to Petitioner's conviction.

Additionally, although this Court has already concluded that the jury instructions for all other counts were free of error, the Court now also considers, as an alternative basis for its decision, whether any such errors would have contributed to Petitioner's conviction.

### c.  Harmlessness

Petitioner argues that the jury instructions at trial were not only erroneous, but that the error was not harmless, and, accordingly, that vacatur is required.  (Pet'r's Mem. 19–25.)[10]  The Government maintains that any error was harmless because the evidence demonstrated, beyond a reasonable doubt for each count of conviction, that Petitioner agreed to receive money in exchange for conduct that constituted "official acts" under *McDonnell*.  (Gov't Mem. 26–33.)

The Court therefore analyzes the trial evidence to determine whether the jury would have returned the same verdict if it had received the narrower "official acts" instruction required by *McDonnell*.[11]

---

[10] The Parties dispute whether Petitioner's claims are procedurally defaulted.  (*Compare* Gov't Mem. 22–26 *with* Pet'r's Reply 4–9.)  The Court declines to decide the issue and proceeds to the merits.

[11] The Parties appear to dispute the appropriate standard for evaluating harmlessness in this case.  Citing direct appeal cases such as *McDonnell*, *Silver I*, and *Skelos*, Petitioner suggests that the appropriate harmlessness test here requires the Government to establish that errors were harmless "beyond a reasonable doubt."  (Pet'r's Mem. 24–25.)  *See Neder v. United States,* 527 U.S. 1, 16 (1999).  The Government, however, invokes precedents involving collateral review of

i.  Wilson-Pakula Scheme

*McDonnell* requires that the Government first "identify a 'question, matter, cause, suit, proceeding or controversy' that 'may at any time be pending' or 'may by law be brought' before a public official." *McDonnell*, 136 S. Ct. at 2368 (quoting § 201(a)(3)).  The "question" (or "matter," etc.) "must . . . be something specific and focused" and "must involve a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee." *Id.* at 2372.  Moreover, the question or matter must be the sort of thing "that can be put on an agenda, tracked for progress, and then checked off as complete." *Id.* at 2369.  Having identified the question or matter, the Government must, second, "prove that the public official made a decision or took an action 'on' that question . . . , or agreed to do so." *Id.* at 2368.  Taking a "decision" or "action" may "include using [one's] official position to exert pressure on another official to perform an 'official act,' or to advise another official, knowing or intending that such advice will form the basis for an 'official act' by another official." *Id.* at 2372.  However, "[s]etting up a meeting,

---

claims not previously raised on direct appeal, suggesting that it is Petitioner's burden to establish prejudice.  (*See* Gov's Mem. 26 (citing *Frady*, 456 U.S. at 169).)  Because there is a dispute about whether Petitioner raised the errors properly on direct appeal, and because "[i]t is an open question in the Second Circuit whether, when jury instructions are being evaluated for the first time on collateral review for a constitutional defect, the more deferential standard of harmless error applies, or the more stringent standard of harmless error applies," *Xiang v. United States*, No. 09-CV-7579, 2010 WL 3155052, at *6 n.4 (S.D.N.Y. Aug. 6, 2010) (citations omitted), the Court declines to reach these issues.  Instead, because the Government can establish harmlessness even under the more stringent "beyond a reasonable doubt" standard, this Court assumes (without deciding) that this standard applies here.

Relatedly, the following analysis also necessarily resolves Petitioner's challenges based on the sufficiency of the evidence.  If the Court determines that the evidence at trial was sufficient to make any erroneous jury instructions "harmless," by definition, it has also concluded that there was sufficient evidence to convict.  *See United States v. Binday*, 804 F.3d 558, 572 (2d Cir. 2015) (explaining that review for sufficiency is "exceedingly deferential" (citation and quotation marks omitted)), *cert. denied*, 136 S. Ct. 2487 (2016).

talking to another official, or organizing an event (or agreeing to do so)" are not, "without more," within the "definition of 'official act.'" *Id.*; *see also Ng Lap Seng*, 934 F.3d at 130 (reiterating two-step process required by *McDonnell*).

As to the first requirement, approval of a Wilson-Pakula certificate constitutes a "'question, matter, cause, suit, proceeding or controversy' that 'may at any time be pending' or 'may by law be brought' before a public official." *McDonnell*, 136 S. Ct. at 2368 (quoting § 201(a)(3)).[12] First, such a certificate "involves a formal exercise of [official] power." *Id.* Under New York law, the approval reflected in a Wilson-Pakula certificate is a necessary requirement to permit a "candidate seeking the nomination of a party of which he is not a member . . . to compete in the primary election." *Halloran*, 821 F.3d at 327 (citation omitted); *see also* N.Y. Elec. Law § 6–120(3). Moreover, as such a certificate represents the formal "consent of the appropriate party committee," *Halloran*, 821 F.3d at 327, it is clearly "of the same stripe as a lawsuit before a court, a determination before an agency, or *a hearing before a committee*," and is thus "similar in nature to a 'cause, suit, proceeding or controversy,'" *McDonnell*, 136 S. Ct. at 2369 (emphasis added) (quoting § 201(a)(3)). A Wilson-Pakula approval also fits neatly into *McDonnell's* category of actions that are "relatively circumscribed—the kind of thing that can be put on an agenda, tracked for progress, and then checked off as complete." *Id.* After all, a vote of a party's committee members authorizing (or

---

[12] Although § 201(a)(1) defines "public official" to mean officials of the *federal* government, the use of § 201(a)(3)'s definition of "official act" in the honest services context is not so confined. Indeed, *McDonnell* itself concerned a *state* official. *McDonnell*, 136 S. Ct. at 2365; *see also United States v. Bahel*, 662 F.3d 610, 632 (2d Cir. 2011) (explaining that the honest services fraud statute applies not only to government and private sector employees, but employees of international organization as well). Petitioner does not argue that acts taken by party officials in their official capacity cannot support an honest services charge.

refusing to authorize) such a designation is a concrete, discrete step.  It either occurs, or it does not.

As to the second *McDonnell* requirement, Petitioner argues that the evidence presented at trial risked that the jury convicted based on conduct that is not culpable under *McDonnell*. (Pet'r's Mem. 20, 24.)  In particular, Petitioner argues that "the Wilson-Pakula Scheme involved, at most, the arrangement of a 'meeting, call or event' that the *McDonnell* Court found to fall short of an official act."  (*Id.* at 20.)  Petitioner also argues that "the county chairmen [whom Petitioner bribed] could not grant the Wilson-Pakula certificate," because it "could only be granted by their respective county committees."  (*Id.* at 20–21.)  In Petitioner's view, "the conduct for which the chairmen were being paid, and for which [Petitioner] was accused of accepting money to broker, amounted to 'expressing support for [a project]' at a meeting, which[,] absent an exercise of official pressure, is not an official act."  (*Id.* at 21 (quoting *McDonnell*, 136 S. Ct. at 2371).).  Thus, argues Petitioner, even if the Government may have presented some evidence of acts that remain "official" under *McDonnell*, "the jury may have convicted [Petitioner] for conduct that is not unlawful, and a properly instructed jury might have reached a different conclusion."  *Silver I*, 864 F.3d at 119.

Petitioner's arguments are unpersuasive.  The chairmen's agreed-upon conduct with respect to the Wilson-Pakula Scheme clearly constitutes "official action" even after *McDonnell*. Indeed, *McDonnell* expressly establishes that an "official act" need not be the *determinative* action with respect to the pending "question, matter, cause, suit, proceeding or controversy."  On the contrary, an official "may also make a decision or take an action on a 'question, matter, cause, suit, proceeding or controversy' by using his official position to exert pressure on *another* official to perform an 'official act.'"  *McDonnell*, 136 S. Ct. at 2370 (emphasis in original).

20

Accordingly, "if a public official uses his official position to provide advice to another official, knowing or intending that such advice will form the basis for an 'official act' by another official, that too can qualify as a decision or action for purposes of § 201(a)(3)." *Id.* (citation omitted). Relatedly, "setting up a meeting, hosting an event, or making a phone call is [not] always an innocent act . . . . A jury could conclude, for example, that the official was attempting to pressure or advise another official on a pending matter." *Id.* at 2371. Accordingly, Petitioner's insistence that the Wilson-Pakula certificate required the approval of county committees (rather than just the bribed chairmen), and that the bribed chairmen's efforts to ensure a Wilson-Pakula included (in part) statements at a meeting, misses the point. The chairmen's own votes, even if not technically sufficient to produce the certificate, and their exertion of pressure on other committee members (even if by way of statements at meetings), qualify as official acts under *McDonnell*. *Id.* at 2371 ("[I]f the official agreed to exert . . . . pressure or give . . . advice [on a pending matter] in exchange for a thing of value, that would be illegal."); *Ng Lap Seng*, 934 F.3d at 144 (explaining that "bribery encompasses . . . the corrupt selling of what our society deems not to be legitimately for sale," including a "Senator's vote") (quoting *United States v. Zacher*, 586 F.2d,912, 916 (2d Cir. 1978)).

At trial, the evidence that Petitioner's bribes were exchanged for such official acts was overwhelming. For example, the jury heard testimony from Bronx Republican Party chairman Jay Savino that a person seeking a Wilson-Pakula certificate "would need the support of the Republican Party Chairm[en] and their executive committees in order to run on the Republican line," and "would have to come and see me." (Tr. 1832–33.) Evidence further established that, as chairman, Savino served as a gatekeeper for anyone seeking a Wilson-Pakula; he would present a potential candidate to "my executive committee" for a vote, and advocate for a position

in the subsequent vote. (*Id.*) Manhattan Republican Party chairman Dan Isaacs confirmed this reality, explaining, "I'm the leader of the committee, and before [a person seeking a Wilson-Pakula] would meet with the rest of my committee, he needed to meet with me," and "as the chairman, I hold considerable influence over how my committee votes." (*Id.* at 1977.) Moreover, the jury heard audiotape of Savino explaining to Petitioner that "absent three votes," meaning "without the support of three Republican chairmen," Smith would not be able to obtain a Wilson-Pakula. (*Id.* at 1846.) As the Second Circuit explained on Petitioner's direct appeal, "[i]n practice, according to testimony at trial, . . . Smith needed the consent of at least three of the five Republican Party county chairs representing the five boroughs of New York City." *Halloran*, 821 F.3d at 327.

In light of these and other facts, it is clear that the evidence established, beyond a reasonable doubt, that Petitioner sought from these chairmen something far more substantial than mere meetings, events, or phonecalls. On the contrary, he sought formal, influential, "official action" on a concrete, official pending matter. In other words, "there can be no dispute that . . . issuing a Wilson-Pakula [is an] official act[]." *Id.* at 340 n.13. Moreover, it is "clear beyond a reasonable doubt that a rational jury would have found [Petitioner] guilty" based solely on such actions. *Ng Lap Seng*, 934 F.3d at 129 (quoting *Botti*, 711 F.3d at 308).

### ii. Discretionary Funding Scheme

Although this Court has already determined that Petitioner's wire fraud conviction with respect to the discretionary funding scheme survives based on a money-or-property-fraud theory, the Court rejects Petitioner's challenge to the honest services theory as well.

As to the first *McDonnell* requirement, the question of whether and where to allocate New York City Council discretionary funding is clearly a specific and focused question that

involves a formal exercise of government power.  *See McDonnell*, 136 S. Ct. at 2370 (explaining that determinations of whether a state-created commission would "allocate grant money for the study" of a certain drug "qualif[ies] as questions or matters under § 201(a)(3)"); *Halloran*, 821 F.3d at 340 n.13 ("[T]here can be no dispute that disbursing public funds . . . [is an] official act[] . . . *McDonnell* has no apparent relevance to the issues in this appeal."); *United States v. Nelson*, No. 10-CR-99, 2018 WL 6795419, at *5 (M.D. La. Dec. 26, 2018) (holding that "certain decisions do qualify as 'official acts,' including whether a state commission will allocate money to a particular cause").  Moreover, the allocation of funding is clearly "the kind of thing that can be put on an agenda, tracked for progress, and then checked off as complete."  *McDonnell*, 136 S. Ct. at 2369.  It is therefore a "question, matter, cause, suit, proceeding or controversy" within the meaning of § 201(a)(3).

As to the second *McDonnell* requirement, the Court concludes that it is "clear beyond a reasonable doubt that a rational jury would have found [Petitioner] guilty" of agreeing to make a decision on such allocations in exchange for a bribe.  *Ng Lap Seng*, 934 F.3d at 129 (quoting *Botti*, 711 F.3d at 308).  Put simply, the evidence overwhelmingly showed that Halloran, who had access to New York City Council discretionary funding, agreed to divert that funding in exchange for benefits from Raj.  For example, the Government introduced letters from Halloran where he expressly agreed to "allocate discretionary funding as needed up to our allotment of 40,000 to 80,000" to a fictious company for work as a no-show consultant.  (Tr. 599–601.) Indeed, Petitioner acknowledges that "[i]t was discussed that a portion of the discretionary funds would be kicked back to Halloran, and in addition, Halloran demanded money up front."  (Pet'r's Mem. 3–4;) *see also Halloran*, 821 F.3d at 332 (holding, on direct appeal, that "the most natural inference to be drawn from [Petitioner's] dealings with Raj and Stern" was that Petitioner

"intended to arrange from them to obtain discretionary funding," and that "the evidence adequately supported that inference"). Further, the Government identified this specific conduct to the jury; it did not muddy the water with respect to what Petitioner's culpable conduct was. (*See* Tr. 3855 ("Halloran took bribes in exchange for diverting New York City money.").)

Petitioner makes much of the fact that, after agreeing to allocate these funds, he did little to give effect to that agreement. For example, Petitioner argues that the letters promising such funds were not "binding on the City" and could not "have been used by 'Raj' or Stern to demonstrate an entitlement to City funds," and that "none of the nonprofits had applied for or received discretionary funding in amounts even close to $80,000." (Pet'r's Mem. 4.) That Petitioner did not ultimately divert the funding, however, is legally irrelevant. *See McDonnell*, 136 S. Ct. at 2370–71 ("[A] public official is not required to actually make a decision or take an action . . . ; it is enough that the official agree to do so." (citation omitted)); *see also People v. Pignatello*, 833 N.Y.S.2d 882, 886 (Sup. Ct. 2007) (noting that, under Section 200.10, "the crime of bribe receiving is complete upon the solicitation and agreement"). By agreeing to allocate the funds in exchange for a bribe, Petitioner completed the crime.

Moreover, Petitioner's suggestion that he was simply "playing" Raj, (Pet'r's Mem. 4–5 ("'Raj' was concerned . . . that Halloran might be trying to play [them] by getting money from him and Stern in exchange for nothing. . . . 'Raj' was played, just as he had feared."),) concedes his own liability. After all, to establish honest services fraud through "official act" bribery, a defendant need not intend to perform the official act; he need only *agree* to perform the act. *McDonnell*, 136 S. Ct. at 2371 ("Nor must the public official in fact intend to perform the 'official act,' so long as he agrees to do so. A jury could, for example, conclude that an agreement was reached if the evidence shows that the public official received a thing of value

knowing that it was given with the expectation that the official would perform an 'official act' in return." (citation omitted)). Indeed, just weeks ago, the Second Circuit reaffirmed that even where an official is "'playacting' and giving false promises of assistance to people he believed were offering him money to influence his official actions, he violate[s] the bribery statute." *United States v. Silver*, __ F.3d __, 2020 WL 284426, at *7 (2d Cir. Jan. 21, 2020) (quoting *United States v. Myers*, 692 F.2d 823, 842 (2d Cir. 1982)). In so doing, the Second Circuit conclusively rejected the "argument that there must be a meeting of the minds between the payor and the official as to the corrupt purpose of the payments." *Id.* In other words, "it is the official's *conveyed* intent—not her actual intent—that is determinative in an honest services fraud conviction." *Id.* (emphasis in original).

Petitioner argues that the Government's introduction into evidence of Petitioner's letters—written on City Council letterhead and addressed to local charities under Halloran's control and to Raj's company—creates the possibility that the jury may have been impermissibly misled into believing that the writing of those letters were themselves official acts. (Pet'r's Mem. 22.) Not so. It is true that the "us[e] of government letterhead is not, by itself, a formal exercise of government power on a matter similar to a hearing or lawsuit." *Silver I*, 864 F.3d at 120. Here, however, the *content* of the letters demonstrated Petitioner's agreement to divert New York City Council discretionary funding. *See McDonnell*, 136 S. Ct. at 2371 ("If an official sets up a meeting, hosts an event, or makes a phone call on a question or matter that is or could be pending before another official, that could serve as evidence of an agreement to take an official act.").[13] In other words, the letters constitute overwhelming evidence of Petitioner's agreement

---

[13] The letters in this case thus stand in sharp contrast to the letters at issue in *Silver I*. Here, Petitioner's letters clearly stated his intent to take an official act (i.e., allocate funding). By contrast, the three letters at issue in *Silver* did not offer such indications. The first letter (to Dr.

and intent to take official action, namely, diverting Council funding. The jury was entitled to rely on these letters as evidence of an agreement to perform an official act.

The Court thus concludes that it is clear beyond a reasonable doubt that a rational jury would have found Petitioner guilty based solely on Petitioner's agreement to perform official acts and, accordingly, that any error in jury instruction was harmless. In sum, the record leaves no doubt that Petitioner "agreed to ensure that favorable governmental decisions would be made . . . [as to] funding." *Boyland*, 862 F.3d at 292. Stated differently, even if instructed erroneously, there was no risk that Petitioner was convicted for "conduct that is not unlawful." *McDonnell*, 136 S. Ct. at 2375. Accordingly, even if any of Petitioner's Discretionary Funds Scheme convictions relied on an "official act" (which, this Court has concluded, they do not), such convictions would still survive.

### 2. *Brady/Giglio* Claim

Petitioner argues that his conviction is constitutionally infirm because the Government withheld relevant evidence under *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972). In particular, Petitioner argues that the Government improperly withheld evidence concerning the activities and relationships of government cooperator Stern, including Stern's "use of straw donors[] on behalf of several Democratic candidates." (Pet'r's Mem. 26.) Such evidence, Petitioner insists, "would have added great weight to Petitioner's selective prosecution and entrapment defenses." (*Id.*) Relatedly, Petitioner has moved for discovery, seeking purported Government records concerning Stern and a subpoena for notes and

---

Taub) stated Silver's intent to take an action ("help navigate the [charity permit] process if needed") that, the Second Circuit concluded, may not constitute an official act at all. *See Silver*, 864 F.3d at 120. The second (a letter of recommendation to a city grantee) and third (a public letter expressing strong opposition to a clinic) letters stated no intent or agreement concerning any action, official or otherwise. *See id.* at 120–22.

source material related to Stern's activities.  (*See generally* Mem. In Supp. Of Mot. For Discovery Under Rule 6 of the Rules Governing Section 2255 Petitions (Dkt. No. 560).)  The Court first discusses the *Brady* claim and then the related Discovery Motion.

a.  Applicable Law

Under *Brady*, the Government is required to disclose all material evidence that is favorable to a criminal defendant.  *Brady,* 373 U.S. at 87.  There are three elements to a *Brady* violation: first, the evidence must be favorable to the defendant "either because it is exculpatory, or because it is impeaching"; second, the "evidence must have been suppressed by the prosecution, either willfully or inadvertently;" and third, "prejudice [to the defense] must have ensued."  *United States v. Douglas*, 525 F.3d 225, 245 (2d Cir. 2008) (alteration omitted) (quoting *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999)), *cert. denied*, 555 U.S. 1033 (2008). Under *Giglio*, where the "credibility [of] a witness [is] . . . an important issue in the case, . . . evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury [is] entitled to know of it."  *Giglio*, 405 U.S. at 154–55.  Suppressed exculpatory evidence is prejudicial, if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006) (citation and quotation marks omitted). When seeking vacatur based on a *Brady* claim, a defendant is required to show that "the favorable evidence [including evidence related to witness credibility] could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  *Id*. (citations and quotation marks omitted); *see also United States v. Payne*, 63 F.3d 1200, 1209–10 (2d Cir. 1995) (explaining that vacatur is proper "if there is a reasonable probability that, had the [suppressed] evidence been disclosed to the defense, the result of the proceeding would have

been different," and noting that "evidence whose disclosure is required under *Brady* may consist not only of exculpatory evidence but also of impeachment evidence"), *cert. denied*, 516 U.S. 1165 (1996).

<u>b.  Application</u>

The Court concludes that Petitioner cannot establish either of the latter two elements of his purported *Brady* claim.

With respect to the second element of a *Brady* violation, Petitioner cannot establish that the Government suppressed anything.  "As a matter of law, mere speculation by a defendant that the government has not fulfilled its obligations under *Brady v. Maryland*, is not enough to establish that the government has, in fact, failed to honor its discovery obligations."  *United States v. Upton*, 856 F. Supp. 727, 746 (E.D.N.Y. 1994) (citation omitted); *see also Franza v. Stinson*, 58 F. Supp. 2d 124, 154 (S.D.N.Y. 1999) (collecting cases); *Harris v. United States*, 9 F. Supp. 2d 246, 275 (S.D.N.Y. 1998) ("Conclusory allegations that the government suppressed or concealed evidence do not entitle [Petitioner] to relief.") (citation and quotation marks omitted).

Here, Petitioner's allegation is based on precisely such speculation.  Citing several articles from the *Rockland Journal News*, Petitioner claims to have recently learned that Stern appeared several times on a community radio program, the New York Jewish Communications Channel ("NYJCC"), sometimes in support of (and perhaps in coordination with) Democratic candidates for public office.  (Pet'r's Mem. 8.)  Petitioner also claims that some of these candidates then received "thousands in donations from two people [the *Rockland Journal News*] has identified as being linked to the [NYJCC]."  (*Id.*)  Petitioner adds that "Stern has also been linked to campaign finance crimes relating to the reelection campaigns" of several other prominent Democrats, none of whom has been prosecuted.  (*Id.* at 10.)

Relying on these articles, Petitioner then makes several speculative leaps: first, he concludes that "Stern had used [NYJCC host company] Talkline as a front for two years, [and] that the NYJCC was Stern's mechanism for ingratiating himself with politicians who[m] he wanted to incriminate." (*Id*. at 11.) Second, Petitioner theorizes that certain additional figures connected to his own illegal activity were also government cooperators, and that "NYJCC Talkline was a sham political show that the government used to entrap politicians." (*Id.* at 31.) Third, Petitioner infers that Stern "actively target[ed Halloran] for sting operations." (*Id.* at 10 (italics omitted).) And fourth, Petitioner concludes that "given that the activities of informants are meticulously documented by the Government, it is inconceivable that, at minimum, Stern's FBI handlers would not have known of and documented the withheld information." (*Id.* at 30.) In other words, Petitioner does not identify specific documents or records suppressed by the Government; rather he theorizes Stern's involvement in additional illegal activity and the identities of additional cooperators (based on mere inferences from uncorroborated local newspaper articles), and then speculates that the Government simply "must" have related documents or records. Such theorizing cannot support a claim under *Brady*. *See Chaplin v. Kirkpatrick*, No. 17-CV-718, 2018 WL 6605917, at *10–11 (N.D.N.Y. Dec. 17, 2018) (holding that a petitioner's claim of withheld laboratory evidence based on a news article citing confidential sources was "entirely speculative" and could not support a *Brady* claim); *Franza,* 58 F. Supp. 2d at 153–54 (rejecting *Brady* claims based on speculation about what the Government may possess).

Petitioner's arguments with respect to the third element of his *Brady* claim fail as well. Petitioner cannot explain with specificity how the purportedly missing material would have contributed meaningfully to his defense, let alone persuasively argue that its absence undermines

confidence in the verdict. Petitioner claims that, with additional evidence about Stern's conduct, "an entrapment and/or selective prosecution defense would have been the main focus of the defense strategy from the outset." (Pet'r's Mem. 30.) Petitioner asserts that he "would have shown that Stern had a long-standing pattern of using the NYJCC to meet political figures, ingratiate himself with them, and induce them to partake in illegalities that they would not have done on their own." (*Id.*) In particular, Petitioner argues that the *Brady* evidence would aid him in proving that Stern had used similar means in the past to "manufacture crimes in exactly the way he did in this case" and that other figures involved in the disbursement scheme were Stern's collaborators and government cooperators. (*Id.* at 30–31.) In keeping with this alternative defense "focus," Petitioner suggests he would have sought "plea agreements, cooperation agreements, non-prosecution agreements, documentation of benefits paid, documentation of politicians [the alleged cooperators] donated to (particularly politicians who appeared on NYJCC and/or Talkline), recorded conversations, etc." and he would have called additional witnesses to testify. (*Id.* at 31 n.5, 32.)

These arguments fail for several reasons. First, the Supreme Court has emphasized that the legal standard governing a "selective-prosecution" defense is "a demanding one." *United States v. Armstrong*, 517 U.S. 456, 463 (1996). In fact, a defendant must establish by "clear evidence" that prosecutors acted in defiance of the Constitution's guarantee of equal protection, by acting with "discriminatory effect and . . . motivated by a discriminatory purpose." *Id.* at 465 (quotation marks omitted) (quoting *Wayte v. United States*, 470 U.S. 598, 608(1985)). The difficulty of establishing such a claim casts serious doubt on Petitioner's argument that, with a few additional documents, this theory would have become the "focus" of his defense. Moreover, even if Petitioner did choose to advance a "selective prosecution" defense, there is every reason

to believe it would not have succeeded. First, it is unlikely that Petitioner could establish discriminatory effect "by clear evidence;" indeed he acknowledges that several Democrats with whom Stern engaged in illegal acts were prosecuted. (*See* Pet'r's Mem. 11.) Petitioner would have had even greater difficulty establishing a discriminatory motive (i.e., that the Government targeted Republicans); in fact, he does not explain how any of the purportedly withheld material even suggests such a motive.

Petitioner's purported *Brady* arguments with respect to entrapment are similarly farfetched. Entrapment is a "relatively limited defense," *United States v. Russell*, 411 U.S. 423, 435 (1973), and one that is "risky and rarely successful," *Jimenez v. United States*, Nos. 10-CR-316, 15-CV-1974, 2015 WL 5098075, at *6 (S.D.N.Y. Aug. 31, 2015). Petitioner's suggestion the would have "focused" on this defense is, therefore, dubious from the start.

But even if Petitioner did make such a defense central to his case, it is almost certain to have failed. Indeed, Petitioner fails to explain how any of the purportedly withheld evidence would have contributed to a defense of entrapment, let alone produced a different outcome. A "valid entrapment defense" requires two elements: "government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in the criminal conduct." *Mathews v. United States*, 485 U.S. 58, 63 (1988) (citations omitted). The defendant bears "the burden of showing inducement" and, "if inducement is shown, the prosecution has the burden of proving predisposition beyond a reasonable doubt." *United States v. Cromitie*, 727 F.3d 194, 204 (2d Cir. 2013) (citations omitted). At trial, the jury was instructed on the law of entrapment and the issue was argued by both sides during their summations. (Tr. 3952–56, 4001–03 , 4097–99.) The Government presented compelling evidence that Petitioner himself took the initiative in significant elements of the scheme. (*Id.* at 1417 (testimony indicating that Petitioner proposed a

specific means of concealing payments), 1601 (same), 4002 (government summation discussing several instances where Petitioner took the initiative).) Any additional countervailing evidence would therefore need to be similarly compelling.

Petitioner, however, does not suggest that *any* of the purportedly omitted evidence concerns interactions between himself and Stern or any other government agent. In other words, none of it sheds light on whether Halloran was "induced" or "predisposed" to commit the relevant crime. On the contrary, the purported evidence simply relates to government agents' past interactions with individuals other than Halloran. Such evidence does not, therefore, relate to—let alone could it alter a jury's evaluation of—whether Halloran was induced or predisposed to commit the crimes at issue. *See Garcia v. Lee*, No. 11-CV-1803, 2018 WL 2268129, at *18 (S.D.N.Y. May 17, 2018) (concluding that the identity of a confidential informant was irrelevant to an entrapment defense because the confidential informant was not present during the purported entrapment).

### c. Petitioner's Motion for Discovery

"A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). Rather, Rule 6(a) provides: "A party shall be entitled to invoke the processes of discovery available under the Federal Rules of Civil Procedure if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise." Rule 6(a) of Rules Governing Section 2254 Cases. "Good cause" is established where "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is entitled to relief." *Bracy*, 520 U.S. at 908–09 (alteration, citation, and quotation marks omitted). By contrast, however, "[g]eneralized

statements regarding the possibility of the existence of discoverable material will not be sufficient to establish the requisite 'good cause.'" *Pizzuti v. United States*, 809 F. Supp. 2d 164, 176 (S.D.N.Y. 2011) (collecting cases); *see also DiPietro v. United States*, Nos. 10-CV-199, 10-CV-2585, 2019 WL 1949860, at *3 (S.D.N.Y. Apr. 16, 2019) (explaining that a § 2255 petitioner has a "heavy burden" in establishing a right to discovery); *Cooper v. United States*, Nos. 13-CV-3769, 08-CR-356, 2015 WL 9450625, at *5 (S.D.N.Y. Dec. 22, 2015) (same).

Petitioner cannot establish good cause here. As explained above, Petitioner's arguments for the existence of potential *Brady* material are based on a series of inferential leaps that amount to speculation. Such speculation does not suffice to show good cause. *See Ruine v. Walsh*, 00-CV-3798, 2005 WL 1668855, at *6 (S.D.N.Y. July 14, 2005) ("Rule 6 does not license a petitioner to engage in a 'fishing expedition' by seeking documents 'merely to determine whether the requested items contain any grounds that might support his petition, and not because the documents actually advance his claims of error.'" (quoting *Charles v. Artuz*, 21 F. Supp. 2d 168, 169 (E.D.N.Y. 1998))). Similarly, even assuming the existence of the evidence Petitioner seeks, any such evidence would have no effect on the jury's verdict. *See Hirschfeld v. Comm'r of Div. of Parole*, 215 F.R.D. 464, 465 (S.D.N.Y. 2003) ("The Court may, in its discretion, deny discovery where the petitioner provides no specific evidence that the requested discovery would support his habeas corpus petition." (citation omitted)). Finally, Petitioner had the benefit of significant discovery concerning Stern, called Stern as a witness for the defense, and questioned him in a thorough direct examination. (Tr. 2268–2344, 2369–99, 2485–2501, 2538–53, 2590–2619.) That Petitioner has already had substantial opportunity to probe Stern's background similarly weighs against his claim of good cause now. *See Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340–41 (2d Cir. 2000) (finding no good cause under Federal Rule of Civil

Procedure 16(b) where a party failed to discover necessary information despite having had the opportunity to do so).

Because Petitioner cannot establish good cause, his Discovery Motion is denied.

### 3.  Prosecutorial Misconduct Claim

Finally, Petitioner argues that he "is entitled to vacatur of his conviction due to recently-learned information regarding Alvin Bragg's participation in making divergent decisions regarding whether to prosecute various politicians targeted by Moshe Stern."  (Pet'r's Mem. 33.) Here, Petitioner refers to certain 2016 newspaper articles which suggest that Assistant United States Attorney Alvin Bragg, one of the prosecutors in his case, had signed off on a cooperation agreement with Stern in 2010, and that a prominent Democrat, Eric Schneiderman, had appeared on NYJCC prior to his successful 2010 election.  (*Id.* at 33–34; *see also* Dkt. Nos. 541-2, 541-2 (newspaper articles).)  Petitioner infers from these articles that "Stern was committing illegal activities in conjunction with" the Schneiderman  and other Democratic campaigns, (Pet'r's Mem. 12), that Bragg "directed Stern's infiltration" of Schneiderman's campaign, and that Bragg was then "involved in the decision" not to prosecute Schneiderman.  (Decl. of Daniel J. Halloran (Dkt. No. 541-1) ¶ 6.)  Accordingly, Petitioner argues that prosecutorial misconduct (particularly "selective prosecution") deprived him of due process and necessitates vacatur of his conviction. (Pet'r's Mem. 35.)

### a.  Applicable Law

As explained above. the Supreme Court has emphasized that the legal standard governing a "selective-prosecution" defense is "a demanding one."  *Armstrong*, 517 U.S. at 463.  In fact, a defendant must establish by "clear evidence" that prosecutors acted in defiance of the Constitution's guarantee of equal protection by acting with "discriminatory effect and . . .

motivated by a discriminatory purpose." *Id.* at 465 (quotation marks omitted) (quoting *Wayte*, 470 U.S. at 608); *see also United States v. Batista*, 684 F.3d 333, 342 (2d Cir. 2012) ("A defendant alleging prosecutorial misconduct ordinarily bears 'a heavy burden.'" (*quoting United States v. Locascio*, 6 F.3d 924, 945 (2d Cir. 1993)), *cert. denied*, 568 U.S. 1196 (2013). Moreover, "[t]o warrant reversal, [alleged] prosecutorial misconduct must cause the defendant substantial prejudice by so infecting the trial with unfairness as to make the resulting conviction a denial of due process." *United States v. Elias*, 285 F.3d 183, 190 (2d Cir. 2002) (citations and quotation marks omitted), *cert. denied*, 537 U.S. 988 (2002).

### b. Application

Petitioner cannot meet this heavy burden. First, Petitioner's claim of selective prosecution is based on multiple speculative leaps. Petitioner points to no evidence that Schneiderman engaged in criminal activity, and no evidence that Bragg (or any other AUSA) considered prosecuting Schneiderman. "Mere speculation . . . is not sufficient to show discriminatory purpose" and establish a claim for selective prosecution. *United States v. Chalmers*, 474 F. Supp. 2d 555, 569 (S.D.N.Y. 2007). Second, even if Petitioner's speculation (that Bragg declined to prosecute Schneiderman in exchange for a job) was supported by facts, such facts would still suggest prosecutorial misconduct *only* with respect to the *non*-prosecution of Schneiderman, not the actual prosecution of Petitioner. A person asserting a claim for selective prosecution must establish that "he has been singled out for prosecution," *United States v. Sun Myung Moon*, 718 F.2d 1210, 1229 (2d Cir. 1983) (quoting *United States v. Berrios*, 501 F.2d 1207, 1211 (2d Cir. 1974)), *cert. denied*, 466 U.S. 971 (1984), not that someone else was singled out for non-prosecution. Petitioner's selective prosecution claim thus "lacks merit

because he failed to show that he had been singled out." *United States v. Fares*, 978 F.2d 52, 60 (2d Cir. 1992).

### III. Conclusion

For the reasons discussed above, the Court dismisses the Petition and denies Petitioner's Discovery Motion.

As Petitioner has not made a substantial showing of the denial of a constitutional right, a Certificate of Appealability shall not be issued, *see* 28 U.S.C. § 2253(c)(2); *Lucidore v. N.Y. State Div. of Parole*, 209 F.3d 107, 111–12 (2d Cir. 2000), and the Court further certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this judgment on the merits would not be taken in good faith, *see Coppedge v. United States*, 369 U.S. 438, 445 (1962) ("We consider a defendant's good faith . . . demonstrated when he seeks appellate review of any issue not frivolous."); *Burda Media Inc. v. Blumenberg*, 731 F. Supp. 2d 321, 322–23 (S.D.N.Y. 2010) (citing *Coppedge* and finding that an appeal may not be taken in forma pauperis if the trial court certifies in writing that it is not taken in good faith).

The Clerk of the Court is respectfully directed to enter a judgment in favor of Respondent and to close this case.

SO ORDERED.

DATED:    February 6 , 2020
             White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE